## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| SAMARITAN MINISTRIES INTERNATIONAL, a religious Illinois non-profit corporation,<br>    6000 N. Forest Park Drive<br>    Peoria, Illinois 61614,<br><br>and ten of its New Mexico members, namely,<br><br>ZACHARY & RACHEL CORDEL, 662 CR F, Clovis, New Mexico 88101,<br><br>DAVID ALLAN & MONETTE BELL, 3 Mountain Vista Trail, La Luz, NM 88337,<br><br>REV. ANDREW & HEATHER HEATH, 1310 Meadow Lane, Roswell, NM 88203,<br><br>JAY & AMY O'NEILL, 275 Blue Sky Lane, Mesilla Park, NM 88047, and<br><br>REV. NATHAN & REBEKAH BIENHOFF, 3501 Highland Road, Roswell, NM 88201,<br><br>                                  *Plaintiffs*,<br>    v.<br><br>ALICE T. KANE, in her personal capacity and in her official capacity as the Superintendent of Insurance for New Mexico, 1120 Paseo de Peralta 4th Floor, Santa Fe, NM 87501,<br><br>                                  *Defendant*. | Case No. 1:23-cv-1091<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**<br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED COMPLAINT

COME NOW the Plaintiffs, SAMARITAN MINISTRIES INTERNATIONAL, and ten

of its members in New Mexico, namely, ZACHARY & RACHEL CORDEL, DAVID ALLAN

& MONETTE BELL, REV. ANDREW & HEATHER HEATH, JAY & AMY O'NEILL, and

REV. NATHAN & REBEKAH BIENHOFF, by counsel, and for their causes of action against

Defendant ALICE T. KANE, in her personal capacity and in her official capacity as the New

Mexico Superintendent of Insurance, and allege and state as follows:

## **COMPREHENSIVE OVERVIEW OF THE CASE**

1.       Samaritan Ministries ("Samaritan") and the ten individual Plaintiffs (collectively

"Plaintiffs"), together with over 270,000 other members nationwide,[1] form a health care sharing

ministry ("HCSM" or "ministry"). HCSMs "are ***non-insurance*** entities in which members 'share

a common set of ethical or religious beliefs and ***share medical expenses*** among members ***in***

***accordance with those beliefs***.'"[2] Each month, Samaritan solicits its members to send notes,

prayers, and financial support directly to their fellow members in need, without exercising any

ownership or control over that support. This Christian ministry—which has operated freely as

non-insurance, without any consumer complaint, nationwide, including in New Mexico, for

decades—is now under threat by Defendant Alice Kane and her Office of the Superintendent of

Insurance ("OSI"). Given the many detailed allegations and claims that will follow, Plaintiffs

believe an initial, comprehensive overview of their case will provide a useful framework.

### **Snapshot of the Case**

2.       This case is about OSI's "longstanding campaign to assert regulatory dominance

over"[3] these sharing ministries to banish them from New Mexico. This anti-HCSM campaign

began about three years ago, under one of Defendant's predecessors. After allowing these

sharing ministries, and comparable secular entities such as fraternal benefit societies, to operate

free of insurance regulation for decades, OSI decided that ***these ministries***, and ***not the secular***

---

[1] Samaritan's members total 270,642 as of November 25, 2023.

[2] www.healthinsurance.org/glossary/health-care-sharing-ministry (accessed 12/5/2023; emphasis added) (quoting Affordable Care Act's "religious exemptions" at 26 U.S.C.§5000A(d)(2)(B)).

[3] *Air Evac EMS, Inc. v. McVey, Ins. Com'r*, 37 F.4th 89, 94 (4th Cir. 2022) ("***Air Evac***").

*entities*, would be subject to its regulation. Defendant did not merely inherit this campaign; she has intensified it. In the words of this Court, OSI has become "***unnecessarily aggressive***" toward HCSMs, saying in effect, "well you know[,] you've been in operations [here] for years, ***but now we're coming for you***." ¶107 below (emphasis added). And so they are. Plaintiffs, including ten of Samaritan's 918 New Mexico members,[4] find themselves squarely in Defendant's crosshairs.

3.        These sharing ministries that Defendant is "coming for" are religious charities exempt from tax and insurance mandates under federal law. If fraud or abuse is Defendant's concern (it is not), it can be addressed by a well-armed IRS and state attorney general. Defendant knows these ministries are not insurance because OSI allowed them to operate freely for decades as non-insurance. In actual fact, these ministries are expressive religious associations totally incompatible with the Insurance Code—a fact Defendant is exploiting to oust them all from New Mexico. In so doing, Defendant is harming the harmless in violation of their rights to religious freedom, religious autonomy, free expression and association, and equal protection.

### Brief Overview of the Case

4.        In March 2020—just four months after OSI declared these sharing ministries to be voluntary religious associations sharing medical needs, and not insurers—a new Superintendent distorted the term "insurance" beyond all recognition to try to bring these religious charities under OSI control.[5] That same month, OSI commenced a hostile campaign against these ***ministries***, leading to Cease & Desist Orders ("C&Ds") against at least five of them, ordering them either to shut down in New Mexico or to fully comply with its Insurance Code.[6]

---

[4] Samaritan's members in New Mexico total 918 as of October 1, 2023. Samaritan's first New Mexico member joined in 1996 and Samaritan has operated in New Mexico ever since.

[5] *See* ¶¶728-742, below (comparing OSI Press Releases of Dec. 3, 2019 and Mar. 26, 2020).

[6] NMSA 1978, §§59A-1-1 *et seq.* ("***Insurance Code***" or "***Code***").

5.     Defendant now helms this anti-HCSM campaign, which grows more hostile daily.

6.     Defendant has both civil and criminal enforcement authority. "[E]very violation of the Insurance Code is" subject to "criminal prosecution" "punishable by a fine" up to $10,000 per violation[7] and/or subject to civil penalties up to $20,000 per violation.[8]

7.     Applied to Samaritan, a C&D would threaten its very existence, and not just in New Mexico. A C&D would present Samaritan with a Hobson's choice to (a) elect exile from New Mexico or (b) comply with its Insurance Code. But either choice would prevent Samaritan from complying with federal law necessary for its existence nationwide. *See* ¶¶947 & 957 below.

8.     Either choice would deprive Samaritan's 918 New Mexico members, and eventually its 270,642 total members, of the particular Christian ministry that they have chosen and to which they are constitutionally entitled. The situation is dire for several related reasons.

9.     **First**, Samaritan's ministry is totally incompatible with the Insurance Code. ¶¶1151-78. It is a square peg to a round hole. Compliance is not even possible. ¶¶903-957.

10.     **Second**, even if Samaritan nevertheless somehow complied with the Code, that very compliance would transform it into something other than what it is and always has been.

11.     **Third**, even if Samaritan somehow found a way to maintain its sharing-ministry identity while complying with the Code, that very compliance would make it noncompliant with crucial laws elsewhere: Samaritan would lose its federal tax-exempt status, its federal HCSM status, and its state safe-harbor status in many states. ¶¶903-983; esp. 947 & 957.

12.     ***Catch-22*** is an understatement. A C&D forcing Samaritan's compliance with the Insurance Code is the same as a death sentence for its New Mexico ministry. *Id*.

13.     This tragedy is OSI's *aim*. OSI has evicted four HCSMs and is circling a fifth:

---

[7] NMSA 1978, §59A-1-18.

[8] NMSA 1978, §59A-15-10.

Gospel Light/Liberty and its 490 New Mexico members.[9] In each case, OSI issued a C&D imposing a fine up to $20,000 "*per transaction*," which OSI defines as each "*membership*" "*sold*" in New Mexico. OSI imposed fines of $5,000 per transaction on Liberty but $20,000 per transaction on OneShare.[10] These fines total in the millions of dollars for each HSCM.

14.      In the *Liberty* case, OSI refused the courtesy of *staying* its C&D while Liberty sought judicial review.[11] Instead, OSI obtained a court order (TRO) immediately enforcing it.[12]

15.      Why this hostility? And why now? These HCSMs have been operating for years. Their activities are neither *commercial* nor *insurance*—**nor can they be under federal law**. ¶¶947-83. This was the national consensus, including in New Mexico—until now. ¶¶708-37.

16.      At the heart of this case is Samaritan's monthly solicitation of its own members to give to those in need. That activity not only defies all insurance norms but is in fact "expressive religious activity," "doubly protected" by the First Amendment. "Where the Free Exercise Clause protects **religious exercises**, whether communicative or not, the Free Speech Clause provides overlapping protection for **expressive religious activities**."[13] Thus, "the First Amendment **doubly protects** religious speech[.]"[14] Where this "double" protection for Free

---

[9] ***Gospel Light*** Mennonite Church Medical Aid Plan **(dba Liberty Healthshare)** *v. N.M. OSI*, No. 1:23-CV-00276-MLG, 2023 WL 4546544, at *10 (D.N.M. July 14, 2023) ("***Liberty I***"), *adhered to on reconsideration*, 2023 WL 6686684 (D.N.M. Oct. 12, 2023) ("***Liberty II***").

[10] Compare OSI Liberty C&D (Nov. 23, 2021) (Exhibit 41) & OSI Liberty Final Order (Feb. 22, 2023) (Exhibit 50) with OSI OneShare C&D (Jan. 13, 2021) (Exhibit 38). Other HCSMs affected here include Jericho and Sedera. A fifth, known as Aliera/Trinity, is not a HCSM.

[11] *Liberty I*, 2023 WL 4546544, at *2.

[12] State Court TRO (Aug. 17, 2023) (Ex. 51). **Exhibit** may be abbreviated "**Ex**" hereinafter.

[13] *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) (emphasis added) ("***Kennedy***"); *See also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ("***Reed***") (Free Speech Clause).

[14] *Kennedy*, 142 S.Ct. at 2421 (emphasis added).

Exercise and Speech applies, the government "must satisfy *at least* 'strict scrutiny.'"[15]

17.     As Defendant sees it now, an HCSM is *insurance*. As the saying goes, if you are a hammer, everything looks like a nail. If you are an insurance regulator, everything may look like insurance. But HCSMs *didn't* until now. OSI had regarded them as non-insurance until now.

18.     It is only the Defendant now, alone among the nation's insurance regulators, who goes to the extreme. To reach the expressive religious activity of HCSMs like Samaritan, Defendant is stretching *insurance* to the breaking point—where it reaches all associational activity that involves any kind of mutual sharing of burdens.

19.     This OSI reach, according to its lawyer's statements to this Court, extends even to five church members staying after Sunday service to arrange the sharing of their medical bills. *See* ¶233. It evidently extends to Samaritan's solicitation of its members to send notes, prayers, and financial help directly to other members in need. This aggression is audacious and illegal.

20.     Defendant's duty to "*aggressively* confront the *problem* of insurance *fraud*"[16] is admirable in the abstract. But Samaritan has nothing to do with that problem. Samaritan has never incurred a consumer complaint *anywhere* in 29 years of nationwide operations, and it has earned judicial appreciation as a model HCSM. ¶222. Defendant's aim is way off.

21.     In any case, the targeting of HCSMs cannot "qualify as neutral when it is 'specifically directed [at] religious practice.'"[17] Here, OSI's campaign is specifically directed at a wholly *religious sector* of health care sharing *ministries*, defined by statutory *religious exemptions*, targeting them in a way that struck this Court as "unnecessarily aggressive." ¶107.

22.     In truth, Samaritan's burden-sharing ministry is religious activity beyond the

---

[15] *Kennedy*, 142 S.Ct. at 2426 (emphasis added).

[16] NMSA 1978, §59A-16C-2 (emphasis added).

[17] *Kennedy*, 142 S.Ct. at 2422.

Superintendent's reach. And the Superintendent's policy and practice to the contrary, targeting this religious sector for harsh and discriminatory treatment, violates federal law as well as numerous rights of the Plaintiffs guaranteed by the Constitution of the United States.

23.     Defendant's anti-HCSM campaign, if allowed to swallow Samaritan, will cause its ministry in New Mexico "to cease to exist,"[18] and jeopardize it everywhere else.

## Overview of Samaritan Ministries

24.     Samaritan is a Christian parachurch ministry, founded in Illinois in 1991 and engaged in nationwide ministry since 1994. "Parachurch organizations are Christian faith-based organizations that work outside and across denominations to engage in social welfare and evangelism. Parachurch organizations seek to come alongside the church and specialize in things that individual churches may not be able to specialize in by themselves."[19]

25.     Samaritan operates as a "Health Care Sharing Ministry" as defined by the Affordable Care Act ("ACA").[20] The U.S. Government has recognized 107 HCSMs under the "Religious Exemptions" of the ACA.[21] *Samaritan is number 3 on this list*.

26.     The ACA's religious exemption of HCSMs, like similar provisions in state law,[22] protects both the HCSMs and their members *by exempting the members* from penalties for failing to maintain "insurance" coverage. ***Thirty-one states have gone further*** via "safe harbor" laws *for the HCSMs themselves*, treating these ministries as non-insurance and "safe" from insurance

---

[18] *Slattery v. Hochul*, 61 F.4th 278, 290 (2d Cir. 2023) ("***Slattery***") (quoting *Christian Legal Society v. Walker*, 453 F.3d 853, 863 (7th Cir. 2006) ("***CLS***")).

[19] https://en.wikipedia.org/wiki/Parachurch_organization.

[20] 26 U.S.C.§5000A(d)(2)(B) (defining "health care sharing ministries"). Title 26 of the United States Code is the **Internal Revenue Code** and may be referenced as "**IRC**" hereafter.

[21] *See* ACA-Certified HCSM List (Ex. 20).

[22] *See* footnote 334 below for citations to the relevant laws.

regulation.[23] Samaritan operates compliantly as non-insurance nationwide: in the 31 states with safe harbors and in the 19 states without safe harbors.

27.    HCSMs have 500-year-old roots in the medical aid plans of the Mennonites, Amish, and other Anabaptists that arose from the Protestant Reformation. Thus, unsurprisingly, over half of the 107 ACA-certified HCSMs have "Mennonite" in their name.[24] As one U.S. court of appeals has stated: "we are fully convinced that the Medical Aid Plan was simply another form of the various mutual aid plans established and used by the Mennonites in general to further their strongly held religious belief that they must 'bear one another's burdens'" (quoting *Galatians* 6:2).[25] This same verse, *Galatians* 6:2—"Carry each other's burdens, and in this way you will fulfill the law of Christ."—is the foundational Scripture for Samaritan.

28.    Samaritan facilitates the association of likeminded Christians to "fulfill the law of Christ" by sharing one another's burdens from illness and injury. Members voluntarily associate to support one another spiritually through prayer, emotionally through cards and letters, and financially through monetary gifts sent directly to each other. Samaritan insists, and each member agrees, that Samaritan does not guarantee reimbursement of any medical expense, that it does not assume any legal risk, that each member remains responsible for their own medical bills, and that any shortfall in member contributions over any period may (and does) result in lower sharing amounts available from member-to-member contributions for eligible bills.[26] In fact, Samaritan everywhere disclaims all assumption of risk, promise to pay, and other earmarks of insurance, and it expressly makes its members responsible for their own medical bills.

---

[23] *See* footnote 329 below for citations to all 31 state safe-harbor laws.

[24] *See* ACA-Certified HCSM List (Ex. 20).

[25] *Bethel Conserv. Mennonite Church v. Com'r*, 746 F.2d 388, 392 (7th Cir. 1984) ("***Bethel***").

[26] Such contribution shortfalls result in members receiving lower amounts from the direct contributions from fellow members than the amounts of their medical bills eligible for sharing.

29.      In sum, Samaritan's sharing ministry is **not** about collecting a "premium" from members, "pooling" the money, and distributing it for medical bills. To the contrary, Samaritan first receives information about members' medical needs and then asks fellow members to send funds, notes, and prayers to minister to those members in need. Thus, Samaritan merely coordinates direct, voluntary, member-to-member, monthly giving to those in need.

30.      In this way, Samaritan's members directly share their health care burdens among themselves, voluntarily contributing funds, as coordinated by the ministry. And these monthly contributions rise or fall depending on the amount of contributions made and the amount of eligible medical bills submitted for sharing. No sharing is guaranteed, ever. No member is legally obligated to contribute funds, ever. No members are dropped due solely to their financial hardship, ever. And all members remain legally responsible for their own medical bills, always. This is **not** health insurance. Ironically, ***Defendant herself agrees***. Her own agency has declared, publicly and repeatedly, that HCSMs like Samaritan are **not** health insurance.

31.      Samaritan is distinct from insurance in many ways common to all HCSMs. But Samaritan also is distinct among HCSMs, and its particular characteristics must be considered on their own merit in light of the constitutional principles at stake.

32.      Samaritan is among the largest ACA-verified HCSMs and operates nationwide. Samaritan has long maintained accreditation and an A+ rating with the Better Business Bureau ("BBB"),[27] and is one of two HCSMs recently accredited by the Healthcare Sharing Accreditation Board.[28] And Samaritan is further distinct, if not unique, in at least three ways.

33.      **First**, Samaritan operates like a congregational church. It is governed by its

---

[27]  www.bbb.org/us/il/peoria/profile/health-sharing-ministries/samaritan-ministries-international-0724-90012037 (accessed 10/29/2023).

[28]  https://hcsab.org/accredited-organizations (accessed 10/29/2023).

members through their control of the Board of Directors. It is conducted by its members through their ongoing assembly and sharing. All members must maintain certification from their *pastor*[29] that they follow Christ in word and deed and attend a Biblical church. In short, Samaritan pursues, disciples, and serves a distinct religious body whose members share *directly* in one another's spiritual, emotional, and financial needs arising from illness and injury. This ministry is performed by discipling, praying with and for, and writing checks to one another. It is reflected in Samaritan's name, taken from Christ's Parable of the Good Samaritan in *Luke* 10:25-37. Samaritan enables its members to "fulfill the law of Christ" by "carrying" the "burdens" of fellow believers (*Galatians* 6:2), even as "each one should carry their own load" (*id*. at 6:5), "not looking to [their] own interests but each [one] to the interests of the others" (*Philippians* 2:4).

34.     **Second**, Samaritan's ministry amounts to a model HCSM. HCSMs are largely defined by the ACA and thirty-one state safe-harbor laws, creating thirty-two sets of legal requirements for HCSMs, including idiosyncratic requirements like Pennsylvania's mandate that all members of each HCSM "have the approval of their pastor."[30] In a Venn Diagram of these various data sets, Samaritan falls in or very near the intersection, forming a paradigmatic HCSM.

35.     **Third**, Samaritan has not been subject to a single consumer complaint in its three decades of nationwide ministry. This fact is so remarkable that it bears repeating. In nearly thirty years of facilitating member-to-member ministry in all fifty states plus the District of Columbia, for hundreds of thousands of members, ***Samaritan has not incurred a single complaint*** with any attorney general ("AG"), any insurance commissioner, or even the BBB. Instead, Samaritan has faithfully served its membership everywhere and threatened the public ***nowhere***.

---

[29] While "pastor" for Samaritan's ministry typically means a pastoral leader in the member's church, it can include a non-pastoral leader to whom a member is spiritually accountable.

[30] 40 Pa. Stat. §23(b)(2) ("limited to individuals who … are members of the same … religion, who have the approval of their pastor").

36. Thus, Samaritan is harmless, and targeting it is like targeting the Amish and other Anabaptists who started HCSMs 500 years ago[31] and have run most of them ever since.

37. Once again, since 1994 nationwide, and since 1996 in New Mexico, Samaritan has operated free of insurance regulation in all fifty states plus the District of Columbia.

38. The lone exception, now, is New Mexico, where Defendant suddenly decided to treat HCSMs such as Samaritan as "insurance" to bind or destroy them with the Insurance Code.

### Case Overview Through the Lens of *Woodmen*

39. The *Woodmen* cases[32] analyzed fraternal benefit societies under New Mexico law—which has always granted such "fraternals" special solicitude, including their own 46-section Article of the Insurance Code.[33] *Woodmen* is distinct from Samaritan's case in critical ways. Yet, it provides a useful lens and framework to view Samaritan's case.

40. "The sole question in the case is whether plaintiff, organized as a [religious nonprofit corporation] in Illinois [and operating] from [1996] to the present in New Mexico as [***non-insurance***], is subject to"[34] irreparable injuries to itself and the individual Plaintiffs.

41. Defendant is poised to "claim plaintiff is subject to the" Insurance Code[35] because, Defendant alleges, HCSMs like Plaintiff engage in practices governed by that Code.

42. "But the fact that" Samaritan arranges for its members to share each other's medical expenses, solely for shared religious reasons, "does not convert [it] into [an insurance

---

[31] *See, e.g.*, Kristyn Rohrer & Lauren Dundes, "Sharing the Load: Amish Healthcare Financing," §§1.2-1.3 (Dec. 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5198134.

[32] *Modern Woodmen of Am. v. Casados*, 15 F.Supp. 483 (D.N.M. 1936) (three-judge court) ("***Woodmen I***"); *Modern Woodmen of Am. v. Casados*, 17 F.Supp. 763 (D.N.M. 1937) ("***Woodmen II***"). *See State v. Royal Neighbors*, 44 N.M. 8 (1939) (applying *Woodmen II*).

[33] NMSA 1978, §59A-44-1 to 44-46 ("Fraternal benefit societies") ("**Fraternal Article**").

[34] *Woodmen II*, 17 F.Supp. at 765.

[35] *Woodmen II*, 17 F.Supp. at 765.

company].""[36] Samaritan's expressive and associational religious "practices do not convert it from a [health care sharing ministry] into an old line insurance company."[37]

43.     "Plaintiff argues that since it … has never been licensed as an insurance company [anywhere], it is not subject to [the Insurance Code]. It is likewise forcibly argued that since plaintiff is concededly [treated everywhere as ***non-insurance***], it is exempt [from the Code]."

44.     "[Plaintiff] alleges, both flatly and in great circumstantial detail, that it is [***non-insurance***] as defined by the New Mexico statutes. It alleges that the administrative officers of the state have, with full knowledge of its form of organization and the character of its business, treated it as [***non-insurance***] for nearly thirty years."[38]

45.     Since 1996, Samaritan has operated openly in New Mexico without an insurance license and "defendant or [her] predecessors [at] least tacitly approved. If plaintiff has [acted contrary to the Code,] the Superintendent of Insurance should not have approved [it], or if [she] did the Attorney General should have brought a proceeding to restrain [Samaritan]."[39]

46.     "Whether plaintiff's [religious activities] are [insurance] is a question [for the] Superintendent of Insurance[.] For years that official has approved [those activities as non-insurance]. Implicit in such approvals is a finding [the activities] met the statutory standard."[40]

47.     "Each year since" 1996, Samaritan has operated in New Mexico without an insurance license. Defendant's job is to "determine whether it meets the statutory requirements as [non-insurance or instead] is an insurance company…. Each year, [Defendant] had, or could

---

[36] *Woodmen II*, 17 F.Supp. at 767.

[37] *Woodmen II*, 17 F.Supp. at 765.

[38] *Woodmen I*, 15 F.Supp. at 485.

[39] *Woodmen II*, 17 F.Supp. at 768.

[40] *Woodmen II*, 17 F.Supp. at 768.

procure, copies of bylaws, policies … or such other [information from Samaritan] as [Defendant] needed…. Each year [Samaritan] was determined to be [non-insurance and allowed to operate] as such. No one throughout the years has challenged such determination."[41]

48.    "If [Samaritan] is not or was not [free from insurance regulation,] it should not have been [treated] as such; if the Attorney General or other law enforcing agency believed that the [determination] of the Superintendent of Insurance [was] contrary to law, the remedy was [to] invoke the aid of the courts in an appropriate proceeding to set aside [such determination]. *It is neither fair nor proper to permit such [determinations] to go unchallenged for many years, induce reliance upon them by such acquiescence, and then ask courts to disregard the [determinations] to the end that … penalties may now be assessed for the years gone by*."[42]

49.    "[If] the present head of the insurance department alleges [the] determinations of [her] predecessors were erroneous, and asks this court to disregard them[, t]his we cannot do."[43]

50.    Defendant will cause Samaritan "irreparable injury [by] revoking [its non-insurance status] which it has enjoyed since [1996] and by attempting to throw [it] into the hands of [regulators and subject it to] cumulative penalties [of millions of dollars]. When the penalties are so severe that [Samaritan], as a practical proposition, cannot run the risk of asserting [its] constitutional right in court, equity has power to protect [it] while [it] has [its] day in court."[44]

51.    Samaritan has conducted its sharing ministry "in New Mexico since [1996], and has built up a large good will and established [ministry] in the state which would be destroyed if

---

[41] *Woodmen II*, 17 F.Supp. at 766.

[42] *Woodmen II*, 17 F.Supp. at 767 (emphasis added).

[43] *Woodmen II*, 17 F.Supp. at 766.

[44] *Woodmen I*, 15 F.Supp. at 486 (citing *Ex parte Young*, 209 U.S. 123 (1908)).

defendant" forced Samaritan's compliance with the Insurance Code.[45]

52.     "State officers may exercise only such authority as is conferred upon them by Constitution or statute; if they, under color of statutory authority, threaten irreparable injury to a citizen, that citizen may invoke the aid of the courts[.]"[46]

53.     "[It might be] suggested that, notwithstanding the allegations of the [Complaint], plaintiff is no longer a real [sharing ministry] but is in fact an insurance company in masquerade; but such does not appear from the [Complaint], and we must take its allegations as true."[47]

54.     In summary: "The defendant[ should] be enjoined from attempting to [enforce against] plaintiff the [requirements] imposed upon insurance companies[.]"[48]

55.     As detailed below, the gravest harms to Samaritan and its members are violations of their constitutional rights. Defendant is both exceeding her authority and discriminating against HCSMs, for which compensatory and perhaps punitive damages are warranted.

### <u>Overview of This As-Applied Challenge</u>

56.     Samaritan is not now challenging the validity of the Insurance Code itself or any of its regulations. Rather, Samaritan brings this case as an as-applied challenge to OSI's startling new policy and practice of subjecting HCSMs like Samaritan to the Insurance Code.

57.     "There are two types of constitutional challenges, 'as-applied' challenges and 'facial' challenges. As-applied challenges are the standard kind of constitutional challenge, while facial challenges are unusual."[49] Facial challenges are rare, and this is not one of them.[50]

---

[45] *Woodmen I*, 15 F.Supp. at 485.

[46] *Woodmen I*, 15 F.Supp. at 487 (citing *Ex parte Young*, 209 U.S. 123).

[47] *Woodmen I*, 15 F.Supp. at 485.

[48] *Woodmen I*, 15 F.Supp. at 487.

[49] M. Adler, *Rights, Rules, and the Structure of Constitutional Adjudication*, 113 Harv. L. Rev.

58.     Samaritan is only seeking a judicial decision that, on these facts, under ***federal law***, it is entitled to exemption from OSI's new policy and practice of subjecting HCSMs like Samaritan to the Insurance Code. Such a decision necessarily will be limited in scope.

59.     First, Samaritan seeks a tailored exemption applicable to it on its own merit.

60.     Second, a "decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."[51] Precedential value will be limited to persuasively similar situations.

<u>**Overview of this Pre-Enforcement Challenge**</u>

61.     Pre-enforcement challenges like this one are proper whenever there is a "credible threat" that a challenged law will be "enforced against" the plaintiff.[52]

62.     Just like the Christian web designer in *303 Creative*, Samaritan "faces a credible threat of sanctions unless [it] conforms [its] views to the State's."[53]

<u>The Three Primary Factors for Pre-Enforcement Challenges</u>

63.     "[The] three factors [for] determining a credible fear of [enforcement are]: **(1)** whether the plaintiff showed ***past enforcement*** against the ***same conduct***; **(2)** whether authority to initiate [legal action is] limited to a [state] agency [or whether] ***any person could file a complaint*** against the plaintiffs; and **(3)** whether the state ***disavowed future enforcement***."[54]

---

1371, 1386–87 (2000) (discussing *U.S. v. Salerno*, 481 U.S. 739 (1987) ("***Salerno***")).

[50] *Dickerson v. Napolitano*, 604 F.3d 732, 742 (2d Cir. 2010).

[51] *Camreta v. Greene*, 563 U.S. 692, 709 (2011).

[52] *Peck v. McCann*, 43 F.4th 1116, 1132 (10th Cir. 2022) ("***Peck***"); *accord Frank v. Lee*, 84 F.4th 1119, 1133 (10th Cir. 2023) ("***Frank***"); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1171-76 (10th Cir. 2021), *aff'd on this ground*, 600 U.S. 570, 588-89, 597-98 (2023) ("***303 Creative***").

[53] *303 Creative*, 600 U.S. at 597 (upholding preenforcement challenge) (emphasis added).

[54] *Peck*, 43 F.4th at 1132 (internal punctuation omitted; emphasis added).

<u>All Three Factors Not Needed</u>

64.     Samaritan need not show all three if the threat is sufficiently credible or evident.

65.     For example, the threat of enforcement "is generally credible where a challenged 'provision on its face proscribes' the conduct in which a plaintiff wishes to engage, and the state 'has not disavowed any intention of invoking [the] provision' against the plaintiff."[55]

<u>Extremely Low Evidentiary Bar in this First Amendment Context</u>

66.     In this Circuit, "***First Amendment context*** creates unique interests that lead us to apply the standing requirements somewhat ***more leniently***, ***facilitating pre-enforcement suits***."[56]

67.     "As to whether a First Amendment plaintiff [like Samaritan] faces a credible threat of prosecution, the ***evidentiary bar*** that must be met is ***extremely low***."[57]

<u>What Is Necessary to Meet this Extremely Low Standard</u>

68.     Samaritan need only show, at most, some evidence **(a)** of "*past enforcement* against *nearly identical* conduct" and the state's failure "to *disavow future enforcement*,"[58] **or (b)** that the challenged policy "*on its face proscribes* the *conduct in which a plaintiff wishes to engage*, and the *state has not disavowed* any intention of invoking [it] against the plaintiff."[59]

69.     Though it need not, Samaritan can show **all** applicable factors with ***abundant*** evidence. While the evidentiary standard is ***extremely low***, the actual evidence is ***extremely high***.

---

[55] *Frank*, 84 F.4th at 1133 (quoting *U.S. v. Sup. Ct. of N.M.*, 839 F.3d 888, 901 (10th Cir. 2016)); *accord Bella Health & Wellness v. Weiser*, 2023 WL 6996860 (D.Colo. Oct. 21, 2023) ("***Bella***"); *Darren Patterson Christian Academy v. Roy*, 2023 WL 7270874 (D.Colo. Oct. 20, 2023) ("***Darren***"); *Littlefield v. Weld Cnty.*, 2023 WL 6962087 (D.Colo. Oct. 19, 2023) ("***Littlefield***").

[56] *Peck*, 43 F.4th at 1129 (emphasis added).

[57] *Peck*, 43 F.4th at 1133 (citation omitted; emphasis added).

[58] *303 Creative*, 6 F.4th at 1174 (emphasis added); *accord Bella*, 2023 WL 6996860, at *6-13.

[59] *Frank*, 84 F.4th at 1133 (quoting *U.S. v. Sup. Ct. of N.M.*, 839 F.3d at 901) (emphasis added).

Factor (1): OSI's Past Enforcement Against Similar Conduct

70.     OSI's enforcement action against Samaritan's peer ministry Gospel Light—an "unnecessarily aggressive" action in the words of this Court at ¶107—establishes this factor.

71.     That enforcement action against Gospel Light is much more than an example of "past enforcement" against "nearly identical" conduct in which Plaintiff "wishes to engage."[60]

72.     That action against Gospel Light is an aggressive ***ongoing*** enforcement against the ***same*** kind of conduct in which Samaritan ***has been engaged*** in ***New Mexico*** for ***27 years***.

73.     Furthermore, OSI also has pursued aggressively several other health care sharing ministries, all peers to Samaritan, all engaging in the same kind of religious health care sharing.

74.     Further still, even if this ongoing enforcement of the same conduct somehow was not established beyond all doubt, the challenged OSI policy and practice of subjecting all HCSMs to the Insurance Code, based on its sweeping new interpretation of ***insurance***, "*on its face proscribes* the conduct in which [Samaritan] wishes to engage."[61]

75.     Moreover, OSI's unmistakable intent is to shut down all HCSMs in New Mexico.

76.     Thus, no matter how this factor is analyzed, Samaritan "credibly fears enforcement that would certainly cause [its] alleged First Amendment deprivations."[62]

77.     The strength of this factor alone establishes Samaritan's standing beyond doubt.

Factor (2): Anyone (Not Just OSI) Can Initiate Legal Action

78.     Though this factor need not be shown here, it is established beyond doubt.

79.     The threat from OSI's anti-HCSM policy is not limited to OSI-initiated action.

---

[60] *303 Creative*, 6 F.4th at 1174; *Frank*, 84 F.4th at 1133; *Bella*, 2023 WL 6996860, at *6-13.

[61] *Frank*, 84 F.4th at 1133 (quoting *U.S. v. Sup. Ct. of N.M.*, 839 F.3d at 901) (emphasis added).

[62] *Darren*, 2023 WL 7270874, at *7 n.3; *accord Bella*, 2023 WL 6996860, at *7-10.

80.     The Insurance Code also provides for a "***private right of action***."[63]

81.     Under the Insurance Code: "**Any person can file a complaint**."[64] "Anyone can file a complaint for violating the requirements imposed on [insurers]."[65]

82.     In *303 Creative*, "the Tenth Circuit held that [the] Colorado [law at issue] allowed '***any person***' to file a complaint against the plaintiff, ***weighing in favor of [standing]***."[66]

83.     Thus, Samaritan remains in *double* jeopardy every day since anyone can "initiate a lawsuit that, on its own, would jeopardize Plaintiff's [non-insurance status ***and***] anyone may file a complaint with the [Insurance] Department that would do so."[67]

84.     Further still, "even if [OSI] were to issue an advisory opinion favoring [Samaritan], the opinion wouldn't prevent anyone [else] from filing a complaint."[68]

85.     This factor further establishes Samaritan's standing beyond all doubt.

<u>Factor (3): OSI Has Not Disavowed Future Enforcement</u>

86.     Far from "disavowing" enforcement,[69] OSI continues its aggressive enforcement against Samaritan's peer ministry Gospel Light/Liberty. ¶¶103-110.

87.     OSI's actual, ongoing enforcement posture against HCSMs is the very antithesis of disavowal. OSI not only has not ***disavowed future*** enforcement. It is engaged in ***aggressive ongoing*** enforcement against HSCMs like Samaritan.

88.     This factor also further establishes Samaritan's standing beyond all doubt.

---

[63] NMSA 1978, §59A-16-30 ("Private right of action") (emphasis added).

[64] *Colo. Union v. Griswold*, 2023 WL 5426581, at *8 (10th Cir. Aug. 23, 2023) ("***Griswold***").

[65] *Griswold*, 2023 WL 5426581, at *4.

[66] *Darren*, 2023 WL 7270874, at *8 (emphasis added).

[67] *Darren*, 2023 WL 7270874, at *8.

[68] *Griswold*, 2023 WL 5426581, at *5.

[69] *Darren*, 2023 WL 7270874, at *8-11; *Bella*, 2023 WL 6996860, at *11-12.

<u>Additional Factor: Nothing Remotely Resembling a HCSM Is Safe</u>

89.     OSI stated in this Court that it would have "no choice" but to enforce the Code against five church members getting together to share medical expenses if their activities fit OSI's sweeping new insurance definition for HCSMs. ¶¶233-242, below.

90.     If OSI has "no choice" but to pursue five harmless church members—if five church members staying after service to arrange sharing are in jeopardy—then surely Samaritan is in jeopardy every day, despite its unblemished service record nationwide for three decades.

91.     To quote this Court again, Defendant and OSI are telling Samaritan, just as they told Liberty, "well you know[,] you've been in operations [here] for years, **but now we're coming for you**." ¶107 below (emphasis added). Indeed they are.

92.     This factor also further establishes Samaritan's standing beyond all doubt.

<u>Samaritan Easily Meets the Extremely Low Standard for Standing</u>

93.     In First Amendment cases like ours, the "evidentiary bar" for standing is "***extremely low***."[70] Yet, the evidence for it here is ***extremely high***.

94.     The threat to Samaritan not only is credible; it is virtually certain.

95.     This daily threat to Samaritan will continue until either **(a)** OSI disavows its sweeping new definition of insurance for HCSMs or **(b)** this Court enjoins the same result.

96.     Mere disavowal of intent to enforce against Samaritan is insufficient.

97.     Even if OSI disavows all enforcement intent whatsoever against Samaritan, its sweeping insurance policy for HCSMs leaves Samaritan exposed to a "private right of action."[71]

98.     Indeed, "even if [OSI] were to issue an advisory opinion favoring [Samaritan], the

---

[70] *Peck*, 43 F.4th at 1133 (emphasis added).

[71] NMSA 1978, §59A-16-30 ("Private right of action").

opinion wouldn't prevent anyone [else] from filing a complaint."[72]

99.     Defendant must abandon OSI's rogue policy and practice as applied to HCSMs, reinstate its former policy and practice as applied to HCSMs, and thus return to the fold of insurance regulators everywhere, lest someone initiate a private action under OSI's rogue policy.

### Detailed Overview of this Case

#### OSI's Role Here: Protect Consumers

100.     Insurance regulators everywhere exist to protect **consumers** "from unsafe and unsound insurance companies" and "insurance fraud."[73] That is how OSI long has described its Mission. As OSI's Annual Report for 2015 (Ex. 42) explained:[74]

> The mission of the OSI is to provide consumers with convenient access to reliable insurance products which are underwritten by dependable and financially sound companies. The OSI strives to ensure that these companies have a proven history of fair and reasonable rates and are represented by trustworthy and qualified agents. The OSI is committed to consumer protection and to the deterrence and prosecution of insurance fraud.

101.     See also OSI's performance metrics in its Annual Reports for 2015 (Ex. 42), 2018 (Ex. 43), 2019 (Ex. 44), 2020 (Ex. 45), 2021 (Ex. 46), and 2022 (Ex. 47).

102.     There have been no complaints against Samaritan in New Mexico (or anywhere). Samaritan is nothing like true insurance and, as shown below, it fits no OSI enforcement profile other than being a health care sharing ministry, to which OSI has become hostile. Yet, it cannot rest secure in its non-insurance status because it is in fact a HCSM like Liberty and the others and thus falls squarely within OSI's target zone in its anti-HCSM campaign.

---

[72] *Griswold*, 2023 WL 5426581, at *5.

[73] *Liberty II*, 2023 WL 6686684, at *7 (decision on reconsideration).

[74] ALL HIGHLIGHTING and **red underlining** in excerpted material herein is added for emphasis; and extraneous text, before or after excerpted material, may be blacked/whited out.

<u>OSI's Pursuit of Liberty Has Been Unnecessarily Aggressive</u>

103.    Paving its way to Samaritan, OSI is forcefully pursuing Liberty.

104.    Gospel Light Mennonite Church Medical Aid Plan (***dba Liberty Healthshare***) operated unfettered in New Mexico until "two people lodged consumer complaints."[75]

105.    On November 23, 2021, OSI issued a C&D to Liberty and fined it $2,510,000. Ex. 41. OSI issued its "Decision" against Liberty on January 20, 2023 (Ex. 49), and its "Final Order" on February 22, 2023 (Ex. 50). OSI didn't stop there. Rather than agree to a stay of its C&D while Liberty sought judicial review, OSI sought a court order to enforce it *immediately*.

106.    On August 17, 2023, OSI procured a TRO ordering Liberty to "cease and desist from soliciting, offering to sell, selling, collecting membership fees or monthly share amounts, or servicing Health Care Sharing Ministries in New Mexico until [Liberty] complies with the requirements of the New Mexico Insurance Code." Ex. 51 at 2.[76]

107.    As characterized by this Court, OSI's posture toward Gospel Light has been "unnecessarily aggressive," because OSI sought to enforce its C&D against Gospel Light based only on OSI's view of the law and before Gospel Light could appeal OSI's view to the courts.[77]

```
23              THE COURT:  Let me ask you a practical
24    question, and this is something that has been --
25    I've been wondering about since the inception of
 1    this case frankly.
 2              What is the urgency -- and I sort of asked
 3    you about this the last time we were all together --
```

---

[75] *Liberty I*, 2023 WL 4546544, at *2; *id*. at *11; *Liberty II*, 2023 WL 6686684, at *1.

[76] *See also* Liberty Hrg. Tr. (Aug. 8, 2023) (Ex. 58) at 47-61; *id*. at 61-62 (state court).

[77] Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 29-32 (this federal Court).

4   but what is the urgency from OSI's perspective in

5   trying to, you know, make them pay up on the fine

6   that's been issued and stop operating?

7            Why is it that OSI is unwilling to let the

8   substantive legal issues be decided before taking

9   these collective enforcement actions against Gospel

10  Light? . . . .

19            Why can't you just let those legal issues

20  get decided before -- I just don't understand the

21  urgency.

22            MR. THIES:  Your Honor, we already had

23  those legal issues decided.

24            THE COURT:  By an administrative -- they

25  have a number of levels of appeal before it's

1   conclusively resolved.  I think saying, well, you

2   know, we have an administrative decision, so now,

3   you know, you've been in operation for years, but

4   now we're coming for you.

5            It seems, you know, it seems unnecessarily

6   aggressive until the underlying legal issues are

7   conclusively resolved.

8            MR. THIES:  The reason Gospel Light showed

9   up on our radar is because we received customer

10  complaints.  And we addressed those customer

11  complaints and reviewed that and those customer

12  complaints deal with the failure to pay medical....

108.     So, two Liberty members complained "they didn't get [the] health care coverage [they] thought they had."[78] That is what OSI says prompted it to seek an emergency TRO to shut down Liberty's operations, and stop all sharing, *immediately*, before any proper judicial review of the law and the rights of the parties, even to the detriment of Liberty's nearly 490 other New Mexico members. Based on OSI's representations, the state court issued the TRO.[79]

109.     That is the situation that OSI says forced its hand, that created its "***urgency***" and "***unnecessarily aggressive***" posture that said, "well you know … you've been in operations for years, ***but now we're coming for you***," ¶107 (emphasis added), and in the meantime, you must "shut down" immediately, regardless of the consequences for your other members.[80]

110.     "Unnecessarily aggressive" is too kind a description of OSI's posture against Liberty, and that posture serves as a shocking parable for Samaritan.

<u>Samaritan Is Next in Line</u>

111.     Samaritan and the individual Plaintiffs expect they are next, despite the absence of any formal complaint against Samaritan or other catalyst for an OSI investigation. If five harmless church members are unsafe from OSI, *see* ¶233-242, so is Samaritan.

112.     Besides, OSI's anti-HCSM policy on insurance not only captures Samaritan but also invites or supports "any person" to bring a legal action under that policy. ¶¶79-84 above.

113.     As shown by all evidence, OSI will penalize Samaritan severely: (a) fines of ***at least*** $4,590,000 to $18,360,000 for its 918 existing New Mexico memberships (plus any other memberships it has "sold" in New Mexico), (b) permanent expulsion from New Mexico, and (c)

---

[78] Liberty Hrg. Tr. (Aug. 8, 2023) (Ex. 58) at 21-22 (state court).

[79] Liberty Hrg. Tr. (Aug. 8, 2023) (Ex. 58) at 56-62. In issuing the TRO, the state court found that OSI's policy of subjecting HCSMs to the Insurance Code was likely to prevail.

[80] Liberty Hrg. Tr. (Aug. 8, 2023) (Ex. 58) at 56-62.

permanent loss of all associated constitutional rights for Samaritan and 918 of its members.

<u>OSI's U-Turn Against HCSMs Constitutes Religious Discrimination</u>

114.    As detailed below, OSI has performed a sudden U-Turn in its policy and practice toward HCSMs. This new policy and practice for HCSMs is illegal for many reasons.

115.    To start, OSI's new policy and practice constitutes ***religious discrimination*** under the First Amendment, because it is neither "neutral" toward religion nor "general applicable."[81]

<u>OSI's U-Turn Is Discriminatory Regardless of Its Motives</u>

116.    In this case, Samaritan and its members can easily "carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is ***not 'neutral' or 'generally applicable.'***"[82] "Should a plaintiff make a showing like that, this ***Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny.'***"[83]

117.    The Constitution demands strictly neutral and equal treatment.[84] Thus, ***any*** non-neutral or non-generally applicable ***action by OSI*** that harms Samaritan discriminates against Samaritan "***no matter how well-intentioned***,"[85] "***regardless of design or intent***,"[86] and "***even in***

---

[81] *Kennedy*, 142 S.Ct. at 2421; *Fulton v. Phila.*, 141 S.Ct. 1868, 1876 (2021) ("***Fulton***"); *Tandon v. Newsom*, 141 S.Ct. 1294, 1296 (2021) ("***Tandon***");*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63 (2020) ("***Cuomo***"); *Masterpiece Cakeshop v. Colo. C.R. Com'n*, 138 S.Ct. 1719, 1727 (2018) ("***Masterpiece***"); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("***Lukumi***"); *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) ("***Smith***").

[82] *Kennedy*, 142 S.Ct. at 2421-22 (quoting *Smith*, 494 U.S.at 879-81 (emphasis added).

[83] *Kennedy*, 142 S.Ct. at 2422 (quoting *Lukumi*, 508 U.S. at 546) (emphasis added).

[84] *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("***Trinity Lutheran***"); *Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2254 (2020) ("***Espinoza***"); *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 781-82 (2022) ("***Carson***").

[85] *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 689 (9th Cir. 2023) (***en banc***) ("***FCA En Banc***"), *largely confirming the panel decision*, 46 F.4th 1075 (9th

*the absence of any motive to do so*,"[87] and will be "subject to strict scrutiny *regardless of* the government's *benign motive*, *content-neutral justification*, or *lack of 'animus.'*"[88]

118.     Such strict neutrality has long been the law of this Circuit,[89] and it explains why it is irrelevant whether "faith-based bigotry" has motivated OSI, since the "constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[90]

119.     Discriminatory intent here is "*merely the intent to treat differently*."[91]

120.     OSI's treatment of HCSMs violates this strict-neutrality command in two ways.

121.     **First**, OSI's new policy and practice toward HCSMs is not, nor can it be, "neutral" toward religion because it targets an explicitly and wholly religious sector.

122.     OSI's current campaign against health care sharing *ministries*—a distinctly and obviously *religious* community defined by "religious exemption" in the ACA and by "religious" traits in the state safe harbors—targets a sector that is facially, definitionally, wholly "*religious*."

123.     **Second**, OSI's new policy and practice toward HCSMs is not "generally applicable" because the Insurance Code as applied by OSI exempts fraternal societies and many other comparable secular entities. ¶¶281-301, below.

124.     A "law might appear to be generally applicable on the surface but not be so in

---

Cir. 2022) ("**FCA Panel**") (emphasis added).

[86] *FCA En Banc*, 82 F.4th at 689 (emphasis added).

[87] *FCA En Banc*, 82 F.4th at 672 (emphasis added).

[88] *FCA En Banc*, 82 F.4th at 686 n.8 (quoting *Reed*, 576 U.S. at 165) (emphasis added).

[89] *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) ("**Colo. Christian**") (McConnell, J). Then-Judge Michael McConnell is the leading religious freedom scholar of our time. In any case, his opinion for the Tenth Circuit in *Colo. Christian* is the law of this Circuit.

[90] *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) ("**Neace**") (quoting *Colo. Christian*).

[91] *Colo. Christian*, 534 F.3d at 1260 (emphasis added).

practice due to exceptions for comparable secular activities."[92] "The reason [for strict scrutiny] is obvious: if [OSI] can easily grant an exemption, then the law stops being [applied] generally."[93]

125.    For either or both of these reasons, OSI's anti-HCSM campaign—regardless of OSI's motives—invokes and fails strict scrutiny as explained below.

OSI's U-Turn Is Needlessly Hostile and Likely Motivated by Animus

126.    While motive need not be shown, an invidious motive is damning and can serve as a foil to more clearly see the **non**invidious discrimination that still violates strict neutrality.

127.    OSI's motives are suspect. In fact, OSI's sudden, "unnecessarily aggressive" anti-HCSM campaign may be self-evidently invidious, inexplicable apart from animus.

128.    In any case, evidence of animus abounds. ¶¶204-246, below.

129.    Any and all such invidious actions are egregious and flatly prohibited. Religious animus is "odious to our Constitution"[94] and simply barred.[95]

130.    All such actions are simply "*'set aside' … without further inquiry*."[96] "To be sure, where governmental bodies discriminate out of 'animus' against particular religions, such decisions are **plainly unconstitutional**,"[97] as "religious animus [is] **not a permissible government interest**."[98] "Because **government actions [invidiously] discriminating against**

---

[92] *Neace*, 958 F.3d at 413.

[93] *FCA Panel*, 46 F.4th at 1093 (applying *Tandon* and *Fulton*).

[94] *Carson*, 142 S.Ct. at 1996 (citing *Espinoza*, 140 S.Ct. at 2263, quoting *Trinity Lutheran*).

[95] *Kennedy*, 142 S.Ct. at 2422 n.1.

[96] *Kennedy*, 142 S.Ct. at 2422 n.1 (quoting *Masterpiece*, 138 S.Ct. at 1732) (emphasis added).

[97] *Colo. Christian*, 534 F.3d at 1260 (emphasis added).

[98] *Jesus Christ Is the Answer Ministries v. Baltimore*, 915 F.3d 256, 262 n.3 (4th Cir. 2019) ("**Jesus Christ Is the Answer**"). Animus is not even "permissible [much less] compelling." *Id*.

*religious exercise a fortiori serve no legitimate purpose*, no balancing test is necessary[.]"[99]

131.    In addition to all other relief, animus would support punitive damages.

<div align="center">OSI's U-Turn Also Invades Religious Autonomy</div>

132.    Another form of First Amendment violation that is flatly barred is state intrusion into the guaranteed "autonomy" of religious institutions—i.e., their independence from the State.

133.    "Among other things, the Religion Clauses protect the right [of] religious institutions to decide matters 'of faith and doctrine' *without government intrusion*. State interference in that sphere would *obviously violate* the free exercise of religion, *and any attempt* by government to *dictate or even to influence* such matters would constitute one of the central attributes of an *establishment* of religion. The First Amendment *outlaws such intrusion*."[100]

134.    "[This] independence of religious institutions in matters of 'faith and doctrine' is closely linked to independence [in] 'matters of church government,'"[101] and usually is referred to church or religious "autonomy."[102] Intrusion is outlawed without any scrutiny or balancing.

135.    As shown below at ¶¶1151-1178, it is only necessary to list some of the hundreds of Section *titles* within the 91 Articles of the Insurance Code (i.e., the initial 62 Articles plus 29 additions) to show their obvious autonomy-invading intrusion into, and entanglement with, Samaritan's internal governance (structure/polity), membership, and sharing requirements.

136.    Subjecting Samaritan to the Insurance Code would dictate most of Samaritan's governance, management, personnel, policy, and planning decisions, *see* ¶¶1151-1178, all of

---

[99] *Brown v. Borough of Mahaffey*, 35 F.3d 846, 850 (3d Cir. 1994) ("***Brown***") (emphasis added).

[100] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020) ("***Our Lady***") (citing *Hosanna-Tabor Evangelical Lutheran Sch. v. EEOC*, 565 U.S. 171 (2012) ("***Hosanna***")).

[101] *Our Lady*, 140 S.Ct. at 2060.

[102] *Our Lady*, 140 S.Ct. at 2060.

which Samaritan members have determined will be dictated by their shared Biblical faith.

137.     All such intrusions are simply "***barred*** by the church autonomy doctrine."[103]

### The Upshot: At a Minimum, Samaritan Is Guaranteed an Exemption

138.     Even apart from any animus or any autonomy-invading intrusion, OSI ***must*** exempt ***Samaritan*** from the Insurance Code if its application to Samaritan lacks ***either*** strict neutrality ***or*** strict general applicability. The Supreme Court has been clear on this point.[104]

139.     "[Our] decisions have made the following points clear. First, government regulations are not neutral and **generally applicable**, and therefore trigger strict scrutiny[,] whenever they treat ***any* comparable secular** activity **more favorably than religious exercis**e…. Second, whether two activities are comparable for purposes of the Free Exercise Clause must be **judged against the asserted government interest** that justifies the regulation at issue. Comparability is concerned with the **risks various activities pose**[.]"[105]

140.     The First Amendment test asks: (1) whether "*any* comparable secular activity [is being treated] more favorably than religious exercise,"[106] and, if so, (2) what is "the asserted government interest that justifies the regulation,"[107] and (3) what is "the asserted harm of granting ***specific exemptions*** to ***particular religious claimants***,"[108] since, (4) if there is no compelling "**interest in denying [such] an exception**,"[109] (5) it ***"must" be granted***.[110]

---

[103] *Bryce v. Episcopal Church*, 289 F.3d 648, 659 (10th Cir. 2002) ("***Bryce***") (emphasis added).

[104] *Tandon*, 141 S.Ct. 1294; *Fulton*, 141 S.Ct. 1868.

[105] *Tandon*, 141 S.Ct. at 1296 (bold added; italicized *any* is in the original).

[106] *Tandon*, 141 S.Ct. at 1296 (emphasis in original, by the Supreme Court).

[107] *Tandon*, 141 S.Ct. at 1296.

[108] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[109] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[110] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

141.    Thus, religious exercise **must** be treated at least as well as **any** comparable secular exercise—with comparability judged by the asserted **interests** and **risks** at issue. The mere "'*favoring [of] comparable secular activity is sufficient' to trigger strict scrutiny*."[111]

142.    If a "specific exemption" for a "particular religious claimant" will harm the state's goals no more than a secular exemption, the **religious exemption must be granted**—here, in the form of an injunction restraining OSI enforcement against Samaritan.

143.    Here, the Insurance Code exempts actual health insurance by fraternal societies. ¶¶1058-1082. Every such secular exemption, full or partial, undermines the Code's **interest** in protecting "consumers from unsafe and unsound insurance companies" and "insurance fraud" in the same way an exemption for Samaritan would.[112] Exempting Samaritan **poses** the same **risks**.

144.    Strict scrutiny is triggered here for two distinct but related reasons.

145.    **First**, OSI's interests in enforcing the Code "are undermined by the disparate treatment of comparable secular activity."[113] **Second**, the mere existence of the exemptions "undercut[s] the State's expressed interests."[114] In either case, OSI "treats some comparable secular [activity] more favorably than [Samaritan's] religiously motivated [activity]."[115]

146.    While Samaritan may occasionally emphasize the "discretionary" nature of OSI's anti-HCSM campaign, it is just to make Samaritan's case that much easier. The existence of official discretion in applying the law and exemptions presents the worst case for Defendant.[116]

---

[111] *Bella*, 2023 WL 6996860, at *17 (quoting *FCA En Banc*, 82 F.4th at 686) (emphasis added).

[112] *Liberty II*, 2023 WL 6686684, at *7 (describing primary goals of insurance regulation).

[113] *Bella*, 2023 WL 6996860, *19 (citing *Tandon*, 141 S.Ct. at 1296; *Fulton*, 141 S.Ct. at 1877).

[114] *Bella*, 2023 WL 6996860, at *15 (citing *Fulton*, 141 S.Ct. at 1877).

[115] *Bella*, 2023 WL 6996860, at *16 (citing *Tandon*, 141 S.Ct. at 1296).

[116] Some have argued *Fulton* requires the existence of "unfettered discretion," but the Ninth Circuit just rejected such an "overly narrow" view of *Fulton*. *FCA En Banc*, 82 F.4th at 687.

147.    Indeed, that OSI may challenge Samaritan's preenforcement standing simply by voluntarily disavowing any intent to enforce against Samaritan is itself proof of OSI's discretion.

148.    OSI actions toward Samaritan cannot pass strict scrutiny because they are not the "*least restrictive means* of achieving some *compelling state interest*."[117] This test, and OSI's failure to pass it, is discussed at ¶¶984-1113 & 1179-1364, and is only briefly summarized here.

149.    **First**, as to *compelling state interest*, OSI's interest in insurance regulation is too general, as a matter of law, to qualify as *compelling*. Moreover, OSI's interests in consumer protection cannot be compelling, in the context of this case, because OSI allowed Samaritan to operate freely in New Mexico for decades without any harm to the public. *Id*.

150.    **Second**, as to *least restrictive means*, OSI's expected attempt to force Samaritan's compliance with the Code or expel it from New Mexico cannot possibly be the least restrictive means to achieve any compelling (or even legitimate) state interest, given OSI's longstanding acquiescence in Samaritan's non-insurance status that engendered no harm whatsoever to OSI's consumer-protection interests. Ironically, expulsion from New Mexico is the ***most*** restrictive means to achieve even a *marginally legitimate* state interest. OSI cannot pass this test. *Id*.

<u>To Evaluate the Federal Claims, Insurance Must Be Federally Defined</u>

151.    To evaluate Samaritan's federal constitutional claims requires defining OSI's new ***HCSMs-are-insurance*** policy based on its pliable new definition of "insurance."

152.    This task of defining OSI's new HCSMs-are-insurance policy is a ***federal task*** for at least seven reasons, summarized here and detailed further below at ¶¶947-983 & 1677-1724.

153.    **First**, this new OSI policy must be assessed to establish OSI's enforcement threat

---

[117] *Thomas v. Review Board*, 450 U.S. 707, 718 (1981) (8-1) ("***Thomas***") (emphasis added).

to Samaritan, which will establish its preenforcement standing to bring this federal case.

154. **Second**, OSI's sudden departure from the universal legal definition of insurance will establish a baseline for evaluating OSI's conduct and motives under the U.S. Constitution and whether they violate Plaintiffs' rights under the U.S. Constitution.

155. **Third**, assessing OSI's sudden shift in policy after long acquiescence is essential to determine whether Defendant's threatened enforcement action against Samaritan is justified under the federal constitutional standard of strict scrutiny, which requires the state to prove its proposed action is the least restrictive means to achieve a compelling state interest.

156. **Fourth**, a federal judicial determination of insurance is necessary to resolve the preemption conflict between OSI's new definition and the federal definition under the U.S. McCarran Ferguson Act that enables New Mexico to regulate the "business of insurance."

157. **Fifth**, a federal judicial determination of insurance is necessary to resolve the federal preemption conflict between OSI's definition of insurance and the federal definition of insurance under IRC §501(m), which disqualifies any nonprofit that provides "commercial-type insurance" from the §501(c)(3) status it needs for its continued operation and existence.[118]

158. **Sixth**, a federal judicial determination of insurance is necessary to resolve the federal preemption conflict between OSI's definition of insurance and the federal definition of HCSMs (IRC §5000A/ACA), because the latter depends upon *continuous §501(c)(3) status*.

159. **Seventh**, a federal judicial determination of insurance is necessary to resolve the federal preemption conflict between OSI's definition of insurance and the federal definition of

---

[118] "Congress intended a broad definition of the term 'commercial-type insurance.'" *Paratransit Ins. v. Com'r*, 102 T.C. 745, 752 (1994) ("***Paratransit***"); *accord Fla. Hosp. Tr. Fund v. Com'r*, 103 T.C. 140, 158 (1994) ("***FHTF***"), *aff'd*, 71 F.3d 808 (11th Cir. 1996). The IRS follows *Paratransit* and *FHTF* to enforce §501(m). *E.g.*, I.R.S. P.L.R. 201218017 (May 4, 2012). *See also FICURMA v. U.S.*, 850 F.Supp.2d 125 (D.D.C. 2012) (following *Paratransit* and *FHTF*).

HCSMs (IRC §5000A(d)(2)(B)), because the latter depends upon *HCSMs being non-insurance*.

<u>The Federal Definition of Insurance Under McCarran Ferguson Act</u>

160.     Under the McCarran Ferguson Act ("MFA"), federal law reserves "insurance regulation" to the states by protecting such state regulation from "federal preemption."[119]

161.     But only state regulations that regulate "insurance" as federally defined by the MFA qualify for this protection from federal preemption. "Insurance" here is a term of art.

162.     As to its meaning, since the MFA is federal law, "how the ***States may have ruled is not decisive***."[120] In such "***federal statutes*** …'***insurance***' and 'annuity' are ***federal terms***."[121] Thus, under the MFA, "the ***meaning of 'insurance'*** … is a ***federal question***."[122]

163.     Thus, to qualify under the MFA, states must define "insurance" consistently with federal cases. For example, *Air Evac* held that an insurance commissioner's "enforcement threat against" a "Membership Program" like Samaritan's did not "involve regulation of the business of insurance" as defined by the MFA.[123] "The Defendant has presented nothing to counter Air Evac's evidence that the Membership Program provides … ***no indemnification***. The McCarran Ferguson Act applies ***only to regulation of the business of insurance***. Air Evac is likely to prevail in demonstrating that its Membership Program is ***not insurance***, and therefore that ***any state regulation of it is preempted***[.] The Defendant's ***efforts to employ a broad definition of 'insurance'*** to reach Air Evac's program … is unlikely to alter that outcome."[124]

---

[119] *SEC v. Variable Annuity Life Ins.*, 359 U.S. 65, 67 (1959) ("***Variable Annuity***").

[120] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[121] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[122] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[123] *Air Evac*, 523 F.Supp.3d at 872, *aff'd on other grounds*, 37 F.4th 89.

[124] *Air Evac*, 523 F.Supp.3d at 873 (emphasis added).

164.    The federal requirements for insurance are straightforward.

165.    Insurance always requires *assumption* of "*true risk*."[125] "'[I]nsurance' involves a *guarantee* that at least some fraction of the benefits will be payable in fixed amounts. The companies that issue these annuities [do] take the risk of failure. *But they guarantee nothing*[.] There is *no true underwriting* of risks, *the one [real] earmark of insurance*[.]"[126]

166.    "[If risk] is not shifted [to] others, there can be *neither insurance nor indemnity*. Insurance also … involves distribution of the risk, but *distribution without assumption hardly can be held to be insurance*. These are *elemental conceptions and controlling ones*."[127]

167.    Insurance always requires a legally enforceable promise or "ultimate *obligation to indemnify* the insured."[128] Only one "*compelled to pay* another party due to a *legal obligation* [fulfills] indemnification,"[129] since an "*obligation to indemnify* [arises from a] *legal obligation* to pay."[130] To "*shift [the] entire responsibility*" "is *exactly what indemnity means*."[131]

168.    All such terms must be given their *plain meaning*. "[The Supreme] Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."[132]

---

[125] *Variable Annuity*, 359 U.S. at 71 (emphasis added).

[126] *Variable Annuity*, 359 U.S. at 71-73 (citations omitted; emphasis added).

[127] *Jordan v. Group Health*, 107 F.2d 239, 245 (D.C. Cir. 1939) ("*Jordan*") (emphasis added).

[128] *Marathon v. Md. Ins.*, 243 F.3d 1232, 1244 (10th Cir. 2001) ("*Marathon*") (emphasis added).

[129] *Stewart v. EMJ Corp*, 2005 WL 300420, at *5 (10th Cir. 2005) ("*Stewart*") (emphasis added).

[130] *In re Wallace & Gale*, 385 F.3d 820, 831 (4th Cir. 2004) ("*In re Wallace*") (emphasis added).

[131] *ERC v. Archstone Smith*, 603 F.Supp.2d 814, 825 (D.Md. 2009) ("*ERC*") (emphasis added).

[132] *Bostock v. Clayton County*, 140 S.Ct. 1731, 1749 (2020).

169.    Preemption challenges are proper in this preenforcement context.[133]

### OSI's Application of Insurance Law Is Preempted and/or Invalidated

170.    "Put simply, federal law preempts contrary state law. [A]mong the three types of preemption, the one relevant here is called **conflict preemption**. [A] state-law provision will be preempted if it conflicts with federal law, either because (1) **compliance with both** federal and state regulations is a **physical impossibility**, **or** because the provision (2) **stands as an obstacle** to the accomplishment and execution of the full **purposes and objectives** of federal law."[134]

171.    Defendant's policy of applying the Insurance Code to HCSMs like Samaritan is "conflict preempted" on both (1) **impossibility** and (2) **obstacle** grounds. *See* ¶¶1674-1730.

172.    Apart from preemption, OSI's sweeping new definition of insurance, as applied to HCSMs like Samaritan, discriminates both invidiously and noninvidiously against those HCSMs in violation of the First and Fourteenth Amendments to the U.S. Constitution. ¶¶984-1250.

173.    In sum: **(a)** OSI's determination of insurance that disagrees with the federal determination of insurance is preempted by federal statutory law, and **(b)** OSI's application of its interpretation to a HCSM like Samaritan is invalidated by federal constitutional law.

### Overview of OSI's Preempted and Unconstitutional Actions

174.    In its feverish campaign to expel HCSMs, OSI has twisted itself in knots with its sudden U-Turn on HCSM policy trailed by its wildly divergent declarations of insurance law.

175.    The plain truth is this. Only if Samaritan legally "**assume[s] some of the risk** of paying its members' claims [will] its **membership contract** [be] one **undertaking to indemnify**

---

[133] *LWV v. Sullivan*, 5 F.4th 714, 729 (7th Cir. 2021) ("*Arizona v. U.S.*, 567 U.S. 387 (2012) … largely upheld a preenforcement preemption challenge to multiple provisions of [Arizona] law").

[134] *Supreme Court of N.M.*, 839 F.3d at 917-18 (citations & internal punctuation omitted; emphasis added). *Accord Club Madonna v. Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022).

its members."[135] Using a legal contract to "shift" or "transfer" the "***risk to another entity [is] insurance [in] every jurisdiction in the United States***."[136]

176.    This is the law everywhere, even, depending on the situation, New Mexico.

177.    OSI's own website (Ex. 56) acknowledges this truth:



9/24/23, 4:12 PM                                          Office of Superintendent of Insurance

**New Mexico
Office of Superintendent of Insurance**

• **Health Care Sharing Ministries**

Under these arrangements, members pay a monthly fee. When they have health care expenses, members can request that the ministry or other members share part of the cost. However, the ministry is <mark>not legally obligated to pay</mark> for members' health care costs.

https://www.osi.state.nm.us/pages/insurances/health/health-resources/other-types-of-health-insurance

178.    Slide #3 of a recent OSI public webinar (Ex. 37) says the same:

<mark>**Health care sharing ministry**</mark>/**health share coverage**
•   Designed to look like health insurance
•   Unregulated coverage
•   They make <mark>**no** guarantee they will pay any claims</mark> and say they are NOT health insurance.

179.    This absence of any legal obligation or guarantee to pay, ***by itself, as confirmed by OSI itself***, prevents Samaritan's ministry from being insurance under the law everywhere.

180.    But, ever since its March 2020 U-Turn, OSI has lived in a state of contradiction.

181.    OSI may be able to define insurance however it likes, perhaps even changing its mind from time to time. What it may not do is slap the insurance label on Samaritan in direct contradiction to federal law and the federal constitutional rights of Samaritan and its members.

---

[135] *Altrua HealthShare v. Deal*, 154 Idaho 390, 395 (2013) (a Samaritan peer) (emphasis added).

[136] Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 179-81 (expert testimony of Kevin McCarty, Florida Ins. Com'r for 13 years, 2003–2016, and NAIC President for 2012). During McCarty's tenure, Florida investigated Liberty and determined it "was not in the business of insurance." *Id*.

182.    OSI is labeling the ***expressive religious activity*** of these sharing ***ministries*** as ***insurance***. But OSI "cannot foreclose the exercise of constitutional rights by mere labels."[137] Nor may it use labels as a cloak for even *benign* discrimination, let alone *hostility* and *animus*.

<u>The Constitution Bars Even Subtle Departures from Neutrality</u>

183.    "The [First Amendment] extends beyond facial discrimination [to] ***forbid subtle departures from neutrality***[.]"[138] "Official action that ***targets religious conduct*** for ***distinctive treatment*** cannot be shielded by mere compliance with the requirement of ***facial neutrality***."[139]

184.    "The Free Exercise Clause protects against governmental ***hostility*** which is ***masked***, as well as overt. The Court ***must survey meticulously the circumstances***[.]"[140]

185.    "A law that targets religious conduct for ***distinctive treatment*** or advances ***legitimate*** governmental interests ***only against conduct with a religious motivation*** will survive strict scrutiny ***only in rare cases***."[141]

186.    All these rules from *Lukumi* have been the law of the land since 1993, when *Lukumi* was decided. Thus, Defendant has violated well-established law and is without excuse.

<u>Factors Relevant to Assessing Neutrality</u>

187.    "Factors relevant to the assessment of governmental neutrality include 'the ***historical background*** of the decision under challenge, the ***specific series of events leading to*** the enactment or official policy in question, and the … ***administrative history***.'"[142]

---

[137] *NAACP v. Button*, 371 U.S. 415, 429 (1963) ("***Button***").

[138] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[139] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[140] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[141] *Lukumi*, 508 U.S. at 546 (citations & internal punctuation omitted; emphasis added).

[142] *Masterpiece*, 138 S.Ct. at 1731) (quoting *Lukumi*) (cleaned up; emphasis added).

OSI's Anti-HCSM Campaign Began With the Non-HCSM Scam Aliera

188.    OSI's anti-HCSM campaign evidently began with the non-HCSM scam *Aliera*.

189.    This OSI campaign began no later than December 3, 2019, when OSI issued a press release (Ex. 30) about a "company" named *Aliera* "that markets itself as" a HCSM but is controlled by *Timothy Moses*—"who [was] convicted of *felony* securities *fraud and perjury*"—and was found in *"several states' legal actions"* to have "*misappropriate[d] assets*" and "*misrepresented itself* to state insurance regulators." Ex. 30 (emphasis added).

190.    OSI stated: "Aliera is a *for-profit company* and *cannot qualify as a health care sharing ministry under state or federal law*"; "OSI is concerned about potential *fraudulent or criminal activity on the part of Aliera*"; and "*Additional states*, including Texas, Colorado, and Washington, *have issued [C&Ds] against Aliera[.]*" Ex. 30 (emphasis added).

191.    What these "several states' legal actions" found was that *Aliera* was a *secular*, *for-profit company* that never was nor ever could be a *health care sharing ministry* under any law anywhere, and that *Mr. Moses* had merged his shill Aliera with a series of fake "HCSMs" of his own making, including *Trinity*, and ran the operation scandalously. ¶¶743-760.

192.    At least twelve states issued C&Ds and heavy fines against *Aliera/Trinity*.[143] Many class-action and other lawsuits ensued, by customers and state AGs. It was no surprise when Aliera/Trinity went bankrupt and out of business in 2022. ¶¶743-760.

193.    OSI issued its own C&D against Aliera/Trinity on March 26, 2020. Ex. 32.[144] OSI confirmed its C&D in a Decision (Nov. 17, 2020; Ex. 35) and a Final Order (Nov. 19, 2020; Ex. 36), upholding its $2,680,000 fine and banishing Aliera/Trinity from New Mexico.

_____

[143] *See* http://www.symslaw.com/aliera-and-trinity-litigation/stateregulation (linking to C&Ds, decisions, & consent orders against Aliera/Trinity in California, Colorado, Connecticut, Iowa, Maryland, New York, New Hampshire, New Jersey, New Mexico, Oregon, Texas, Washington).

[144] Also available by searching for Aliera or Trinity at https://edocket.osi.state.nm.us/home.

194.     What evidently began as a discrete OSI action against the non-HCSM Aliera—a notorious "*scam*" founded and run scandalously by an ex-felon and subject to legal actions everywhere—expanded into a hostile campaign against *real* HCSMs, to shut them *all* down.

<u>Overview of OSI's Four Motives</u>

195.     Though not dispositive here, motives matter. And animus is not OSI's sole motive here, of course. "Consumer protection," OSI recently stated, is its great motivating task:[145]

```
14            That's the task, the directive for the
15   Insurance Department, to make sure those consumers
16   are protected by -- if somebody is engaging in the
17   business of insurance, they either have to stop or
18   they have to comply with our statute.....
```

196.     Consumer protection is not the only other motive here. In its 2015 Annual Report (Ex. 42 at 4), long before it began it anti-HCSM campaign, OSI described its Vision as follows:

> The vision of OSI is to become one of the country's leading regulatory agencies with respect to overseeing the insurance industry in New Mexico and ensuring that New Mexico insurance consumers are treated fairly and honestly. In addition, OSI strives to be a leader with respect to the roll out of the Patient Protection and Affordable Care Act (PPACA), commonly called the Affordable Care Act (ACA) or "Obamacare" and ensuring New Mexicans have access to quality and affordable health insurance that maintains a level of minimum standards.

197.     The Superintendent's cover letter for this Report (Ex. 42 at 6) declared:

> I am very proud of the strides made by our young agency during the last two years, including: increasing our National Regulatory Ranking; having the third largest reduction in the number of uninsured individuals due to the Affordable Care Act, with our plans being the third lowest cost health insurance plans for individuals in the United States; continuing to combat insurance fraud; remaining a financially sound agency; and implementing new technology resources as available.

---

[145] Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 33.

198.    Leading the charge for the ACA and for OSI's own ACA-regulated insurance marketplace is not OSI's only other motive here. OSI also, understandably, wants to protect its own insurance producers from competition. ¶¶832-839. Such *protectionism* is endemic to U.S. markets, and always has been, and is the reason for *antitrust* laws.

199.    In short, OSI's motives appear to be: (1) protecting consumers from unfairness and fraud (*consumer protection*), (2) leading the charge for the ACA (*ACA politics*), (3) protecting New Mexico's own insurance producers and regulated marketplace (*protectionism*), and (4) expelling these conservative health care sharing *ministries* from the State (*animus*).[146]

### OSI Has Strayed Badly From Neutrality

200.    Wielding its new understanding of the Insurance Code through administrative actions, OSI has bullied several HCSMs to leave the state and is pressuring Liberty in federal and state court after ordering it to shut down in New Mexico. ¶¶103-110, above.

201.    OSI, together with the Office of the Attorney General ("OAG"), has demeaned HCSMs while favoring the state's regulated industry, reflecting both favoritism toward the home-state marketplace and animus toward the ministries.[147] ¶¶774-812, below.

202.    The egregious motive here is animus. It is hard to understand OSI's laser-focused aggression against HCSMs without considering the possibility of animus toward the kind of conservative social and economic religious views held by sharing ministries like Samaritan.

203.    The evidence suggesting invidious discrimination is so extensive here that even a cursory overview of it for this introductory section will take several pages.

---

[146] Non-neutral treatment is prohibited regardless of motive. *Reed*, 576 U.S. at 165.

[147] *See Masterpiece*, 138 S.Ct. at 1731.

Overview of the Evidence of OSI Animus Toward HCSMs

204.    On March 26, 2020—*the same day OSI issued its C&D against Trinity/Aliera*

*(Ex. 32)*—OSI refenced that C&D in this public warning against *real* HCSMs (Ex. 31):



**FOR IMMEDIATE RELEASE:**
**March 26, 2020**

**Contact: Melissa Gutierrez**
**melissa.gutierrez@state.nm.us**

## NM OFFICE OF SUPERINTENDENT OF INSURANCE
## CAUTIONS CONSUMERS ABOUT HEALTH CARE SHARING MINISTRIES

SANTA FE, NM –The New Mexico Office of Superintendent of Insurance cautions consumers who have subscribed, or are considering subscribing to health benefit plans offered by Health Care Sharing Ministries (HCSM) that these are not authorized health insurance plans.  A HCSM may use marketing practices that suggest its plans include the protections found in approved health insurance plans.  However, that may not be correct.

These plans may be less expensive than a regulated major medical plan. They may also appear to provide the benefits and protections that a major medical plan is required to provide under the Affordable Care Act ("ACA") and other health insurance regulations.  In reality, though, a HCSM plan is an unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and ACA compliant major medical plan.

Consumers should be aware of the following regarding HCSM plans:

- They do NOT comply with the ACA, even if their materials say they do.

[Next is the fifth of six bullet points:]

- Members may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that result from an activity the ministry does not agree with.

205.    Then, after quoting the Superintendent as "urg[ing] consumers not to purchase"

any such non-ACA compliant "plan,"[148] the press release continued:

---

[148] OSI relentlessly insists that HCSMs are *non-compliant* with the ACA. Plaintiffs note that members of ACA-compliant HCSMs *are* "considered compliant with the individual mandate" of the ACA. Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 173 (expert testimony of Kevin McCarty). Thus, "ACA compliance" works both ways here.

The ==Superintendent== of Insurance ==is taking action to protect consumers from unauthorized HCSM.== ==Today, OSI issued an Order to Cease and Desist== and to Impose Penalties against a HCSM operating in New Mexico. Any person with questions regarding the Cease and Desist Order may contact Rebecca Branch, Assistant Staff Counsel, at rebecca.branch@state.nm.us or (505) 827-4535.

==If a consumer has any problems== with a health care sharing ==ministry,== or believes they've been ==deliberately misled== by one of these entities, please contact OSI to let the agency know and find out about any available assistance. Any person with such a complaint should contact OSI at 1-855-427-5674 or https://www.osi.state.nm.us/index.php/contact-us/.

206.   Thus, this OSI press release characterized all HCSMs as (a) *deceptive*, *religiously-discriminatory, unauthorized insurance products* **even** **before** (b) a single court—*or even OSI itself*—had adjudicated whether HCSMs even constituted *insurance*.

207.   These OSI actions reflect both animus and prejudgment bias.

208.   In March 2021, OSI issued a *Consumer Advisory* (Ex. 40)[149] warning the public about "scammers trying to lure people into purchasing … bad plans" and featuring "health care sharing ministries" as a prime example of such scammers:

 

**SUPERINTENDENT**
Russell Toal

**DEPUTY SUPERINTENDENT**
Jennifer A. Catechis

**CONSUMER ADVISORY**
**MARCH INSURANCE TIP OF THE MONTH**

As the Special Enrollment Period gets underway, OSI wants consumers to know that there are ==scammers trying to lure people== into purchasing low-quality health insurance or health insurance-like products. These ==low-quality== products DO NOT meet the requirements of the ACA because they offer extremely limited coverage. These might be short-term plans, trade association plans, ==health care sharing ministries== or other limited plans. These ==bad plans== can leave consumers stuck with huge medical bills from doctors and hospitals. These non-ACA plans deny and limit

209.   Thereafter, OSI co-produced *Staying Covered After COVID* (Ex. 37):

[149] https://www.osi.state.nm.us/wp-content/uploads/2021/03/Consumer-Advisory-March-2021.pdf.



**Staying Covered After COVID:**

**A Health Insurance Options Webinar**

210.    Slide #3 of this OSI webinar (Ex. 37) includes each of the following excerpts:

# The Lure of Insurance Scams

Insurance scammers look for vulnerable populations both during and outside of open enrollment periods for major medical coverage.

- **Health care sharing ministry**/health share coverage
  - Designed to look like health insurance
  - Unregulated coverage
  - They make **no** guarantee they will pay any claims and say they are NOT health insurance.

211.    Slide #5 advises consumers about scams, listing items typical of HCSMs:

# How to Avoid Scams

- Do not buy coverage advertised as:
  - "costing less than what's available on the Marketplace/Exchange"
  - "alternatives to traditional health insurance options"

- Avoid any plan where you have to join an association or club to get coverage!

212.    Slide #12 issues this "**Caution**" linking HCSMS with **junk insurance**:

**Caution**

This may be a time when people may try to sell you junk insurance, limited benefit plans, or health care sharing ministry coverages.

Go to beWellnm.com to learn more about your health care options!

213.    In all, the above OSI slides **cautioned** consumers against health care sharing ministries, equating them with "**Insurance Scams**," "**scammers trying to lure people**," "**scammers look[ing] for vulnerable populations**," and "**junk insurance**" "**designed to look like**

*health insurance*," all while plugging the home-state market through *Wellnm.com*.

214.    This *webinar has continued* with "*encore presentation[s]*."[150]

215.    On August 10, 2020, New Mexico joined other States in a letter to the Treasury Department (Ex. 33),[151] seeking to block a Proposed Rule that would provide tax benefits to the members of HCSMs like Samaritan. That 11-page letter begins and ends as follows:

<div align="center">August 10, 2020</div>

*Via e-filing at www.regulations.gov*

Secretary Steven Mnuchin
U.S. Department of the Treasury
Internal Revenue Service

RE:    "Certain Medical Care Arrangements" RIN 1545–BP31; IRS REG–109755–19

Dear Secretary Mnuchin:

<div align="center">[This letter's defamatory content is detailed at ¶¶774-812, below.]</div>

Gurbir S. Grewal
New Jersey Attorney General

Hector Balderas
New Mexico Attorney General

216.    In its nine pages of text, this "AG Letter" generates a series of impressions.

217.    *Aliera* appears 18 times, *Trinity* another seven times, and *Unity* (the predecessor of Trinity) once, giving the Aliera entities a total of *26 mentions*.

218.    Words suggesting "*sham*" appear frequently, including "*fraud*" appearing eight times, "*confusion*" six times, "*deception*" thrice, "*target[ing]*" twice, "*mimicking*" twice, "*capitalizing on consumers*" once, "*schemes*" once, and "*deploying aggressive marketing practices*" once, for total mentions of *23 times*.

219.    In these same nine pages of text, and amidst the *26 mentions of the Aliera entities*

---

[150] OSI Webinar Invite (Apr. 6, 2023) (Ex. 54) (emphasis added).

[151] Also at https://portal.ct.gov/-/media/AG/HSM-Comment-Letter.pdf (accessed 12/5/23).

and the **23 mentions** of words associated with predatory **shams, scams, and frauds**, this New Mexico-co-signed AG Letter called out **Samaritan Ministries International** by name.

220.    This Letter did not name any other legitimate HCSM: **just Samaritan**.

221.    In sum, this AG Letter described in scathing terms the notorious non-HCSM scam known as Aliera/Trinity, *see* ¶¶774-812, and used that scam to tarnish all health care sharing ministries, including *Samaritan by name*. Again, the **only actual HCSM singled out by name in in this defamatory letter was Samaritan**. ¶¶794-800 (discussing AG Letter in detail).

222.    Ironically, a leading federal case involved in cleaning up the Aliera scandal actually uses **Samaritan** to show what a "**legitimate HCSM" looks like, to "highlight the difference**" with Aliera/Trinity.[152] This case—and the insurance commissioner's report upon which the case was relying—used Samaritan as a kind of Gold Standard.

223.    OSI still publicizes the Trinity/Aliera scam alongside its HCSM press release:[153]



9/24/23, 4:12 PM                                    Office of Superintendent of Insurance

New Mexico
**OSI** **Office of Superintendent of Insurance**

• **Health Care Sharing Ministries**

Under these arrangements, members pay a monthly fee. When they have health care expenses, members can request that the ministry or other members share part of the cost. However, the ministry is ==not legally obligated to pay== for members' health care costs. State insurance regulators generally do not provide oversight of health care sharing ministries. See OSI's ==caution to consumers regarding Healthcare Share Ministries Trinity Cease and Desist at:==

• Healthcare Share Ministries - Press Release
• Trinity Cease and Desist

https://www.osi.state.nm.us/pages/insurances/health/health-resources/other-types-of-health-insurance

224.    Yet, the very name of this OSI website link says it all: ***coverage-that-is-not-***

---

[152] *LeCann v. Aliera*, 2021 WL 2554942, at *32 & n.32 (N.D.Ga. June 22, 2021) ("***LeCann***").

[153] https://www.osi.state.nm.us/pages/insruances/health/health-resources/coverage-that-is-not-insurance.

*insurance*.[154] In text, images, and links, OSI has declared that HCSM are *not insurance*.[155]

225.    Such contradictions are head-spinning, since OSI's current anti-HCSM campaign is based and fueled *entirely* upon its determination that HCSMs *are insurance*.

226.    OSI has stirred the pot against HCSMs not only in New Mexico but nationwide.

227.    At a March 2, 2023 subgroup meeting of the NAIC, the official minutes (Ex. 52 at 8; Ex. 53 at 3)[156] report Cynthia Cisneros of OSI as stating:

> Cisneros said New Mexico has been working proactively to steer consumers away from HCSMs and scam plans with webinars and advertising. Crow said consumers may not seek help or information until it is too late.

228.    Thus, OSI advised the nation's insurance regulators that OSI (proudly) has "been *working proactively to steer consumers away from HCSMs and scam plans* with *webinars* and *advertising*." *Id*. (emphasis added). And so it has.

229.    OSI has promoted, and continues to promote, its anti-HCSM animus in webinars, "encore presentation[s]," and advertising, as demonstrated above, *see* ¶¶204-214, and as demonstrated further below, *see* ¶¶761-812.

230.    Animus, as well as the three other OSI motives, are evident in OSI's advertising and slides in its PowerPoint presentations ("PPTs") shown above and below. But OSI's oral remarks during its *live* presentations are less guarded and more telling.

231.    On April 6, 2023, for example, OSI presented the below "encore presentation." *See* the Invitation (Ex. 54) and the Presentation (Ex. 55).[157]

---

[154] https://www.osi.state.nm.us/pages/insruances/health/health-resources/coverage-that-is-not-insurance.

[155] The National Association of Insurance Commissioners ("**NAIC**") describes a HCSM as "an unregulated, non-insurance product." https://content.naic.org/cipr-topics/insurance-fraud.

[156] Also at https://content.naic.org/sites/default/files/national_meeting/Bcmte_MinutesPacket.pdf and https://content.naic.org/sites/default/files/call_materials/ci-minutes-4.17.pdf.

[157]    https://a.storyblok.com/f/132761/x/3ee5ee595a/staying-covered-after-covid_-health-insurance-



232. This live recording of ***Staying Covered After COVID*** includes the PPT slides at Exhibit 37 and described above, ¶¶230-231. It also includes OSI's unfiltered remarks, which, as detailed later in this Complaint, relentlessly characterize HCSMs as scams while endlessly promoting New Mexico's ACA exchange (www.BeWellNM.com), reflecting a strong bias and protectionism. The tone and manner also indicate OSI's open disdain for these "*ministries*."

233. As further evidence of motive, OSI recently stated that its HCSMs-are-insurance policy would capture even five church members agreeing to cost-share their medical bills.[158]

```
 2  █████████  When you apply a functional test, what
 3  they are actually doing constitutes the business of
 4  insurance and that's why we took the enforcement
 5  action. . . .
22           THE COURT:  What if there were only five
23  members and five of them had gotten together -- five
```

options-post-public-health-emergency-unwinding-20230406_113857-meeting-recording.mp4.

[158] Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 33-34.

```
24    members -- what if five members of Gospel Light or
25    any other church for that matter who come together
1     and say, we are going to pay for each other's
2     medical bills.  We are going to pool within, just
3     the five of us.
4              Would you be seeking to try and enforce
5     the Insurance Code against five people?
```

**OSI's remarkable reply**:

```
6              MR. THIES:  If we got a complaint
7     associated with those five members, we would review
8     it and then make a determination whether they are
9     engaging in the unauthorized business of insurance.
10             If the five members were, then we would
11    have to take enforcement.  If we concluded that the
12    five members were engaging in the unauthorized
13    business of insurance, yes, we would take
14    enforcement action against them.
```

234.    This "functional test" to define insurance "does not pass the straight-face test."[159] It includes none of the earmarks of "insurance" as defined anywhere else. It is patently overbroad and absurd. It is the exact opposite of what insurance regulators typically do.

235.    "[B]roadly defining insurance, which really only scares insurance regulators, when you broadly define insurance, because it has unintended consequences."[160]

---

[159] *FCA En Banc*, 82 F.4th at 692.

[160] Liberty Hrg. Tr. (Ex. 57) at 183 (expert testimony of Kevin McCarty, former 13-year Ins.

236.    That OSI's new "functional test" may derive from "health benefit plans" in the "Trade Practices and Fraud" Article of the Insurance Code is irrelevant, since that section also relies on OSI's definition of "insurance."[161] *See also* OSI Liberty Decision (Jan. 20, 2023) (Ex. 49).[162] What matters is the "***definition of insurance***" and that definition is all OSI's doing.[163]

237.    OSI concocted this sweeping definition of insurance to target heath care sharing *ministries*, a *wholly religious sector*. These HCSMs are called ***ministries***, a term with obvious and distinctive religious meaning. Thus, OSI's campaign lacks even "facial neutrality," because it refers to "religious practices" or at least practices that have "strong religious connotations."[164]

238.    OSI's sweeping anti-HCSM policy also ensures Samaritan's pre-enforcement standing. The threat here to Samaritan not only is credible; it is virtually certain. For example, in the *Liberty* case, Hrg. Tr. (June 2, 2023) (Ex. 57) at 67, OSI stated that: "Our—

```
 7  │ position is the healthcare sharing ministry needs to
 8  │ comply with the Insurance Code.
```

239.    **OSI was unequivocal about its enforcement policy**:[165] "[I]n this—

```
19  │ case, because they have refused to comply with our
20  │ statute, we have no other choice but to continue to
21  │ force them to stop to protect the consumers.
```

---

Com'r of Florda, and NAIC President for 2012). "Q: [HCSMs are] not insurance or any other sort of thing like that[.] Is that your understanding? A. That is absolutely correct." *Id*. at 184.

[161] NMSA 1978, §59A-16-21.2. This section applies to a "health ***insurance*** carrier … ***subject to*** the ***insurance*** laws and regulations of this state." §59A-16-21.2(C)(2) (emphasis added).

[162] "As explained *infra*, the Hearing Officer finds [that] Respondent's HCSMs fall within the New Mexico ***definition of insurance*** [as] health benefits plans as defined by Section 59A-**16-21.2**" Ex. 49 at 1-2 (emphasis added). OSI's Decision cites §59A-16-21.2 eleven times.

[163] To the extent OSI may claim that its hands were tied by this recent statute on health benefit plan, the legislature may be complicit in OSI's misconduct. Discovery will tell.

[164] *Lukumi*, 508 U.S. at 533-36.

[165] Hrg. Tr. (June 2, 2023) (Ex. 57) at 33.

240.    So, OSI has "*no other choice* but to continue to force *them* to stop *to protect the consumers*." *Id*. (emphasis added). Those included in the "them" is astounding.

241.    OSI said it would pursue even five church members staying after service to share medical expenses if their activity fit OSI's warped "functional" definition of insurance. ¶233.

242.    If OSI has "no choice" but to pursue the five harmless church members—if five church members staying after Sunday service are in jeopardy—then surely Samaritan is in jeopardy, despite its unblemished service record. To quote this Court again, OSI is telling Samaritan, just as it has told Liberty, "well you know[,] you've been in operations [here] for years, ***but now we're coming for you***." ¶107 above (emphasis added). Indeed they are.

243.    Besides, OSI's HCSMs-are-insurance policy invites legal action by consumers under that policy, robbing Samaritan and its New Mexico members of any rest or repose.

244.    All the OSI warnings about HCSMs are part of the same anti-HCSM campaign.

245.    OSI has exhibited its hostility toward HCSMs in many additional ways, including email by Defendant's predecessor, whose disdain for HCSMs was well known. ¶¶803-810.

246.    All such animus is "odious to our Constitution"[166] and outlawed.[167]

### Simpler Than Animus: Religious Autonomy & Simple Discrimination

247.    Even assuming *arguendo* that this case fails to prove animus, it is certain to prove unconstitutional non-neutrality or non-general applicability, requiring exemption for Samaritan.

248.    It also is certain to prove unconstitutional intrusion into Samaritan's religious autonomy, also requiring exemption for Samaritan.

249.    Simply put, both grounds are simpler than proving motive (animus) and both

---

[166] *Carson*, 142 S.Ct. at 1996 (citing *Espinoza*, 140 S.Ct. at 2263, quoting *Trinity Lutheran*).

[167] *Kennedy*, 142 S.Ct. at 2422 n.1.

require the same relief: a court order enjoining OSI's new HCSMs-are-insurance policy sufficiently to protect Samaritan from OSI and from any OSI-inspired private actions.

250. Autonomy is addressed next because it poses an absolute bar to OSI here.

## Simpler Than Animus #1: Religious Autonomy

251. As explained above, state action that intrudes on the internal affairs of a religious institution is flatly "***barred*** by the church autonomy doctrine."[168] ¶¶1136-1148.

252. As shown below at ¶¶1151-1178, it is only necessary to list some of the hundreds of Section ***titles*** within the 91 Articles of the Insurance Code (i.e., the initial 62 Articles plus 29 additions) to show their obvious autonomy-invading intrusion into, and entanglement with, Samaritan's internal governance (structure/polity), membership, and sharing requirements. *Id*.

253. Even a cursory or superficial consideration of applying the Code to Samaritan's ministry reveals a futile exercise of trying to force a square peg into a round hole. *Id*.

254. Any such violation of Samaritan's religious autonomy is "flatly forbidden."[169] There is no strict or other judicial scrutiny. The offending state action is simply enjoined.

255. But the result is the same: exempting Samaritan from the Insurance Code.

## Simpler Than Animus #2: Simple Discrimination

256. In this case, OSI's application of the Insurance Code is not "a valid and neutral law of general applicability."[170] It therefore discriminates against HCSMs like Samaritan.

257. "Plaintiffs need not show explicit animus or 'targeting' of religion [to] prevail. It is enough to show targeting of a practice [that OSI knows] to be undertaken for religious reasons

---

[168] *Bryce*, 289 F.3d at 659 (10th Cir.) (emphasis added).

[169] *Colo. Christian*, 534 F.3d at 1266.

[170] *Smith*, 494 U.S. at 879; *accord U.S. v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (***en banc***) (explaining *Smith*); *Darren,* 2023 WL 7270874, at *16 (D.Colo.).

by those who will bear the burden of the regulation."[171]

258.     In its campaign to ban health care sharing *ministries*—defined by *religious exemptions* in the ACA and the thirty-one state safe-harbor laws—OSI knew that the "burden of [its policy] or its effect in real operation will fall predominantly on religious adherents."[172] Thus, "it is sufficient that [OSI] had knowledge that the predominant effect of [its anti-HCSM policy] would be to burden religious practice and that the [policy] does indeed have that effect."[173]

259.     It may be true that that a State "generally has the power to 'prophylactically' ban certain practices [without] banning all other practices that might be in a similar position. But when the practice it chooses to ban is one that it knows is undertaken for religious reasons, it loses the protections of *Smith's* 'safe harbor' rule [of neutrality and general applicability]."[174]

260.     It may "not typically [be] a problem" for OSI to "single out" certain activity "for strict regulation, even if comparable activity goes unregulated. *But* doing so in a way that *burdens religious activity* triggers *strict scrutiny*."[175]

261.     Whereas intrusion on autonomy and proof of animus both categorically invalidate offensive state action, simple discrimination may be justified by satisfying strict scrutiny.

262.     And with multiple First Amendment rights at stake here, the Court must apply "*at least* strict scrutiny*,"[176] and exempt Samaritan by injunction when that test is not met.

263.     Any OSI C&D against Samaritan in the circumstances of this case will violate both (a) strict neutrality and (b) strict general applicability. Each is addressed in turn.

---

[171] *Bella*, 2023 WL 6996860, at *18 (D.Colo. Oct. 21, 2023).

[172] *Bella*, 2023 WL 6996860, at *18 (quoting *Lukumi*, 508 U.S. at 535-36) (cleaned up).

[173] *Bella*, 2023 WL 6996860, at *18 n.4.

[174] *Bella*, at *19 (citing *Smith*, 494 U.S. at 879).

[175] *Bella*, 2023 WL 6996860, *17 (citing *Lukumi*, 508 U.S. at 545) (cleaned up; emphasis added).

[176] *Kennedy*, 42 S.Ct. at 2426 (internal punctuation omitted; emphasis added).

<u>Simple Discrimination #1: Violation of Strict Neutrality</u>

264.    "The [First Amendment] extends beyond facial discrimination [to] '***forbid subtle departures from neutrality***[.]'"[177] "A law that targets religious conduct for ***distinctive treatment*** or advances ***legitimate*** governmental interests ***only against conduct with a religious motivation*** will survive strict scrutiny ***only in rare cases***."[178]

265.    "A government policy will not qualify as ***neutral*** if it is 'specifically directed [at] religious practice,' [if] it 'discriminates on its face,' or if a religious exercise is otherwise its 'object.'"[179] OSI's anti-HCSM campaign at issue here targets a ***wholly*** "religious practice."

266.    The Constitution demands *strictly* neutral and equal treatment.[180] Thus, ***any*** non-neutral or non-generally applicable ***action by OSI*** that harms Samaritan discriminates against Samaritan "***no matter how well-intentioned***,"[181] "***regardless of design or intent***,"[182] and "***even in the absence of any motive to do so***,"[183] and will be "subject to strict scrutiny ***regardless of*** the government's ***benign motive***, ***content-neutral justification***, or ***lack of 'animus.'***"[184]

267.    Such strict neutrality has long been the law of this Circuit,[185] and it explains why it is irrelevant whether "faith-based bigotry" has motivated Defendant, since the "constitutional

---

[177] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[178] *Lukumi*, 508 U.S. at 546 (citations & internal punctuation omitted; emphasis added).

[179] *Kennedy*, 142 S.Ct. at 2422 (emphasis added).

[180] *Espinoza*, 140 S.Ct. at 2254 (quoting *Trinity Lutheran*, 582 U.S. at 458).

[181] *FCA En Banc*, 82 F.4th at 689 (citing Supreme Court precedent) (emphasis added).

[182] *FCA En Banc*, 82 F.4th at 689 (emphasis added).

[183] *FCA En Banc*, 82 F.4th at 672 (emphasis added).

[184] *FCA En Banc*, 82 F.4th at 686 n.8 (quoting *Reed*, 576 U.S. at 165) (emphasis added).

[185] *Colo. Christian*, 534 F.3d at 1260 (10th Cir.) (McConnell, J.).

benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[186]

268.   All "disparate treatment of religion" is non-neutral.[187] Put simply, *non-neutral* actions by OSI are *non-neutral* even if they arise from "merely the intent to treat differently."[188]

269.   Defendant's actions self-evidently violate strict neutrality. ¶¶204-246 above.

### Simple Discrimination #2: Violation of Strict General Applicability

270.   "A government [will] fail the ***general applicability*** requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's ***asserted interests in a similar way***,' or if it provides '***a mechanism for individualized exemptions***.'"[189]

271.   "[The Supreme] Court's decisions have made the following points clear. First, government regulations are not neutral and **generally applicable**, and therefore trigger strict scrutiny[,] whenever they treat ***any* comparable secular** activity **more favorably than religious exercis**e.... Second, whether two activities are comparable for purposes of the Free Exercise Clause must be **judged against the asserted government interest** that justifies the regulation at issue. Comparability is concerned with the **risks various activities pose**[.]"[190]

272.   A "law might [seem] generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."[191] "The reason [for strict scrutiny] is obvious: if [OSI] can easily grant an exemption, then the law stops being [applied] generally."[192]

273.   The Insurance Code, as applied by OSI, violates the above principles many times

---

[186] *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (quoting *Colo. Christian*, at 1260).

[187] *Cuomo*, 141 S.Ct. at 66.

[188] *Colo. Christian*, 534 F.3d at 1260.

[189] *Kennedy*, 142 S.Ct. at 2422 (emphasis added).

[190] *Tandon*, 141 S.Ct. at 1296 (bold added; italicized *any* is in the original).

[191] *Neace*, 958 F.3d at 413.

[192] *FCA Panel*, 46 F.4th at 1093 (applying *Tandon* and *Fulton*).

over. To start, it is riddled with individualized exemptions and mechanisms for exemptions.

274.    The Code section entitled, "Application of the code as to **particular types** of **insurers, organization or subject**," states that "No provision of the Insurance Code shall apply to: [A] fraternal benefit societies … [B] nonprofit health care plans … [C] health maintenance organizations … [D] prepaid dental plans … [E] motor clubs … [F] bail bondsmen … [G] insurance premium finance companies … [and H] title insurers and title insurance agents." [193]

275.    **Also**, "Charitable gift annuities [are] exempt from regulation as insurance."[194]

276.    "**In addition to** organizations and businesses **otherwise exempt**, the Insurance Code shall not apply to: [A] [certain] labor organization[s,]" [B] credit union share insurance … and similar corporations and funds[, and C] [certain] risk management division[s]."[195]

277.    Variations of "exemption" appear throughout the Code. Forms of "exempt*" appear at least 82 times, and forms of "exclusion," "limitation," and "exception" appear scores of times."[196] Not all these references are relevant, but many are, as discussed at ¶¶1058-1094.

278.    Many other exemptions exist through omission or through definition.[197]

279.    Every such exemption of a secular entity "poses" precisely the same "risk" to the Code's goals, and to OSI's enforcement interests, as would as an exemption for Samaritan.

280.    OSI's actions self-evidently violate strict general applicability. ¶¶1058-1094.

<u>The Best Example of Non-General Applicability Is Fraternals</u>

281.    Fraternal Benefit Societies ("FBS" or "fraternals") receive exceptionally

---

[193] NMSA 1978, §59A-1-15 (emphasis added).

[194] NMSA 1978, §59A-1-16.1. The quoted language is from the title of this section.

[195] NMSA 1978, §59A-1-16 (emphasis added).

[196] *See e.g.,* NMSA 1978, §59A-23E-16 ("Exclusions, limitations and exceptions for certain group health plans and group health insurance").

[197] *See, e.g.*, NMSA 1978, §§59A-23G-1 to 23G-12 (Short-Term Plan and Excepted Benefit).

privileged treatment in their own Article 44 ("FBS Article")[198] of the Insurance Code.

282.    "Except as herein provided, societies shall be governed by [this FBS Article] and shall be *exempt from all other provisions of the insurance laws of this state* unless they are expressly designated therein, or unless it is specifically made applicable by that article."[199]

283.    "[Certain kinds of fraternal societies] shall also be exempt from *all other provisions of the general insurance laws of this state*."[200]

284.    "Since 1905 the New Mexico statutes have [treated fraternals as] exempt from all provisions of the insurance laws of this state."[201]

285.    "The legislators of New Mexico, for reasons which doubtless seemed good to them, have *exempted fraternal societies from [the Insurance Code] with the one hand*, and with the *other authorized such societies to issue essentially the same policies* as do old line *[insurance] companies subject to the [Code]*."[202]

286.    This basic picture remains true today. *See* FBS Article of the Insurance Code.[203]

287.    "Defendants' *real complaint*, as we see it, is that the legislature has *exempted fraternal societies* from many of the *burdens imposed upon insurance companies* and at the *same time permitted them to do almost anything an insurance company may do*."[204]

288.    "[T]he operations of the fraternal society as an insurance company 'does not deprive the association of its character as a fraternal benefit association, and subject it to the laws

---

[198] NMSA 1978, §§59A-44-1 to 44-46 ("Article 44" or "**FBS Article**").

[199] NMSA 1978, §59A-44-23 (emphasis added).

[200] NMSA 1978, §59A-44-40(F). ("Exemption of certain societies") (emphasis added).

[201] *Woodmen I*, 15 F.Supp. at 484-85.

[202] *Woodmen II*, 17 F.Supp. at 765 (emphasis added).

[203] NMSA 1978, §§59A-44-1 to 44-46.

[204] *Woodmen II*, 17 F.Supp. at 769 (emphasis added).

governing old line insurance companies[.]'"[205]

289.    All these observations are all the truer as applied to Samaritan, which, unlike fraternals, is not like an insurance company at all. But there is more.

290.    The Insurance Code privileges fraternals in many more ways. ¶¶1058-1094.

291.    As just one more example here, fraternals are exempt from the nondiscrimination mandate in Section 59A-16-12 of the Code, which provides in its entirety:

### § 59A-16-12. Discrimination in insurance

No insurer shall, on the basis of the race, color, religion or national origin of any individual or group of persons:

A. refuse to make insurance available to any applicant for insurance; or

B. treat any such applicant or insured differently than any other applicant or insured with respect to the terms, conditions, rates, benefits or requirements of any such insurance contract.

This section shall not apply to life insurance contracts or annuities entered into prior to the section's effective date. This section shall not be construed to affect criteria for acceptance into membership of any fraternal benefit society.

292.    This exemption alone establishes Samaritan's case.

293.    As Samaritan neither is nor could be a fraternal, it is not exempt from this section.

294.    Forcing Samaritan's compliance with this section's prohibition on ***religion-based*** discrimination would severely harm or destroy Samaritan's ministry in at least three ways.

295.    **First**, it would prevent Samaritan from restricting its membership to likeminded Christians, destroying Samaritan as it currently defines itself. ¶¶402-488, 1073-1082.

296.    **Second**, it would prevent Samaritan's compliance with the ACA's requirement that HCSM "members [must] share a common set [of] religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in

---

[205] *Woodmen II*, 17 F.Supp. at 768.

which a member resides[.]"[206] ¶¶613-617, 1251-1262, 1700-1713.

297.    **Third**, and relatedly, it would prevent Samaritan's compliance with state mandate exemptions and state safe-harbor laws that mirror or model the ACA. ¶¶941-983.

298.    In short, the ACA and applicable state laws require that the members of each HCSM (a) "***share a common set of religious beliefs***," (b) "share medical expenses among members ***in accordance with those beliefs***," and (c) do so "***without regard to the State*** in which a member resides." This sharing of beliefs and expenses must occur without regard to any member's State of residence—i.e., uniformly—***in New Mexico the same as in New York***.

299.    The Insurance Code contains many hundreds of sections, many of which are problematic for Samaritan. But this one section is telling and alone could dispose of this case.

300.    This one section—compliance with which would severely harm if not destroy Samaritan—does ***not even apply to fraternals***, which, ironically—***unlike*** HCSMS such as Samaritan—***are*** providing actual ***insurance***. Fraternals are simply ***exempt***.

301.    This one section alone proves lack of general applicability.

<u>The Solution Here Is Simple: An Exemption for Samaritan</u>

302.    Since the Insurance Code provides such (and so many) exemptions to secular entities that pose the same risks to consumer protection as Samaritan, and that even offer actual health insurance (unlike Samaritan), strict scrutiny requires an exemption for Samaritan.

303.    Even the U.S. military recently had to bend to the weight of strict scrutiny.

304.    **The Marines**: "In meeting [strict scrutiny], the Marine Corps cannot rely on 'broadly formulated interests.' Instead, [it] must demonstrate the specific harm that *'would'—not*

---

[206] IRC §5000A(d)(2)(B)(ii)(II).

*could*—result from '*granting specific exemptions to particular religious claimants.*'[207] "*[T]hat is [strict scrutiny's] point*: Government *must, if able, afford religious exercise equal stature with other interests that it accommodates.*"[208] The Marine Corps failed strict scrutiny; so the court awarded injunctive relief (i.e., an exemption) to the three religious claimants.

305.    **The Navy**: "[The Navy has] not demonstrated 'paramount interests' that justify vaccinating these 35 [Seals in] violation of their religious beliefs. [The Navy insists] that 'given the small units and remote locations in which special-operations forces [operate, it] determined that unvaccinated [Seals] are at significantly higher risk of becoming severely ill from COVID-19 and are therefore medically unqualified to deploy.'"[209] The Navy failed strict scrutiny; so the court awarded injunctive relief (i.e., an exemption) to the religious claimants.

306.    **The Air Force**: "Once plaintiffs [show a burden on their religion, the] government [must] 'demonstrate'—in other words, satisfy the 'burdens' of production and 'persuasion'—that the challenged government action falls within [strict scrutiny's] narrow exception to its ban on burdening religion. This exception [is] what the Supreme Court has called the 'most demanding test known to constitutional law': strict scrutiny."[210] The Air Force failed strict scrutiny; so the court awarded injunctive relief (i.e., exemptions) to the religious claimants.

307.    If strict scrutiny requires the U.S. armed forces to exempt particular religious claimants in the face of national-security interests, then surely strict scrutiny must require OSI to exempt one (harmless) health care sharing ministry in the face of lesser state interests.

---

[207] *Singh v. Berger*, 56 F.4th 88, 97 (D.C. Cir. 2022) ("***Singh***") (exempting several Sikh recruits from the Marine Corps' grooming policies as applied to boot camp) (emphasis added).

[208] *Singh*, 56 F.4th at 100 (emphasis added).

[209] *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 351 (5th Cir. 2022), *partial stay granted*, 142 S.Ct. 1301 (2022) ("***Navy Seals***").

[210] *Doster v. Kendall*, 54 F.4th 398, 419 (6th Cir. 2022) ("***Doster***").

308.     Furthermore, the Insurance Code provides not only numerous secular exemptions but also "discretionary" exemptions,[211] which only strengthens Samaritan's case for exemption.

309.     The existence of OSI discretion in exemptions is not necessary for Samaritan's case, but it makes Samaritan's case unassailable. And OSI discretion is extensive.

310.     Almost everything OSI does is an exercise of discretion. Every C&D it issues, and every Consent Order it negotiates, are exercises of discretion. Every OSI assessment whether an entity is an insurer, or what the penalty shall be, is an exercise of discretion. OSI's complete turnaround in HCSM policy over four short months shows that OSI actions against HCSMs have been wholly discretionary. All this is well established by OSI's actions in the *Liberty* case.

311.     In short, OSI has discretion to choose whom to target and whom to ignore, whom to pursue and whom to exempt, whom to punish, by how much, and when.

312.     Moreover, exempting a fraternal and exempting Samaritan each undermine or implicate the state's consumer-protection goals in precisely the same way.

313.     An exemption for Samaritan is mandatory.

<u>The Urgency of Samaritan's Case</u>

314.     OSI's counsel declared it "must" go after these HCSMs and has "no other choice but to continue to force them to stop to protect the consumers." ¶¶238-241.

315.     Yet for 25 straight years prior to 2020 OSI allowed HCSMs to operate freely in New Mexico. Either OSI was flagrantly derelict in its duty that whole time or during that whole time OSI had concluded reasonably and in good faith that HCSMs were non-insurance.

316.     Sadly, OSI has passed the point of no return. It's all in now, obtaining a TRO to

---

[211] *E.g.*, NMSA 1978, §59A-15-16 (upon conditions "satisfactory to the superintendent").

compel Liberty to cease its operations in New Mexico *immediately*.[212]

317.    In its C&D against Liberty, OSI said the "functional elements of Liberty's health benefits are identical to those of a 'mainstream' health insurance plan." Ex. 41 at 3, ¶12. That conclusion defies reality everywhere, even (sometimes) New Mexico. ¶¶738-816.

318.    Whatever the merits of that conclusion, it definitely does not apply to Samaritan's ministry, as shown throughout this Complaint. Yet Samaritan awaits its OSI fate.

319.    Samaritan, whose reputation remains untarnished by a single member complaint filed at any time anywhere in its nearly three decades of nationwide ministry, is not required to wait until it is tarnished by a C&D, as happened to its peers, or subjected to biased agency process, as happened to Liberty, before it can protect its federal rights to minister to its members.

320.    "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[213]

321.    "This principle applies in pre-enforcement cases as well."[214]

322.    Here, OSI threatens "doubly protected" rights. "Where the Free Exercise Clause protects *religious exercises*, whether communicative or not, the Free Speech Clause provides overlapping protection for *expressive religious activities*."[215] Thus, "the First Amendment *doubly protects* religious speech[.]"[216] Where this "double" protection for Free Exercise and Speech applies, the government "must satisfy *at least* 'strict scrutiny.'"[217]

323.    Actually, OSI threatens rights not just doubly protected by the Constitution, *but*

---

[212] State Court TRO (Aug. 17, 2023) (Ex. 51) at 2.

[213] *Cuomo*, 141 S.Ct. at 67 (enjoining NY pandemic restrictions on churches and synagogues).

[214] *Bella*, 2023 WL 6996860, at *20 (citing cases); *Darren*, 2023 WL 7270874, at *17 (same).

[215] *Kennedy*, 142 S.Ct. at 2421 (emphasis added); *Reed*, 576 U.S. at 165 (Free Speech Clause).

[216] *Kennedy*, 142 S.Ct. at 2421 (emphasis added).

[217] *Kennedy*, 142 S.Ct. at 2426 (emphasis added).

*protected a dozen times over*, as demonstrated in the many Causes of Action below.

324.    Despite all these protections, OSI is ***coming for*** Samaritan, and "awaiting proceedings violating the Constitution is a 'risk [Samaritan] ought not to be required to take.'"[218]

<p style="text-align:center">The Many Harms to Samaritan</p>

325.    Samaritan is "***likely to suffer irreparable harm***" because OSI is "likely to shut down [its] membership program which would result in the loss of [its members] and employees, damages that could not be remedied by money damages. ***Besides, the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury***.'"[219]

326.    Irreparable harm has already begun as Samaritan must protect itself from OSI. In past weeks, Samaritan turned away twelve New Mexico memberships due to the OSI threat.

327.    Those potential members, while not Plaintiffs, are New Mexicans. They cannot now, and perhaps never may, join Samaritan. They are temporarily, and perhaps permanently, barred from joining their chosen ministry and exercising their religious associational rights.

328.    OSI's anti-HCSM campaign has harmed Samaritan's reputation and alarmed its New Mexico members, including individual Plaintiffs, who fear the restriction of their federal rights and the permanent loss of the ministry they consider as important as worship in church. See all six Declarations attached to this Complaint (Exhibits 24-29) and ¶¶402-488, below.

329.    OSI's "behavior has frustrated [Samaritan's] mission and caused it to divert resources in response to that frustration of purpose."[220] OSI's inevitable C&D against Samaritan will cause it to divert "a huge amount of staff time, energy, effort, and prayer that would

---

[218] *Air Evac*, 37 F.4th at 103. Samaritan's case mirrors *Air Evac*.

[219] *Air Evac*, 37 F.4th at 103 (emphasis added).

[220] *FCA En Banc*, 82 F.4th at 682.

normally have been devoted to … ministry."[221] Samaritan will have to divert "extensive time 'from working on ministry-advancing activities to instead address' the impact of [the C&D] on the [members]."[222] "Lost money and 'staff time spent responding' to a challenged government action are directly redressable[.]"[223] All these harms are real, significant, and will only escalate. Samaritan "credibly fears any number of consequences," "even simply an investigation"[224]

330.    OSI's threatened actions against Samaritan would violate its rights regardless of OSI's motives. But, to the extent of their relevance, OSI's motives are not pure.

331.    Animus is evident everywhere. OSI has gone out of its way to (a) target and shame an entire religious sector of health care sharing *ministries*, composed mainly of devout or conservative Christians who may hold unpopular religious views on life, marriage, gender, even the ACA and public health care, and (b) warn the public about the "religious or moral restrictions from [a] sharing ministry [concerning] an activity the ministry does not agree with." Ex. 31.[225]

332.    Regardless—animus or no animus—the law *compels a "specific exemption" for a "particular religious claimant'"*[226] named *Samaritan*.

333.    For *this* case, it matters not whether other HCSMs are entitled to exemption from the Insurance Code. Samaritan is, as the evidence discussed herein clearly shows.

334.    This specific exemption may be as simple as an unequivocal certified statement from OSI that Samaritan's ministry is *not* "insurance" subject to the Insurance Code.

335.    Or else, it will need to come in the form of injunctive relief from this Court.

---

[221] *FCA En Banc*, 82 F.4th at 683 (citation & internal punctuation omitted).

[222] *FCA En Banc*, 82 F.4th at 683.

[223] *FCA En Banc*, 82 F.4th at 683.

[224] *Darren*, 2023 WL 7270874, *11 (citing *SBA List v. Driehaus*, 573 U.S. 149, 165-66 (2014)).

[225] *See Littlefield*, 2023 WL 6962087, at *7 (retaliation for expressive religious activities).

[226] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

## The Damages Sought

336.     A specific exemption or disavowal alone might not satisfy Plaintiffs' need for injunctive and declaratory relief unless such exemption or disavowal includes a correction of OSI's rogue HCSMs-are-insurance policy that might sustain consumer legal action.

337.     And any such exemption or disavowal, however crafted, would not satisfy Plaintiffs' claims for damages for ongoing and past injury. In cases like this, "both compensatory and punitive damages are available upon proper proof."[227]

338.     "Compensatory damages [are] mandatory; once liability is found, the jury is required to award … damages in an amount appropriate to compensate [plaintiffs]."[228]

339.     Even if no actual damages are proven, and even if all personal-capacity claims are dismissed, "nominal damages" are still available here.[229]

340.     Punitive damages, are "permitted … when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[230] For Defendant Kane "to be eligible for punitive damages, it [is] not necessary that [she] engage in any intentional misconduct beyond that required for [her] to be liable for compensatory damages."[231] In both cases, qualified immunity is *not* available for violating "clearly established" constitutional rights.[232]

341.     "Regardless of the interests that the State may have, those interests cannot

---

[227] *Thurairajah v. City of Fort Smith*, 3 F.4th 1017, 1026 (8th Cir. 2021) ("*Thurairajah*") (citing *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("*Smith v. Wade*")).

[228] *Thurairajah*, 3 F.4th at 1026 (citing *Smith v. Wade*, 461 U.S. at 52).

[229] *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 799-802 (2021) ("*Uzuegbunam*").

[230] *Eisenhour v. County*, 897 F.3d 1272, 1280 (10th Cir. 2018) ("*Eisenhour*") (quoting *Smith v. Wade*, 461 U.S. at 56); *see Kolstad v. Am. Dental Assn*, 527 U.S. 526, 536 (1999) ("*Kolstad*").

[231] *Eisenhour*, 897 F.3d at 1281 (10th Cir.).

[232] *Littlefield*, 2023 WL 6962087, at *10-11 (denying qualified immunity).

override the Plaintiffs' interest in protecting their First Amendment rights."[233] OSI "has not, and likely cannot, provide an interest sufficiently compelling to justify an infringement on Plaintiff's Free Exercise rights. [A C&D] therefore likely would not survive strict scrutiny, and Plaintiff is likely to succeed on its religion-based First Amendment claims."[234]

342.     And Free Exercise is just one of Samaritan's many claims here, each one sufficient independently to defeat any OSI defense and require an exemption for Samaritan.

343.     New Mexico has cast aside the universal definition of insurance in its haste to expel a *religious* sector that the State openly disdains for that sector's socially and economically conservative religious views and that the State sees as competition to its own marketplace.

344.     To the extent OSI might rely on a 2019 statute on "health benefit plans" to excuse its actions here, any such attempt would be futile. Whether or not the state legislature is or might be complicit in the State's anti-HCSM campaign, the law makes the ***enforcers*** liable.

345.     This rule that holds the state's enforcers responsible applies to all actions, like this one, brought under 42 U.S.C. §1983, including attorney-fee liability under §1988.

346.     "[G]overnment officials are not bound to follow state law when that law is itself unconstitutional. Quite the contrary: in such a case, they are bound ***not*** to follow state law…. If … the law they are enforcing turns out to be invalid, §1988 puts the financial burden on the state officials. The judgment of Congress is that the burden rests more properly on them than on the party who has been wronged by the application of an invalid law."[235]

347.     There is no doubt that Defendant is the proper party to hold responsible here.

348.     Liability issues aside, Defendant should have behaved better.

---

[233] *Bella*, 2023 WL 6996860, *20 (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)).

[234] *Darren*, 2023 WL 7270874, at *16 (relying on *Fulton*, 141 S.Ct. 1878-82).

[235] *Carhart v. Stenberg*, 192 F.3d 1142, 1152 (8th Cir. 1999), ***aff'd***, 530 U.S. 914 (2000).

349.    "Given the conflict between the Free Exercise Clause and the application of [state law] here, [OSI] should have disregarded [state law] and decided this case conformably to the Constitution[.] That *supreme* law of the land condemns discrimination against religious [HCSMs] and the families [that depend on] them. They are members of the community too, and their exclusion from [New Mexico] is odious to our Constitution and cannot stand."[236]

350.    Enough has been said above to support Samaritan's case. But the need to justify all the relief it seeks warrants presentation of a full picture. A full picture is provided below.

## <u>EXHIBITS</u>

As verified at the end of this Complaint, Plaintiffs certify that each Exhibit below is a true and accurate copy of what it purports to be.[237] "SMI" is Samaritan Ministries International.

1. SMI Bylaws (current, as amended and redacted) ("**Bylaws**").

2. SMI Sharing Guidelines/Sep. 2023 ("**Sharing Guidelines**" or "**Guidelines**").[238]

3. SMI Sample Monthly Newsletter ("**Nov. 2022 Newsletter**").

4. SMI Membership Application ("**Membership Application**").

5. SMI Annual Membership Continuation Form ("**Membership Cont. Form**").

6. SMI Church Leader Verification Form ("**Church Leader Verification Form**").[239]

7. SMI Annual Church Leader Verification ("**Annual Church Leader Verif.**").

8. SMI Member Statement of Faith ("**Member Statement of Faith**").[240]

---

[236] *Espinoza*, 140 S.Ct. at 2262–63 (citations & punctuation omitted; cleaned up). Here, the U.S. Supreme Court was admonishing the state supreme court. But the rule applies to all enforcers.

[237] Exhibits are numbered in their logical/chronological order, not in their order of appearance herein, and are titled for ease of use. Some show redactions to protect private information.

[238] Also at https://samaritanministries.org/guidelinespdf.

[239] This Church Leader Verification Form is Section 5 of the Membership Application.

[240] This Member Statement of Faith is Section I.A of the Sharing Guidelines.

9. SMI Staff Statement of Faith ("**Staff Statement of Faith**").

10. SMI Employee Handbook, §2.07 ("**Employee Handbook, §2.07**").

11. SMI Expanded Core Values ("**Expanded Core Values**").[241]

12. SMI Sample Monthly Share Slip ("**Sample Share Slip (May 2021)**").

13. SMI Sample Monthly Prayer Guide ("**Sample Prayer Guide (Oct. 2022)**").

14. SMI Example of Actual Member Sharing ("**Member Sharing Example**").

15. SMI Sample Handwritten Letters to SMI ("**Sample Member Letters**.").

16. SMI Sample Cards & Notes to SMI ("**Sample Cards & Notes**").

17. SMI Articles of Incorp. & Amdmt. ("**SMI Articles (Sep. 11, 1991)**").

18. SMI IRS Ruling: IRC 501(c)(3) Tax Status ("**IRS Det. Ltr. (June 17, 2005)**").[242]

19. SMI CMS Ruling: IRC 5000A HCSM Status ("**CMS Det. Ltr. (Feb. 26, 2014)**").[243]

20. List of 107 ACA-Compliant/5000A HCSMs ("**ACA-Certified HCSM List**").[244]

21. SMI Story as Explained in *Sharing the Burden* (book) ("**SMI Story**").

22. SMI Model as Explained in *Missional Medicine* (book) ("**Missional Medicine**").

23. SMI Impact Report 2023 ("**SMI Impact Report (Oct. 19, 2023)**").

24. SMI/Organizational Plaintiff's Decl. by COO Will Cooper ("**Cooper Decl.**").

25. Individual Plaintiffs Zachary & Rachel Cordel Declaration ("**Cordel Decl.**").

26. Individual Plaintiffs David Allan & Monette Bell Declaration ("**Bell Decl.**").

27. Individual Plaintiffs Rev. Andrew & Heather Heath Declaration ("**Heath Decl**.").

---

[241] These Core Values, approved in Feb. 2022, expanded on Core Values in the Bylaws.

[242] The Internal Revenue Service ("IRS") is part of the U.S. Department of the Treasury.

[243] The Centers for Medicare & Medicaid ("**CMS**") is part of the U.S. Department of Health & Human Services. The **IRS** and **CMS** both acted under the Internal Revenue Code ("**IRC**").

[244] This is the complete list of all 107 Health Care Sharing Ministries recognized as compliant with the ACA's HCSM safe harbor codified at 26 U.S.C. §5000A(d)(2)(B). *As shown on the list*, one of the **108** applications was withdrawn, resulting in **107** verified HCSMs.

28. Individual Plaintiffs Jay & Amy O'Neill Declaration ("**O'Neill Decl.**").

29. Individual Plaintiffs Rev. Nathan & Rebekah Bienhoff Decl. ("**Bienhoff Decl.**").

30. OSI Press Release re Aliera/Trinity ("**OSI PR re Aliera-Trinity (Dec. 3, 2019)**").

31. OSI Press Release re HCSMs ("**OSI HCSM Advisory (Mar. 26, 2020)**").

32. OSI v. Trinity/Aliera C&D ("**OSI Trinity-Aliera C&D (Mar. 26, 2020)**").

33. AG Letter against HCSMs ("**AG Letter (Aug. 10, 2020)**").[245]

34. AG Letter against HCSMs Press Release ("**AG Press Release (Aug. 11, 2020)**").

35. OSI v. Trinity/Aliera Decision ("**OSI Trinity-Aliera Decision (Nov. 17, 2020)**").

36. OSI v. Trinity/Aliera Final Order ("**OSI Trinity-Aliera Final (Nov. 19, 2020)**").

37. OSI PPT for Webinars warning vs. HCSMs ("**OSI PPT (2021-2023)**").

38. OSI v. OneShare C&D ("**OSI OneShare C&D (Jan. 13, 2021)**").

39. OSI v. OneShare Consent Order ("**OSI OneShare C.O. (Mar. 17, 2021)**").

40. OSI Advisory re Scams/HCSMs ("**OSI Advisory re Scams (March 2021)**").

41. OSI v. Liberty C&D ("**OSI Liberty C&D (Nov. 23, 2021)**").

42. OSI Annual Report for 2015 ("**OSI Annual Report 2015**").

43. OSI Annual Report for 2018 ("**OSI Annual Report 2018**").

44. OSI Annual Report for 2019 ("**OSI Annual Report 2019**").

45. OSI Annual Report for 2020 ("**OSI Annual Report 2020**").

46. OSI Annual Report for 2021 ("**OSI Annual Report 2021**").

47. OSI Annual Report for 2022 ("**OSI Annual Report 2022**").

48. OSI Toal Email w Fmr. Okla. Comr. Kerr ("**OSI Email (Dec. 5, 2022)**").

---

[245] Also available at: https://oag.ca.gov/system/files/attachments/press-docs/8-10-20%20Multi-State%20Comment%20Letter%20on%20Healthcare%20Cost%20Sharing%20Ministries.pdf   or https://portal.ct.gov/-/media/AG/HSM-Comment-Letter.pdf (both accessed 12/5/2023).

49. OSI v. Liberty Decision ("**OSI Liberty Decision (Jan. 20, 2023)**").

50. OSI v. Liberty Final Order ("**OSI Liberty Final Order (Feb. 22, 2021)**").

51. OSI v. Liberty, State Court TRO vs. Liberty ("**TRO vs Liberty (Aug. 17, 2023)**").

52. OSI at 3/2/23 NAIC Subgroup Mtg. ("**NAIC Minutes (Mar. 23, 2023)**").[246]

53. OSI at 3/2/23 NAIC Subgroup Mtg. ("**NAIC Minutes (Apr. 17, 2023)**").[247]

54. OSI *Encore* Webinar Invite ("**OSI Webinar Invite (Apr. 6, 2023)**").

55. OSI *Encore* Webinar Presentation ("**OSI Webinar (Apr. 6, 2023)**").[248]

56. OSI Web Page re HCSMs (**last accessed Sept. 24, 2023**).

57. Transcript: Liberty Hearing in this Court ("**Liberty Hrg. Tr. (June 2, 2023)**").

58. Transcript: Liberty Hearing in State Court ("**Liberty Hrg. Tr. (Aug. 8, 2023)**").

59. Judgment, United States v. Moses ("**Judgment vs. Aliera Founder**").

60. Docket Sheet, United States v. Moses ("**Docket Sheet vs. Aliera Founder**").

61. Aliera v. AHS, Ordering Injunction/Receiver ("**Aliera (Ga. Apr. 25, 2019)**").

62. Aliera v. AHS, Ordering Aliera to Segregate Funds ("**Aliera (Ga. Aug. 19, 2020)**").

63. SMI v. Maryland, Dismissal Due to Settlement ("**SMI (D.Md. Feb. 21, 2023)**").

64. IRS Letter to Rep. Joe Donnelly ("**IRS Ltr. to Rep. Donnelly (June 22, 2016)**").

65. Indiana Insurance Commissioner re HCSMs ("**Ind. Com'r (May 7, 2009)**").

66. Georgia Insurance Commissioner re HCSMs ("**Ga. Com'r (Mar. 4, 2011)**").

67. Oklahoma Insurance Commissioner re HCSMs ("**Okla. Com'r (Aug. 16, 2011)**").

68. NBCSL Resolution for HCSMs ("**NBCSL (Dec. 12, 2008)**").

---

[246] Also at https://content.naic.org/sites/default/files/national_meeting/Bcmte_MinutesPacket.pdf (accessed 12/5/2023). This same 3/2/23 subgroup meeting is addressed in separate Minutes.

[247] https://content.naic.org/sites/default/files/call_materials/ci-minutes-4.17.pdf (acc. 12/5/2023).

[248]   https://a.storyblok.com/f/132761/x/3ee5ee595a/staying-covered-after-covid_-health-insurance-options-post-public-health-emergency-unwinding-20230406_113857-meeting-recording.mp4.

## PARTIES[249]

### Organizational Plaintiff Samaritan (Health Care Sharing Ministry)

351.    Samaritan is a Christian ministry that seeks out, disciples, and serves a distinct religious body whose members share directly in one another's spiritual, emotional, and financial needs (arising from illness and injury) via monthly solicitations and communications among Samaritan and its member households. It is one of the three largest HCSMs. The ministry is governed largely by its members through their control of its governing Board under the Bylaws (Ex. 1), which includes their consent to its Sharing Guidelines (Ex. 2) and Statement of Faith (Ex. 8), and through their virtual assembly and sharing facilitation via the monthly publication of its *Christian Health Care Newsletter*, e.g., November 2022 Newsletter (Ex. 3).[250]

352.    Samaritan is a Biblically Christian ministry, as defined in its Bylaws (Ex. 1):

### ARTICLE II

#### PURPOSE, AND MISSION STATEMENTS WITH CORE VALUES

"And Jesus came and said to them, All authority in heaven and on earth has been given to me. Go therefore and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, teaching them to observe all that I have commanded you. And behold, I am with you always, to the end of the age." Matthew 28:18-20 (ESV)

### Purpose Statement *(Why we exist)*

Our Purpose is to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves.

Matthew 28:18-20
Mark 12:28-30
Matthew 22:36-40

### Mission Statement *(What we do)*

---

[249] Color-coordinated headings occur hereafter for ease of reference and reader's convenience.

[250] Also available at https://samaritanministries.org/uploads/newsletters/202211.pdf.

Our Mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community.

Galatians 6:2, Philippians 2:3-4, Romans 12:10,12,13,15, John 13.:34, 35

## SMI Core Values

These six shared values define who we are and what it means to be on the Samaritan Team. This is our behavioral blueprint, our script on how we think, act, and make decisions. The strength of our culture and the accomplishment of our Mission depend on us integrating and embedding these values into everything we do: the way we hire, train and develop, evaluate performance, approach tasks and projects, relate to one another, and serve members.

Our Core Values are the anchors for *all* the work that we do. If we're to fulfill our Purpose and execute our Mission of redeeming health care, we will have all been aligned, acting the same way, with the values directing our paths. It is our hope and expectation that as we hold to and live out these Core Values, God will increasingly use Samaritan Ministries, both staff and members, to bring His Kingdom realities to this earth!

1. Jesus-Centric Life
2. Joy-Filled Community
3. Christ-Compassionate Service
4. Strategy-Focused Collaboration
5. Kingdom-Minded Stewardship
6. Ever-Growing Excellence

353.     A few additional core principles of Samaritan merit attention here. **First**, all Samaritan members are members of the "Body of Christ."[251] **Second**, all Samaritan members are called to put others ahead of themselves and to consider others to be more important than themselves. **Third**, the burdens of this earthly life can be lifted by many loving hands that are folded in prayer. **Fourth**, the reward for faithfulness and obedience is for all eternity.[252]

354.     Every core principle of Samaritan discussed above and below applies to all persons who associate and collaborate together in its sharing ministry, for four reasons.

---

[251] The Bible refers to the body of all Christians as *the Body* of Christ or *the Church* of Christ. *See, e.g.*, *I Corinthians* 12:27; *Ephesians* 4:12 (NLT). As part of its role in that Body, Samaritan serves as a parachurch organization doing what most churches are unable to do for themselves.

[252] For additional background, see Expanded Core Values (Ex. 11).

355.   **First**, all Directors, all Officers, and all full-time staff must be and remain "members" in good standing of the sharing ministry. *See* Bylaws (Ex. 1), Art. VI at §3(A) (all Directors); Employee Handbook (Ex. 10) at §2.07 (all full-time staff). The Handbook states:

> **2.07 STAFF MEMBERSHIP REQUIREMENT**
> **NOTE: As adopted by the Board of Directors:**
> It is crucial to develop a sense of community among our members and is also crucial that the ministry provided by the staff of SMI be effective by being connected to that member community. Therefore, it is required that all full time Samaritan staff members be a participant in one of Samaritan's sharing programs.

Recently, in addition to adding stricter requirements for full-time staff, Samaritan added new sharing-membership requirements for part-time staff working more than 15 hours a week.

356.   **Second**, it is the whole body of Samaritan's membership—composed of its regular members, its full-time staff, and its leaders—that controls the ministry by controlling its Board of Directors. *See* Bylaws, Art. VI at §2 (electing six of the nine Directors).

357.   **Third**, this same body of members controls the "Mission" of directly sharing each other's burdens—which *is* the ministry and its reason to exist—as discussed above and below.

358.   **Fourth**, if a member has a disagreement with Samaritan staff as to whether a medical bill qualifies for sharing under the Sharing Guidelines, the matter is resolved by the binding decision of a randomly selected member panel. *See* Guidelines (Ex. 2) at §XII(A).

359.   Thus, it is impossible to separate Samaritan's health care sharing ministry from Samaritan's membership—which embodies, controls, and conducts the ministry. This includes Samaritan's 918 New Mexico members, represented by the ten individual Plaintiffs.

360.   Samaritan's particular Christian doctrine is fundamental to its ministry. It devotes seven pages (one-third) of its 21-page Bylaws to its ***Doctrinal Positions***. *See* Bylaws (Ex. 1), Art. III. These Positions begin with the ministry's foundational belief:

**ARTICLE III**

## DOCTRINAL POSITIONS

**Section 1. Doctrinal statement.**

We believe the Bible alone is the inspired Word of God; therefore, it is the final and only source of absolute spiritual authority. *(Matthew 5:17-18; Luke 24:44-49; 2 Timothy 3:16-17, 2 Peter 1:19-21)*

361.    For Samaritan, the Bible "is the supreme authority, not only in all matters of faith and conduct, but in everything it teaches." Bylaws, Art. III at §2(B). It governs all of life.

362.    These seven pages of specific Doctrinal Positions in Samaritan's Bylaws cover many areas of thought and life, including, for example, "Authority of Scripture (*id*. at §2); Creationism (*id*. at §2(C)); "Marriage and Sexuality" (*id*. at §3(A)); "Minimum Standards" (concerning sexuality) (*id*. at §3(C)); and the "Biblical Created Order of Men and Women" (*id*. at §4), including "The Danvers Statement" (sexuality, gender, and roles) (*id*. at §3(A)).[253]

363.    Since Samaritan exists to serve a particular kind of membership, it strictly limits its membership. Samaritan enshrines five key member qualifications in its Bylaws:

## ARTICLE IV

### MEMBERS

**Section 1. Qualifications.** Membership shall be open to persons of both sexes in accordance with the rules and regulations set forth by the Board of Directors. A member must:

   (a) Be a Christian living by biblical principles
   (b) Attend church 3 out of 4 weeks per month
   (c) Totally abstain from illegal substances, and sexual activity outside of traditional biblical marriage, one man, one woman

---

[253] Members are not required to explicitly affirm certain documents that Directors and staff are required to affirm, e.g., the Bylaws (Ex. 1) and the "Staff Statement of Faith" (Ex. 9). But all religious principles stated therein are the organizing principles of the ministry that all members explicitly embrace and directly control, as stated above and explained further below.

(d) Either abstain from alcohol or limit consumption of alcohol to moderate amounts so as to never drink to drunkenness, and

(e) Abstain from tobacco use (a rare celebratory cigar or pipe, e.g. at the birth of a baby, is an allowed exception)

364.    Members ***must*** meet these qualifications at Bylaws (Ex. 1), Art. IV at §1. The first three qualifications are highlighted due to their role in this case: (a) "Be a Christian living by biblical principles"; (b) "Attend church [at least] 3 out of 4 weeks per month"; and (c) "Totally abstain from … sexual activity outside of traditional marriage, one man, one woman." *Id.*

365.    These qualifications are "requirements" for membership. "I agree to abide by the membership requirements listed in Sections I and II of the Guidelines." Membership Application (Ex. 4) at §3. "To become a member, you must meet all the requirements of this section and submit an application, including a church leader verification." Guidelines (Ex. 2) at §1.

366.    The *first qualification* of Samaritan membership—"Be a Christian living by biblical principles"—is also its *first requirement*: "Be a professing Christian living by Biblical principles [and] affirm [the] Statement of Faith." Guidelines (Ex. 2) at §I(A). This requirement is expounded in the Member Statement of Faith, which all members affirm. "I have read and do affirm the member Statement of Faith." Membership Application (Ex. 4) at §3.2; Member Statement of Faith (Ex. 8). The entire membership, including all Directors, Officers, and staff, must reaffirm all such requirements annually. *See* Membership Continuation Form (Ex. 5).

367.    As in any *voluntary association*,[254] Samaritan's members can lose membership or privileges by failing to fulfill membership requirements. Members must "continue to meet [membership] requirements and fulfill all membership responsibilities." Guidelines (Ex. 2) at §1. "SMI retains the discretion to remove from membership any member whose behavior violates

---

[254] Examples are "trade associations, trade unions, learned societies, professional associations, and environmental groups." https://en.wikipedia.org/wiki/Voluntary_association. "All such [groups] reflect freedom of association [as] members may choose whether to join or leave[.]" *Id.*

Biblical standards such that they may bring the ministry into disrepute." *Id*. "I understand that I must send to all assigned needs and be current in sharing with members and the office, to be eligible to have my own needs shared." Membership Application at §3.

368.    But no Samaritan member is abandoned due to financial struggles, as the membership provisions in Article IV of the Bylaws (Ex. 1) make clear:

**Section 6. Those in Need.** All membership fees and other financial requirements of members or applicants may be waived in full or part, based upon the individuals' inability to pay.

No one shall be denied membership participation in any need sharing ministry, whether it be spiritual, emotional, or financial, who lacks the financial means, through personal resources or biblically mandated assistance, to pay their shares or any administrative fees within the resources so provided by the Board of Directors.

369.    Members support struggling members via (a) extra contributions for medically needy members and (b) "sponsorship" for financially struggling members to help them maintain their memberships so long as they try in good faith to "carry their own load" (*Galatians* 6:5).

**Organizational Plaintiff Samaritan (Declaration by COO Will Cooper)**

370.    Samaritan COO Willie (Will) Cooper has attested to the following on behalf of Samaritan in his Declaration filed together with this Complaint. *See* Cooper Decl. (Ex. 24).[255]

371.    I have resided in Maryland for about 26 years.

372.    I have been married to Roberta Cooper for 27 years. We have two grown children.

373.    I have been employed by Samaritan Ministries International ("Samaritan") for over three years, first as its Chief Information Officer and now as its Chief Operations Officer ("Chief Operating Officer" or "COO").

374.    Prior to joining Samaritan's staff in March of 2020, I held various management positions with corporations such as Amdocs, Unisys, and Verizon, and also served as a pastor.

---

[255] This Declaration and the following five Declarations are all set forth verbatim herein.

375.    More information about my background, experience, and faith can be found at https://samaritanministries.org/blog/whats-it-like-to-be-a-black-executive-in-america-a-q-a-with-samaritans-cio-will-cooper.

376.    As required of all full-time staff of Samaritan, and documented in its Handbook, I am a member of Samaritan's sharing ministry, and thus subject to all ordinary membership requirements. I am also subject to additional requirements for staff and still more for officers.

377.    I have been a member of Samaritan since 2020. I share the ministry's Christian faith and its belief in the power of this Christian ministry to improve lives here and now and to support the Gospel of Jesus Christ in saving souls for all of eternity.

378.    This ministry called "Samaritan" embodies the Parable of the Good Samaritan given by Jesus Christ (*Luke* 10:29-37). This ministry facilitates and fulfills the Great Commission of Christ to all his followers to "go and make disciples and teach[] them to obey everything I have commanded you" (*Matthew* 28:16-20, NIV). This ministry also facilitates and fulfills Christ's "greatest commandment" to love God supremely and love your neighbor as yourself (*Mark* 12:28-34). In short, this ministry "fulfills of the law of Christ," as *Galatians 6:2* explicitly teaches: "Carry each other's burdens, and in this way you will fulfill the law of Christ."

379.    Samaritan and our members believe the Bible as Holy Scripture—the authoritative Word of God—directed to all of Christ's followers (Christians), who associate together worldwide as the "Body" or "Church" of Jesus Christ. As Scripture teaches, Christians are to assemble and associate together to fulfill Scripture, by discipling each other, encouraging each other, ministering to each other, praying with and for each other, and bearing and sharing each other's burdens.

380.   An essential part of Samaritan's Christian ministry is associating together as likeminded believers to fulfill Scripture. For example, *Matthew* 18:19-20 teaches: "Again, truly I tell you that if two of you on earth agree about anything they ask for, it will be done for them by my Father in heaven. For where two or three gather in my name, there am I with them." Samaritan and its members believe in the potent power of prayer when Christians pray together.

381.   This associational aspect of Christianity in general, and of Samaritan in particular, has been core to Christianity since the earliest Christian church founded by Christ's disciples. We Samaritan members carry out associational relationships in many ways, from sending notes and cards of prayer and encouragement to each other to amassing and praying for our needs on prayer lists to sharing our needs, beliefs, doctrines through our monthly newsletter to service on Samaritan's staff (like me) and service on our Board of Directors (controlled by members).

382.   For Samaritan and its members, this ministry is about supporting each other spiritually, emotionally, and financially in time of need. This ministry also is about the power of prayer to comfort and encourage. But is about more than that. It is about the power of prayer to heal, supernaturally, according to Scripture. There is no healing force on earth more powerful.

383.   My first impression of Samaritan, when I was being recruited to Samaritan, was that it was a church that was recruiting me partly because of my experience as a pastor.

384.   I continue to view Samaritan as Christian ministry akin to a church, but more like a parachurch ministry that supports local churches (as part of the larger "Church" of Jesus Christ), helping churches do vital Christian ministry that they cannot do themselves. I talk about this aspect of Samaritan's health care sharing ministry in an interview that is available on the Samaritan web site at https://samaritanministries.org/blog/mission-and-purpose-q-a.

385.   I love the ministry of Samaritan and I am deeply troubled by the actions of

Superintendent Kane and [OSI] toward Samaritan in New Mexico, and by the harms those actions are causing to Samaritan, to our membership, to our staff, and to me and my family as Samaritan members.

386.     The actions of Superintendent Kane and [OSI] will inevitably (if not happening already) generate needless questions and groundless doubts from our staff, our members, and the broader public that could harm our staff and member morale and seriously harm our ministry's credibility and efficacy in New Mexico, and nationwide.

387.     The actions of Superintendent Kane and OSI have been a significant source of expense, worry, and distraction to Samaritan and its leaders, including me as Chief Operating Officer, and pose much greater risks into the future, including possible criminal liability and even closure of our ministry in New Mexico.

388.     Superintendent Kane and OSI recently issued a C&D against one of our peer ministries known as Liberty Healthshare, fining them over $2 million dollars and ordering them to cease operating in New Mexico unless and until they have fully complied with the New Mexico Insurance Code.

389.     The actions by Superintendent Kane and OSI against Liberty have caused a great deal of litigation in the state and federal courts of New Mexico, and tremendous harm and cost to Liberty and to all HCSMs, including Samaritan.

390.     Superintendent Kane and OSI have already forced out of New Mexico at least four health care sharing ministries. Their actions against those four HCSMs and against Liberty demonstrate a real and likely imminent threat to Samaritan.

391.     All these actions by Superintendent Kane and OSI have been and continue to be a tremendous burden on our Samaritan ministry, on our religious exercise, and on the religious

exercise, expression, and association of our members in New Mexico.

392.   The seemingly inevitable C&D by Superintendent Kane and OSI, and any hearing or trial by [OSI] (presided over by Defendant Kane), will do great harm to our ministry by publicly questioning its legality and legitimacy and casting a cloud over its future availability, in New Mexico and, inevitably, elsewhere.

393.   Any such C&D and OSI trial will force this ministry to incur the substantial burden and expense of preparing for and taking part in that trial, to endure an adversarial process from the State prosecuting this ministry, and to suffer a lasting stain on the reputation of this ministry.

394.   If such actions by Superintendent Kane and OSI are allowed to proceed, they almost certainly will close the ministry for all New Mexico members.

395.   Such closure also would deprive any (future) staff in New Mexico from their ability to comply with the requirements of their job. For example, if I were a resident of New Mexico, the closure of Samaritan in New Mexico not only would deprive me and my family of this much-desired Christian ministry but also would deprive me of the ability to comply with my own job requirements, including maintaining active membership in Samaritan's ministry. This is a real harm to any current or future Samaritan employees who reside in New Mexico.

396.   By depriving any Samaritan employee from New Mexico of their membership in Samaritan, the Superintendent Kane and OSI literally will force them not only to violate the requirements governing their own employment but also to serve as a bad example for the ministry and staff they manage, undermining their own example and authority.

397.   The actions of Superintendent Kane and OSI also will cause related harms to Samaritan of permanent loss of members in New Mexico and elsewhere, of loss of contributions

that support the ministry and its staff and serve member needs, and of a likely domino effect of actions by insurance commissioners in other states and perhaps private lawsuits against Samaritan.

398.    In addition to the harms stated or implied above, the actions of Superintendent Kane and OSI may result in layoffs of valued, well-trained Samaritan staff and the loss of Samaritan members and reputation that may be impossible to regain.

399.    All the above harms are significant to Samaritan and its members, especially those in New Mexico, such as the ten individual Plaintiffs in this lawsuit. These harms can and will be quantified for this lawsuit. But the greatest harm is to the Gospel of Jesus Christ, which is the mission of Samaritan and all its members. That harm cannot be quantified. Indeed, it is infinite.

400.    All the above harms substantially burden the ministry and religious exercise of Samaritan and all its members, but especially to those in New Mexico, such as the ten individual Plaintiffs, and infringe their constitutional rights.

401.    This infringement of constitutional rights is a significant harm, and deeply offensive, to all the Plaintiffs in this lawsuit and all the members of Samaritan. It cannot easily be quantified, but it certainly is irreparable.

## Individual Plaintiffs Zachary & Rachel Cordel

402.    Individual Plaintiffs Zachary and Rachel Cordel have attested to the following in their Declaration filed together with this Complaint. *See* Cordel Decl. (Ex. 25).

403.    We are residents of the State of New Mexico. Rachel has been a resident since 1991 and Zachary since 2009. We live at 662 CR F, Clovis, New Mexico 88101.

404.    Clovis is a mid-sized city of about 40,000 residents, where most residents work in

the areas of agriculture, railroad, or military.

405.    We have been married to each other for more than ten years and together are the parents of three children named Elliot (age 10), Brose (age 8), and Thea (age 4).

406.    In addition to raising our children, we both work in agriculture. Zachary operates a dairy farm and Rachel gardens and sells produce for a farmer's market, which has 12 vendors and sells fresh produce and baked goods. These occupations also enable us to provide daily chores and vocational training for our children and bonding time for our family.

407.    Rachel also serves as a Board Member of a local Christian school, where our two eldest children attend.

408.    We are members of Central Baptist Church in Clovis.

409.    We have been members of Samaritan Ministries International for over ten years. We share the same Christian faith with Samaritan and firmly believe in its model of sharing health burdens with fellow believers in a likeminded Christian community. Samaritan is sometimes called a "health care sharing ministry." There is a good reason why Samaritan is called a "ministry." Unlike any insurance, Samaritan requires its members to rely on their faith in God and their fellow members to contribute to needs as they arise, since Samaritan never guarantees any reimbursement. Samaritan also is unlike any insurance in how Samaritan involves giving as much as receiving.

410.    <u>Giving side</u>. During the past ten-plus years with Samaritan, we have loved the giving to fellow members in need. Each month we send checks (or more recently make electronic payments) to specific individuals who are believers and members of this Christian community, to share in their healthcare burdens. We always include notes of encouragement and our prayers. We feel our participation is a direct line into their lives, to support them materially

and spiritually, just as much as if they were members of our church or discipleship group or Bible study.

411.   <u>Receiving side</u>. For our own serious healthcare burdens, we have received the personal checks (or more recently, electronic payments) from our Christian brothers and sisters in this ministry. Their physical and electronic notes of encouragement and prayers have touched us deeply. The following two personal experiences explain how this sharing ministry works.

412.   For the birth of our first child, we had decided for personal and religious reasons on a home birth with the assistance of a midwife. Samaritan provided [through its members] for such births, including sharing the cost of midwife, [whereas] insurance did not. Our fellow Samaritan members reimbursed the cost of that home birth. They also sent us notes of spiritual encouragement and prayers for our spiritual and physical well-being. Some members even sent us baby gifts and gift cards for such use. This whole experience was very meaningful to us. It was a Christian community bearing and sharing one another's burdens very much like a Christian church.

413.   Years later, while we were visiting Zachary's parents in Kansas, our son Elliot had a frightening episode of labored breathing, unable to get enough air to breathe, resulting in a visit to the local emergency room. His condition was diagnosed, and it has required ongoing treatment. Our fellow members of Samaritan were there for us and have continued to share this burden with us. They share it in every meaningful way, going well beyond money. And we, of course, reciprocate.

414.   This mutual bearing and sharing of burdens fulfills a central command of Scripture. "Carry each other's burdens, and in this way you will fulfill the law of Christ." (*Galatians* 6:2, NIV). Obeying this command is deeply spiritual and restorative, and has benefits

in this world as well as the next. "[P]ray for each other so that you may be healed. The prayer of a righteous person is powerful and effective." (*James* 5:16, NIV) These truths are reinforced throughout the Bible.

415.    As devout Christians, we believe in the power of prayer. Praying for and receiving prayer from others facilitates healing through encouragement. But it does much more. The God in whom we trust, and to whom we pray, hears those prayers and acts on them. There is a saying that prayer is the nerve that moves the muscle of God. The healing power of prayer is unlimited. This was never more important in our lifetimes than during the recent years of pandemic.

416.    There is additional power in communal prayer and Christian fellowship. Jesus said, "where two or three gather in my name, there am I with them." (*Matthew* 18:20, NIV) The community of believers is a theme throughout Scripture. "And let us not neglect our meeting together, as some people do, but encourage one another, especially now that the day of [Christ's] return is drawing near." (*Hebrews* 10:25, NLT). This communal activity is vital to Christians.

417.    Samaritan for us is about the Biblical duty and blessing of mutual burden-sharing, about blessing and being blessed, with the giving as important as the receiving. We and all our fellow Samaritan members are a Christian family, bearing and sharing the burdens of one another, taking care of each other, and encouraging each other in the faith. These activities are deeply spiritual and have profound impacts in this life and for all eternity.

418.    Because we take seriously our mutual obligations to our fellow members in the Samaritan ministry, we avoid needlessly burdening them with cost. Thus, we did not submit for sharing the costs of home birth with our second and third child. We could have submitted those costs for sharing, just as we did with our first child, but we did not want add burdens for our

82

fellow believers to bear when we felt God had provided us with the necessary resources. We share this as an example of the deep spiritual commitment of Samaritan members to each other.

419.    Samaritan is not insurance or anything like it. For us, it is not some kind of insurance substitute. We do not want insurance. Insurance companies can never replicate what Samaritan is and what it does.

420.    Our Christian faith, based on God's Word in the Holy Bible, would prevent us from obtaining insurance. Insurance programs are governed by antidiscrimination requirements and other regulations that impose or support social policies on sensitive matters such as life, gender, and sexuality, that are contrary to God's Word. Even as our Christian faith requires us to love all people and to repent of our own sins, it prevents us from condoning sin or participating in programs that support sin, such as, for example, abortion, euthanasia, same-sex marriage, or gender reassignment. Samaritan does not support such activities.

421.    For the above reasons, we want and need Samaritan's ministry. We need it because of its unique ability to express our Christian faith through facilitating mutual burden sharing by its membership community as part of the Body of Christ. This mutual burden sharing includes spiritual and emotional burdens as well as financial. We also need it because there is no secular substitute. Even if a substitute existed, it would require supporting activities contrary to our faith.

422.    We were upset to learn of the actions of the New Mexico Superintendent of Insurance to close down ministries like Samaritan or force them out of New Mexico. The loss of Samaritan would be a very big loss for us, our family, and our whole community. It would feel like losing a family member or our fellowship. It would be like showing up at our longtime church one Sunday morning to find the doors barred and a notice posted that the state has shut it

down.

423.     Any action by the state to shut down Samaritan or force it out of New Mexico would harm us and our family in very serious and ongoing ways. It surely would violate our basic rights under the Constitution. Any such action by the state, even the threat of such action, would tarnish the name of Samaritan, including our own names, and cause some of our fellow members to leave the membership, out of worry or confusion. The loss of members would impoverish this Christian fellowship both spiritually and financially, and diminish the freedoms of New Mexicans.

### Individual Plaintiffs David Allan & Monette Bell

424.     Individual Plaintiffs David Allan ("Allan") and Monette Bell have attested to the following in their Declaration filed together with this Complaint. *See* Bell Decl. (Ex. 26).

425.     We have been married to each other since 1994 and have four children. Their names and ages are: Caleb (26), Frederick (Derick) (24), Megan (22), and Bethany (19). Derick and Megan are married. Caleb is engaged to be married later this year.

426.     We have resided in New Mexico since 1995. Allan also attended high school and college here. Our address is 3 Mountain Vista Trail, La Luz, NM 88337.

427.     La Luz is near Alamogordo, a mostly military community serving Holloman Air Force Base, White Sands Missile Range, and (more distantly) Fort Bliss Army Base.

428.     Allan works for an electrical contractor that serves civilian and military customers, including Holloman AFB. Monette teaches math and other subjects to secondary students at Imago Dei Academy, a Christian school in Alamogordo. Allan previously served on a local private school board while Monette was a teacher at the same school (Legacy Christian Academy).

429.    We are active church goers. For the past six years, we have attended Christ Community Church in Alamogordo, where Monette is a group leader in Women's Bible Study.

430.    We are members of Samaritan Ministries International, a Christian health care sharing ministry, or HCSM. We have been members of Samaritan twice, including continuously for the past five years. We agree with the Christian faith of Samaritan and its mutual caring, bearing, and sharing model. This model commits all members to both giving and receiving.

431.    When we write checks to fellow members in need, each month, the names we enter on each check are real people facing real health setbacks or crises. We always include uplifting notes and prayers. Allan, being better with words, usually writes the notes for both of us.

432.    When we do this, we enter the lives of fellow members. They are burdened with sickness, fear, pain, and stress. And all that is made worse by the mindboggling and wildly expensive healthcare system. And all that was made worse in recent years due to Covid-19. All such burdens can make members sicker or slower to recover. These burdens affect their whole family. These burdens can cause them or their loved ones to doubt their faith or the goodness of God. We help them carry these burdens, which are spiritual and emotional as much as financial. These people are our brothers and sisters in need. They are our fellow sharers in the faith-filled community called Samaritan. We are blessed by blessing them.

433.    Our fellow members have likewise been there for us during our hours of need. Allan suffered a broken knee in 2020, the first year of the pandemic. Those were dark times filled with stress and limited access to healthcare. The whole knee experience was painful and expensive and unnerving. But we were blessed both through Samaritan and the GCRMC medical center (GCRMC wrote off much of the bills). The remaining bills were submitted to Samaritan

for sharing by our fellow members. All bills were shared (reimbursed). The personal checks, notes, and prayers for Allan and our family were a spiritual investment in our family. It was very encouraging during a difficult time.

434.    Monette has had her own health crisis recently. After a trip to the ER, she was diagnosed and then had surgery. It has been a difficult and painful time. We are still gathering the medical bills to submit to Samaritan for sharing by our fellow members. There is no promise of reimbursement. Samaritan membership is not insurance. But we have faith in our fellow members to share these costs (much as they did when Allan broke his knee). Health-care-sharing through Samaritan depends on faith rather than legal guarantees. Participation strengthens our faith.

435.    Like all Samaritan members, we believe the Bible. Some key verses help explain what happens through Samaritan and why. The best place to start is Galatians 6:2. Different translations or versions of the Bible express Galatians 6:2 in different ways. They use the verbs *bear*, *carry*, and *share* and the nouns *burdens*, *troubles*, and *problems*. As Christians, we must:

    (a) Bear ye one another's burdens, and so fulfil the law of Christ. (KJV)

    (b) Carry each other's burdens, and in this way you will fulfill the law of Christ. (NIV)

    (c) Share each other's burdens, and in this way obey the law of Christ. (NLT)

    (d) Share each other's troubles and problems, and so obey our Lord's command. (TLB)

    (e) By helping each other with your troubles, you truly obey the law of Christ. (NCV)

    (f) You obey the law of Christ when you offer each other a helping hand. (CEV)

436.    The above activity, described by Galatians 6:2, is what we Samaritan members do through Samaritan and why we do it. It "fulfills the law of Christ." What could be more important for a Christian? There are dozens, probably hundreds, of supporting Scriptures.

437.    We are Christians: followers of Jesus Christ. Each Christian is part of the "Body

of Christ," also known as "the Church." This global body of Christians is made up of smaller denominations, churches, and fellowships that adhere to various creeds, emphasizing various aspects of Christianity. We Samaritan members form a body of Christians emphasizing the bearing, carrying, and sharing of burdens that accompany sickness and accidents. We are like congregants in a church called Samaritan. We act like congregants in a church called Samaritan.

438.    For all of the above reasons, we would be frustrated if this ministry were shut down in New Mexico. The very idea that the state might have this power is deeply troubling. It would deprive our family of a chosen form of Christian fellowship and worship. It would violate our right to religious freedom. And it would leave us with few if any alternatives.

439.    Samaritan is nothing like an insurance company. It would be illogical and probably illegal to regulate it as if it were. We members cannot abide insurance regulation any more than Samaritan can. It's not just the added costs, burdens, and complications of being regulated. It's a matter of conscience and obedience to Scripture. We members share burdens in a particular way, through Samaritan, to obey Scripture and to exercise our faith. Imposing legal guarantees and requirements would displace or undermine the faith-foundation of what we do. And some of the legal requirements that govern insurance companies, and would govern Samaritan if it were treated as such, would contradict Scripture. For example, we cannot knowingly support some of the social policies and medical procedures, such as elective abortion and sex-reassignment, promoted or required by insurance regulation. It would violate Scripture and our conscience.

440.    The threat that the state might shut down our Samaritan ministry is very unsettling and wrong. To reduce the risk of that outcome, and to protect our constitutional rights and hold the state accountable to its constitutional limits, we have joined this lawsuit as plaintiffs.

## **Individual Plaintiffs Rev. Andrew & Heather Heath**

441.    Individual Plaintiffs Rev. Andrew and Heather Heath have attested to the following in their Declaration filed together with this Complaint. *See* Heath Decl. (Ex. 27).

442.    We were married in Montana in 2011. In 2014, we moved to New Mexico, where Andrew took over as senior pastor of Mountain View Baptist Church in Roswell. We have been residents of New Mexico since that time (2014).

443.    We have five children. Isaac is ten years old. Zoe is eight. Judah is six. Noah is five. And Elijah is five months.

444.    We live in Roswell, a former military town surrounded by oil and gas fields and pecan orchards.

445.    As noted, Andrew works as the senior pastor of Mountain View Baptist Church.

446.    Heather stays home to homeschool the Heath children and assists with the homeschooling of other people's children. Our homeschooling model is known as "Classical Conversations," a community-based Christian approach to classical education.

447.    We both grew up in Christian homes but did not develop our own personal faith in and commitment to Jesus Christ until our teenage years. We have always been active church goers. For the past nine years, we have attended Mountain View Baptist Church in Roswell, where Andrew pastors and Heather serves as nursery coordinator. She also leads a Mothers' prayer group at another church in town.

448.    We joined Samaritan Ministries International in 2014, shortly before moving to New Mexico in September of that year. So, we have been Samaritan members from New Mexico since September 2014.

449.    We agree with the Christian faith of Samaritan and its Biblical model of mutual

sharing of healthcare-related burdens among likeminded believers. And we were especially grateful for this ministry during the recent challenging years of COVID.

450.    We love the traditional and personal touch of writing and receiving physical checks from named individuals. Although Samaritan now also facilitates contributions via the Internet [EFT], we continue to write physical checks and notes rather than use [EFT]. It is usually Pastor Andrew who writes the checks and notes, with Scriptures and words of encouragement and prayer, because he is good at it. But we participate in Samaritan together and he speaks for both of us.

451.    Since joining Samaritan, our major medical needs have involved the appendicitis of our son Isaac and the pregnancies and the births of four of our children. Heather has had four difficult pregnancies, two of which resulted in miscarriages. All births are stressful. And few experiences are more tragic than the loss of a child (miscarriage) or the potential loss of a child (appendicitis). These were very trying times. But Samaritan was there for us, sharing our financial and emotional burdens. Members sent Heather gifts and gift cards for our babies. One woman who had experienced miscarriage sent Heather a book on healing the wounds that result from miscarriage.

452.    Participation in Samaritan is a classic exercise of religion for several reasons. (All Scripture references below are to the New International Version (NIV) of the Bible, unless otherwise noted.)

453.    First, it fulfills the commands of Scripture. Galatians 6:2 tells us to "[c]arry each other's burdens, and in this way you will fulfill the law of Christ." Galatians 6:10 continues this theme: "Therefore, as we have opportunity, let us do good to all people, especially to those who belong to the family of believers." James 5:16 tells us to "pray for each other so that you may be

healed. The prayer of a righteous person is powerful and effective." All followers of Christ act as His hands and feet in service to the whole body of Christians, giving "rest" to those "who are weary and burdened" (Matthew 11:28), helping them enjoy freedom in Christ, relief from the bondage and burdens of this world. (Galatians 5:1) Scripture tells us "to keep His commands [which] are not burdensome" (I John 5:3), but liberating. (Galatians 5:1)

454.    Jesus astounded his followers with the "Parable of the Good Samaritan" (the origin of Samaritan Ministries), by explaining true love of neighbor as caring for and healing the physical wounds of a battered stranger, including paying his medical expenses. (Luke 10:25-37)

455.    Jesus expanded this teaching in His frightening Parable of the Sheep and the Goats. There, Jesus said that caring for the sick and destitute was the same as caring for Jesus Himself, and that those who failed in this duty "will go away to eternal punishment." (Matthew 25:31-46) This is a powerful illustration of the Biblical duty of love and care for one another.

456.    Second, this communal activity is itself a powerful form of worship, pleasing to God. In Matthew 18:20, Jesus said, "where two or three gather in my name, there am I with them." Hebrews 10:25 instructs us to not "neglect our meeting together, as some people do, but encourage one another, especially now that the day of [Christ's] return is drawing near." The latter verse is expounded by the Amplified Bible: "let us consider [thoughtfully] how we may encourage one another to love and to do good deeds, not forsaking our meeting together [as believers for worship and instruction], as is the habit of some, but encouraging one another; and all the more [faithfully] as you see the day [of Christ's return] approaching." (Hebrews 10:25 (AMP))

457.    Most religions are communal and associate and express themselves in fellowship. Christianity has always been an intensely communal religion. The earliest Christian church,

which formed after Christ's death and resurrection, voluntarily held "everything in common" and gave "to anyone who had need." (Acts 2:44-45) They served and ministered to one another in very practical ways (Acts 2:42-47), which obviously included healthcare needs. They "devoted themselves to the Apostles' teaching and to fellowship" (Acts 2:42) as acts of service to their fellow believers and acts of worship and obedience to God. (Acts 2:42-47)

458.    The healthcare aspect of this mutual-service and burden-sharing matured during the early years of the Protestant Reformation. In the early 1500s, Amish, Mennonite, and other Anabaptist Protestants formed healthcare sharing ministries within their own local church bodies. These internal church ministries grew, and expanded to other faiths, and became today's health care sharing ministries. Samaritan is an excellent modern example or paradigm of such a ministry.

459.    Fellowship among Christians is true worship to God and unleashes His power, even as it nurtures the faith of all who participate. That is what Samaritan means to us—authentic Christian fellowship and worship—because that is what it means to God and to our fellow members.

460.    Third, the essential caretaking activity of Samaritan members is an exercise of their faith in God, and His Providence, rather than the promises of men or guarantees of government. This is in stark contrast to insurance. We Samaritan members depend on God for our needs, trusting that He will move upon the hearts of our fellow members and provide them sufficient resources to contribute to the care of fellow members. We trust that our mutual commitment to God and our fellow members will see us through difficult times of accident or illness. To replace this faith-reliance with reliance on a legal contract or promise or guarantee would destroy the spiritual foundation and purpose of the faith-building, fellowship-driven

exercise of Samaritan's ministry.

461.   Fourth, Samaritan is a uniquely Christian ministry that provides for healthcare consistently with Scriptural morality. We and our fellow members cannot in good conscience participate in or support health insurance or healthcare programs that compel or provide coverage or procedures for abortion, sex-reassignment, and other procedures contrary to Scripture. Most or all health insurance companies, and many insurance alternatives, do just that, which also would be required of Samaritan if it were regulated like insurance. Subjection to insurance regulation is not just red tape: it is an existential threat. It would cause Samaritan to cease to exist.

462.   In summary, Samaritan is not just *a* Christian ministry; it *is* Christian ministry. It follows Christ's teachings and example in the most practical and authentic ways. It is a classic expression and exercise of Christian faith. Consequently, it is nothing like "insurance" and nobody ever mistakes Samaritan for, or confuses it with, insurance. We do not want insurance.

463.   We want and need this Biblical ministry called Samaritan. We want and need it because of its unique ability to express our Biblical, Christian faith in all the ways described above.

464.   If Samaritan were shut down in New Mexico, or forced to leave the state, or made unavailable to us for any reason, we would be deeply disappointed. If the state were the cause of Samaritan's demise in New Mexico, we would be severely distressed. Any such action by the state would contradict the very purpose of the state—which is to "secure" and protect our God-given rights to the free exercise of religion and free expression guaranteed by the federal and state constitutions. Any such state action would add insult to injury and be profoundly offensive. To help ensure this does not happen we have joined this lawsuit as plaintiffs.

## Individual Plaintiffs Jay & Amy O'Neill

465.    Individual Plaintiffs Jay & Amy O'Neill have attested to the following in their Declaration filed together with this Complaint. *See* O'Neill Decl. (Ex. 28).

466.    We have been married to each other since 2003. Together we have four children. Their names and ages are: Madeline (18), Kieron (15), Rachel (9), and Moira (1). Madeline is in her first year of college. Our address is 275 Blue Sky Ln., Mesilla Park, N.M. 88047.

467.    We are lifelong residents of New Mexico, born and raised here. We met in college at New Mexico State University in Las Cruces, the second-largest university in the second-largest city in the state. Amy grew up in Las Cruces, not far from our current home in Mesilla Park. The White Sands Missile Range is nearby. Our area is known for military, agriculture, and education, being a college town. Jay grew up in Albuquerque.

468.    We run a small healthcare practice. Amy is a doctor of oriental medicine. She is a licensed and board-certified acupuncturist and herbologist and has been practicing this specialty for 20 years. She holds a bachelor's degree in community health education and a master's degree in oriental science. Jay does the billing and serves as a stay-at-home dad.

469.    We are longtime active church goers and currently attend Immaculate Conception Catholic Church in El Paso, where our son Kieron serves as an altar boy.

470.    We have been members of Samaritan Ministries International since 2017. It is a Christian health care sharing ministry. We agree with the Christian faith of Samaritan and its mutual caring, bearing, and sharing model.

471.    Each month we write physical checks and handwrite physical cards to our fellow members in need. It is not anonymous giving or writing. Each month we write and give directly to other named members to help relieve their financial, emotional, and spiritual burdens

associated with illness or accident. We pray for and minister to fellow Christians by name and need, and send them money directly to their homes. They do the same for us when we have needs.

472.    We have submitted our needs to fellow members through Samaritan on three main occasions. Kieron had hand surgery in the summer of 2021 when he was 13. Rachel had eye surgery in 2018 for [strabismus] when she was four. And Amy had an emergency C-section to deliver Moira in 2022. Each of these were painful and stressful events, especially the last two. Each time we were on the receiving end of checks, cards, notes, and prayers from our fellow members. Their financial, emotional, and spiritual support was like a healing balm for our family. Because we are healthcare providers ourselves, we probably understand better than most members how such support can contribute directly and powerfully to physical and mental recovery and healing.

473.    Our Samaritan membership is as essential to our free exercise of religion, and our spiritual well-being, as church membership. In fact, Samaritan operates very much like a Christian church or fellowship that specializes in meeting needs of members facing accident or disease. And it does so in a way compatible with our Christian beliefs on morality. We could never join an insurance or other healthcare program that supports activity that clearly violates Scripture. One example is elective abortion. Samaritan won't share expenses for such a procedure. There are other examples of procedures and activities incompatible with our faith. If state regulation ever required Samaritan to support such activities, it would destroy Samaritan or our role in it.

474.    We understand that regulators have been ordering health care sharing ministries to either (a) leave the state or (b) submit to insurance regulation (i.e., become insurance

companies). It appears the state is determined to run all such ministries out of New Mexico. We believe such action against Samaritan is imminent. Because any such action against Samaritan would deprive us of our Christian healthcare ministry and fellowship, it would deprive us our constitutional rights to free exercise of religion, free expression, and free association. These injuries would be deeply personal and offensive. We have joined this lawsuit as plaintiffs to help avoid that result.

### Individual Plaintiffs Rev. Nathan & Rebekah Bienhoff

475.    Individual Plaintiffs Rev. Nathan & Rebekah Bienhoff have attested to the following in their Declaration filed together with this Complaint. *See* Bienhoff Decl. (Ex. 29).

476.    We have been married to each other since 1995 and have two children, Nathan Jr. who is 26, and Hannah Morris, who is 22 and married to Scott Morris, a police officer. Hannah and Scott have two children: Andrew (Andy) and Lily. In addition to our two biological children, we have an unofficially adopted daughter, Samantha, who is an adult and married now.

477.    We live at 3501 Highland Road, Roswell, New Mexico 88201. We moved here from Texas in January 2020 when Nate became a pastor here. He grew up in Northern California not too far from Chico and Redding. Rebekah grew up in South Florida.

478.    Nate is the lead pastor at Roswell First Church of the Nazarene. He has been in full-time Christian ministry with the Nazarene Church since 1997. Before Roswell, he was lead pastor at Cornerstone Church of the Nazarene in Lake Jackson, Texas.

479.    Like many pastors' spouses, Rebekah also serves on the staff of our church in Roswell, where is she is the Music Director. At our previous church in Lake Jackson, Texas, she served as the Youth Director. For most of her adult life, Rebeka[h] served in various school systems and court systems. Her last court role was as Deputy Clerk in the Felony District Court

for Brazoria County, Texas. Her last school roles were as administrative assistant and substitute teacher.

480.    We both grew up in Christian homes and are lifelong church goers. Our Christian faith is not just important to us but defines who we are. It permeates our lives and expresses itself in many ways, including how we choose to address health care.

481.    We have been members of Samaritan Ministries since 2017, with Nate joining first and Rebekah joining after leaving a job with employer-provided insurance. We both had insurance for decades and know very well how it works. It does not describe what Samaritan does at all. We agree whole-heartedly with the Christian-faith-based sharing model of Samaritan.

482.    Each month we help relieve the financial, emotional, and spiritual burdens of our fellow Samaritan members with health needs. Like all members, we used to do this by mailing checks and cards and notes directly to the homes of the member in need. But in recent years, an Internet option [EFT] became available. Members now have the choice of sharing needs by paper or electronic means. Either way the sharing is direct (member-to-member) and the effect is the same. Monthly financial contributions and notes of exhortation and prayer are just as meaningful over the Internet. Whether we use [EFT] or paper, all members remain committed to all members in need and pray and care for them by name.

483.    We all remain devoted to each other as part of our common faith in Jesus Christ. This Christian devotion plays out in many practical ways, as our own recent health crises have shown. Last year, *we* were members [in] need, and those needs were great, on every level.

484.    Nate's crisis came first. He suffered sepsis three times as a result of a perforated colon and extreme diverticulitis. He was in and out of the ER, and hospitalized, several times, and ultimately needed surgery to resect (remove) two-thirds of his colon. These very serious

events occurred over a period of very stressful months.

485.     When Nate's crisis began, we had many questions about the process of sharing. So we contacted Samaritan. When a woman from Samaritan called Nate, he was pulling his truck into a gas station. As Nate pumped gas, and after he finished, she explained how the sharing system worked. She didn't promise or guarantee anything, from anyone, but reaffirmed our common belief in God's Providence. Nate was relieved by her clear and friendly explanations. But he was stunned with emotion when she asked him, near the end of their call, if they could pray together. She didn't say, May I pray for you? She said, Let's go before the Lord together. As Nate stood there at the gas station, they prayed together, approaching God jointly with petitions for peace and healing. Nate wept. He was overwhelmed with the recognition that he and his "sister" from Samaritan together serve a faithful God who uses us to meet each other's needs.

486.     Then came Rebekah's crisis last October. She had been worried almost sick by Nate's health scare and the possibility of losing him. Before Nate had a chance to recover, Rebekah needed a hysterectomy. Following her surgery, while she was caring for Nate, the physical strain of moving him ruptured her hysterectomy and caused a hernia. It was a case of the sick caring for the sick. It might have been comical if we hadn't been so miserable. But God saw us through, using our Christian brothers and sisters at Samaritan. All our medical bills were taken care of. Members shared their emotional and spiritual support with us. At one point, when Rebekah didn't know whether Nate would live or die, a female employee with Samaritan shared her own similar experiences with Rebekah and asked to pray with Rebekah and did pray with her. The cards and notes we received were precious. We kept them despite our anti-clutter bias.

487.     We believe in Samaritan and the Christian fellowship it fosters. Our participation in Samaritan is both an aspect and a function of our freedoms of religion and association.

488.     We have been advised that New Mexico is ordering ministries like Samaritan to either leave the state or register as insurance companies. Such actions are wrong and inexcusable. Samaritan does not offer insurance and our membership is not an insurance policy. It offers no promise or guarantee at all. Even if Samaritan was willing to be regulated like insurance, it would not just waste our financial contributions with needless regulations but would actually destroy what Samaritan is and what it does. It would turn the Samaritan sharing model into a legal guarantee. It would rob us of our Christian healthcare fellowship and our First Amendment rights. We joined this litigation to help protect ourselves and our fellow members in New Mexico.

## Defendant Alice T. Kane (Personal & Official Capacities)

489.     Defendant Alice T. Kane ("Kane") has been the Superintendent of Insurance for New Mexico since June 12, 2023, succeeding interim Superintendent Jennifer Catechis.[256]

490.     Two of Defendant Kane's predecessors mentioned herein are John G. Franchini ("Franchini"), who served as Superintendent from July 27, 2010 to December 31, 2019, and Russell Toal ("Toal"), who served as Superintendent from January 1, 2020 to January 20, 2023. All three of these Superintendents are, understandably, career insurance professionals.

491.     For example, as of OSI's 2015 OSI Annual Report, "Franchini ha[d] more than 35 years' experience in the insurance industry." Ex. 42 at 6. That experience is approaching 45 years now. Except for 9 years as Superintendent, all or most of it was in the commercial insurance sector or in trade associations representing that sector's interests. *See id*. at 5-6.

---

[256] https://content.naic.org/node/8846 (profile of Alice T. Kane) (accessed 11/3/2023). Former Deputy Superintendent Jennifer Catechis served as interim Superintendent from January 21, 2023 until Kane's appointment. Online sources provide conflicting data on precise dates here.

According to his own online posted profile, he has returned to the private insurance world.[257]

## Experience



**Insurance Consultant**
John G. Franchini Consulting
Apr 2020 - Present · 3 yrs 8 mos



**Superintendent of Insurance for the State of New Mexico**
Aug 2010 - Dec 2019 · 9 yrs 5 mos

492.    Toal's career fits a similar pattern, but with more government experience. Toal's path has been more of a traditional "revolving door," moving in and out of government, between public regulation and the commercial sector it regulates.[258]

## Experience



**Health Policy Consultant**
Rtoal consulting · Self-employed
Feb 2023 - Present · 10 mos
Santa Fe, New Mexico, United States · Hybrid
Skills: Project Management · Program Management · Project Planning · Health Insurance · Public Health



**Superintendent**
New Mexico Office of the Superintendent of Insurance · Full-time
Jan 2020 - Jul 2023 · 3 yrs 7 mos
Santa Fe, New Mexico, United States

493.    Defendant Kane has followed Franchini's private-sector pattern. Before becoming Superintendent on July 12, 2023, Kane spent nearly 50 years as a lawyer and consultant inside and outside of major insurance companies,[259] serving their private commercial interests. This includes senior positions with New York Life (25 yrs., 11 mos.), Zurich (5 yrs., 9 mos.), and

---

[257] https://www.linkedin.com/in/john-g-franchini-b9479344 (accessed 11/3/2023).

[258] https://www.linkedin.com/in/russell-toal-95326b76/details/experience (accessed 11/3/2023).

[259] https://content.naic.org/node/8846 (profile of Alice T. Kane) (accessed 11/3/2023).

Guardian (2 yrs., 8 mos.); law partnerships with Duane Morris (5 yrs., 2 mos.), Clifford Chance

(2 yrs., 10 mos.), and Dewey & LeBoeuf (1 yr.); and freelancing (2 yrs.).[260]

## Experience



**Sales Consultant**
Freelance
Dec 2021 - Present · 2 yrs
New York, United States
Skills: Insurance



**Vice President and Senior Adviser to the General Counsel**
Guardian Life Insurance Company · Full-time
Mar 2020 - Oct 2022 · 2 yrs 8 mos



**Counsel**
Clifford Chance US LLP
Jun 2017 - Mar 2020 · 2 yrs 10 mos
31 West 52nd Street New York New York 10019

Insurance Regulatory Counsel



**General Counsel of the Americas and Interim Global General Counsel**
Zurich Insurance Company Ltd.
Oct 2005 - Jun 2011 · 5 yrs 9 mos



**General Counsel, Secretary and Executive Vice President in charge of Asset Management**
New York Life Insurance Company
Aug 1972 - Jun 1998 · 25 yrs 11 mos

494.    As Superintendent of Insurance, Defendant Kane is "the chief officer of the

Office of Superintendent of Insurance,"[261] or "OSI."

495.    Prior to the creation of OSI, the "Superintendent of Insurance [was] the director of

the Insurance Division of the Public Regulation Commission,"[262] previously referred to as the

---

[260] https://www.linkedin.com/in/alice-kane-256a5a68/details/experience (accessed 11/3/2023).

[261] NMSA 1978, §59A-2-2(A).

[262] *Valdez v. Metropolitan Property & Cas. Ins.*, 867 F.Supp.2d 1143, 1193 (D.N.M. 2012).

"New Mexico Public Regulation Commission's (NMPRC) Superintendent of Insurance."[263]

496.    An overview of this reorganization appears in OSI's 2015 Report:

> The New Mexico Public Regulation Commission (PRC) appointed
> John G. Franchini as Insurance Superintendent July 27, 2010.
> During the 2013 legislative session, legislation effectuating a
> Constitutional Amendment [that was] passed in the 2012 general
> election (HB 45) removed the insurance division from the PRC and
> created a stand-alone agency, The Office of Superintendent of
> Insurance (OSI). This was effective July 1, 2013…. These actions
> removed the insurance regulatory function from the [PRC] (where
> it was housed as the "Insurance Division") and placed it in [the]
> newly-created adjunct state agency [OSI]." [Ex. 42 at 6-7.]

497.    Whether in its current home of OSI or its former home of the Insurance Division
(of the New Mexico PRC),[264] OSI's chief has had the same basic powers. "The Superintendent
… 'shall administer and enforce the laws with which it is charged and has every power conferred
by law.' The Superintendent has the power to make 'reasonable rules and regulations necessary
for or as an aid to administration or effectuation of any provision of the Insurance Code.'"[265]

498.    "All powers relating to state supervision of insurance, insurance rates and rate
practices, together with collection of insurance licenses, taxes or fees, and all records pertaining
to such supervision are under control of the office of superintendent of insurance."[266]

499.    As superintendent, Defendant Kane has strong job protection—removeable only

---

[263] *Quynh Truong v. Allstate Ins. Co*., 227 P.3d 73, 76, 147 N.M. 583, 586 (N.M. 2010).

[264] Cases refer to OSI's predecessor as the **Insurance Division**, *e.g.*, *Quynh Truong*, 147 N.M. at
598, **Division of Insurance**, *e.g.*, *Quynh Truong*, 147 N.M. at 593, **Insurance Department**, *e.g.*,
*Bhasker v. Kemper Casualty Insurance Co.*, 284 F.Supp.3d 1191, 1200 (D.N.M. 2018), and
**Department of Insurance**, *e.g.*, *Coll v. First Am. Title*, 642 F.3d 876, 883 (10th Cir. 2011).

[265] NMSA 1978, §59A-2-2(A).

[266] NMSA 1978, §59A-2-1.

after a "hearing" proving her "incompetence, willful neglect of duty or malfeasance in office."[267] This job protection adds even more insulation and discretion to her performance of duties.

500.    As superintendent, Defendant Kane selects, manages, and empowers her staff,[268] and has vast discretionary powers to run OSI. Among other things, **"**A. The superintendent shall:

(a) ***organize and manage*** the office of superintendent of insurance and direct and supervise ***all its activities***;

(b) execute the duties imposed upon the superintendent by the Insurance Code;

(c) enforce those provisions of the [Code] that are administered by the superintendent;

(d) have the powers and authority expressly conferred by ***or reasonably implied from*** the provisions of the Insurance Code;

(e) conduct ***such examinations and investigations*** of insurance matters, in addition to those expressly authorized, ***as the superintendent may deem proper*** upon ***reasonable and probable cause*** to determine whether a person has violated a provision of the Insurance Code or to secure information useful in the lawful enforcement or administration of the provision;

(f) have the power to sue or be sued;

(g) have the power to make [&] enforce all contracts, agreements and other instruments necessary, ***convenient or desirable*** in the exercise of the ***superintendent's powers*** and functions ***and for the purposes of the Insurance Code***;

(h) prepare an annual budget for the office of superintendent of insurance;

(i) have the right to require performance bonds of employees as the superintendent ***deems necessary*** pursuant to the Surety Bond Act[];

(j) comply with the provisions of the Administrative Procedures Act;

(k) upon an order based upon the invocation of a state of emergency …, take those actions necessary to ensure access to insurance and the stability of insurance markets during the emergency. ... ; and

---

[267] NMSA 1978, §59A-2-2(E).

[268] NMSA 1978, §59A-2-4 and NMSA 1978, §59A-2-7.

(l)  have **such additional powers and duties** as may be provided by other laws ….”[269]

501.    One example of the latter “powers … provided by other laws” is where “liability for [certain] payments … provided under the Workers’ Compensation Act … shall be apportioned in the **discretion** of the superintendent of insurance[.]”[270]

502.    In addition to the powers listed above, the “superintendent, after a hearing thereon, may make **reasonable** rules and regulations necessary for **or as an aid to** administration or effectuation of any provision of the Insurance Code administered by the superintendent, and from time to time withdraw, modify or amend any such rule or regulation.”[271]

503.    The superintendent also has discretion to assess the good faith (or bad faith) of offenders to determine the propriety and level of penalties.[272]

504.    “The Legislature has also empowered the superintendent to examine any matter that [she], in [her] sole discretion, determines to be relevant to an insurer’s financial affairs,”[273] including various “special examination[s] conducted at the **discretion** of the superintendent.”[274]

505.    The superintendent also has virtually unbridled discretion to determine if, when, and how to investigate or litigate matters she deems to be within OSI’s jurisdiction.[275]

506.    In short, the above powers include discretion to apply the Code in any manner Superintendent Kane deems appropriate, including how she interprets and enforces (a) all formal

---

[269] NMSA 1978, §59A-2-8 (emphasis added).

[270] *Chevron Res. v. N.M. Super. of Ins.*, 114 N.M. 371, 375-76 (Ct.App. 1992) (emphasis added).

[271] NMSA 1978, §59A-2-9(A) (emphasis added).

[272] NMSA 1978, §59A-2-9(D).

[273] *Jornigan v. N.M. Mutual*, 2004 WL 3426752, at *1 (D.N.M. 2004) (“**Jornigan**”).

[274] *Jornigan*, 2004 WL 3426752, at *3 (citing NMSA §59A–4–5(A)) (emphasis added).

[275] NMSA 1978, §59A-2-11.

(explicit), individualized exemptions,[276] and (b) all informal (implicit) exemptions that result from her discretionary determination that an activity does not constitute "insurance."

507.    In deciding "whether the Superintendent [had] created a statutory exemption," the New Mexico Supreme Court held: "When a governmental agency exercises its authority under the statute to **grant an express exemption** for conduct that may otherwise be within the scope of a statute's prohibitions, it is making law, pursuant to the Legislature's recognized power to grant '**agencies the discretion** of promulgating rules and [regs that] have the force of law.'"[277]

508.    As provided throughout the Insurance Code, and as demonstrated by her conduct in the *Liberty* case, Superintendent Kane has nearly unfettered discretion to enforce the Code.

509.    "The Insurance Code expressly grants the superintendent of insurance broad authority to enforce provisions of the Insurance Code."[278] It "invest[s] the superintendent of insurance with broad administrative powers under the Insurance Code.'"[279]

510.    "The superintendent is specifically authorized to conduct 'examinations and **investigations**' into '**whether any person has violated any provision** of the Insurance Code.' The Insurance Code sets forth administrative procedures for investigating and remedying insurance practices that are **unfair or deceptive to the public**. Furthermore, the superintendent is charged with the responsibility of reviewing insurance policies before they are used in the state for **any inconsistent, ambiguous, misleading or deceptive statements**."[280]

---

[276] NMSA 1978, §59A-1-15 ("fraternal benefit societies … nonprofit health care plans … health maintenance organizations … motor clubs [etc.]"); NMSA 1978, §59A-1-16.1 ("Charitable gift annuities"); NMSA 1978, §59A-1-16 ( "labor organization" and "risk management division").

[277] *Quynh Truong v. Allstate Ins.*, 147 N.M. 583, 590-91 (N.M. 2010) ("**Quynh Truong**").

[278] *Azar v. Prudential Ins. Co.*, 68 P.3d 909, 935, 133 N.M. 669, 695 (N.M.App. 2003).

[279] *Quynh Truong*, 147 N.M. at 597.

[280] *Azar*, 133 N.M. at 695 (emphasis added).

511.    All of these powers of the Superintendent are the very definition of discretion.

512.    In fact, insurance regulators everywhere are generally subject to an "abuse of discretion" standard during judicial review of their actions, because they all have substantial discretion in doing everything they do. A few examples may suffice.

513.    "Respondents next assert that the Commissioner's reversal of the ALJ's order imposing sanctions against the Division was an abuse of discretion. We agree."[281] "By its own terms, the regulation has no application in these cases and the Commissioner abused his discretion by concluding otherwise."[282] "We find little evidence in the record to support the amount of the penalty and thus hold the Commissioner abused his discretion."[283] "[T]he only issue to be addressed is whether the commissioner abused her discretion."[284] "[T]he Department has abused its discretion in construing the statute to the contrary."[285] A Commissioner's "failure to provide fair procedures or proceed in the manner required by law is an abuse of discretion."[286]

514.    The discretion of OSI is so broad, in fact, that it can easily cloak internal mischief and crime. "In 2001, Eric Serna became the superintendent of New Mexico's insurance division. Shortly after assuming that position, Mr. Serna hired Mr. Ruiz as a deputy superintendent. [P]rior to Mr. Ruiz's tenure as [deputy] superintendent the insurance division *rarely assessed* fines against companies who employed unlicensed adjusters. Mr. Ruiz, however, *revived the licensing*

---

[281] *Colorado Div. of Ins. v. Statewide Bonding*, 518 P.3d 309, 320-23 (Colo.App. 2022).

[282] *RLI Ins. Co. v. Superior Court & Dept. of Ins.*, 51 Cal.App.4th 415, 436 (1996).

[283] *Sheppard, Com'r of Ins. v. Old Republic Life Ins. Co.*, 21 Pa.Cmwlth. 360, 366 (1975).

[284] *Hanover Ins. Co. v. Com'r of Ins.*, 443 Mass. 47, 49–50 (2004).

[285] *Fla. Windstorm Ass'n v. Sunset Realty & Dep. of Ins.*, 516 So.2d 1037, 1038 (Fla.App. 1987).

[286] *Garamendi, Ins. Com'r v. Golden Eagle Ins.*, 128 Cal.App.4th 452, 466 (2005).

*requirement* and **perpetrated a quid pro quo scheme** through **his enforcement of it**."[287]

515.    Superintendent Kane has used her office and her discretion to perpetuate the non-neutral and non-generally applicable (i.e., discriminatory) policies of her predecessors, such as former Superintendent Toal, against health care sharing ministries such as Samaritan.

516.    Superintendent Kane has in fact acted discriminatorily against health care sharing ministries—an exclusively religious sector of "shared religious beliefs." AG Letter (Ex. 33) at 2.[288] As such, her actions lack even "facial neutrality," because they relate to "religious practices" or at least practices that have "strong religious connotations."[289]

517.    With Samaritan squarely in her crosshairs, Superintendent Kane is almost certain to do the same to Samaritan. In the process, she will be discriminating in a way that she knows or should know violates clearly established constitutional law. Thus, Superintendent Kane is the proper official both to enjoin and to hold responsible for damages in this case.

518.    If the evidence establishes animus or other illicit motive on the part of Superintendent Kane, she may be held liable for punitive damages.

519.    Superintendent Kane is sued here in her official and her individual capacities.[290]

## JURISDICTION AND VENUE

520.    This action arises under the U.S. Constitution, including the First and Fourteenth Amendments and the Supremacy Clause, either as directly applicable to the States or as

---

[287] *U.S. v. Ruiz*, 589 F.3d 1310, 1311 (10th Cir. 2009) (emphasis added).

[288] HCSMs fill "a small niche in the healthcare market for people with shared religious beliefs." *Id*. This may be a case of stating the obvious, but New Mexico did explicitly state it.

[289] *Lukumi*, 508 U.S. at 533-36.

[290] "To 'establish a defendant's individual liability in a suit brought under §1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation.'" *Kravitz v. Purcell*, ___ F.4th ___, 2023 WL 8177114, at *12 (2d Cir. Nov. 27, 2023) ("**Kravitz**").

incorporated by Supreme Court decision, and other federal laws, including 42 U.S.C. §1983.

521.    This Court is vested with original jurisdiction over these claims under 28 U.S.C. §1331 (Federal Question) and 28 U.S.C. §1343 (Civil Rights). "Federal courts … have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.' [Thus,] a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'"[291]

522.    This Court is vested with authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201 and 28 U.S.C §2202.

523.    This Court has jurisdiction to award the requested injunctive relief under 28 U.S.C. §1331 and 28 U.S.C. §1343.

524.    This Court's "virtually unflagging" obligation to hear claims[292] includes original jurisdiction under 28 U.S.C. §1331, and/or supplemental jurisdiction under 28 U.S.C. §1367(a), of Plaintiffs' claim under the state Religious Freedom Restoration Act ("RFRA") of New Mexico ("NMRFRA"), NMSA 1978, §28-22-4, and other state-law issues interwoven herein.

525.    Original jurisdiction under §1331 extends to NMRFRA and other state law issues herein that raise a "substantial federal question," e.g., because Plaintiffs' "right to relief necessarily depends on resolution of a substantial question of federal law,"[293] or "vindication" of Plaintiffs' rights "necessarily turn[s] on some construction of federal law."[294]

526.    This is particularly true in federal-preemption cases like this one. "A plaintiff may assert federal preemption as [a] cause of action to enjoin state officials from interfering with

---

[291] *Sprint Communications v. Jacobs*, 571 U.S. 69, 77 (2013) ("***Sprint***").

[292] *Sprint*, 571 U.S. at 77 ("***Sprint***").

[293] *Franchise Tax Bd. v. CLVTSC*, 463 U.S. 1, 28 (1983); *accord, e.g., Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 908-09 (10th Cir. 2017).

[294] *Franchise Tax Bd.* 463 U.S. at 9.

federal rights. In that context, a claim of preemption [is] a federal question under §1331."[295]

527.    This Court also separately has supplemental jurisdiction over NMRFRA under §1367(a). "[U]nless one of the conditions of 28 U.S.C. §1367(c) exists, courts are not free to decline jurisdiction."[296] This Court should exercise supplemental jurisdiction over the NMRFRA claim unless all "federal claims are dismissed before trial,"[297] indeed, "early in the litigation."[298]

528.    Supplemental jurisdiction is a well-worn path for state RFRAs like the NMRFRA.

529.    "[Regarding] jurisdiction over state-law claims, a district court should consider [whether] 'judicial economy, convenience, fairness, and comity.' Here, all the factors weigh in favor of retaining supplemental jurisdiction of the *[Tennessee RFRA]* claim[.]"[299]

530.    "The defendant moves to dismiss the *[Illinois] RFRA* claim [but] because the court is *not dismissing all of the federal claims*, it will *continue to exercise [supplemental] jurisdiction over the IRFRA claim*."[300]

531.    "[Here], the [*Florida RFRA* claim is] clearly related to the federal claims."[301]

532.    Even after entering judgment against a religious claimant on all federal claims,

---

[295] *Local 12004 v. Mass.*, 377 F.3d 64, 74 (1st Cir. 2004) (citing *Shaw v. Delta,* 463 U.S. 85 (1983); *see United Ass'n of JAPPFI v. Bechtel Power Corp.*, 834 F.2d 884, 886 (10th Cir. 1987) ("[I]f a 'federal cause of action completely pre-empts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily *arises under* federal law.'").

[296] *Ganley v. Jojola*, 402 F.Supp.3d 1021, 1077 (D.N.M. 2019) (citing cases).

[297] *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("*Gibbs*").

[298] *Barnett v. Hall, Estill*, 956 F.3d 1228, 1232 (10th Cir. 2020); *Birdwell v. Glanz*, 790 F.Appx. 962, 964 (10th Cir. 2020) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

[299] *McGlone v. Metro. Gov't*, 2016 WL 11654231, at *3 (M.D.Tenn. 2016) (Crenshaw, C.J.) (relying on *Carnegie-Mellon*, 484 U.S. at 350) (emphasis added).

[300] *Baer v. White*, 2009 WL 1543864, at *10 (N.D.Ill. 2009) (Manning, J.) (emphasis added).

[301] *Lawson v. McDonough*, 2006 WL 3844474, at *27 (N.D. Fla. 2006).

courts decide and enter judgment on a state RFRA, such as *Alabama's RFRA*.[302]

533.    This Court has jurisdiction to award costs and attorneys' fees under the Civil Rights Act, 42 U.S.C. §1988(b), and the NMRFRA, NMSA 1978, §28-22-4.

534.    Venue is proper in the United States District Court for the District of New Mexico under 28 U.S.C. §1391(b), because Defendant resides in the District of New Mexico, and the events giving rise to the claim occurred within the District of New Mexico.

## GENERAL ALLEGATIONS

### Overview of Health Care Sharing as Classic Religious *Ministry*

535.    The term "health care sharing ministry" evidently first appeared in Missouri's "safe harbor" law in 2007[303] and was embraced by the ACA's HCSM religious exemption.[304] The current HCSM model is embraced by the ACA and protected by it.

536.    But the HCSM concept is much older. It began with Mennonite, Amish, and other Anabaptist faith traditions during the persecutions of the Protestant Reformation in the 1500s.[305]

537.    Citing this faith tradition, a federal appeals court upheld tax-exempt status for a Mennonite church under Section 501(c)(3) of the Internal Revenue Code, stating:

---

[302] *E.g.*, *Thai Meditation Ass'n of Alabama v. City of Mobile*, 83 F.4th 922, 930-32 (11th Cir. 2023) ("*TMAA*") (citing federal constitutional cases to hold the City failed strict scrutiny).

[303] Mo. Stat. §376.1750(2) ("a 'health care sharing ministry' is a faith-based nonprofit … that: (1) Limits its membership to those who are of a similar faith; (2) Acts as ….").

[304] 26 U.S.C. §5000A(d)(2)(B). Title 26 is better known as the Internal Revenue Code ("*IRC*").

[305] The term *Anabaptist* (one who baptizes again) originally was an insult that resulted in persecution. Anabaptists, like Baptists and other Protestants, rejected "infant baptism" as a substitute for "believer's baptism" of those old enough to seek baptism after confessing faith in Christ. For this belief, many Anabaptists were executed by drowning: their "third baptism" and "the best antidote to Anabaptism." William R. Estep, THE ANABAPTIST STORY 67 (3rd ed. Eerrdmans 1996). Such persecution was well documented by the Library of Congress in its 1998 national exhibition and related book entitled, RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC (1998), both produced by its Chief of Manuscripts James H. Hutson.

"[W]e are fully convinced that the Medical Aid Plan was simply another form of the various mutual aid plans established and used by the Mennonites in general to further their strongly held religious belief that they must 'bear one another's burdens.'" [quoting *Galatians* 6:2, KJV, which states that when Christians bear the burdens of fellow believers, they "fulfill the law of Christ"][306]

538.    This type of ministry—based on *Galatians 6:2* and supporting Scriptures—is common among various Christian traditions, including Samaritan's. More than 100 HCSMs exist in the U.S., with total membership of about 1.5 million. *See* Alliance of Health Care Sharing Ministries.[307] At least 107 of these HCSMs have been recognized by the U.S. Government as "Health Care Sharing Ministries" under the ACA.[308] *See* ACA-Certified HCSM List (Ex. 20).[309] Meeting the ACA requirements protects a HCSM and its members.

539.    The ministry of burden sharing is central to Christianity, which has always ministered to the faithful and spread the faith through education and health care. This is why so many health care entities bear Christian names or heritages. Google searches for "Presbyterian Hospital," "Methodist Hospital," "Baptist Hospital," "Lutheran Hospital," and "Episcopal Hospital" yield millions of results, as do searches for Christian saints in hospital names.[310]

540.    Many such health care entities with deep Christian origins have no Christian symbolism in their name.[311] And even secular entities like Johns Hopkins recognize the

---

[306] *Bethel Mennonite*, 746 F.2d at 392 (quoting *Galatians* 6:2).

[307] http://ahcsm.org/about-us/data-and-statistics.

[308] IRC §5000A(d)(2)(B).

[309] Over half of these 107 ACA-certified HCSMs have "Mennonite" in their name.

[310] *E.g.,* https://cnsblog.wordpress.com/2009/04/06/us-catholic-hospitals-dominate-top-100-list. Adjusting for intervening words (e.g., "Methodist *Children's* Hospital" or "Baptist *Memorial* Hospital"), hospital synonyms (e.g., "Presbyterian *Medical Center*," "Methodist *Cancer Center*," or "Baptist *Clinic*"), and Christian symbolism (e.g., "*Holy Cross* Hospital"), yields vast results.

[311] *See* www.mayoclinic.org/about-mayo-clinic/documentary (Ken Burn's documentary on Christian origins of Mayo Clinic). This also is true with educational. "Harvard College was

significant Christian contributions to health care and health education: "A familiar sight at the hospital is the marble statue *Christus Consolator* (or '**Christ, The Divine Healer**)[.]'"[312]

## The Meaning of Plaintiff's Name *Samaritan*

541.     Samaritan is named *Samaritan* because it believes deeply in "**Christ, the Divine Healer**," the author of the famous Parable of the Good Samaritan. *See Luke* 10:25-37.

542.     That Parable describes Christ's response to an antagonistic lawyer who wanted to know how to "inherit eternal life." *Luke* 10:25. Christ said to love God with all your heart, soul, mind, and strength and to "love your neighbor as yourself." *Id*. at 27. Trying to "justify himself," the lawyer asked, "Who *is* my *neighbor*?" *Id*. at 29. Jesus defined "loving your neighbor" as the response of a man from Samaria (enemy of Israel) to a badly wounded Jewish stranger: "A man was going down from Jerusalem to Jericho, when he was attacked by robbers. They stripped him of his clothes, beat him and went away, leaving him half dead." *Id*. at 30. First a Priest and then a Levite passed the wounded man without stopping to help. *Id*. at 31-32. But a passing Samaritan stopped, "bandaged [his] wounds," "brought him to an inn and took care of him," paid the "innkeeper," asked the innkeeper to "look after him," and promised the innkeeper that when he (the Samaritan) returned, "I will reimburse you for any extra expense [incurred]." *Id*. at 33-35.

543.     *Samaritan* is not just a symbol of Christianity—it *is* Christianity in action, since it personifies what Christ called the two Greatest Commandments (and summing up) of all Holy Scripture: love God and love neighbor. *Matthew* 22:36-40; *Luke* 10:27.[313] These two Greatest

---

[312] founded in 1636 as a Puritan/Congregationalist institution and trained ministers for many years." https://en.wikipedia.org/wiki/Harvard_Divinity_School. "Theological education was the earliest academic purpose of Yale University." https://en.wikipedia.org/wiki/Yale_Divinity_School.

[312] https://en.wikipedia.org/wiki/Johns_Hopkins_Hospital (emphasis added).

[313] "'Teacher, which is the greatest commandment in the Law?' Jesus replied: 'Love the Lord your God with all your heart and with all your soul and with all your mind.' This is the first and

Commandments form the Purpose Statement of Samaritan. *See* Bylaws (Ex. 1) at Art. II.

## The Reason Why Samaritan Exists

544.    Samaritan exists to fulfill the two Greatest Commandments of Jesus Christ, the author of the Christian religion. "**Our Purpose** is to glorify God by growing and equipping disciples of Jesus Christ to love God with all their heart, soul, mind and strength, and to love and care for their neighbor as themselves." Bylaws at Art. II ("Purpose Statement *(Why we exist)*").

545.    Samaritan chose a specific "means" to achieve this Purpose:

### Mission Statement *(What we do)*

Our Mission is to redeem health care by helping the Body of Christ love one another through sharing each other's health care burdens while experiencing authentic Biblical community.

Galatians 6:2, Philippians 2:3-4, Romans 12:10,12,13,15, John 13.:34, 35

546.    This "means" or "Mission Statement"—"what Samaritan does"—is captured by its namesake parable of the Good Samaritan, described above.

547.    Samaritan brings this Parable to life for its membership, a distinct part of the Body of Christ. It enables them to "fulfill the law of Christ" by "carrying" the "burdens" of fellow believers (*Galatians* 6:2), even as "each one should carry their own load" (*id*. at 6:5),[314] "not looking to [their] own interests but each [one] to the interests of the others," *Philippians* 2:4. *See* Core Values in Bylaws at Art. II and ¶3 ("Christ-Compassionate Service").

548.    That is what Samaritan does and why it does it. All its members affirm it and reaffirm it annually. "[You] Believe you are to bear one another's burdens. *Gal*. 6:2 | *Phil*. 2:4." Guidelines (Ex. 2) at §I(C). "I understand that the purpose of Samaritan's financial sharing is to

---

greatest commandment. And the second is like it: 'Love your neighbor as yourself.' All the Law and the Prophets hang on these two commandments." *Matthew* 22:36-37. "'Love the Lord your God with all your heart and with all your soul and with all your strength and with all your mind'; and 'Love your neighbor as yourself.' … 'Do this and you will live.'" *Luke* 10:27-28.

[314] "For every man *shall* bear his own burden." *Galatians* 6:5 (KJV) (emphasis added).

bear one another's medical burdens." Membership Application (Ex. 4) at §3.10.

549.     Samaritan is quintessentially *Christian ministry*. It enables its members to "take care" of and "reimburse" each other in the love of Christ, sharing not just financial resources but also spiritual hope and strength through common faith in "Christ, the Divine Healer."

550.     Samaritan's members are not "policyholders," or "participants" in a "plan." They are *members of a community*. "Samaritan Ministries" is a community of believers who are loving one another in a Christ-commanded and practical way by sharing in the emotional, spiritual, and financial aspects of health care needs. Samaritan considers members part of the Samaritan family and historically, members have often reported feeling a strong sense of "belonging."

551.     Samaritan's members are bound together in mutual Christian love and commitment that is expressed directly member to member.

## The Reasons Why Samaritan's Ministry Is Distinct/Unique

552.     Samaritan emphasizes the following **twelve** distinct characteristics.

### Reason #1: Distinct Member-To-Member Sharing

553.     **FIRST**, Samaritan members engage in classic, direct, member-to-member sharing of their spiritual, mental, emotional, and financial aspects of illness and injury. Samaritan's role is limited to soliciting its members to send notes, prayers, and financial support directly to fellow members in need, without exercising any ownership or even control over that financial support.

554.     Samaritan members share a deep common faith in Jesus Christ and His power to heal lives and save souls. Out of that shared faith, they share financial resources by sending checks (or EFTs) directly to one another—along with their prayers and spiritual notes—all of which are personal, powerful, and deeply significant. Page 6 of the Guidelines (Ex. 2) explains:

Overview

> Every month, members of Samaritan Ministries give to other members who have medical needs. ==Members pray and send their monthly share, along with notes of encouragement, directly to the member in need.== This allows members to minister to all aspects of the need: spiritual, emotional, physical, and financial.

555.    An example of actual member-to-member sharing illustrates how it works. *See* Member Sharing Example (Ex. 14). *See also* Sample Monthly Share Slip (Ex. 12); Sharing Guidelines (Ex. 2) at 6 (Overview) and at §3(F) ("Sending Notes. Along with your monthly share, send a note of encouragement to the member with the medical need to which you are assigned. Also pray for this member and for other members listed in the Prayer Guide."); Sample Monthly Prayer Guide (Ex. 13); Membership App. (Ex. 4) at §3.5 ("pray for specific medical needs, send notes of encouragement, and directly share financially in another member's need"); Nov. 2022 Newsletter (Ex. 3) at 1; Sample Member Letters (Ex. 15); Sample Cards & Notes (Ex. 16); SMI Story (Ex. 21); Missional Medicine (Ex. 22); SMI Impact Report 2023 (Ex. 23).

556.    The Declarations of the ten individual Plaintiffs, with their testimonies of what Samaritan means to them and their families and how they participate, are vital evidence. *See* Cordel Declaration (Ex. 25); Bell Declaration (Ex. 26); Heath Declaration (Ex. 27); O'Neill Declaration (Ex. 28); and Bienhoff Declaration (Ex. 29). See also the Declaration of Will Cooper (Ex. 24), who not only is the Chief Operating Officer of Samaritan, but also, like all other full-time staff, all Directors, and most part-time staff, is a member of Samaritan's sharing ministry.

### Reason #2: Distinct Commitment to Biblical Principles

557.    **SECOND**, Samaritan's sharing ministry is guided through and through by Biblical principles. Its Sharing Guidelines (at pp. 4-5) begin with its "Foundational Principles."

## Foundational Principles

**We believe the following Biblical principles are basic to the life of every believer; therefore foundational to our health care sharing ministry:**

558.   The five listed Foundational Principles are as follows:

**Jesus Christ is our Provider for every need.**
As the Creator of all things, He is the only One with all the resources necessary to meet every need that occurs in His creation.

**Our needs are more than physical.**
Human beings are more than just a collection of cells, and we have needs that go beyond the physical body. Our members come together to meet the financial, physical, and spiritual aspects of each medical need.

**God has made us stewards of His resources.**
As a first line of defense, members of the Body of Christ are responsible to use the resources they've been given by God to care for themselves, their family, and others.

**Our local Christian church offers us support.**
We seek to support and supplement the local Body, not replace it. We depend on local Christian church leaders to provide accountability for the Samaritan members under their care.

**Mankind is the crown of His Creation.**
Because we bear the image of God, we are to respect all human life at all stages of development. Therefore, we live according to Biblical principles in all aspects of our lives by treating our bodies as temples of the Holy Spirit.

559.   These Foundational Principles reinforce Samaritan's beliefs that: (a) obedience to God and His Word is the ultimate source of complete wholeness, financially, physically, and spiritually, (b) each Samaritan member has an individual stewardship duty to God to use all

resources entrusted to them responsibly, and (c) Samaritan "depend[s] on local Christian church leaders to provide accountability for the Samaritan members under their care."

560.    Another shared belief that merits attention is the Biblical mandate for believers to resolve disputes among themselves, using the Church as needed. The short version of this shared Biblical belief and commitment appears in Section 3 of the Membership Application (Ex. 4):



A longer version or exegesis of this Biblical conflict-resolution mandate constitutes an entire Section of the Sharing Guidelines (Ex. 2) at §XII ("Reconciling Disagreements").

### Reason #3: Distinct Responsibilities of Members

561.    **THIRD**, these Foundational Principles, along with those cited elsewhere herein, impose unique responsibilities on Samaritan members, including its leaders and staff, as follows.

562.    Members not only certify their faith in a common Christian doctrine; each must obtain, initially and annually, a written certification from their *pastor* that they are a follower of Christ committed to His Word.[315] *See* "Church Leader Verification" in "Required Church

---

[315] For the annual certification, see Annual Church Leader Verification (Ex. 7). As noted above, *pastor* in this context can be a non-pastoral leader to whom a member is spiritually accountable.

Information" in the Membership Application (Ex. 4) at §5; *accord* Ex. 5 at §4; Ex. 6 at §5; Ex. 7.

563.    All Samaritan adults "must attend" church at least three weeks per month (health and weather permitting)—at a "Biblical, Christian church" (whose definition specifies examples of churches that do not qualify)—and must have their pastors verify attendance initially and annually. *See id.*; Membership Application at §3(3.a), §5; Sharing Guidelines at §I(B).

564.    All members must submit to the personal accountability of their church leaders and must consent to Samaritan working with those leaders to hold each member accountable to the Biblical requirements of membership. "We depend on local Christian church leaders to provide accountability for the Samaritan members under their care." Guidelines (Ex. 2) at 4-5. The "membership requirements benefit all members by being Scriptural [and] ensuring proper accountability." *Id.* at §I. Each member has a church leader or other "accountability partner" to certify the member's compliance and good standing. *Id.* at §I(K). Each member consents to Samaritan seeking "the assistance of the member's Christian church," including exchanging all "necessary information to address [any] issue and hold the member accountable." *Id.* at §III(H).

### Reason #4: Distinct Equality in Responsibilities Across the Ministry

565.    **FOURTH**, there is no distinction in Samaritan membership responsibilities between its members and its leaders. All Samaritan staff and leaders must be members of its sharing ministry and comply equally with all membership requirements. ¶¶351-369, above.

566.    But of staff and leaders, even more is required.

567.    All staff, which includes Officers but excludes Directors (who are non-compensated non-employees), must attest to a more detailed "Staff Statement of Faith" (Ex. 9).

568.    All Officers, including those in the "Ministry Cabinet," Bylaws (Ex. 1), Art. VIII at §1(A), §2, must "meet the Biblical requirements for the office of deacon (*I Tim*. 3:8-13) and be

in agreement with SMI's Doctrinal Statement and positions as reflected in Article III." Art. VIII at §1(B). "Due to the spiritual nature of our purpose and the theological foundations upon which this ministry stands (See Article III), of necessity the leaders of this ministry must be mature in their Christian walk and meet Biblical standards for leadership. This [is] to represent the ministry to the members and general public, and to teach the same to the staff in word and deed." *Id*.

569.    All Directors, who together constitute Samaritan's "supreme governing … body," Bylaws (Ex. 1), Art. I at §(4), must agree to a "Board member Statement of Faith," Guidelines (Ex. 2) at §IV(A.1), which is more detailed than that required of staff.

570.    In addition, all Directors must: (a) when elected have "been a regular member for an uninterrupted two years [and] been in good standing for all periods of membership in the past five years," (b) be certified by their pastor or other church leader as meeting the Biblical requirement for the church office of "elder as set forth in *1 Timothy* 3," (c) "[a]nnually sign a statement that [they agree] with all the doctrinal statements" of Samaritan, and (d) submit a copy of their "church's statement of faith/doctrinal statement or positions" and a statement from a church leader "affirming that the church's statement of faith/doctrinal statement or positions are consistent with the doctrinal positions of Article III of these bylaws." Bylaws, Art. VI at §3(A).

571.    All members, including staff and leaders, must certify annually that they continue to meet all membership requirements, including all faith requirements and church leader verifications. *See* Guidelines (Ex. 2) at 16 (§I.L); Membership Continuation Form (Ex. 5).

### Reason #5: Distinct Governance Role of Members

572.    **FIFTH**, members have a major role in governance. *See* Guidelines at §IV(A). They have supermajority control of Samaritan's Board of Directors, its "supreme governing …

body," Bylaws (Ex. 1), Art. I at §4, by electing two-thirds of its nine Directors, Art. VI(§§1-2).[316]

573.    Members also control, in two distinct ways, whether their suggested monthly shares (contributions) increase.[317] **First**, members control the Board of Directors, which controls "any proposed share increases." Guidelines at §IV(A). **Second**, members can veto proposed increases by simple, direct, majority vote. "For Share Increases—All proposed share increases for Classic or Basic will be submitted to the membership of that program for their approval. The share increase will not be implemented if more than 50% of the households in that program vote against the proposed share increase." §IV(A)(2).

### Reason #6: Indeterminate (Non-Fixed) Contributions and Sharing

574.    **SIXTH**, and relatedly, the amount of monthly sharing contributions is not fixed. Nor is the amount or percentage of needs met. Both can fluctuate for various reasons. Guidelines at 11 ("Balancing Needs and Shares"). "If all needs cannot be met, we use a prorating method to evenly distribute the burden. For example, if there is only enough share money for 97% of the needs submitted for a particular month, 97% of each need would be shared for that month." *Id*. Such proration has occurred ten times in the past seven years. If monthly shares exceed needs, members are asked to contribute less. *Id*. at §VI(D) ("Balancing Needs and Shares/Proration"). This has occurred twice in the past seven years.

### Reason #7: Membership Can Be Retained During Hard Times

575.    **SEVENTH**, no member is abandoned due solely to their financial struggles. Members support struggling members through *extra contributions* for medically needy members

---

[316] *Accord* Guidelines (Ex. 2) at 7. "SMI is governed by a nine member Board of Directors, all of whom are SMI members. Six of the Board members are elected by the membership." *Id*.

[317] Each month for 11 months each year, each member sends contributions directly to another member with medical needs. This is the monthly share requested by SMI. One month each year, members send their monthly share amount to Samaritan for operational costs. Ex. 2 at 11.

and through *sponsorship* for financially struggling members to help them maintain membership so long as they try to "carry their own load" (*Galatians* 6:5), both spiritually and financially.

576.    "All membership fees and other financial requirements of members or applicants may be waived in full or part, based upon the individuals' inability to pay. No one shall be denied membership participation in any need sharing ministry, whether it be spiritual, emotional, or financial, who lacks the financial means, through personal resources or biblically mandated assistance, to pay their shares or any administrative fees within the resources provided by the Board of Directors." Bylaws (Ex. 1), Art. IV at §6.

577.    For example, from April 2020 through August 2023, there were 915 Samaritan membership households on sponsorship contributing reduced shares. And 59 percent of those households that were on sponsorship at any time during that period remain active members.

## Reason #8: Biblical Commitment to Mutuality of Burden Sharing

578.    **EIGHTH**, the requirement that each member do their part is a matter of shared religious doctrine. It is about much more than mutual benefit or even fairness. Members believe the Bible, which condemns idleness. Much of *Proverbs* speaks against it. *See, e.g.*, *Proverbs* 10:4, 26; 12:24, 27; 13:11; 14:23; 15:19; 19:15; 20:4, 13; 21:5, 17, 25-26; 22:13, 29; 24:33-34; 26:13-16; 28:19; 22. The New Testament is no more indulgent. "The one who is unwilling to work shall not eat." *II Thessalonians* 3:10. The next verse explains why. "[S]ome among you are idle and disruptive. They are not busy; they are busybodies." *Id*. at 3:11. Instead, every believer "must work, doing something useful with their own hands." *Ephesians* 4:28. The next words explain why: "that they may have something to ***share with those in need***." *Id*. (emphasis added).

579.    This Biblical commitment to mutuality in burden sharing is critical to Samaritan's ministry. Each member must "carry their own load" (*Galatians* 6:5), spiritually and financially.

For the Plaintiffs, mutuality in sharing is not simply a fine idea; it is their shared theology.

### Reason #9: Strict Spiritual/Moral Obligations of Members

580.     **NINTH**, all Samaritan member requirements, whether spiritual or financial, are of equal obligation. Members who engage in any kind of unrepentant misconduct that violates these obligations risk losing their memberships or the privileges thereof. "Membership Requirements Violated—Needs arising from conduct inconsistent with the membership requirements, or occurring when a member is not meeting the membership requirements, are not shareable." Guidelines at §VIII(D)(14). This principle applies as much to church-attendance failure, for example, as it does to failure to make requested monthly contributions to sharing of needs.

581.     **Samaritan has strict membership requirements for many reasons, such as:**

(a)     Samaritan's health care sharing is an expression of shared Christian faith, not simply a financial transaction. Those who affirm these requirements are indicating their commitment to a distinctive Christian approach to their health care where members care for each other spiritually, emotionally, and financially.

(b)     To maintain a sense of community, it is essential to maintain shared core values and behavior, and to associate around those shared core values and behavior.

(c)     Members sharing these Biblical values will wisely steward their own health and their own consumption of health care services out of conviction to obey their Biblical duties to (i) care for their own health and that of their fellow believers and (ii) avoid burdening the community with foolish or needless medical expense.

(d)     A strong sense of community is essential to establish the needed trust in fellow members that they will be there to assist you in your time of need.

(e)     Prayers for healing, and messages of support, mean much more coming from a community in which a member feels an intricate part. *See* Cordel Declaration (Ex. 25); Bell Declaration (Ex. 26); Heath Declaration (Ex. 27); O'Neill Declaration (Ex. 28); Bienhoff Declaration (Ex. 29). *See also* Cooper Declaration (Ex. 24).

### Reason #10: Internal Operations Are Thoroughly Religious

582.  **TENTH**, the internal operations of Samaritan and its staff are intensely religious. Such internal operations reflect internal doctrine and lead by example. Examples include:

(a)   Every Board meeting opens with a time of a devotional message from the Bible and then prayer by the Board members.

(b)   Once a month the entire local staff meets in a local church auditorium, with remote staff attending virtually, with up to half of the meeting devoted to Biblical messages, prayer, and praise-and-worship singing.

(c)   Two times a week Samaritan staff are invited to a time of prayer for thirty minutes coordinated by Samaritan's full-time staff chaplain.

(d)   Every department includes a regular prayer time in its operations.

(e)   One to two times per year there is a staff-wide day of fasting and prayer.

(f)   Staff donate paid-time-off, financial support, and meals to help bear the burdens (medical and otherwise) of fellow staff.

(g)   Staff receive additional paid time off for religious mission trips.

### Reason #11: The Ministry Is Deeply Associational and Expressive

583.  **ELEVENTH**, Samaritan is deeply associational and expressive. These communal aspects of Samaritan are just as important to the members as they are to Samaritan. And they merit careful attention here, with many excerpts from attached documents.

584.  "Samaritan Ministries is a community of Christians," Guidelines (Ex. 2) at §XII, who "encourage a spirit of community," *id*. at §IV(B). Samaritan shares its common faith with each member to encourage each other in the faith.

585.  The ten individual Plaintiffs associate through Samaritan for reasons going way beyond sharing financial burdens, as the following excerpts from their Declarations show.

586.  "[E]ach month, the names we enter on each check are real people facing real health setbacks or crises. We always include uplifting notes and prayers…. When we do this, we

enter the lives of fellow members. They are burdened with sickness, fear, pain, and stress. And all that is made worse by the mindboggling … healthcare system [made worse] in recent years due to Covid-19. All such burdens can make members sicker or slower to recover. These burdens affect their whole family. These burdens can cause them or their loved ones to doubt their faith[.] We help them carry these burdens, which are spiritual and emotional as much as financial. These people are our brothers and sisters in need. They are our fellow sharers in the faith-filled community called Samaritan. We are blessed by blessing them. Our fellow members have likewise been there for us during our hours of need. [First health crisis.] The personal checks, notes, and prayers for Allan and our family were a spiritual investment in our family. It was very encouraging during a difficult time…. [Second health crisis.] Samaritan membership is not insurance. But we have faith in our fellow members to share these costs [based] on faith rather than legal guarantees. Participation strengthens our faith…. We Samaritan members form a body of Christians emphasizing the bearing, carrying, and sharing of burdens that accompany sickness and accidents. We are like congregants in a church called Samaritan. We act like congregants in a church called Samaritan." D. Allan & Monette Bell Decl. (Ex. 26) at ¶¶7-13.

587.    "Each month we write physical checks and handwrite physical cards to our fellow members in need … to help relieve their financial, emotional, and spiritual burdens associated with illness or accident. We pray for and minister to fellow Christians by name and need, and send them money directly to their homes. They do the same for us when we have needs. We have submitted our needs [on] three main occasions. [Describing three health crises]. Each time we were on the receiving end of checks, cards, notes, and prayers[.] Their financial, emotional, and spiritual support was like a healing balm[. As] healthcare providers ourselves, we probably understand better than most members how such support can contribute directly and powerfully to

physical and mental recovery and healing. [Samaritan] is as essential to our free exercise of religion, and our spiritual well-being, as church membership. In fact, Samaritan operates very much like a [church that] specializes in meeting needs of members facing accident or disease. And it does so in a way compatible with our Christian beliefs on morality. We could never join an insurance or other healthcare program that supports activity that clearly violates Scripture…. If state regulation ever required Samaritan to support such activities, it would destroy Samaritan or our role in it…. Because any such action against Samaritan would deprive us of our Christian healthcare ministry and fellowship, it would deprive us our constitutional rights to free exercise of religion, free expression, and free association. These injuries would be deeply personal and offensive." Jay & Amy O'Neill Decl. at (Ex. 28) at ¶¶6-9.

588.    "We have been members of Samaritan [for] ten years…. Unlike any insurance, Samaritan requires its members to rely on their faith in God and their fellow members to contribute to needs as they arise[.] Samaritan also is unlike any insurance in how Samaritan involves giving as much as receiving. **<u>Giving Side</u>**. [W]e have loved the giving to … specific individuals who are believers and members of this Christian community, to share in their healthcare burdens. We always include notes of encouragement and our prayers. We feel our participation is a direct line into their lives … as if they were members of our church or discipleship group or Bible study…. **<u>Receiving Side</u>**. For our own serious healthcare burdens, we have received the personal checks … from our Christian brothers and sisters in this ministry. Their … notes of encouragement and prayers have touched us deeply. The following two personal experiences explain how this sharing ministry works. For the birth of our first child … [our] fellow Samaritan members reimbursed the cost of that home birth. They also sent us notes of spiritual encouragement and prayers for our spiritual and physical well-being. Some members

even sent us baby gifts and gift cards for such use. This whole experience was very meaningful to us. It was a Christian community bearing and sharing one another's burdens very much like a Christian church." Zachary & Rachel Cordel Decl. (Ex. 25) at ¶¶7-10.

589.    "As devout Christians, we believe in the power of prayer. Praying for and receiving prayer from others facilitates healing through encouragement. But it does much more. The God in whom we trust, and to whom we pray, hears those prayers and acts on them…. There is additional power in communal prayer and Christian fellowship. [Discussing Scriptures.] This communal activity is vital to Christians…. We and all our fellow Samaritan members are a Christian family, bearing and sharing the burdens of one another, taking care of each other, and encouraging each other in the faith. These activities are deeply spiritual and have profound impacts[.] Insurance companies can never replicate what Samaritan is and what it does…. Our Christian faith … would prevent us from obtaining insurance … governed by antidiscrimination … regulations that impose or support social policies on sensitive matters such as life, gender, and sexuality, that are contrary to God's Word. Even as our Christian faith requires us to love all people and to repent of our own sins, it prevents us from condoning sin or participating in programs that support sin[. W]e want and need Samaritan's ministry. We need it because of its unique ability to express our Christian faith through facilitating mutual burden sharing by its membership community[.] This mutual burden sharing includes spiritual and emotional burdens as well as financial. We also need it because there is no secular substitute. Even if a substitute existed, it would require supporting activities contrary to our faith." *Id*. at ¶¶11-19.

590.    "Members now have the choice of sharing needs by paper or electronic means. Either way the sharing is direct[, and monthly] notes of exhortation and prayer are just as meaningful over the Internet. Whether we use [EFT] or paper, all members remain committed to

all members in need and pray and care for them by name. We all remain devoted to each other as part of our common faith in Jesus Christ. This Christian devotion plays out in many practical ways, as our own recent health crises have shown. Last year, *we* were members [in] need, and those needs were great, on every level." Rev. Nate & Rebekah Bienhoff Decl. (Ex. 29) at ¶¶7-8.

591.    "When Nate's crisis began, we had many questions about the process of sharing…. When a woman from Samaritan called Nate, he was pulling his truck into a gas station…. She didn't promise or guarantee anything, from anyone, but reaffirmed our common belief in God's Providence. Nate was relieved by her clear and friendly explanations. But he was stunned with emotion when she asked him, near the end of their call, if they could pray together. She didn't say, May I pray for you? She said, Let's go before the Lord together. As Nate stood there at the gas station, they prayed together, approaching God jointly with petitions for peace and healing. Nate wept. He was overwhelmed with the recognition that he and his 'sister' from Samaritan together serve a faithful God who uses us to meet each other's needs." *Id.* at ¶10.

592.    "Then came Rebekah's crisis last October. She had been worried almost sick by Nate's health scare and the possibility of losing him. [W]hile she was caring for Nate, the physical strain of moving him ruptured her hysterectomy and caused a hernia. It was a case of the sick caring for the sick. It might have been comical if we hadn't been so miserable. But God saw us through, using our Christian brothers and sisters at Samaritan. All our medical bills were taken care of. Members shared their emotional and spiritual support with us. At one point, when Rebekah didn't know whether Nate would live or die, a female employee with Samaritan shared her own similar experiences with Rebekah and asked to pray with Rebekah and did pray with her. The cards and notes we received were precious. We kept them despite our anti-clutter bias. We believe in Samaritan and the Christian fellowship it fosters. Our participation in Samaritan is

both an aspect and a function of our freedoms of religion and association." *Id*. at ¶¶11-12.

593.    "We joined Samaritan [in 2014].... Fellowship among Christians is true worship to God and unleashes His power, even as it nurtures the faith of all who participate. That is what Samaritan means to us—authentic Christian fellowship and worship—because that is what it means to God and [our] members." Rev. Andrew & Heather Heath Decl. (Ex. 27) at ¶¶7, 18.

594.    "[Our p]articipation in Samaritan is a classic exercise of religion for several reasons.... **First**, it fulfills the commands of Scripture. [Discussing Scriptures.] **Second**, this communal activity is itself a powerful form of worship, pleasing to God. [Scriptures.] The healthcare aspect of this mutual-service and burden-sharing matured during the early years of the Protestant Reformation. In the early 1500s, Amish, Mennonite, and other Anabaptist Protestants formed healthcare sharing ministries within their own local church bodies. These internal church ministries grew, and expanded to other faiths, and became today's health care sharing ministries. Samaritan is an excellent modern example or paradigm of such a ministry." *Id*. at ¶¶11-17.

595.    "**Third**, the essential caretaking activity of Samaritan members is an exercise of their faith in God, and His Providence, rather than the promises of men or guarantees of government. This is in stark contrast to insurance. We Samaritan members depend on God for our needs, trusting that He will move upon the hearts of our fellow members and provide them sufficient resources to contribute to the care of fellow members.... To replace this faith-reliance with reliance on a legal contract or … guarantee would destroy the spiritual foundation and purpose of the faith-building, fellowship-driven exercise of Samaritan's ministry." *Id*. at ¶¶19.

596.    "**Fourth**, Samaritan is a distinctive Christian ministry that [acts] consistently with Scriptural morality. We and our fellow members cannot in good conscience participate in or support health insurance or healthcare programs that compel or provide coverage or procedures

for abortion, sex-reassignment, and other procedures contrary to Scripture. Most or all health insurance companies, and many insurance alternatives, do just that, which also would be required of Samaritan if it were regulated like insurance. Subjection to insurance regulation is not just red tape: it is an existential threat. It would cause Samaritan to cease to exist." *Id*. at ¶¶20.

597.    "[S]amaritan is not just *a* Christian ministry; it *is* Christian ministry. It follows Christ's teachings and example in the most practical and authentic ways. It is a classic expression and exercise of Christian faith. Consequently, it is nothing like 'insurance' and nobody ever mistakes Samaritan for, or confuses it with, insurance. We do not want insurance. We want and need this Biblical ministry called Samaritan. We want and need it because of its unique ability to express our Biblical, Christian faith in all the ways described above." *Id*. at ¶21.

598.    All the above testimony by the ten individual Plaintiffs is embodied in Samaritan's day-to-day ministry in many additional ways, including the following.

599.    Samaritan maintains a **Personal Care Team** comprised of three staff, two of whom are ordained ministers. The purpose of this Team is to provide spiritual comfort, pastoral counseling, and theological insight in a variety of situations. This Team ministers to members facing crises such as terminal illness, deceased family members, tubal/ectopic pregnancies, failing marriages, mental-health complications from medical conditions, involuntary psychiatric commitments, and many other crises. This Team gently cares for these members, providing direction, prayer, and encouragement, while upholding the authority of each member's local church. This Team also answers questions on the meaning and purpose of various membership requirements and a variety of other difficult issues or questions confronting members.

600.    Samaritan also sponsors local fellowship dinners for members around the country. Recent such dinners occurred on September 21, 2023 in Austin, Texas (140 members present);

on April 24, 2023 in San Antonio, Texas (140 members); and on October 6, 2022 in Denver, Colorado (200 members). Such dining together for worship, prayer, and fellowship has been central to Christianity for over 2,000 years. *E.g., Luke* 22:14-20 (The Last Supper); *Acts* 2:46.

601.    Samaritan's ministry embodies all these communal, associational, and expressive religious activities. And all activities discussed above are reflected in Samaritan's policies.

602.    As stated in the Guidelines (Ex. 2) at §IV(B) ("Communicating with each other"): "At SMI we believe all members of the Body of Christ should give input for the mutual edification of the whole body. We encourage members to communicate with staff about all issues of health care. Your input can help us be more aware of ways to improve the ministry."

603.    Samaritan also operates a continual virtual forum for its members to meet, confer, and associate together in traditional, Biblical Christian community. Discussion follows.

604.    Key content for this forum is shared in Samaritan's monthly newsletter, which facilitates the membership's expressive association through teaching, exhortation, and discipleship. As an example, the November 2022 Newsletter (Ex. 3) contains this summary:[318]

**November 2022**
- This Month at Samaritan
- Missional medicine: Samaritan member and bioethicist shares his vision for redeeming health care.
- Noteworthy: Live in a constant attitude of thanksgiving. By Julia Ekstrom.
- Member Spotlight: Dan Stayskal of White Thorn Events. Also, Why SMI? By Kathryn Nielson.
- This Thanksgiving, practice the lost art of feasting. By David Mathis of desiringGod.com.
- Knowing more about body mechanics may prevent injury. By Jonathan Hamm of MOOSE Physical Therapy.
- The Doorpost: Psalm 63:1. By Ray King.

605.    Each month's sixteen-page newsletter shares content on the religious, medical, and social values and views of interest to Samaritan's members, in line with its Biblical views. For example, the November 2022 Newsletter (Ex. 3) contains articles and section titles such as

---

[318] https://samaritanministries.org/member-webapp/newsletter-page (accessed 10/28/2023).

"Missional Medicine" (a Samaritan member and bioethicist discusses his new book and venture on Christian health care); "Member Spotlight" (a member couple "show[] there is no limit to creative ways of spreading the Gospel"); "Bible" (Thanksgiving piece) ("[w]hat makes feasting a means of God's grace for nourishing our souls is explicitly celebrating Christ together in faith"); "Health" (how "posture, body mechanics, and ergonomics can help you prevent injury"); "Prayer for the Persecuted Church" (international missionary issues and prison ministries).

606.    A phrase from the Thanksgiving piece above epitomizes Samaritan's ministry: "explicitly celebrating Christ together in faith." By so celebrating Christ together in faith, Samaritan members "fulfill the Law of Christ," including His two Greatest Commandments to love both God and neighbor, enriching this life and the life to come. ¶¶541-544.

607.    The October 2023 Newsletter, for example, contains comparable content:[319]

## October 2023

- This Month at Samaritan
- We are not insurance. Not now. Not ever. By Greg Feulner.
- Noteworthy: Jesus wins! By Julia Ekstrom.
- A health insurance insider learned that sharing is a better model. By Steve Bassett.
- Member Spotlight: Craig Russell, SS American Memorial. Also, Why SMI? By Michael Miller.
- How to put on the full armor of God. By Anthony Hopp.
- 50 percent off here may not be as good as 20 percent off there. By Bryan Rudolph.
- The Doorpost: 2 Peter 2:1. By Ray King.

608.    Samaritan's members continually educate, support, exhort, encourage, disciple, and pray for one another, all as aligned with their shared Biblical views. In this sense, it is a classic voluntary association, one of believers and members of the Body of Christ fulfilling His Great Commission and embodying the Parable of the Good Samaritan.

### Reason #12: The Ministry Serves a Vital Parachurch Function

609.    **TWELFTH**, Samaritan serves a vital, mutually reinforcing "parachurch"

---

[319] https://samaritanministries.org/member-webapp/newsletter-page (accessed 10/28/2023).

function. This function may be illustrated in several ways.

610.   All Samaritan members must be members or regular attenders of their own local "Biblical, Christian church." ¶563. Consequently, nearly all Samaritan members are members of at least two related Christian bodies: (a) Samaritan and (b) their own local church. For each member, these two memberships complement and reinforce one another.

611.   The size of some medical needs is too great for most local churches to help bear. The largest expense shared through Samaritan to date was $2.9 million for Neonatal Intensive Care in a heartbreaking situation. Many needs above $1 million have been shared.

612.   At the same time, Samaritan depends on local churches to: (a) certify that Samaritan's members meet their spiritual requirements; (b) certify that Samaritan's Officers (as deacons) and Directors (as elders) meet their heightened spiritual requirements; and (c) provide accountability for our mutual members (e.g., that funds shared through Samaritan for medical bills are used for that purpose). ¶¶564-571.

## The Reasons Why Samaritan Is Most Un-like Insurance

613.   To start, it bears repeating that Samaritan's role in the regular monthly ministry is limited to soliciting its members to send notes, prayers, and financial support directly to fellow members in need, without exercising any ownership or even control over that financial support.

614.   Included above are examples of the Biblical beliefs of Samaritan's members that allow them to hold, and to share medical bills in accordance with, the same beliefs. This is required by the insurance-mandate exemptions and by many safe harbors. ¶¶944-983.

615.   For example, the ACA mandates that HCSM "members [must] share a common set [of] religious beliefs and share medical expenses among members in accordance with those

beliefs and without regard to the State in which a member resides[.]"[320]

616.    Thus, under the ACA (and most applicable state laws, which mirror or model the ACA), the members of each and every qualifying HCSM must (a) "**share a common set of religious beliefs**," (b) "share medical expenses among members **in accordance with those beliefs**" and (c) do so "**without regard to the State** in which a member resides."

617.    This sharing of beliefs and expenses must occur without regard to any member's State of residence—i.e., uniformly, nationwide—**in New Mexico the same as in New York**.

618.    Samaritan complies with these requirements, which necessarily distinguishes it from insurance. And Samaritan's ministry model is distinct from insurance in many other ways.

619.    Samaritan *memberships* are not insurance-like *products* or *plans* and they are not *sold* by insurance professionals. Samaritan has never used insurance agents, brokers, producers, or any other licensed or commissioned person who sells health insurance, to market or "sell" memberships. (Nearly 50% of new members come from existing-member recommendations.)

620.    Samaritan's relationship with local churches is symbiotic. "Our local Christian church offers us support. We seek to support and supplement the local body, not replace it. We depend on local Christian church leaders to provide accountability for the Samaritan members under their care." *Foundational Principles*, Sharing Guidelines (Ex. 2) at 5. The ministry of Samaritan is no more insurance than the ministries of local churches across the United States.

621.    It is because Samaritan is so distinct from insurance, and offers none of its guarantees, that consumer confusion has not been a problem, as shown by the total absence of consumer complaints over Samaritan's nearly 30-year sharing history.

622.    The written testimony of individual Plaintiffs further illustrates this point.

---

[320] IRC §5000A(d)(2)(B)(ii)(II). *See* ¶¶1251-1262, 1700-1730 (discussing applicable laws).

623.    "We both had insurance for decades and know very well how it works. It does not describe what Samaritan does at all…. [We are aware] that New Mexico is ordering ministries like Samaritan to either leave the state or register as insurance companies. Such actions are wrong and inexcusable. Samaritan does not offer insurance and our membership is not an insurance policy. It offers no promise or guarantee at all." Bienhoff Dec. (Ex. 29) at ¶¶6, 13.

624.    "Samaritan is nothing like [insurance and it] would be illogical and probably illegal to regulate it as if it were. We members cannot abide insurance regulation any more than Samaritan can. It's not just the added costs, burdens, and complications of being regulated. It's a matter of conscience and obedience to Scripture. We members share burdens in a particular way [to] obey Scripture and to exercise our faith. Imposing legal guarantees and requirements would displace or undermine the faith-foundation of what we do." Bell Decl. (26) at ¶15.

625.    "In summary, Samaritan … *is* Christian ministry. It follows Christ's teachings and example in the most practical and authentic ways. It is a classic expression and exercise of Christian faith. Consequently, it is nothing like "insurance" and nobody ever mistakes Samaritan for, or confuses it with, insurance. We do not want insurance." Heath Decl. (Ex. 27) at ¶21.

626.    "Samaritan is not insurance or anything like it. For us, it is not some kind of insurance substitute. We do not want insurance. Insurance companies can never replicate what Samaritan is and what it does." Cordel Decl. (Ex. 25) at ¶17.

627.    As also *required* by safe-harbor laws (discussed further below), Samaritan everywhere expressly disclaims any assumption of risk, promise to pay, and other hallmarks of insurance, and it expressly makes its members responsible for their own medical bills.

628.    For example, Section 3 of the Membership Application (Ex. 4) states:



629.    Similar terms are pervasive in Samaritan materials, starting with the preface to its Sharing Guidelines. "Health care sharing is not insurance. Members share one another's medical expenses through voluntary giving, not because of legal obligation." Ex. 2 at ii; *id.* at 6 ("Overview"); *id.* at 10 (Section: "***We Are Not Insurance***"); *id.* at 81-89 ("**Legal Notices**").[321]

630.    In other words, Samaritan expressly, consistently, and persistently disclaims any assumption of risk, promise to pay, and other customary legal incidents of insurance.

631.    **Additional indicia of Samaritan's non-insurance status include**:

(1)     No risk measuring.

(2)     No underwriting (based on, e.g., age,[322] sex, physical condition, location).

(3)     No "coverage period": membership is perpetual (so long as, and for as long as, membership requirements are met; membership is designed to be "for life").

(4)     No open-enrollment period.

(5)     No "premium" or monthly amount sent to Samaritan.

(6)     No subrogation rights.

---

[321] *See* https://samaritanministries.org/about/transparency-legal (accessed 11/15/2023).

[322] Some age-banding does exist in the Basic program.

(7)     No reinsurance/stop-loss.

(8)     No "reserves" for paying a surge in sharing requests.

(9)     No adjustment to sharing based on medical costs where member lives.

(10)    No residential restriction on membership: fully portable wherever member lives.

(11)    No health-condition preclusion from membership: no one is turned down for membership based on health conditions.

(12)    No health-condition effect on monthly share amount: monthly contributions do not increase based health conditions.

(13)    No restrictions on methods of treatment (so long as it is lawfully prescribed by health care professional and does not violate the religious/moral standards).

(14)    No penalties for untimely contributions (i.e., "late payments").

(15)    No PPO or out-of-network penalties: member free to see any lawful provider.

(16)    No pulling out of a "market" or "canceling" any class of "policyholders."

632.    Samaritan's hundreds of thousands of members evidently understand this.

633.    This non-insurance understanding is borne out in the written testimony of the ten individual Plaintiffs and by the total absence of any member complaints filed with any public or private regulator anywhere during Samaritan's nearly 30 years of nationwide ministry.

634.    In short, Samaritan's members directly share their health needs and costs among themselves—voluntarily giving their contributions, as suggested and coordinated by the ministry—and frequently donate extra for needy members and give special, personalized gifts.

635.    Again, the individual Plaintiffs make the point.

636.    "All births are stressful. And few experiences are more tragic than the loss of a child (miscarriage) or the potential loss of a child (appendicitis). These were very trying times. But Samaritan was there for us, sharing our financial and emotional burdens. Members sent Heather gifts and gift cards for our babies. One woman who had experienced miscarriage sent Heather a book on healing the wounds that result from miscarriage." Heath Decl. (Ex. 27) at ¶10.

637.     "For the birth of our first child, we had decided for personal and religious reasons on a home birth with the assistance of a midwife. Samaritan provided for such births, including sharing the cost of midwife, [whereas] insurance did not. Our fellow Samaritan members reimbursed the cost of that home birth. They also sent us notes of spiritual encouragement and prayers for our spiritual and physical well-being. Some members even sent us baby gifts and gift cards for such use." Cordel Decl. (Ex. 25) at ¶10.

638.     Samaritan bears no resemblance to insurance.

639.     No sharing is guaranteed, ever. No member is legally obligated to contribute funds, ever. No member is dropped due solely to financial hardship, ever. All members remain legally responsible for their own medical bills, always. There are no legal incidents of insurance.

640.     In Defendant's ironic view, however, this total absence of the customary legal incidents of insurance is no barrier to her imposing the Insurance Code on Samaritan.

### The Reasons Why OSI Exists

641.     The New Mexico Office of the Superintendent of Insurance exists to enforce the New Mexico Insurance Code, i.e., to regulate the "business" or "transaction" of "insurance."

642.     Superintendent Kane does this through her leadership of the Office of Superintendent of Insurance.

643.     OSI has two key constituencies: insurance consumers and insurance producers. According to OSI's Annual Report for 2022 (Ex. 47 at 5):

## What Is the OSI?

The paramount role of the OSI is to make sure the insurance industry is operating in the best interests of New Mexicans. It does this by serving and engaging three primary groups: consumers, producers, and policy issuers. The most important of these groups is consumers of insurance. The

> OSI serves consumers by investigating and prosecuting fraud, which keeps prices low and protects customers, by monitoring market rates and enforcing fair and competitive pricing of insurance products, and through public education.

644.    In OSI's own words, then, its "paramount role" is to ensure the "best interests of New Mexicans," especially the interests of the "consumers of insurance," primarily "by investigating and prosecuting fraud to "protect[] customers" and "enforcing fair and competitive pricing of insurance products." *Id.*

645.    "In general, New Mexico's Insurance Code permits and encourages independent action by and reasonable price competition among insurers as an effective way to produce rates that are not excessive, inadequate or unfairly discriminatory."[323]

646.    To "combat insurance fraud" in recent years, OSI has staffed up and leveraged its resources through "a greater number of joint operations, prosecutions, and convictions." Cover Letter of Former Superintendent Toal, OSI Annual Report for 2021 (Ex. 46).

647.    According to the 2021 Annual Report (preface), OSI's mission is as follows:

## Agency Mission

> The mission of the Office of Superintendent of Insurance is to provide consumers with convenient access to reliable insurance products that are underwritten by dependable and financially sound companies. The agency strives to ensure that these companies have a proven history of fair and reasonable rates, are represented by trustworthy and qualified agents, and treat consumers fairly and honestly. The Office of Superintendent of Insurance is committed to insurance consumer protection, fraud prosecution, and education, striving to become one of the nation's leading regulatory agencies.

648.    In general, the 2021 Report touts OSI's progress in "encouraging New Mexicans to enroll in comprehensive health insurance coverage" through the ACA exchanges, including

---

[323] *Coll v. First Am. Title*, 642 F.3d 876, 882 (10th Cir. 2011) (punctuation omitted; cleaned up).

OSI's "press releases [and] TV interviews … urging people to sign up." *Id*. at 6.

649.    The data below are from OSI's Annual Report for 2022 (Ex. 47).

650.    OSI has "109 full-time equivalent (FTE) positions." *Id*. at 6. OSI's top "Performance Measure" for 2022 was "97.72%" closure of all "internal and external insurance-related grievances" "within 180 days of filing." *Id*. at 9.

651.    OSI's "Civil Investigations Bureau is responsible for providing professional investigative work of possible infractions and civil enforcement of ***violations of the Insurance Code***, rules, and regulations. The Bureau conducts ***investigations [of] complaints*** [to] develop[] a ***factual basis*** for allegations of ***violations of the Insurance Code***…. Inquiries that warrant administrative action, discipline or criminal prosecution are referred to the office of Legal Counsel or referred to the Fraud Bureau. Civil Investigations, the Office of Legal Counsel, and the Fraud Bureau collaborate in matters involving both civil and criminal action to ***ensure that consumers are adequately protected***." *Id*. at 13 (emphasis added).

652.    "Advertisement review is done to ensure ***clear and truthful disclosure*** of the benefits, limitations, and exclusions of health insurance policies in order to ***protect*** prospective purchasers from ***deceptive and misleading marketing practices***." *Id*. at 18 (emphasis added).

653.    "The Managed Health Care Bureau (MHCB) administers and enforces the New Mexico[] ***Patient Protection Act*** and related healthcare regulations. MHCB handles ***complaints and inquiries from consumers*** experiencing denials of health insurance coverage[.] The Bureau reviews external grievance appeals, proposes rule amendments, and ***takes appropriate enforcement actions where merited***. Conducting ***outreach presentations throughout the State*** to inform consumers and health care providers of their rights and responsibilities under the Affordable Care Act is also one of [its] key responsibilities[.]" *Id*. at 21 (emphasis added). In

2022, the "Total Grievances/Inquiries" handled by MHCB was 565. *Id*.

654.    "The Producers Licensing Bureau reviews licensing applications for individuals and ***Business entities who want to conduct insurance business in New Mexico***." *Id*. at 23 (emphasis added). "[The] Bureau licenses over 248,110 insurance professionals, as well as non-risk-bearing insurance entities." *Id*. at 23. "The Bureau determines the qualifications and eligibility of applicants, review DPS and FBI records for resident applicants, approves pre-licensing and continuing education courses, tracks continuing education credits, and processes license applications, renewals, and the appointment of agents by insurance companies." *Id*.

655.    In 2022, the number of "complaints received by the Consumer Assistance Bureau" was 714. *Id*. at 9. The number of "complaints received by the Investigations Bureau" was 386. *Id*. at 10. The number of "complaints received by the Investigations Bureau for which enforcement action was taken" was 135. *Id*. The number of "cases referred to the criminal division" was 26. *Id*. The percentage of "Criminal Division referrals processed and recommended for further administrative action, prosecution, probation and/or closure for insufficient information within ninety days" was 100%. *Id*.

656.    The above reported activities and figures for OSI are impressive. But none of those grievances, complaints, investigations, or prosecutions related in any way to Samaritan.

657.    OSI received no complaints against Samaritan in 2022 or in any other year.

658.    There is no reason to believe Samaritan presents the slightest challenge to OSI's commitment to "insurance consumer protection" and "fraud prosecution."

659.    Yet, Samaritan remains imminently threatened by OSI. ¶¶61-113, above.

### Samaritan's Basic Organizational Structure/Foundation

660.    Samaritan was incorporated in Illinois on September 11, 1991. *See* Articles of Inc.

(Ex. 17).[324] It began its sharing ministry nationwide in 1994, advertising in a magazine with nationwide circulation and open to members nationwide. Its first New Mexico member joined in 1996. Samaritan has long operated in all 50 states and the District of Columbia. Its ministry has over 270,000 members nationwide, including 918 in New Mexico as of October 1, 2023.

661.    Samaritan has received two relevant legal determinations from the United States Government under provisions of the ACA and the IRC. Both provisions are codified in the IRC.

662.    **First**, Samaritan received its federal tax-exempt status under IRC §501(c)(3) on June 17, 2005. IRS Det. Ltr. (Ex. 18).[325] **Second**, Samaritan received its federal HCSM status under IRC §5000A on February 26, 2014. CMS Det. Ltr. (Ex. 19) and ACA-Certified HCSM List (Ex. 20) (Samaritan is No. 3).[326] These federal determinations are discussed further below.

663.    To its knowledge, Samaritan has never been the subject of a consumer complaint filed in any jurisdiction with any government agency or regulator or with BBB. In other words, during Samaritan's nearly 30 years of nationwide sharing ministry, not one consumer complaint has been filed against it with any insurance commissioner, any attorney general, any other public agency, or even the BBB. This includes, specifically, New Mexico.

664.    Again, it is because Samaritan's ministry bears so little resemblance to insurance, and promises none of the guarantees of insurance, that consumer confusion has not been a problem, as shown by the complete absence of consumer complaints.

665.    Instead, Samaritan continues to well serve its New Mexico members, as attested by the ten individual Plaintiffs in this case. *See* Exhibits 25-29.

---

[324] *See also* IL Sec. State Corp. Lookup for "Samaritan Ministries" or File Number "56529845."

[325] This IRS ruling is also available at *Samaritan Ministries Int'l*, 2005 WL 1544916 (I.R.S. June 17, 2005) and on Samaritan's website here.

[326] This CMS ruling is also available on Samaritan's website here.

666.   Samaritan maintains accreditation and an A+ rating with the BBB,[327] and is one of only two HCSMs accredited by Healthcare Sharing Accreditation Board.[328] It harms no one.

## Samaritan's Nationwide Legal Status as "Non-Insurance"

667.   In its nearly 30 years of sharing, Samaritan's ministry has operated freely as non-insurance in all 50 states—until now, or imminently, in New Mexico.

668.   Samaritan has never been found in any binding legal decision to be "insurance."

669.   Samaritan remains in good standing with all federal and state regulators, except, evidently, now OSI in New Mexico.

670.   The only reason Samaritan is jeopardized in New Mexico is that OSI has abandoned its sole purpose to wage a biased and illegal war against HCSMs.

## The "Regulation" of Health Care Sharing Ministries

671.   Governments in the United States regulate health care sharing ministries as they do other nonprofit charities, with the chief enforcers being the IRS and state AGs.

672.   But this ancient form of mutual-burden sharing has never been subject to any special or insurance-type "regulation," as commonly understood, at least not in the United States.

673.   The Christian concept of organized sharing of burdensome medical and other expenses is centuries old. ¶¶535-540. It has been centered largely, if not uniquely, in the Anabaptist community, including among the Amish and Mennonite. *Id*.

674.   In 1983, a *non*-Anabaptist health sharing ministry began. It was known at that time as Christian Brotherhood Newsletter ("CBN"), but is known today as Christian Healthcare Ministries ("CHM"). It is among the three largest health care sharing ministries and was the first

---

[327] www.bbb.org/us/il/peoria/profile/health-sharing-ministries/samaritan-ministries-international-0724-90012037 (accessed 10/29/2023).

[328] https://hcsab.org/accredited-organizations (accessed 10/29/2023).

to gain ACA-recognition. *See* ACA-Certified HCSM List (Ex. 20) (CHM is No. 1).

675.    Soon thereafter, Christians of myriad denominations and faiths began establishing and participating in these burden bearing/sharing ministries nationwide.

676.    It was not long before questions arose over how to characterize these ministries and whether their role in assisting their members brought them under state regulation as "health insurance." The answer was a swift and almost universal, "No." As the issue arose in state after state, the conclusion that these ministries were not a proper subject of insurance regulation was resolved by judicial decisions, or legislative action, or both.

677.    Starting around 1990, state legislatures began enacting "safe harbor" laws to keep these ministries "safe" from state insurance regulators. These laws typically describe the traits of those ministries to be recognized as outside the jurisdiction of the state's insurance code. To date, thirty-ones states have enacted such HCSM safe-harbor laws.[329]

678.    To protect these ministries from a different burden—mandated health insurance for their members—Congress created a "Religious Exemption" from the ACA's shared responsibility payment (individual mandate) for any member of a "Health Care Sharing Ministry."[330] This HCSM exemption was one of the many compromises enabling ACA passage.

679.    To enable HCSM members to obtain the benefits of the HCSM exemption in the

---

[329] Ala. Code §22-6A-2 (2012); Alaska Stat. §21.03.021(k) (2016); Ariz. Rev. Stat. §20-122 (2011); Ark. Code §23-60-104(b)(2) (2013); Fla. Stat. §624.1265 (2008); Ga. Code §33-1-20 (2011); Idaho Code §41-121 (2013); 215 Ill. Comp. Stat. 5//4 (b) (2012); Ind. Code §27-1-2.1-1 (2012); Iowa Code §505.22 (1995); Kan. Stat. §40-202(j) (1994); Ky. Rev. Stat. §304.1-120(7) (1994); La. Stat. §22:318 (2014); Me. Rev. Stat. tit. 24-A, §704(3) (2011); Md. Code, Ins. §1-202(a)(4) (1997); Mich. Comp. Laws §550.1865 (2012); Miss. Code. §83-77-1 (2014); Mo. Stat. §376.1750 (2007); Mont. Code §50-4-111 (2021); Neb. Rev. Stat. §44-311 (2014); N.H. Rev. Stat. §126-V:1 (2012); N.C. Gen. Stat. §58-49-12 (2011); Okla. Stat. tit. 36, §110(11) (1998); 40 Pa. Stat. §23(b) (1994); S.D. Codified Laws §58-1-3.3 (2012); Tex. Ins. Code §1681.001 (2013); Utah Code §31A-1-103(3)(c) (1990); Va. Code §38.2-6300 (2008); Wash. Rev. Code §48.43.009 (2011); Wis. Stat. §600.01(b)(9) (1997); Wyo. Stat. §26-1-104(a)(v) (2015).

[330] 26 U.S.C. §5000A(d)(2)(B).

ACA, CMS adopted regulations and an application process to determine which ministries met the exemption's requirements.[331] The HCSM exemption was designed to ensure all Americans had access to HCSMs nationwide: in every state.

680.    As a result, 107 ministries were recognized as "Health Care Sharing Ministries" under the ACA.[332] *See* ACA-Certified HCSM List (Ex. 20).[333] This list begins with Christian Healthcare Ministries/CHM (No. 1), Christian Care Ministry/Medi-Share (No. 2), and Samaritan (No. 3). It also includes by Gospel Light/Liberty (No. 6), Altrua (No. 76), and Anabaptist Healthshare ("AHS," aka OneShare International) (No. 106). *These six HCSMs are mentioned here because they appear elsewhere herein, including in precedential cases*.

681.    To be clear, the federal HCSM exemption in the ACA, like comparable state exemptions,[334] protects both HCSMs and their members *by exempting the members* from penalties for failing to have or maintain "insurance" coverage. Thirty-one states have gone further by enacting safe harbors *for the HCSMs themselves*.[335]

682.    None of these HCSM exemptions/safe harbors impose operational requirements on HCSM themselves. Rather, these legal *protections* for HCSMs define what is necessary for the ministry to be recognized as non-insurance. Nor does a safe harbor create a presumption that

---

[331] **CMS** is the Centers for Medicare & Medicaid in the U.S. Department of Health & Human Services. The **CMS** and **IRS** each have ***HCSM roles*** under the ACA and Internal Revenue Code.

[332] IRC §5000A(d)(2)(B).

[333] CMS made all 107 determinations before this procedure moved to the IRS in 2016/2017. *See* Ex. 20 (cover sheet). No new HCSMs have been added, because the Tax Cut & Jobs Act of 2017 "reduced the individual mandate shared responsibility payment to $0." *U.S. v. Medoc Health*, 470 F.Supp.3d 638, 654 (N.D.Tex. 2020). "With the penalty zeroed out, the IRS can no longer seek a penalty from those who fail to comply." *Calif. v. Texas*, 141 S.Ct. 2104, 2114 (U.S. 2021).

[334] Cal. Gov't Code §100705(c)(2); D.C. Mun. Regs. tit. 26-A, §8901.1(f); 956 Mass. Code Regs. 5.03(3)(d); N.J. Stat. §54A:11-2 (incorporating ACA definitions of §5000A(d)); 44 R.I. Gen. Laws §44-30-101(a)(1) (same).

[335] See footnote 329 above for the complete citation list of the 31 state HCSM safe harbors.

operating outside of its bounds means the HCSM is subject to the state's insurance code. In fact, two key state supreme court decisions considered the issues of (a) qualifying as "insurance" or (b) qualifying for the HCSM safe harbor, as independent questions.[336]

683.    But the ACA exemption does require that HCSMs be federally tax-exempt,[337] as do the comparable state insurance mandate exemptions[338] and most of the state safe harbors.[339] For example, all 107 CMS-certified HCSMs, including Samaritan, had to be exempt under IRC §501(c)(3) to receive HCSM-certification under IRC §5000A(d)(2)(B). *Both of these provisions, key to HCSM status in the United States, are part of the Internal Revenue Code ("IRC")*.

684.    This requirement for HCSMs to have 501(c)(3) status results in virtually all HCSMs being subject to all applicable exempt-organization requirements of the IRC as well as the charitable organization regulation and oversight of all state AGs. Indeed, many AGs have brought enforcement actions against HCSMs for alleged violations of their chartable status or unfair or deceptive trade practices under state statutes and common law.[340]

685.    In any event, HCSMs are subject to all the same state and federal regulations to

---

[336] *See Barberton Rescue Mission v. Ins. Div. of Iowa*, 586 N.W.2d 352 (Iowa 1998) and *Com. v. Reinhold*, 325 S.W.3d 272 (Ky. 2010). So did the Maryland Insurance Administration in recent proceedings involving Samaritan and several other HCSMs. The only state to impose affirmative regulations on HCSMs is Colorado, but those regulations are simply information-reporting obligations, not operational restrictions. *See* Colo. Rev. Stat. §10-16-107.4 (June 8, 2022).

[337] Under 26 U.S.C. §501(c)(3); hereafter: IRC §501(c)(3).

[338] See footnote 334 above.

[339] See footnote 329 above.

[340] *See generally, e.g.*, https://oag.ca.gov/news/press-releases/attorney-general-bonta-takes-legal-action-against-sham-health-care-sharing (California AG brought legal action against Aliera and Trinity: now defunct); www.cantonrep.com/story/news/2022/01/26/liberty-healthshare-reaches-settlement-ohio-attorney-general/9224961002 (Ohio AG settled his legal actions against an HCSM); www.insurancejournal.com/news/midwest/2004/06/02/42834.htm (Ohio AG action). *See also Aliera Healthcare v. AHS*, 355 Ga.App. 381 (2020) (private enforcement). Nationwide, consumer protection acts are always available to corral misbehaving HCSMs. States "certainly [can] regulate them." Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 194 (expert testimony).

which all other non-insurance religious charities are subject.

<u>**State Regulation of Insurance**</u>

686.    At the heart of this case is the undisputed legal principle that New Mexico's authority to regulate HCSMs as "insurance" is limited by federal constitutional and statutory law.

687.    One critical limitation on New Mexico's authority to regulate insurance is a federal law known as the McCarran Ferguson Act of 1945 ("MFA").[341]

688.    As OSI recognizes, the "supremac[y] of the state in regulation of insurance [is] created by the McCarran Ferguson Act." Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 25. "When applicable, [this] reverse preemption doctrine allows state insurance laws to trump federal laws that interfere with the application of the state insurance laws." *Id.* at 26 (emphasis added).

689.    The MFA does reserve "insurance regulation" to the states by protecting such regulation from "federal preemption."[342] But only state regulations that ***regulate "insurance" as federally defined by the MFA*** qualify for this protection from federal preemption.

690.    Because the MFA is a **federal** law, "how the ***States may have ruled is not decisive***."[343] In such "***federal statutes*** …'***insurance***' and 'annuity' are ***federal terms***."[344] Thus, under the MFA, "the ***meaning of 'insurance'*** … is a ***federal question***."[345]

691.    Thus, to qualify for MFA protection, ***states must define "insurance" consistently with federal cases***. For example, *Air Evac* held that an insurance commissioner's "enforcement threat against" a "Membership Program" like Samaritan's did not "involve regulation of the

---

[341] 15 U.S.C. §§1011 *et seq*.

[342] *Variable Annuity*, 359 U.S. at 67.

[343] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[344] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[345] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

business of insurance" as defined by the MFA.[346] "The Defendant has presented nothing to counter Air Evac's evidence that the Membership Program provides … **no indemnification**. The McCarran Ferguson Act applies **only to regulation of the business of insurance**. Air Evac is likely to prevail in demonstrating that its Membership Program is **not insurance**, and therefore that **any state regulation of it is preempted**[.] The Defendant's **efforts to employ a broad definition of 'insurance'** to reach Air Evac's program … is unlikely to alter that outcome."[347]

692.    If New Mexico wants the preemption benefits of federal law (i.e., MFA), it must define "insurance" consistently with federal cases. Like *Air Evac*, federal cases have been clear about the key requirements of "insurance," as a few examples will show.

693.    Insurance always requires **assumption** of "**true risk**."[348] "'[I]nsurance' involves a **guarantee** that at least some fraction of the benefits will be **payable in fixed amounts**. The companies that issue these annuities [do] take the risk of failure. **But they guarantee nothing**[.] There is no true underwriting of risks, **the one [real] earmark of insurance**[.]"[349] For this reason alone, Samaritan's ministry cannot constitute "insurance" under federal law.

694.    "[If risk] is not shifted [to] others, there can be **neither insurance nor indemnity**. Insurance also … involves distribution of the risk, but **distribution without assumption hardly can be held to be insurance**. These are **elemental conceptions and controlling ones**."[350] For this additional reason alone, Samaritan's ministry cannot constitute "insurance" under federal law.

695.    Insurance always requires a legally enforceable promise or "ultimate **obligation to**

---

[346] *Air Evac*, 523 F.Supp.3d at 872, *aff'd on other grounds*, 37 F.4th 89.

[347] *Air Evac*, 523 F.Supp.3d at 873 (emphasis added).

[348] *Variable Annuity*, 359 U.S. at 71 (emphasis added).

[349] *Variable Annuity*, 359 U.S. at 71-73 (citations omitted; emphasis added).

[350] *Jordan*, 107 F.2d at 245 (D.C. Cir.) (emphasis added).

*indemnify* the insured."[351] Only one "***compelled to pay*** another party due to a ***legal obligation*** [fulfills] indemnification,[352] because an "***obligation to indemnify*** [arises from a] ***legal obligation*** to pay."[353] To "***shift [the] entire responsibility***" "is ***exactly what indemnity means***."[354]

696.   Insurance contracts everywhere legally require indemnity upon the occurrence of certain conditions. "**Conditions**—requirements specified in the insurance contract that must be upheld by the insured to qualify for indemnification."[355]

697.   "[T]he nature and purpose of ***any indemnity agreement*** involves the shifting and voluntary ***assumption*** of ***legal obligations***."[356] Thus, "only a person who was ***compelled*** to pay another party ***due to a legal obligation*** is eligible to seek ***indemnification***."[357] New Mexico law used to agree. "***Insurance*** is a ***contract*** whereby one ***undertakes to*** pay or ***indemnify*** another from certain unspecified contingencies[.]"[358] These basic legal principles are indisputable.

698.   All such terms must be given their ***plain meaning***.[359]

699.   Wherever state law defining *insurance* disagrees with federal law defining *insurance*, state law is subject to (a) preemption by the conflicting federal law or (b) invalidation by the U.S. Constitution if the state law, or its application, infringes constitutional rights.

700.   To **label** Samaritan's *expressive religious activity* as *insurance* is an illegitimate

---

[351] *Marathon*, 243 F.3d at 1244 (10th Cir.) (emphasis added).

[352] *Stewart*, 2005 WL 300420, at *5 (10th Cir.) (emphasis added).

[353] *In re Wallace*, 385 F.3d at 831 (emphasis added).

[354] *ERC*, 603 F.Supp.2d at 825 (emphasis added), *aff'd*, 602 F.3d 597 (4th Cir. 2010).

[355] https://content.naic.org/consumer_glossary ("Conditions").

[356] *Trinity Indus. v. Greenlease Holding*, 903 F.3d 333, 351 (3d Cir. 2018) (emphasis added).

[357] *Stewart*, 2005 WL 300420, at *5 (10th Cir.); *Bitco Gen. Ins. v. Monroe Guar. Ins.*, 31 F.4th 325, 329 (5th Cir. 2022) ("The duty to indemnify is the insurer's obligation to pay[.]"); *In re Wallace*, 385 F.3d at 831) (An "obligation to indemnify [arises from] legal obligation to pay.").

[358] NMSA 1978, §59A-1-5 (emphasis added).

[359] *Bostock*, 140 S.Ct. at 1749.

use of state power. OSI "cannot foreclose the exercise of constitutional rights by mere labels."[360]

701.    Any such attempt by OSI runs afoul of numerous federal legal principles and relevant determinations of the federal government, including, for example, the following.

702.    **First**, the U.S. Congress determined that HCSM membership is a valid religious *non-insurance* alternative to *insurance* and thus exempt from the ACA's individual mandate to have *insurance*. If HCSM memberships were or might be insurance, there would have been no reason for Congress to exempt them from the individual mandate, since, in that case, HCSM membership would be insurance and thus satisfy the mandate without any need for exemption.

703.    **Second**, the U.S. CMS certified Samaritan and 106 other HCSMs as ACA-compliant HCSMs under IRC §5000A(d)(2)(B), which requires federal tax-exempt status under IRC §501(c)(3)—a status prohibited to "insurance" providers under IRC §501(m). This amounts to a federal determination that HCSMs like Samaritan are non-insurance.

704.    **Third**, and relatedly, the U.S. IRS determined, as an initial matter and ever since, that Samaritan and the other 106 ACA-certified HCSMs qualify for federal tax-exempt under IRC §501(c)(3)—a status prohibited to "insurance" providers under IRC §501(m). This amounts to a separate/additional federal determination that HCSMs like Samaritan are non-insurance.

705.    **Fourth**, the U.S. IRS has formally advised Members of Congress that "the law does not consider membership in an HCSM as health insurance."[361]

706.    In addition, OSI must tread softly in dealing with HCSMs, because the First Amendment guarantees "special solicitude to the rights of religious organizations."[362] OSI must not burden the religious liberty of Samaritan and its members without very good cause.

---

[360] *Button*, 371 U.S. at 429.

[361] IRS Ltr. to Rep. Joe Donnelly (June 22, 2016) (Ex. 64).

[362] *Hosanna*, 565 U.S. at 189 (2012).

707.     Samaritan and other HCSMs operated without state interference in New Mexico for decades. That changed abruptly three years ago, and any "special solicitude" has vanished.

## Facts Establishing Credible Threat of Enforcement Here

### Twenty-Four Years of Peace

708.     The first New Mexico member of Samaritan joined its ministry in February 1996. Samaritan ministered to its New Mexico members as part of a nationwide community without any hindrance from OSI, or the state of New Mexico generally, for almost 24 years. The same is true, to Samaritan's knowledge, of the other 106 CMS-certified HCSMs.

709.     OSI's peaceful coexistence with HCSMs was supported by the logic of the safe-harbor and insurance-mandate exemptions of legislatures nationwide, *see* ¶¶671-685, and also the "special solicitude" of courts and other public officials, including insurance commissioners, nationwide during this same period (roughly 1996-2019).

710.     By taking no action against Samaritan and other HCSMs for over 20 years, OSI had effectively concluded that Samaritan and the other HCSMs were not "insurers" "transacting insurance" within the meaning of the Insurance Code.[363]

711.     If otherwise—if HCSMs were "insurers" or otherwise "transacting insurance"— then OSI had jurisdiction and was duty-bound to intervene throughout this entire period.[364]

712.     Each year since 1996, Samaritan has operated in New Mexico without an insurance license. All this time it was OSI's job to determine whether Samaritan "meets the

---

[363] NMSA 1978, §59A-1-5 (defining "Insurance"); NMSA 1978, §59A-1-8 (defining "Insurer"); NMSA, 1978, §59A-1-13 (defining "Transacting insurance").

[364] The Insurance Code is replete with "must" and "shall" when it comes to OSI's enforcement of it. *See, e.g.*, *Quynh Truong*, 147 N.M. at 596 (discussing NMSA 1978, §59A–18–14).

statutory requirements as [non-insurance or instead] is an insurance company."[365] All this time it was OSI's implicit determination that Samaritan was not insurance.

713.    "If plaintiff is not or was not [free from insurance regulation,] it should not have been [treated] as such; if the Attorney General or other law enforcing agency believed that the [determination] of the Superintendent of Insurance [was] contrary to law, the remedy was [to] invoke the aid of the courts in an appropriate proceeding to set aside his [determination]. ***It is neither fair nor proper to permit such [determinations] to go unchallenged for many years, induce reliance upon them by such acquiescence, and then ask courts to disregard the [determinations] to the end that … penalties may now be assessed for the years gone by***."[366]

714.    OSI was in good company. Its acquiescence in Samaritan's non-insurance status was consistent with what was then, and what remains, the nationwide consensus on HCSMs. This consensus is evident from a few examples across three categories of decisionmakers.

715.    **First**, as noted above, Congress and most state legislatures enacted either mandate-exemption or safe-harbor laws, or both, for HCSMs during this period. ¶¶671-685.

716.    **Second**, three state supreme courts issued published decisions on HCSMs.[367] These three decisions remain the only applicable, published decisions by any supreme courts.

717.    In the first, the Iowa Supreme Court ruled unanimously for Christian Brotherhood Network ("CBN"). The court noted that (as with Samaritan) the medical needs of CBN members "are paid directly by other" members sending contributions to each other, so that "no medical

---

[365] *Woodmen II*, 17 F.Supp. at 766.

[366] *Woodmen II*, 17 F.Supp. at 767 (emphasis added).

[367] *Barberton Rescue Mission v. Ins. Div.*, 586 N.W.2d 352 (Iowa 1998) ("***BRM***"); *Com. v. Reinhold*, 325 S.W.3d 272 (Ky. 2010); ***Altrua** HealthShare v. Deal*, 154 Idaho 390 (2013).

expenses (other than some small needs) are recorded on [CBN] books."[368] Without "***assumption***

***of risk***"—a "***key element of insurance***"—CBN was "***not insurance***."[369] The court also noted

that the ***complete absence*** of "***member complaints***" was evidence that state action against CBN

was not required to protect consumers or ensure "fair and honest insurance markets."[370]

      718.    In the second case, the Kentucky Supreme Court issued a divided opinion against

Christian Care Ministry's "Medi-Share" program.[371] The majority ruled that Medi-Share was

ineligible for the state's safe harbor, which required *direct* sharing among members (which, of

course, Samaritan does), and that Medi-Share was insurance. Two justices disagreed. "[We] do

not believe that Medi–Share is in the business of insurance [and we] disagree that the Medi–

Share contract falls within the ambit of definitional insurance [in the Kentucky Insurance

Code]."[372] The state legislature responded swiftly to the majority opinion by repealing the direct-

sharing requirement, thus overruling the result of the majority opinion.[373]

      719.    In the third case, the Idaho Supreme Court unanimously ruled for Altrua.[374]

"Altrua must ***assume some of the risk*** of paying its members' claims for its membership contract

to be one ***undertaking to indemnify*** its members…. Altrua may have an obligation … despite its

disclaimers, to pay certain member claims so long as funds are available, but there is ***no evidence***

in the record ***that Altrua has guaranteed or assured*** payment of members' claims. Therefore,

---

[368] *BRM*, 586 N.W.2d at 356. Samaritan is the same. See any Samaritan IRS Form 990 at https://apps.irs.gov/app/eos or www.erieri.com/Form990Finder/Details/Index?EIN=371295601.

[369] *BRM*, 586 N.W.2d at 356-57 (emphasis added).

[370] *BRM*, 586 N.W.2d at 357 (emphasis added).

[371] *Reinhold*, 325 S.W.3d 272.

[372] *Reinhold*, 325 S.W.3d at 280-82 (Scott & Cunningham, JJ., dissenting).

[373] *See* Ky. Rev. Stat. §304.1-120(7) (1994) (safe harbor); 2013 Ky. Sen. B. No. 3 (signed Apr. 5, 2013) (deleting former subsec. (d) that had required "direct" payments between members).

[374] *Altrua*, 154 Idaho 390.

the Hearing Officer's conclusion that Altrua's membership contract is an insurance contract because Altrua assumes some risk of paying its members' claims is clearly erroneous."[375] One concurring judge added: "This is a prime example of an administrative *agency exceeding its statutory powers in an attempt to protect citizens from themselves*. Although this [case] clearly did *not involve health insurance*, the Department *ignored the terms of the contract*[.]"[376]

720.   **Third**, many other state officials have opined that HCSMs are not insurance. The following examples illustrate the point.

721.   "Because the necessary *mutuality of obligation* as to the subject matter of the agreement between the parties is lacking, the Office of the Attorney General is of the opinion that the Christian Brotherhood Network does *not provide 'insurance'*[.]"[377]

722.   The Commissioner has "not established that regulation of [Christian Brotherhood Network] *as an insurance company* is an overriding or compelling state interest. *Nor* has it demonstrated that regulation as an insurance company is the *least restrictive alternative*. [T]aking into consideration the Commissioner's obligation to interpret the statutes under his jurisdiction to avoid a constitutional conflict, the *infringement on the sincere religious beliefs* of CBN and its subscribers *outweighs the Department's interest* in regulation."[378]

723.   "I am writing you in support [of] charitable organizations … called Health Care Sharing Ministries, or HCSMs. HCSMs are charitable organizations that are designed to facilitate the voluntary sharing of the burden of medical expenses among their members. HCSMs do not provide medical insurance." Indiana Insurance Commissioner (May 7, 2009) (Ex. 65).

---

[375] *Altrua*, 154 Idaho at 395 (emphasis added).

[376] *Altrua*, 154 Idaho at 395 (Eismann, J., concurring).

[377] La. Att'y Gen. Op. 98-471, 1999 WL 61192, at *3 (Jan. 13, 1999) (emphasis added).

[378] *In the Matter of the Barberton Rescue Mission aka Christian Brotherhood Network or CBN*, 2003 WL 21634055, at *15 (Minn. Off. Admin. Hrgs. June 18, 2003) (emphasis added).

724.    "As Chair of Georgia's Senate Insurance and Labor Committee at that time, I listened to the presentation from a legislator's and an insurance perspective. I concluded that this was not insurance. The main reason for my conclusion was that there is no guarantee…. The arrangement is completely on faith alone. In Georgia, we have not had any problems with Health Care Sharing…. Based on my information, it appears to me that Health Care Sharing Ministries are not insurance companies but charitable organizations helping participants pay their medical bills." Georgia Insurance Commissioner (Mar. 4, 2011) (Ex. 66).

725.    "As … an advocate of free-market solutions to insurance issues, I support health-care sharing ministries as an option for Oklahoma consumers." *Understanding Faith-Based Options for Healthcare*, Oklahoma Insurance Commissioner (Aug. 16, 2011) (Ex. 67).

726.    "WHEREAS, voluntary healthcare cost-sharing ministries are proven vehicles through which people of the community can obtain low-cost health care support through the sharing of financial gifts used to meet medical expenses for members; … NOW, THEREFORE BE IT RESOLVED, that the National Black Caucus of State Legislators recognizes the valuable work of these organizations and urges states considering a form of universal health coverage to recognize Healthcare Ministry programs and ensure that their citizens have the freedom to make personal health care cost support choices according to their individual needs." NBCSL Res. HHS-09-16, Introduced by Rep. Joe Armstrong of Tennessee (Ratified Dec. 12, 2008) (Ex. 68).

727.    The above public-sector consensus has reinforced what HCSMs themselves must proclaim: ***HCSMs are not insurance***. Leading voices in the private sector have proclaimed the same thing again and again since the ACA's rollout: "It is important to understand that a health care sharing ministry is not health insurance[.]"[379] All this time, New Mexico also was on board.

---

[379] Navigator Resource Guide, Georgetown University Health Policy Institute, FAQ #150

728.     As recently as December 2019 it appeared OSI would continue to respect the non-insurance, wholly-religious character of HCSMs. *See* OSI Press Release (Dec. 3, 2019) (Ex. 30).

## OFFICE OF SUPERINTENDENT OF INSURANCE

**DEPUTY SUPERINTENDENT**

Robert E. Doucette, Jr.



**DEPUTY SUPERINTENDENT**

Andy Romero

FOR IMMEDIATE RELEASE: December 3, 2019

Contact Melissa Martinez, 505-476-0333, eireann.sibley@ins.nh.gov

A few health care sharing ministries (also known as health care sharing organizations) operate in New Mexico. These organizations do not offer insurance, but may present plans in a way that look and feel similar to a health insurance plan. Members of these organizations "share" health costs on a voluntary basis. Consumers should be aware that these plans have no obligation to pay for any medical services and have no requirement to cover any particular categories of health care services, such as preventive care.

729.     Thus, as of December 3, 2019, OSI declared, publicly and unambiguously, that HCSMs "do not offer insurance" but instead are "voluntary" associations with "no obligation to pay." *Id*. This was OSI's application of the Insurance Code, as flatly declared to the public.

730.     This was a proper declaration of OSI for at least six reasons.

731.     **First**, it was lawful. "When the Superintendent, with both expertise and authority in insurance matters, makes and expressly articulates a lawful decision to permit an insurer's conduct, the judicial branch should respect the Superintendent's authority to do so."[380]

732.     **Second**, it honored the plain-meaning rule of statutory interpretation, giving key words in the Insurance Code their plain meaning. "New Mexico courts have long honored [the] plain meaning rule, [i.e., w]hen a statute contains language which is clear and unambiguous, we

---

(March 2014), https://nationaldisabilitynavigator.org/wp-content/uploads/resources-links/Gtown-Guide-v2_March2014.pdf (accessed 12/5/2023).

[380] *Quynh Truong*, 147 N.M. at 592.

must give effect to that language and refrain from further statutory interpretation."[381]

733.   **Third**, it was done in a proper manner. "For [an] exemption to apply in a transparent and unambiguous manner, it is important that it be ***communicated in a way that would give fair notice to all*** who may be affected [thereby], including the regulators themselves, affected consumers, the particular industry involved, the public in general[, etc. In] order for an action or transaction to be deemed expressly permitted and thereby exempted from [statutory coverage], the permission must be ***within the authority of the Superintendent*** to grant and must be specifically ***articulated in some form of public document***."[382]

734.   **Fourth**, it engendered reliance by HCSMs, which have publicly represented they are legitimate sharing ministries under applicable law. HCSMs must "be able to rely on the Superintendent to determine whether their conduct conforms [to] New Mexico law, without risk that such reliance [might] expose them to tort liability,"[383] like fraud or deceptive trade practice. This is a "substantial" factor in considering an "exemption for conduct that has been undertaken in reliance on express permission granted by an agency with lawful authority."[384]

735.   **Fifth**, it was consistent with the policy and implicit determinations of OSI ever since HCSMs began operating in New Mexico decades ago. "***It is neither fair nor proper to permit such [determinations] to go unchallenged for many years, induce reliance upon them by such acquiescence, and then ask courts to disregard the [determinations] to the end that … penalties may now be assessed for the years gone by***."[385] Samaritan began operating in New

---

[381] *Quynh Truong*, 147 N.M. at 593.

[382] *Quynh Truong*,147 N.M. at 598 (emphasis added).

[383] *Quynh Truong*,147 N.M. at 594 (citations & internal punctuation omitted).

[384] *Quynh Truong*,147 N.M. at 594-95.

[385] *Woodmen II*, 17 F.Supp. at 767 (emphasis added).

Mexico 27 years ago in 1996. In the 24 years from 1996 to 2020, OSI took no action against Samaritan, or any other HCSM to Samaritan's knowledge. The Code is clear about the actions OSI "must" and "shall" take to enforce the Code.[386] Its long acquiescence is legally significant.

736.    **Sixth**, and crucially, it was compelled by the Constitution. Whenever OSI faces a conflict between the Insurance Code (as OSI interprets it) and the Constitution (as the U.S. Supreme Court and Tenth Circuit interpret it), OSI's duty is clear. "Given the conflict between the Free Exercise Clause and the application of the [Insurance Code] here, [OSI] should have disregarded the [Insurance Code] and decided this case conformably to the Constitution[.] That *supreme* law of the land condemns discrimination against religious [health care sharing ministries] and the families [that depend on] them. They are members of the community too, and their exclusion from [New Mexico] is odious to our Constitution and cannot stand."[387]

737.    In this case, Samaritan's ministry meets every reasonable definition of non-insurance and every required application of the United States Constitution.

### OSI Launches Its Anti-HCSM Campaign

738.    Again: "Factors relevant to the assessment of governmental neutrality include 'the *historical background* of the decision under challenge, the *specific series of events leading to* the enactment or official policy in question, and the … *administrative history*."[388]

739.    On March 26, 2020—just four months after its December 3, 2019 affirmation of HCSMs (Ex. 30)—OSI announced a U-Turn in HCSM policy with this press release (Ex. 31):

---

[386] *Quynh Truong*, 147 N.M. at 596 (discussing NMSA 1978, §59A–18–14).

[387] *Espinoza*, 140 S.Ct. at 2262–63 (citations & internal punctuation omitted; cleaned up).

[388] *Masterpiece*, 138 S.Ct. at 1731 (citations omitted; cleaned up; emphasis added).



**FOR IMMEDIATE RELEASE:**
**March 26, 2020**

Contact: Melissa Gutierrez
melissa.gutierrez@state.nm.us

## NM OFFICE OF SUPERINTENDENT OF INSURANCE
## CAUTIONS CONSUMERS ABOUT HEALTH CARE SHARING MINISTRIES

SANTA FE, NM –The New Mexico Office of Superintendent of Insurance cautions consumers who have subscribed, or are considering subscribing to health benefit plans offered by Health Care Sharing Ministries (HCSM) that these are not authorized health insurance plans. A HCSM may use marketing practices that suggest its plans include the protections found in approved health insurance plans. However, that may not be correct.

These plans may be less expensive than a regulated major medical plan. They may also appear to provide the benefits and protections that a major medical plan is required to provide under the Affordable Care Act ("ACA") and other health insurance regulations. In reality, though, a HCSM plan is an unauthorized insurance product that likely will not provide the protections of an authorized, regulated, and ACA compliant major medical plan.

Consumers should be aware of the following regarding HCSM plans:

- They do NOT comply with the ACA, even if their materials say they do.

[Next is the fifth of six bullet points:]

- Members may also be subject to religious or moral restrictions from the sharing ministry, which may leave members responsible for the full costs of health care that result from an activity the ministry does not agree with.

740.    Then, after quoting the Superintendent as "urg[ing] consumers not to purchase"

any such non-ACA compliant "plan," this press release (Ex. 31) continues:

The Superintendent of Insurance is taking action to protect consumers from unauthorized HCSM. Today, OSI issued an Order to Cease and Desist and to Impose Penalties against a HCSM operating in New Mexico. Any person with questions regarding the Cease and Desist Order may contact Rebecca Branch, Assistant Staff Counsel, at rebecca.branch@state.nm.us or (505) 827-4535.

If a consumer has any problems with a health care sharing ministry, or believes they've been deliberately misled by one of these entities, please contact OSI to let the agency know and find out about any available assistance. Any person with such a complaint should contact OSI at 1-855-427-5674 or https://www.osi.state.nm.us/index.php/contact-us/.

741.    This OSI release characterized HCSMs as **deceptive**, **religiously-discriminatory,**

*unauthorized insurance products*. And it did so before a single court—or even OSI itself—had

adjudicated whether or not HCSMs constituted "insurance"—showing OSI's prejudgment bias.

742.    The 180-degree turn in OSI policy represented by this public announcement came

without any public explanation of how or why OSI, after allowing HCSMs to operate unfettered

by insurance regulation for decades, was now labeling *all* HCSMs as unauthorized insurers.

### OSI Uses Aliera/Trinity Scam As Launchpad for Its Campaign

743.    The reason for OSI's U-Turn is evident in the content and timing of the above

March 26, 2020 release (Ex. 31), which cited OSI's new C&D against a nameless company:

The Superintendent of Insurance is taking action to protect consumers from unauthorized HCSM. Today, OSI issued an Order to Cease and Desist and to Impose Penalties against a HCSM operating in New Mexico. Any person with questions regarding the Cease and Desist Order may contact Rebecca Branch, Assistant Staff Counsel, at rebecca.branch@state.nm.us or (505) 827-4535.

744.    The nameless company was, of course, Aliera. *See* C&D vs. Aliera (Ex. 32).

745.    A grasp of the menace that was Aliera helps in understanding this case.

746.    Four months earlier, OSI had warned the public about Aliera. Ex. 30. This

December 3, 2019 press release (Ex. 30), discussed above, began as follows:

SANTA FE, NM – As a result of several states' legal actions, the New Mexico Office of Superintendent of Insurance is advising consumers that Aliera, a company that markets itself as a health care sharing ministry, may be operating illegally in New Mexico.

In the past, Aliera acted as a plan administrator to Unity Healthshare, which is a qualified health care sharing ministry. Recently, however, a State of Georgia Superior Court of Fulton County found that "evidence shows that Aliera has taken actions to misappropriate [Unity's] assets; namely by unilaterally attempting to transition the United HCSM plans to Trinity. The court also found that the company misrepresented itself to state insurance regulators, and that "Timothy Moses, who exercises substantial control over Aliera, was convicted of felony securities fraud and perjury in federal court."

The court also found that Aliera is a for-profit company and cannot qualify as a health care sharing ministry under state or federal law. Additional states, including Texas, Colorado, and Washington, have issued cease and desist orders against Aliera/United. OSI is concerned about potential fraudulent or criminal activity on the part of Aliera. Since the company may be an illegal health care sharing ministry, consumers should be aware that if they remain in an Aliera product, they may be covered by an unlicensed insurance company.

747.    **Thus, as of December 3, 2019 (above), OSI knew the following about Aliera:**

(a)     A "company" named *Aliera* "markets itself as" a HCSM.

(b)     That Aliera company was controlled by "*Timothy Moses*."

(c)     Timothy Moses had been "convicted of *felony* securities *fraud and perjury.*"

(d)     Mr. Moses' Aliera were subject to "several states' legal actions."

(e)     Those legal actions found Mr. Moses' Aliera to have "*misappropriate[d] assets*."

(f)     They found that Aliera had "*misrepresented itself* to state insurance regulators."

(g)     They found that Aliera is a "*for-profit company*," and that, consequently, Aliera:

(h)     **Cannot** "*qualify as a health care sharing ministry under state or federal law.*"

(i)     OSI was "concerned about potential *fraudulent or criminal activity [by] Aliera*."

(j)     OSI knew that "[a]dditional states, including Texas, Colorado, and Washington, *have issued [C&Ds] against Aliera[.]*"

748.    In fact, these various legal actions, as of December 3, 2019, had found that *Aliera* was *secular*, *for-profit company* that never was nor could be a religious "health care sharing ministry" under any law anywhere. From its investigation of Aliera, or from widely available public records, OSI knew much more about Aliera, including the following.

749.    In 2006, a decade before he founded Aliera and invented Trinity, Timothy C. Moses "was convicted by a jury in federal court and served prison time for felony securities fraud and perjury in this district."[389] U.S. District Judge Charles Pannell sentenced Moses to 78 months in prison. *See United States v. Moses* (Judgment: Ex. 59; Docket Sheet: Ex. 60). The magnitude of misconduct was described in the Sentencing Memorandum of the U.S. Attorney.[390]

750.    Following the publicity of the trial and the subsequent press releases of the Justice

---

[389] *LeCann v. Aliera Companies*, 2021 WL 2554942, at *2 (N.D.Ga. 2021) (citing *United States v. Timothy C. Moses*, 2006 WL 6168047 (N.D.Ga. Feb. 17, 2006)); *accord Moeller v. Aliera Cos. & Timothy Moses*, 2021 WL 2680159, at *7 (D.Mont. 2021) (same); *United States v. Timothy C. Moses*, 219 F.Appx. 847 (11th Cir. 2007) (affirming convictions and sentences).

[390] *U.S.A. v. Timothy C. Moses*, 2006 WL 6052388 (Govt. Sent. Mem., filed Feb. 16, 2006).

Department and the Securities & Exchange Commission ("SEC"),[391] Mr. Moses did not fade

from the public mind. Instead, he became a cautionary tale in congressional hearings in 2006.[392]

<div align="center">

**IV.**

</div>

**Recent Success Prosecuting Securities Fraud under Section 1348, Title 18**

On February 17, 2006, Timothy C. Moses, former President and CEO of
International BioChemical Industries, Inc. ("IBCL"), was sentenced in Atlanta
on charges of securities fraud in violation of Section 1348 of Title 18, and
perjury. Moses was sentenced to 6 years, 6 months in federal prison to be
followed by 5 years of supervised release, and ordered to pay $1.65 million in
restitution to IBCL shareholders. Moses was convicted on October 27, 2005
following a two-week jury trial.  In all, since its enactment, more than 53
defendants have been charged under Section 1348.

751.    Years later, *"after Mr. Moses was released from federal prison*, Judge Pannell

*revoked Moses' supervised release* because he *misled his probation officer* about his *financial*

*affairs* **and failed to disclose** bank account information and *new lines of credit."*[393]

752.    It was after all this that Mr. Moses invented Aliera/Trinity/Sharity, which has

been embroiled for years in proceedings nationwide over alleged misconduct. "*Aliera and its*

*affiliates* have been investigated, sued, enjoined, and subjected to [C&Ds] in *several*

*jurisdictions*, *all of which* have determined that Aliera's plans [e.g., *Trinity*] do *not qualify as*

*HCSMs* and that Aliera is engaged in the *unauthorized business of insurance*."[394]

753.    *Aliera*, created and controlled by Mr. Moses, has been the subject of numerous

---

[391] *See, e.g.*, *SEC v. Int'l Biochemical & Timothy Moses*, Case No. 1:03-cv-0346-JTC (N.D.Ga),
Litigation Release No. 19446 (Oct. 28, 2005) (S.E.C. Press Release). Former President and CEO
Convicted of Securities Fraud and Perjury, SECDIG 2005-209-6 (Oct. 31, 2005) (S.E.C. Digest).

[392] *Hedge Funds and Independent Analysts: How Independent are Their Relationships*, Hearing
Before the Senate Judiciary Committee, S. Hrg 109-696, at 139 (June 28, 2006), available at
https://www.congress.gov/109/chrg/CHRG-109shrg31059/CHRG-109shrg31059.pdf.

[393] *LeCann*, 2021 WL 2554942, at *2 n.2 (emphasis added).

[394] *LeCann*, 2021 WL 2554942, at *6 (emphasis added).

<div align="center">

160

</div>

enforcement cases by state regulators nationwide. At least *12 states* have issued C&Ds against Aliera/Trinity, including California, Colorado, Connecticut, Iowa, Maryland, New York, New Hampshire, New Jersey, New Mexico, Oregon, Texas, Washington.[395]

754.    Many class-action and other lawsuits were filed by Aliera/Trinity customers and by state AGs. Unsurprisingly, Aliera/Trinity filed bankruptcy and went out of business in 2022.

755.    *One class-action law firm* is behind at least four federal class actions against Aliera that have swept up innocent HCSMs—due to perceived associations with Aliera—*after* an insurance commissioner issued C&Ds and publicized them widely and aggressively.

756.    These four class actions have generated dozens of judicial decisions and orders,[396] representing a great deal of lucrative legal work. Class-action law firms have aligned themselves with insurance commissioners and profited greatly. This is particularly true of the *one firm*.

757.    In *Jackson v. Aliera Companies*, in which U.S. District Judge Barbara Rothman has issued eight reported decisions to date,[397] the one firm produced the 167-entry docket sheet and related documents from Mr. Moses's criminal case (Ex. 69) as evidence against Aliera.

758.    The one firm keeps a library of Aliera misdeeds on its website.[398] The below screenshot represents less than half the list (which has active links to the various documents):

---

[395] *See* http://www.symslaw.com/aliera-and-trinity-litigation/stateregulation (citing and linking to the C&Ds, decisions, and consent orders against Aliera/Trinity in those 12 states).

[396] Sample decisions from these class actions in 2021 alone include: *Smith v. Aliera Companies*, 534 F.Supp.3d 1345 (D.Colo. Apr. 16, 2021); *Jackson v. Aliera Companies*, 462 F.Supp.3d 1129 (W.D.Wash. May 26, 2020); *Duncan v. Aliera Companies*, 2021 WL 4728760 (E.D.Cal. Sep. 9, 2021); *Albina v. Aliera Companies*, 2021 WL 5238590 (E.D.Ky. Nov. 8, 2021).

[397] *Jackson v. Aliera Companies, Inc.*, 2020 WL 1140427 (W.D.Wash. Mar. 9, 2020); *Jackson v. Aliera Cos.*, 462 F.Supp.3d 1129 (W.D.Wash. May 26, 2020); *Jackson v. Aliera Cos.*, 2020 WL 3798937 (W.D.Wash. July 7, 2020); *Jackson v. Aliera Cos.*, 2020 WL 4048309 (W.D.Wash. July 20, 2020); *Jackson v. Aliera Cos.*, 2020 WL 4787990 (W.D.Wash. Aug. 18, 2020); *Jackson v. Aliera*, 2020 WL 5909959 (W.D.Wash. Oct. 6, 2020); *Jackson v. Aliera*, 2020 WL 5984075 (W.D.Wash. Oct. 8, 2020); *Jackson v. Aliera*, 2021 WL 5279731 (W.D.Wash. Nov. 12, 2021).

[398] *See* www.symslaw.com/aliera-and-trinity-litigation/stateregulation (accessed 10/29/2023).

| ALIERA AND TRINITY — STATE REGULATORY ACTIONS |
| --- |
| California Cease and Desist Order |
| Colorado Aliera Cease and Desist Order |
| Colorado Trinity Cease and Desist Order |
| Colorado Aliera Final Agency Action |
| Colorado Trinity Final Agency Action |
| Connecticut Cease and Desist Order |
| Iowa Consent Order |
| Iowa Statement of Charges |
| Maryland Cease and Desist Order |
| Maryland Admin Order 2020-02-025 |
| Maryland Consent Order |

759.    It is no secret that law firms can work hand in hand with insurance commissioners and seek important documents or other information through personal channels.[399]

760.    The truth is this. The regulatory frenzy over Mr. Moses and Aliera has swept up legitimate HCSMs as additional regulatory targets and reflect the toxic spillover harm to any HCSM that is associated, fairly or unfairly, with Aliera. One rotten apple: Aliera.

### OSI Exploits One Bad Aliera Apple to Spoil the Barrell

761.    How toxic is any association with this one rotten apple? A few examples follow.

762.    **First**, Aliera itself sued a legitimate HCSM after it reported Aliera misconduct and severed all ties. In a 31-page decision on April 25, 2019 (Ex. 61), affirmed on appeal, a Georgia court found that the defendant OneShare was a *legitimate HCSM*.[400] A 40-page decision

---

[399] There is persuasive publicly available information that can be produced on this point.

[400] *Aliera Healthcare v. AHS/OneShare*, Civ. No. 2018 CV 308981 (Superior Ct. April 25, 2019) (Ex. 61 at 2), *affirmed*, 355 Ga.App. 381, 844 S.E.2d 268 (2020), ("***Aliera Healthcare***"). Aliera

on August 19, 2020 (Ex. 62) ruled against Aliera and ordered it "to segregate $15,822,509.00 in a separate, interest bearing account over which the Receiver shall have access and oversight."[401] Later, in "guilt by association," OneShare received a C&D from Insurance Commissioner Mike Kreidler, who "ordered OneShare Health LLC to stop selling insurance illegally in Washington state[.] 'This is another sham health care sharing ministry that is preying on people who think they are buying health insurance,' said Kreidler."[402] *After* this defamatory press release, OneShare was ***added*** as a ***defendant*** to ***three of four federal class actions against Aliera***.[403]

763.    **Second**, following a similar Aliera-fueled pattern, OSI issued a C&D to OneShare on January 13, 2021 (Ex. 38) to help launch its Aliera-fueled campaign against legitimate HCSMs. Its back against the wall, OneShare entered a Consent Order with OSI on March 17, 2021 (Ex. 39), choosing to depart New Mexico rather than fight the C&D.

764.    **Third**, the Maryland Insurance Administration ("MIA") lumped Samaritan in with other HCSMs in an anti-HCSM campaign also fueled by the Aliera scandal. Samaritan sued MIA to obtain a favorable settlement and continues to operate in Maryland. *See* Order Approving Voluntary Dismissal in Light of Settlement (D.Md. Feb. 21, 2022) (Ex. 63). But the guilt-by-association with Aliera cost Samaritan and its members dearly in frustration of purpose and loss of resources, reputation, and First Amendment freedoms while the ordeal lasted.

765.    The same potential harm exists for Samaritan here due to OSI's ongoing anti-HCSM campaign. To understand this harm, more must be said about the one bad apple.

766.    As noted earlier in this Complaint, OSI issued its own C&D against Trinity/Aliera

---

sued Anabaptist Healthshare ("AHS") and its wholly controlled subsidiary, OneShare Health.

[401] *Aliera Healthcare* (Aug. 19, 2020) (Ex. 62) at 39.

[402]    https://www.insurance.wa.gov/news/kreidler-orders-oneshare-health-llc-stop-selling-illegal-insurance-washington-state (accessed 11/20/2023).

[403] *See* footnote 396 above and ¶¶754-765.

on March 26, 2020. Ex. 32.[404] OSI confirmed its C&D in a Decision (Nov. 17, 2020; Ex. 35) and a Final Order (Nov. 19, 2020; Ex. 36), upholding its $2,680,000 fine and banishing Aliera.

767.    What began as an OSI enforcement action against Aliera—a notorious healthcare "***scam***" that was founded and run scandalously by an ex-felon and was subject to legal actions everywhere—expanded into a hostile campaign against *all* HCSMs, to shut them *all* down.

768.    In March 2021, OSI issued a *Consumer Advisory* (Ex. 40) warning the public about "scammers trying to lure people into purchasing … bad plans" and featuring "health care sharing ministries" as a prime example of such scammers:

**SUPERINTENDENT**
**Russell Toal**



**DEPUTY SUPERINTENDENT**
**Jennifer A. Catechis**

## CONSUMER ADVISORY
### MARCH INSURANCE TIP OF THE MONTH

As the Special Enrollment Period gets underway, OSI wants consumers to know that there are scammers trying to lure people into purchasing low-quality health insurance or health insurance-like products. These low-quality products DO NOT meet the requirements of the ACA because they offer extremely limited coverage. These might be short-term plans, trade association plans, health care sharing ministries or other limited plans. These bad plans can leave consumers stuck with huge medical bills from doctors and hospitals. These non-ACA plans deny and limit

769.    Thereafter, OSI co-produced ***Staying Covered After COVID*** (Ex. 37):



770.    Slide #3 of this OSI webinar (Ex. 37) includes each of the following excerpts:

## The Lure of Insurance Scams

---

[404] Also available by searching for Aliera or Trinity at https://edocket.osi.state.nm.us/home.

Insurance scammers look for vulnerable populations both during and outside of open enrollment periods for major medical coverage.

- **Health care sharing ministry/health share coverage**
  - Designed to look like health insurance
  - Unregulated coverage
  - They make **no** guarantee they will pay any claims and say they are NOT health insurance.

771.    Slide #5 (Ex. 37) advises consumers about scams, listing items typical of HCSMs:

# How to Avoid Scams

- Do not buy coverage advertised as:
  - "costing less than what's available on the Marketplace/Exchange"
  - "alternatives to traditional health insurance options"

- Avoid any plan where you have to join an association or club to get coverage!

772.    Slide #12 (Ex. 37) issues this "CAUTION" linking HCSMS with *junk insurance*:

**Caution**

This may be a time when people may try to sell you junk insurance, limited benefit plans, or health care sharing ministry coverages.

Go to beWellnm.com to learn more about your health care options!

773.    In all, the above OSI slides CAUTIONED consumers to beware health care sharing ministries, equating them with "*INSURANCE SCAMS*," "*scammers trying to lure people*," "*scammers look[ing] for vulnerable populations*," and "*junk insurance*" "*designed to look like health insurance*," all while plugging the home-state marketplace at *Wellnm.com*. This *webinar has continued* with "encore presentation[s]." OSI Invite (Apr. 6, 2023) (Ex. 54).

774.    On August 10, 2020, New Mexico joined other States in a letter to two federal

agencies (Treasury and IRS),[405] seeking to block a Rule to provide tax benefits to the members

of health care sharing ministries like Samaritan. This 11-page letter begins and ends as follows:

August 10, 2020

*Via e-filing at www.regulations.gov*

Secretary Steven Mnuchin
U.S. Department of the Treasury
Internal Revenue Service

RE:      "Certain Medical Care Arrangements" RIN 1545–BP31; IRS REG–109755–19

Dear Secretary Mnuchin:

[This letter's defamatory content is discussed much, immediately below.]

Gurbir S. Grewal
New Jersey Attorney General

Hector Balderas
New Mexico Attorney General

775.    This AG Letter "urges the agencies to withdraw the proposed rule [because]

allowing tax deductions for payments made to Healthcare Sharing Ministries (HSMs)

undermines the ACA," "leaves consumers with junk coverage," and "treat[s] junk insurance

plans as the real deal." AG Press Release (Ex. 34).[406] (***The AGs use the acronym "HSM."***)

776.    With a stated purpose of protecting the "landmark law" and "reforms" of the

ACA, the AG Letter insists that provision of tax benefits to HSM members will "undermine

these [ACA] reforms by incentivizing consumers to buy into HSMs." AG Letter (Ex. 33) at 1.

777.    The resulting growth of HSMs "will not only cause harm to our residents [but]

inflict fiscal harm on the States and providers." *Id*. (Ex. 33). Page two explains:

---

[405] Exhibit 33. Also: https://oag.ca.gov/system/files/attachments/press-docs/8-10-20%20Multi-State%20Comment%20Letter%20on%20Healthcare%20Cost%20Sharing%20Ministries.pdf   or https://portal.ct.gov/-/media/AG/HSM-Comment-Letter.pdf (both accessed 12/5/2023).

[406] AG Press Release also at https://oag.ca.gov/news/press-releases/attorney-general-becerra-leads-coalition-attorneys-general-opposition-irs (Aug. 11, 2020) (accessed 12/5/2023).

The Proposed Rule will also increase market segmentation, causing the broader insurance market to become smaller, sicker, and more expensive. Furthermore, HSMs are not traditional insurance and claim to be exempt from normal regulation. Thus, incentivizing enrollment could spur HSMs to ramp up fraudulent marketing practices and continue to elude enforcement by the States. At a minimum, the Proposed Rule is sure to increase consumer confusion.

## I.     The Proposed Rule will increase consumer confusion and fraud in the healthcare marketplace.

The Proposed Rule legitimizes HSMs as an alternative to traditional health insurance, further blurring the line between the two for consumers looking to purchase health coverage. Prior to the enactment of the ACA, HSMs filled a small niche in the healthcare market for people with shared religious beliefs.[1]

778.    These "HSMs" evidently were not a problem when they only filled a "small niche" for "people with shared religious beliefs." *Id*. (Ex. 33). It is their recent growth and perceived competition with local insurance markets that is the problem.

779.    "[Their] enrollment [having] grown exponentially," as represented in particular by "***Samaritan Ministries International***,"[407] such HSMs will "cause harm to our residents [and our] State[] and providers" (*id*. at 1) by:

(a) "causing the broader insurance market to become smaller, sicker, and more expensive" (*id*. at 2);

(b) enabling "HSMs to ramp up fraudulent marketing practices and continue to elude enforcement" (*id*.); and

(c) by "increas[ing] consumer confusion and fraud in the healthcare marketplace" (*id*.);

(d) "all in contravention of the reforms established by the ACA and to the great detriment of the States and their residents." *Id*. at 9.

780.    This AG letter characterizes HCSMs as "intent on capitalizing on consumers," *id*. at 2, and "often employ[ing] deceptive marketing tactics." *Id*. (Ex. 33) at 3.

781.    It blames HSMs for causing crippling medical debt, "even homelessness." *Id*. at 4.

---

[407] (Emphasis added.) "Samaritan Ministries International reported that membership increased from 57,277 enrollees in 2011 to 269,809 in 2019." AG Letter (Ex. 33) at 3 note 6.

"The ripple effects from damaged credit can result in long-term economic deprivation, bankruptcy, housing instability, and even homelessness. The confusion HSMs cause by mimicking traditional health insurance is not without a human toll." *Id*. (Ex. 33).

782.    Speaking for 20 of the nation's 50 attorneys general, including New Mexico's, the AG Letter states: "Multiple states' attorneys general and departments of insurance have opened investigations into HSMs' fraudulent practices targeting consumers." *Id*. (Ex. 33) at 4-5.

783.    But the AG letter relies entirely upon one deceptive, secular, for-profit company named Aliera, founded and run by ex-felon Timothy C. Moses, along with *Trinity*, a fabricated "HCSM" that Mr. Moses invented to exploit. ¶¶743-760, above.

784.    Over the past five years, many press reports—including many press releases of state AGs and insurance commissioners—have labeled the Aliera entities a "scam" and "sham" since they do not and never have qualified as Health Care Sharing Ministries.

785.    It is difficult to overstate this point.

**786.    Googling *Aliera* and *SHAM* on 10/30/2023 produces these page-one results:**






"aliera" "SHAM"

About 933,000 results (0.20 seconds)



State of California - Department of Justice (.gov)
https://oag.ca.gov › news › press-releases › attorney-g...

**Attorney General Bonta Takes Legal Action Against Sham ...**

Jan 12, 2022 — **Aliera's sham** business is unlawful and our lawsuit seeks to ensure they are held to account to pay the price for the Californians they lured in ...

Healthcare Dive
https://www.healthcaredive.com › news › healthcare-s...

**Healthcare sharing ministry 'sham' faces suit for allegedly ...**

Jan 13, 2022 — ... **sham**." **Aliera** allegedly scammed thousands of consumers in California by collecting hundreds of millions of dollars in monthly payments but ...



Washington state Office of the Insurance Commissioner (.gov)
https://www.insurance.wa.gov › news › consumer-co...   ⋮

## Consumer complaints lead Kreidler to halt sham health ...

May 13, 2019 — Consumer complaints lead Kreidler to halt **sham** health ... **Aliera** and Trinity deceived consumers about products, operated illegally in Washington.



Garmer & Prather, PLLC
https://www.garmerprather.com › blog › federal-court...   ⋮

## Federal Court awards $4.7 Million Judgment to ...

Nov 29, 2021 — During the first phase of its fraud, **Aliera** sold **sham** HCSM policies through Unity/OneShare. The case in federal court in Lexington will ...



Wall Street Journal
https://www.wsj.com › articles › bankruptcy-of-healthcar...   ⋮

## Bankruptcy of Healthcare Manager Aliera Is Kept in ...

Jan 21, 2022 — image Atlanta-based **Aliera**, which is accused of helping to sell **sham** insurance policies, lost its bid to have its bankruptcy handled in Georgia.



HealthLeaders Media
https://www.healthleadersmedia.com › payer › cali-ag-...   ⋮

## Cali AG Bonta Sues "Sham" Healthcare Sharing Ministry

Jan 18, 2022 — "**Aliera's sham** business is unlawful and our lawsuit seeks to ensure they are held to account to pay the price for the Californians they lured in ...

**787.     Googling *Aliera* and *SCAM* on 10/30/2023 produces these page-one results:**

   "aliera" "SCAM"     

About 28,400 results (0.32 seconds)



Washington state Office of the Insurance Commissioner (.gov)
https://www.insurance.wa.gov › news › aliera-ordered...   ⋮

## Aliera ordered to pay $1 million for selling illegal health ...

Nov 24, 2020 — **Aliera** Healthcare, Inc. was ... "I'm taking action today to send a message to all **scam** artists – if you harm our consumers, you will pay heavily.



CT Mirror
https://ctmirror.org › News › Health   ⋮

## 'It appears this is a scam:' Complaints accelerate against ...

Feb 5, 2021 — David White, a spokesman for **Aliera** Healthcare, one of the groups Connecticut residents have complained about, said the companies provide "a ...



**KIRO-TV**
https://www.kiro7.com › news › healthcare-provider-c... ⋮

## Healthcare provider called a scam by regulators

Nov 15, 2019 — A healthcare provider is being called a "**scam**" by the Washington State Insurance Commissioner. The state has ordered **Aliera** HealthCare to ...



**ConsumerFraudReporting.org**
https://consumerfraudreporting.org › ChristianHealthS... ⋮

## Trinity - Alieracare - Christian Health Sharing Scam

The federal lawsuit against **Aliera** Companies and Trinity Healthshare comes as millions of people who are unable to afford private insurance are attracted to the ...



**Christianity Today**
https://www.christianitytoday.com › news › october ⋮

## Health Care Sharing Ministries Fight for Legitimacy Amid ...

Oct 21, 2020 — Regulators aim to prevent another Trinity HealthShare **scam**. But ... **Aliera**. Talento said that though scams have tarnished the health ...



**Top Class Actions**
https://topclassactions.com › uncategorized › fraudster... ⋮

## Fraudster Can't Wiggle Out of Insurance Scam Claims With ...

Jun 24, 2021 — Fraudster Can't Wiggle Out of Insurance **Scam** Claims With Faith Status, Judge Rules ... "**Aliera** is engaged in the unauthorized business of ...

788.    These reports of Aliera's misdeeds go on and on, emphasizing one regulatory action after another, one class action after another, one press release after another. The few sample Google results above explain the simple math of any ***association with Aliera***:

    (a)  Regulators take enforcement action against Aliera.

    (b)  Regulators publicize their enforcement action against Aliera.

    (c)  Lawyers sue Aliera, sometimes with support of regulators.

    (d)  Regulators expand their enforcement actions to include legitimate HCSMs.

    (e)  Regulators publicize their enforcement actions against legitimate HCSMs.

    (f)  Lawyers ***add*** those legitimate HCSMs to their lawsuits against Aliera.

    (g)  Association with Aliera becomes a death sentence for legitimate HCSMs.

789.    Consider the AG Letter together with the press releases by commissioners and

AGs note above. They all sound alike and mutually reinforcing.

790.     In its nine pages of text, the AG Letter generates this series of impressions:

791.     *Aliera* appears 18 times, *Trinity* another seven times, and *Unity* (the predecessor of Trinity) once, giving the Aliera entities a total of *26 mentions*.

792.     Words suggesting "*sham*" appear frequently, including "*fraud*" appearing eight times, "*confusion*" six times, "*deception*" thrice, "target[ing]" twice, "*mimicking*" twice, "*capitalizing on consumers*" once, "*schemes*" once, and "*deploying aggressive marketing practices*" once, for total mentions of *23 times*.

793.     Clearly, New Mexico has aimed its campaign to "*aggressively* confront the problem of insurance *fraud*"[408] at the wrong targets.

### New Mexico Singles Out, Defames Samaritan

794.     In these same nine pages of text, and amidst the *26 mentions of the Aliera entities* and *23 mentions* of words associated with predatory *shams, scams, and frauds*, the AG Letter called out *Samaritan Ministries International* by name.

795.     The AG Letter did not call out any other legitimate HCSM: *just Samaritan*.

796.     The AG Letter cites no other HCSMs by name. It cites neither any of the other HCSMs caught in OSI's anti-HCSM campaign, nor any other HCSMs listed among the 107 federally recognized Health Care Sharing Ministries in the ACA-Certified HCSM List (Ex. 20).

797.     Thus, *besides Samaritan*, the AG Letter's sole example of these "ministries" is *Aliera*, a single, tragic, fraudulent bad actor that never operated nor qualified as a "Health Care Sharing Ministry" under IRC §5000A or any other legal definition.

798.     This AG Letter exploited one notorious non-HCSM scam known as Aliera/Trinity

---

[408] NMSA 1978, §59A-16C-2 (emphasis added).

to tarnish all health care sharing ministries, including ***Samaritan by name***. Indeed, the ***only actual HCSM singled out by name in this defamatory letter was Samaritan***.

799.   Perhaps the cruelest irony is this. A leading federal case involved in cleaning up the Aliera mess actually uses ***Samaritan*** to show what a "***legitimate HCSM" looks like, to "highlight the difference***" with Aliera/Trinity.[409] This case—and the insurance commissioner's report upon which the case was relying—used Samaritan as a kind of Gold Standard.

800.   In many ways, Samaritan does represent the Gold Standard. To compare it with Aliera was outrageous, defamatory, and unconstitutional toward Samaritan and its members.

### OSI's Leadership of the State's Anti-HCSM Campaign

801.   OSI fired its first shots in the State's anti-HCSM campaign on March 26, 2020 (Exs. 31 & 32) and has led the campaign ever since. A few more examples should suffice.

802.   To this day, OSI still publicizes its C&D in the Trinity/Aliera scam (Ex. 32) alongside its anti-HCSM press release (Ex. 31) on the OSI website (Ex. 56),[410] as follows:

9/24/23, 4:12 PM                                                    Office of Superintendent of Insurance


New Mexico
**OSI** **Office of Superintendent of Insurance**

- **Health Care Sharing Ministries**

Under these arrangements, members pay a monthly fee. When they have health care expenses, members can request that the ministry or other members share part of the cost. However, the ministry is <mark>not legally obligated to pay</mark> for members' health care costs. State insurance regulators generally do not provide oversight of health care sharing ministries. See OSI's <mark>caution to consumers regarding Healthcare Share Ministries Trinity Cease and Desist at:</mark>

- Healthcare Share Ministries - Press Release
- Trinity Cease and Desist

---

[409] *LeCann*, 2021 WL 2554942, at *32 & n.32 (N.D.Ga.) (relying on a Report by the Washington Insurance Commissioner comparing the website of Aliera/Trinity to that of Samaritan).

[410] https://www.osi.state.nm.us/pages/insruances/health/health-resources/coverage-that-is-not-insurance.

https://www.osi.state.nm.us/pages/insurances/health/health-resources/other-types-of-health-insurance

803.    In late fall of 2022, a former Oklahoma Insurance Commissioner, as a consultant for HCSM interests, sent letters to the nation's insurance commissioners about the progress of the new Healthcare Sharing Accreditation Board ("HCSAB"), designed to provide a regulatory check on HCSMs. These letters (such as the one in Ex. 48) announced the first accreditation awarded by HCSAB to Christian Care Ministry (CCM), one of the oldest and largest HCSMs.

804.    This former Commissioner received only one "negative response." It came from "New Mexico," i.e., then-Superintendent Toal, as shown by the email exchange (Ex. 48) below.

**From:** Allen Kerr <allen@allenkerr.com>
**Sent:** Tuesday, December 6, 2022 10:51 AM
**To:** Lindsey Swindle <lswindle@tccm.org>
**Subject:** FW: [EXTERNAL] Healthcare Sharing Accreditation Awarded to Christian Care Ministry
**Importance:** High

Lindsey the only negative response I got from the letters is from New Mexico, see his note below.

**From:** Toal, Russell, OSI <Russell.Toal@osi.nm.gov>
**Sent:** Monday, December 5, 2022 3:30 PM
**To:** Allen Kerr <allen@allenkerr.com>
**Subject:** RE: [EXTERNAL] Healthcare Sharing Accreditation Awarded to Christian Care Ministry

Thank you for this information, Allen. While I respect the CCM business model, under the laws of New Mexico they must be licensed as an insurance company. The accreditation does not change that fact.

805.    This reply from Superintendent Toal to a former peer is relevant for four reasons.

806.    **First**, it was the only negative response from state insurance commissioners.

807.    **Second**, it was curt and dismissive of this news from a peer regulator about a new vetting process and its first accreditation of a leading HCSM (Christian Care Ministry/CCM).

808.    **Third**, it prematurely staked out an absolute and prejudged position.

809.    **Fourth**, it makes it unmistakably clear that Samaritan's fear of an enforcement action is not only "credible" but indisputable and inevitable.

810.    OSI has hunted and hounded HCSMs, and not just in New Mexico. It continues to

take the lead and stir the pot against HCSMs nationwide.

811.    At the March 2, 2023 meeting of the Consumer Information (B) Subgroup of the National Association of Insurance Commissioners, the official minutes (Ex. 52 at 8; Ex. 53 at 3)[411] report Cynthia Cisneros of OSI as stating:

> Cisneros said New Mexico has been working proactively to steer consumers away from HCSMs and scam plans with webinars and advertising. Crow said consumers may not seek help or information until it is too late.

812.    Here, OSI was telling the nation's insurance commissioners, at their official gathering, that OSI (proudly) has "**been working proactively to steer consumers away from HCSMs and scam plans** with webinars and advertising." *Id.* (emphasis added). And so it has.

### Samaritan's Turn Is Coming

813.    As shown above, OSI's anti-HCSM campaign has only escalated.

814.    OSI appears bent on ousting all HCSM from New Mexico, transforming the State into an HCSM-free zone. There are no signs of OSI stopping short of that goal.

815.    OSI's focus on Samaritan is only a matter of time, and appears imminent.

816.    Samaritan's fears OSI enforcement are more than merely "credible."

### OSI's Motives for Its Anti-HCSM Campaign

### OSI's Motives Hiding in Plain Sight

817.    To the extent motives are relevant here, OSI's have been hiding in plain sight. They include at least these four: (1) **consumer protection**, (2) **aggressive ACA implementation**, (3) local market protection (**protectionism**), and (4) and religious **animus**.

818.    Motives 1-3 are well addressed in OSI's 2015 Annual Report (Ex. 42)—**long before OSI began its litigious anti-HCSM campaign and had these litigation-related reasons**

---

[411] Also at https://content.naic.org/sites/default/files/national_meeting/Bcmte_MinutesPacket.pdf and https://content.naic.org/sites/default/files/call_materials/ci-minutes-4.17.pdf.

*for extra caution in declaring its objectives in writing.*

## Consumer Protection

819.    OSI's "paramount role" is to ensure the "best interests of New Mexicans" and especially "consumers of insurance," primarily "by investigating and prosecuting fraud to "protect[] customers" and "enforcing fair and competitive pricing of insurance products." ¶643.

820.    Thus, as with insurance regulators everywhere, OSI's "paramount role" and *motive* is consumer protection. But ACA implementation is not too far behind.

## Aggressive ACA Implementation

821.    After consumer protection, OSI's top declared motive is to "strive" to be a "leader" in "the roll out" of the "Affordable Care Act (ACA) or 'Obamacare'"—nationwide.

822.    In its 2015 Annual Report (Ex. 42 at 4), OSI described its Vision as follows:

### AGENCY VISION

The vision of OSI is to become one of the country's leading regulatory agencies with respect to overseeing the insurance industry in New Mexico and ensuring that New Mexico insurance consumers are treated fairly and honestly. In addition, OSI strives to be a leader with respect to the roll out of the Patient Protection and Affordable Care Act (PPACA), commonly called the Affordable Care Act (ACA) or "Obamacare" and ensuring New Mexicans have access to quality and affordable health insurance that maintains a level of minimum standards.

823.    The Superintendent's cover letter for this same Report (Ex. 42 at 6) declared:

I am very proud of the strides made by our young agency during the last two years, including: increasing our National Regulatory Ranking; having the third largest reduction in the number of uninsured individuals due to the Affordable Care Act, with our plans being the third lowest cost health insurance plans for individuals in the United States; continuing to combat insurance fraud; remaining a financially sound agency; and implementing new technology resources as available.

824.    In addition to Consumer protection, OSI is also proud to help lead the charge for the ACA nationwide and to protect OSI's own ACA-regulated insurance marketplace.

825.    Under "Agency Initiatives" in this same Report (Ex. 42 at 8), ensuring implementation of the ACA is listed first, even ahead of consumer protection:



826.    OSI's organization chart in this same Report (Ex. 42 at 3) reflects the same priorities, as shown in the reporting line descending directly from the Superintendent:

827.    Consumer protection from fraud is a structural priority in this org chart, with its units on "Insurance Fraud Task Force" and "Fraud." And so is the ACA, with its units on "Managed Health Care" and the "Health Insurance Exchange."

828.    Under the six "Agency Accomplishments" in this same Report (Ex. 42 at 9), the first boasts of OSI's improved "Regulatory Ranking" (e.g., increasingly aggressive enforcement)

and the next two boast of ACA-related accomplishments, even outranking anti-fraud measures:

II.   **Keeping Insurance Affordable**
   o   Health insurance rates in New Mexico under the Affordable Care Act are the third lowest for individual plans in the United States.

III.   **Insuring New Mexico**
   o   New Mexico has the 3rd largest reduction in the number of uninsured individuals due to the Affordable Care Act.

V.   **Combating Insurance Fraud**

829.   This same thirty-page Report devotes the next fourteen pages, exactly half its content (excluding front and back covers), to "Agency Organizational Units," showcasing twelve "Bureaus." Ex. 42 at 10-23. The first listed Bureau (p. 10) is for ACA Implementation:

## Agency Organizational Units

### ACA (Affordable Care Act) Implementation Bureau

830.   This Bureau has various duties. Ex. 42 at 10. "In carrying out these duties, the *ACA Implementation Bureau works closely with OSI leadership and all other bureaus involved in health insurance*. The ACA Implementation Bureau is tasked with also developing *numerous new initiatives within OSI related to health insurance reform*." *Id.* (emphasis added).

831.   Another Bureau (p. 20) is devoted to implementing the Patient Protection Act:

### Managed Health Care Bureau

The Managed Health Care Bureau administers and enforces New Mexico's Patient Protection Act and related health care regulations.  The Managed Health Care Bureau handles complaints and inquiries from managed health care consumers and conducts outreach presentations throughout the state to inform consumers and health care providers of their rights and responsibilities under the Patient Protection Act.  The bureau reviews external grievance appeals, proposes rule amendments, and also takes appropriate enforcement actions where merited.

### Protectionism

832.   Scattered throughout this 2015 Report are references to the local "insurance

markets in New Mexico" and their "competitiveness," Ex. 42 at 8 & 11, and the (proper) need to review "insurance entities that want to enter the New Mexico insurance market," *id*. at 12.

833.    In OSI's **2018** Annual Report, the Superintendent explained that OSI personnel (properly) "diligently monitor the insurance industry in New Mexico … to keep communication lines open with our stakeholders." Ex. 43 at 28. Key stakeholders are the insurance companies and associations that Superintendents Franchini, Toal, and Kane spent most of their combined careers serving as insiders and consultants, and whom Franchini and Toal are now serving once again.

834.    In OSI's **2021** Annual Report, the Superintendent highlighted (proper) initiatives resulting in "greater ease of operating in New Mexico for insurers and producers." Ex. 46 at 3.

835.    The **2022** Report emphasizes (properly) that OSI exists to serve not just consumers but also the "essential group [of] insurance brokers and agents, or 'producers.'" Ex. 47 at 5.

836.    There is nothing improper *per se* in these goals and initiatives. That OSI chose to highlight them in its highly-vetted Annual Reports, however, underscores its priorities.

837.    It likely is inevitable that OSI should want to protect its own ***insurers*** and insurance ***producers***—i.e., the local market—from outside competition. It likely would be true even if Superintendents Franchini, Toal, and Kane were not leaders of the "revolving door" that exists to favor and protect the local commercial players. Such ***protectionism*** is endemic to U.S. markets, and always has been, and is the reason why ***antitrust*** laws exist.

838.    The point here is that it does exist. And it matters to this case.

839.    When such ***protectionism*** crosses certain boundaries, as it has in this case, it violates certain statutory and constitutional provisions and rights guaranteed thereunder.

## Animus (Invidious Intent)

840.    Another likely motive here is ***animus***. It is hard to understand OSI's laser-focused aggression against HCSMs without considering the possibility of official animus toward the kind

of conservative economically and socially religious views of sharing ministries like Samaritan.

841.    The conservative religious views of these ministries might be associated with support for free-market (even anti-ACA) health care policy, conservative (such as anti-abortion) social policy, and conservative (especially in recent presidential elections) voting patterns.

842.    In OSI's **2020** Annual Report, the first Annual Report under Superintendent Toal, Toal stated in his cover letter that OSI "moved ***aggressively*** in response to COVID-19 and [has] taken many actions to protect consumers and businesses." Ex. 45 at ii (emphasis added). "The OSI has been—and will continue to be—***aggressive about taking action***" against practices that underserved the public during the pandemic. *Id*. at 6 (emphasis added).

843.    Taking ***aggressive*** action in the face of the pandemic was appropriate as long as it was aimed at the right targets. As such action relates to the anti-HCSM campaign that Toal launched in early 2020, "aggressive" turned out to be understatement.

844.    In his "Closing Remarks (Ex. 45 at 25), Toal highlighted the "$93 thousand in fines and penalties" OSI collected in 2020. That sum is a paltry fraction of the multi-millions of dollars OSI is seeking, and might boast in its next Report, from its anti-HCSM campaign.

845.    In short, OSI's motives appear to be: (1) protecting consumers from unfairness and fraud (***consumer protection***), (2) leading the charge for the ACA (***ACA politics***), (3) protecting New Mexico's own insurance producers and regulated marketplace (***protectionism***), and (4) expelling these conservative health care sharing *ministries* from the State (***animus***).

846.    All four of these motives are evident in OSI's advertising and slides in its PowerPoint presentations ("PPTs") shown above and below. But OSI's oral remarks—while delivering these presentations—are less guarded and more telling.

847.    On April 6, 2023, for example, OSI presented the below "encore presentation."

*See* the Invitation (Ex. 54) and the Presentation (Ex. 55).[412]



848.    This live recording of ***Staying Covered After COVID*** incorporates PPT slides at Exhibit 37 and described above, ¶¶846-847. It also includes unfiltered remarks of OSI, which, as detailed later in this Complaint, relentlessly characterizes HCSMs as scams while tirelessly promoting New Mexico's ACA exchange (www.BeWellNM.com), reflecting strong bias and protectionism. The tone and manner also indicate OSI's disdain for "these *ministries*."

849.    For example (with emphasis added to indicate OSI's own emphasis in tone): 4:25-4:45 ("people get *hoodwinked* [by] health care sharing ministry coverages [which] are designed to look like health insurance"); 5:25-5:45 ("these …ministries … say, yeah, you're going to contribute a ***monthly premium***, but there's no guarantee that that monthly premium will be there to pay your claims"); 8:18-14:20 (using HCSMs as prime examples of "scams" during six minutes on "How To Avoid Scams"); 10:35-10:55 ("marketplace and exchange coverage is often *far **less** expensive* than these … health care sharing ministry coverages, with the financial assistance available through BeWellNM"); 11:15-11:30 (casting the personal freedom described

---

[412]    https://a.storyblok.com/f/132761/x/3ee5ee595a/staying-covered-after-covid_-health-insurance-options-post-public-health-emergency-unwinding-20230406_113857-meeting-recording.mp4.

by some HCSMs as just "freedom from consumer protections"); 12:10-12:25 ("people wind up spending ***hours*** arguing with their ... health care sharing ministry"); 12:20-35 (describing aspects of some HCSMs as "not a line that you potentially want to fall for"); 13:00-13:05 ("avoid any plan where you have to join an association"); 13:30-14:00 (more conspicuous promotion of BeWellNM.com); 27:50-28:12 ("and it's really critical ... [that you] don't get *hoodwinked* into thinking that the only coverage options available are ... a health care sharing ministry").

850.    In addition to OSI's outright protectionism in favoring its own state-regulated marketplace, OSI's use of HCSMs as a "hoodwink" bogeyman may also serve to distract the public from failures of and discontent with many ACA exchanges and government programs.[413]

851.    In its frantic campaign to expel HCSMs, New Mexico has twisted itself into a pretzel, with sudden U-Turns and wildly inconsistent statements. As just one example of the latter, OSI and the AG have both declared publicly, repeatedly, and unequivocally that HCSMs are "not" "insurance." AG Letter (Ex. 33) at 2. *See also* ¶¶176-180, 708-742.

852.    The urgent rush behind New Mexico's anti-HCSM campaign, combined with the complete lack of justification for it, is telling evidence of motive.

853.    Overall, OSI has exhibited hostility to HCSMs like Samaritan in the ways shown above and below and will be further shown in discovery.

854.    All such religious animus by state officials is "odious to our Constitution."[414]

855.    All such religious animus by state officials is prohibited outright.[415]

---

[413]    See, e.g., https://www.city-sentinel.com/faith/more-than-half-of-insured-adults-report-problems-with-their-health-care-plans--/article_5327f932-50c8-11ee-8734-6b0d42ffeb26.html, citing https://www.kff.org/mental-health/poll-finding/kff-survey-of-consumer-experiences-with-health-insurance.

[414]    *Carson*, 142 S.Ct. at 1996 (citing *Espinoza*, 140 S.Ct. at 2263, quoting *Trinity Lutheran*).

[415]    *Kennedy*, 142 S.Ct. at 2422 n.1 (2022) (quoting *Masterpiece*, 138 S.Ct. at 1732).

856.     But this case is simpler than animus.

## With or Without Animus, OSI Violates Samaritan's Rights

857.     "Plaintiffs need not show explicit animus or 'targeting' of religion [to] prevail. It is enough to show targeting of a practice [that OSI knows] to be undertaken for religious reasons by those who will bear the burden of the regulation."[416]

858.     In its crusade against these sharing *ministries*—defined by *religious* exemption in the ACA and by *religious* traits in state safe harbors—OSI knew that the "burden of [its policy] or its 'effect [in] its real operation' will fall predominantly on religious adherents."[417] Thus, "it is sufficient that [OSI] had knowledge that the predominant effect of [its anti-HCSM policy] would be to burden religious practice and that the [policy] does indeed have that effect."[418]

859.     It may be true that that a State "generally has the power to 'prophylactically' ban certain practices [without] banning all other practices that might be in a similar position. But when the practice it chooses to ban is one that it knows is undertaken for religious reasons, it loses the protections of *Smith's* 'safe harbor' rule [of neutrality and general applicability]."[419]

860.     In this case, OSI's application of the Insurance Code is not "a valid and neutral law of general applicability."[420] It therefore discriminates against HCSMs like Samaritan.

861.     "A government [will] fail the *general applicability* requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's *asserted*

---

[416] *Bella*, 2023 WL 6996860, at *18 (D.Colo.). *See Darren*, 2023 WL 7270874 (D.Colo.) and *Littlefield*, 2023 WL 6962087 (D.Colo.). ***Bella***, ***Darren***, and ***Littlefield*** apply **Tenth Circuit** *law*.

[417] *Bella*, 2023 WL 6996860, at *18 (citing *Lukumi*, 508 U.S. at 535-36).

[418] *Bella*, 2023 WL 6996860, at *18 n.4.

[419] *Bella*, at *19 (citing *Emp. Div. v. Smith*, 494 U.S. 872, 879 (1990) ("**Smith**")).

[420] *Smith*, 494 U.S. at 879; *accord U.S. v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (**en banc**) (explaining *Smith*); *Darren*, 2023 WL 7270874, at *16.

*interests in a similar way*,' or if it provides '*a mechanism for individualized exemptions*.'"[421]

862.    "A government policy will not qualify as *neutral* if it is 'specifically directed [at] religious practice [whether] it 'discriminates on its face,' or [a] religious exercise is otherwise its 'object.'"[422] OSI's anti-HCSM campaign targets a wholly "religious practice." As such, OSI's anti-HCSM campaign lacks even "facial neutrality," because it is "specifically directed" at "religious practices" or at least practices that have "strong religious connotations."[423]

863.    OSI's campaign would fail even if it did not facially target religious practices.

864.    "The Free Exercise Clause, like the Establishment Clause, extends *beyond facial* discrimination [to] *forbid subtle departures from neutrality* and covert suppression of particular religious beliefs."[424] "[OSI] action that targets religious conduct for *distinctive treatment* cannot be shielded by mere compliance with the requirement of facial neutrality."[425]

865.    "The Free Exercise Clause of the First Amendment protects against '*indirect coercion or penalties* on the free exercise of religion, not just outright prohibitions.'"[426]

866.    "The Free Exercise Clause protects against [OSI] *hostility* which is *masked*, as well as overt. The Court *must survey meticulously the circumstances* of [OSI] categories to eliminate, as it were, religious gerrymanders."[427] Any OSI action "that targets *religious conduct* for *distinctive treatment* *or* advances *legitimate* governmental interests *only against conduct*

---

[421] *Kennedy*, 142 S.Ct. at 2422 (emphasis added).

[422] *Kennedy*, 142 S.Ct. at 2422 (emphasis added).

[423] *Lukumi*, 508 U.S. at 533-36.

[424] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[425] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[426] *Carson*, 142 S.Ct. at 1996 (emphasis added).

[427] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

*with a religious motivation* will survive strict scrutiny *only in rare cases*."[428]

867.    Any such non-neutral state action violates at least four Constitutional Clauses.

868.    "The **Free Exercise** Clause, *like the Establishment Clause*, extends beyond facial discrimination [to] forbid subtle departures from neutrality and covert suppression of particular religious beliefs."[429] "Government discrimination based on religion violates the **Free Exercise** Clause of the First Amendment, the **Free Speech** Clause of the First Amendment, and the **Equal Protection** Clause of the Fourteenth Amendment."[430] "[State actions] involving discrimination on the basis of religion [are] subject to heightened scrutiny whether they arise under the **Free Exercise Clause**, the **Establishment Clause**, or the **Equal Protection Clause**."[431]

869.    The Constitution demands *strictly* neutral and equal treatment.[432] That's why state actions "are not neutral and generally applicable … whenever they treat *any* comparable secular activity more favorably than religious exercise,"[433] without regard to motive. Even when indications of hostility are "put … aside," state actions "cannot be viewed as neutral [if they

---

[428] *Lukumi*, 508 U.S. at 546 (citations & internal punctuation omitted; emphasis added).

[429] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[430] *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998) ("***Peter***") (emphasis added).

[431] *Colo. Christian*, 534 F.3d at 1266 (cleaned up; emphasis added). This binding Tenth Circuit precedent was authored by then-Judge Michael McConnell, the second-most cited scholar in Supreme Court cases. This distinction applies as to all Justices, who typically cite McConnell *by name*. *E.g.*, *Trump v. Hawaii*, 138 S.Ct. 2392, 2441 (2018) ("***Trump***") (Sotomayor & Ginsburg, JJ., dissenting). "[Under our] precedent, laws 'involving discrimination on the basis of religion [are] subject to heightened scrutiny whether they arise under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause.'" *Id.* (quoting "*Colorado Christian Univ. v. Weaver,* 534 F.3d 1245, 1266 (C.A.10 2008) (**McConnell, J.**)") (emphasis added). *See Fazaga v. FBI*, 965 F.3d 1015, 1058 (9th Cir. 2020), *rev'd on other grounds,* 595 U.S. 344 (2022).

[432] *Espinoza*, 140 S.Ct. at 2254 (quoting *Trinity Lutheran*, 582 U.S. at 458).

[433] *Tandon*, 141 S.Ct. at 1296 (emphasis in original) (citing *Cuomo*, 141 S.Ct. 63).

single out" religious institutions for harsh or unfavorable treatment.[434]

870.    When enforcing this *strict neutrality*, the Supreme Court refuses to consider evidence of targeting, bigotry, animus, or other motive. "But even if we put [that evidence] aside, the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment."[435] In one key case, the Court disregarded motive altogether.[436]

871.    When state actions fail either neutrality or general applicability, there is "no need to consult [the categorical] test" against "official expressions of hostility," since, "in cases like that we have 'set aside' such policies without further inquiry."[437]

872.    The constitutional standard here is straightforward: ***Any*** non-neutral or non-generally applicable ***OSI action*** that harms Samaritan discriminates against Samaritan "no matter how well-intentioned,"[438] "regardless of design or intent,"[439] and "even in the absence of any motive to do so,"[440] and is "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus.'"[441]

873.    Such strict neutrality has long been the law of this Circuit,[442] and it explains why it is irrelevant if "faith-based bigotry" has not motivated OSI, since the "constitutional

---

[434] *Cuomo*, 141 S.Ct. at 66.

[435] *Cuomo*, 141 S.Ct. at 66. Thus, *Cuomo* "put aside" evidence of motive.

[436] *Tandon*, 141 S.Ct. at 1296-97. Thus, *Tandon* disregarded motive altogether.

[437] *Kennedy*, 142 S.Ct. at 2422 n.1 (citing *Masterpiece*, 138 S.Ct. at 1732).

[438] *FCA En Banc*, 82 F.4th at 689.

[439] *FCA En Banc*, 82 F.4th at 689.

[440] *FCA En Banc*, 82 F.4th at 672.

[441] *FCA En Banc*, 82 F.4th at 686 n.8 (quoting *Reed*, 576 U.S. at 165).

[442] *Colo. Christian*, 534 F.3d at 1260.

benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[443] All "disparate treatment of religion" is non-neutral.[444] Put simply, non-neutral actions by OSI are *non-neutral* even if they arise from "merely the intent to treat differently."[445]

874.    But if, as the evidence suggests, faith-based bigotry did animate OSI's actions, those actions are egregious. There will be no judicial scrutiny of such actions. They simply will be "*set aside* … without further inquiry,"[446] and Defendant may be liable for punitive damages.

875.    Regardless of motives: "Factors relevant to [assessing] governmental neutrality include 'the **historical background** of the decision under challenge, the **specific series of events leading to** the enactment or official policy in question, and the … **administrative history**.'"[447]

876.    A brief survey of these factors now follows.

877.    OSI recently adopted an aggressive new definition of insurance that bans all religious communities like Samaritan from operating in New Mexico without compliance with the Insurance Code. OSI actually told this Court that even five church members agreeing to help each other with medical expenses could constitute *insurance*.[448]

```
2   ███████████      When you apply a functional test, what
3   they are actually doing constitutes the business of
4   insurance and that's why we took the enforcement
5   action. . . .
```

---

[443] *Neace*, 958 F.3d at 415 (quoting *Colo. Christian*, 534 F.3d at 1260).

[444] *Cuomo*, 141 S.Ct. at 66.

[445] *Colo. Christian*, 534 F.3d at 1260. This binding Tenth Circuit law.

[446] *Kennedy*, 142 S.Ct. at 2422 n.1 (quoting *Masterpiece*, 138 S.Ct. at 1732).

[447] *Masterpiece*, 138 S.Ct. at 1731 (quoting *Lukumi*, at 540) (emphasis added; cleaned up).

[448] *See* Liberty Hrg. Tr. (June 2, 2023) (Ex. 57) at 33-34.

22          THE COURT:  What if there were only five
23   members and five of them had gotten together -- five
24   members -- what if five members of Gospel Light or
25   any other church for that matter who come together
1    and say, we are going to pay for each other's
2    medical bills.  We are going to pool within, just
3    the five of us.
4              Would you be seeking to try and enforce
5    the Insurance Code against five people?

878.   **OSI's remarkable reply**:

6          MR. THIES:  If we got a complaint
7    associated with those five members, we would review
8    it and then make a determination whether they are
9    engaging in the unauthorized business of insurance.
10             If the five members were, then we would
11   have to take enforcement.  If we concluded that the
12   five members were engaging in the unauthorized
13   business of insurance, yes, we would take
14   enforcement action against them.

879.   This "functional test" to define insurance "does not pass the straight-face test."[449] It abandons universal earmarks of insurance—such as legal obligation, indemnity, or assumption of risk—and embraces none of the earmarks of any legal definition anywhere.

880.   This test derives from "health benefits plans" in §59A-16-21.2 of the "Trade

---

[449] *FCA En Banc*, 82 F.4th at 692.

Practices and Fraud" Article of the Insurance Code,[450] and was addressed in OSI's 100-page administrative decision against Liberty. *See* OSI Liberty Decision (Jan. 20, 2023) (Ex. 49).[451]

881.   The addition of "Health benefits plans" in §59A-16-21.2 changes nothing in the legal analysis, because such plans are still defined as "insurance." Specifically, an entity that offers a "health benefits plan" is a "health ***insurance*** carrier … ***subject to*** the ***insurance*** laws and regulations of this state."[452] The reasoning here is circular and inevitably returns to defining "insurance." The issue remains OSI's definition of "insurance," regardless of Code Section.

882.   And OSI's new insurance definition is patently overbroad and absurd.

883.   It is the exact opposite of what insurance regulators typically do. "[B]roadly defining insurance, which really only scares insurance regulators, when you broadly define insurance, because it has unintended consequences."[453]

884.   OSI concocted it to target heath care sharing ***ministries***, a ***wholly religious sector*** defined by "religious exemptions" for "religious organizations" of "shared religious beliefs." AG Letter (Ex. 33) at 2.[454] New Mexico signed and fully joined this AG Letter.

885.   New Mexico thus agreed that HCSMs fill "a ***small niche*** in the healthcare market ***for people with shared religious beliefs***." *Id*. at 2. This may be a case of stating the obvious, but New Mexico ***did*** state it and thus ***admits*** that the ***sector*** it has targeted is ***wholly religious***.

---

[450] NMSA 1978, §59A-16-21.2 (Eff. June 14, 2019) ("**Health benefit plans**").

[451] "[R]espondent's HCSMs fall within the New Mexico ***definition of insurance*** [as] health benefits plans as defined by Section 59A-16-21.2" Ex. 49 at 1-2 (emphasis added).

[452] §59A-16-21.2 (emphasis added). To the extent OSI may claim that its hands were tied by this recent statute, the legislature may be complicit in OSI's misconduct. Discovery will tell.

[453] Liberty Hrg. Tr. (Ex. 57) at 183 (expert testimony of Kevin McCarty, former 13-year Ins. Com'r of Florda, and NAIC President for 2012). "Q: [HCSMs are] not insurance or any other sort of thing like that[.] Is that your understanding? A. That is absolutely correct." *Id*. at 184.

[454] At 2. HCSMs fill "a small niche in the healthcare market for people with shared religious beliefs." *Id*. This may be a case of simply stating the obvious, but New Mexico ***did*** state it.

886.     Regardless, OSI has targeted entities and concepts—ministries—with obvious and distinctive religious meaning. It thus lacks even "facial neutrality," because it refers to "religious practices" or at least practices that have "strong religious connotations."[455]

887.     To "target" the HCSM sector for fines and expulsion is to "target[] religious conduct for distinctive treatment."[456] This targeting goes well beyond a "subtle departure[] from neutrality," "covert suppression of particular religious beliefs," or "hostility which is masked."[457]

888.     Even if OSI's anti-HCSM hostility were not so blatant, the "Court must survey meticulously the circumstances of" OSI's anti-HCSM actions."[458] And any such action found to "target[] religious conduct for distinctive treatment or advance[] legitimate [state] interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases."[459]

889.     All these *Lukumi* rules on strict neutrality toward religion have been the law of the land since 1993, and have been applied over and over ever since. Defendant Kane has no excuse and should be liable for compensatory and, potentially, punitive damages.

## Samaritan Satisfies Preenforcement Standing

890.     Samaritan's preenforcement standing was established at ¶¶61-99. All intervening allegations have only reinforced it.

891.     All known and undeniable facts give Samaritan and its New Mexico members little repose; they face a daily threat from the anti-HCSM campaign of Defendant and OSI.

---

[455] *Lukumi*, 508 U.S. at 533-36.

[456] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted).

[457] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted).

[458] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted).

[459] *Lukumi*, 508 U.S. at 546 (citations & internal punctuation omitted).

## What's the Harm?

892.     OSI's "behavior has frustrated [Samaritan's] mission and caused it to divert resources in response to that frustration.'"[460] OSI's inevitable C&D against Samaritan will cause it to divert "a huge amount of staff time, energy, effort, and prayer that would normally have been devoted to … ministry."[461] Samaritan will have to divert "extensive time 'from working on ministry-advancing activities to instead address' the impact of [the C&D] on the [members]."[462]

893.     "Lost money and 'staff time spent responding' to a challenged government action are directly redressable[.]"[463] Samaritan also has paused all new-member enrollments in New Mexico. In past weeks alone, Samaritan turned away twelve New Mexico memberships due to the OSI threat. All these harms are real, significant, and will only escalate. In sum, Samaritan "credibly fears any number of consequences," "even simply an investigation"[464]

894.     Samaritan's COO Will Cooper has provided written testimony on behalf of Samaritan about the existing and likely future harms to Samaritan. Some excerpts follow.

### Samaritan Plaintiff's Declaration by COO Will Cooper (Ex. 24)

895.     "I love the ministry of Samaritan and I am deeply troubled by the actions of Superintendent Kane and [OSI], and by the harms those actions are causing to Samaritan, to our membership, to our staff, and to me and my family as Samaritan members. [OSI's actions] are generating needless questions and groundless doubts from our staff, our members, and the broader public that could harm our staff and member morale and seriously harm our ministry's

---

[460] *FCA En Banc*, 82 F.4th at 682.

[461] *FCA En Banc*, 82 F.4th at 683 (citation & internal punctuation omitted).

[462] *FCA En Banc*, 82 F.4th at 683.

[463] *FCA En Banc*, 82 F.4th at 683.

[464] *Darren*, 2023 WL 7270874, at *11 (citing *SBA List*, 573 U.S. at 165-66).

credibility and efficacy in New Mexico, and nationwide." Cooper Decl. (Ex. 24) at ¶¶16-17.

896.   "The actions of … OSI have been a significant source of expense, worry, and distraction to Samaritan and its leaders, including me as Chief Operating Officer, and pose much greater risks into the future, including possible criminal liability and even closure of our ministry in New Mexico. [OSI] recently issued a [C&D to] one of our peer ministries known as Liberty Healthshare, fining them over $2 million dollars and ordering them to cease operating in New Mexico unless and until they have fully complied with the … Insurance Code." *Id*. at ¶¶18-19.

897.   "[OSI's] actions against [the other] four HCSMs and against Liberty demonstrate a real and likely imminent threat to Samaritan. All these actions … have been and continue to be a tremendous burden on our Samaritan ministry, on our religious exercise, and on the religious exercise, expression, and association of our members in New Mexico." *Id*. at ¶¶21-22.

898.   "[A C&D], and any hearing or trial by OSI (presided over by Defendant Kane), will do great harm to our ministry by publicly questioning its legality and legitimacy and casting a cloud over its future availability, in New Mexico and, inevitably, elsewhere. Any such C&D and OSI trial will force this ministry to incur the substantial burden and expense of preparing for and taking part in that trial, to endure an adversarial process from the State prosecuting this ministry, and to suffer a lasting stain on the reputation of this ministry." *Id*. at ¶¶23-24.

899.   "The actions of … OSI also will cause related harms to Samaritan of permanent loss of members in New Mexico and elsewhere, of loss of contributions that support the ministry and its staff and serve member needs, and of a likely domino effect of actions by [other] commissioners [and] private lawsuits against Samaritan. In addition …, the actions of … OSI may result in layoffs of valued, well-trained Samaritan staff and the loss of Samaritan members and reputation that may be impossible to regain." *Id*. at ¶¶28-29.

900.    "All [such harms injure] Samaritan and its members, especially those in New Mexico, such as the ten individual Plaintiffs[.] These harms can and will be quantified for this lawsuit. But the greatest harm is to the Gospel of Jesus Christ, which is the mission of Samaritan and all its members. That harm cannot be quantified. Indeed, it is infinite." *Id*. at ¶30.

901.    "All the above harms substantially burden the ministry and religious exercise of Samaritan and all its members, but especially to those in New Mexico, such as the ten individual Plaintiffs, and infringe their constitutional rights. This infringement of constitutional rights is a significant harm, and deeply offensive, to all the Plaintiffs in this lawsuit and all the members of Samaritan. It cannot easily be quantified, but it certainly is irreparable." *Id*. at ¶¶31-32.

902.    "If such actions … proceed, they almost certainly will close the ministry for all New Mexico members." *Id*. at ¶25.

### The Existential Threat to Samaritan and Its Members

903.    The last item above is the most significant harm, and it is explained further by the following excerpts from the written testimony of the individual Plaintiffs.

#### Plaintiffs Nathan & Rebekah Bienhoff (Ex. 29)

904.    "[OSI] is ordering [HCSMs] to either leave the state or register as insurance companies. Such actions are wrong and inexcusable. Samaritan does not offer insurance and our membership is not an insurance policy. It offers no promise or guarantee at all. Even if Samaritan was willing to be regulated like insurance, it would not just waste our financial contributions with needless regulations but would actually destroy what Samaritan is and what it does. It would turn the Samaritan sharing model into a legal guarantee. It would rob us of our Christian healthcare fellowship and our First Amendment rights." Bienhoff Decl. (Ex. 29) at ¶13.

#### Plaintiffs Zachary & Rachel Cordel (Ex. 25)

905.     "Our Christian faith … would prevent us from obtaining insurance … governed by antidiscrimination requirements and other regulations that impose or support social policies on sensitive matters … that are contrary to God's Word. Even as our Christian faith requires us to love all people and to repent of our own sins, it prevents us from condoning sin or participating in programs that support sin, such as, for example, abortion, euthanasia, same-sex marriage, or gender reassignment. Samaritan does not support such activities…. We also need [Samaritan] because there is no secular substitute. Even if a substitute existed, it would require supporting activities contrary to our faith." Cordel Decl. (Ex. 25) at ¶¶18-19.

906.     "The loss of Samaritan would be a very big loss for us[.] It would be like showing up at our longtime church one Sunday morning to find the doors barred and a notice posted that the state has shut it down. Any [such action] would harm us and our family in very serious and ongoing ways. It surely would violate our basic rights under the Constitution. Any such action by the state, even the threat of such action, would tarnish the name of Samaritan, including our own names, and cause some of our fellow members to leave the membership, out of worry or confusion. The loss of members would impoverish this Christian fellowship both spiritually and financially, and diminish the freedoms of New Mexicans." *Id*. at ¶¶20-21.

<u>Plaintiffs Jay & Amy O'Neill (Ex. 28)</u>

907.     "Our Samaritan membership is as essential to our free exercise of religion, and our spiritual well-being, as church membership. In fact, Samaritan operates very much like a Christian church or fellowship [and] it does so in a way compatible with our Christian beliefs on morality. We could never join an insurance or other healthcare program that supports activity that clearly violates Scripture. One example is elective abortion. Samaritan won't share expenses for such a procedure. There are other examples of procedures and activities incompatible with

our faith. If state regulation ever required Samaritan to support such activities, it would destroy Samaritan or our role in it." O'Neill Decl. (Ex. 28) at ¶8.

908.    "We understand that regulators have been ordering health care sharing ministries to either (a) leave the state or (b) submit to insurance regulation (i.e., become insurance companies).... Because any such action against Samaritan would deprive us of our Christian healthcare ministry and fellowship, it would deprive us our constitutional rights to free exercise of religion, free expression, and free association. These injuries would be deeply personal and offensive. We have joined this lawsuit as plaintiffs to help avoid that result." *Id*. at ¶9.

<u>Plaintiffs Andrew & Heather Heath (Ex. 27)</u>

909.    "Samaritan is a uniquely Christian ministry that provides for healthcare consistently with Scriptural morality. We and our fellow members cannot in good conscience participate in or support health … programs that compel or provide coverage … for abortion, sex-reassignment, and other procedures contrary to Scripture. Most or all health [insurers], and many insurance alternatives, do just that, which also would be required of Samaritan if it were regulated like insurance. Subjection to insurance regulation is not just red tape: it is an existential threat. It would cause Samaritan to cease to exist." Heath Decl. (Ex. 27) at ¶20.

910.    "We want and need this Biblical ministry … because of its unique ability to express our Biblical, Christian faith[.] If Samaritan were … made unavailable to us for any reason, we would be deeply disappointed. If the state were the cause of Samaritan's demise in New Mexico, we would be severely distressed. Any such action by the state would contradict the very purpose of the state—which is to "secure" and protect our God-given rights to the free exercise of religion and free expression guaranteed by the federal and state constitutions. Any such state action would add insult to injury and be profoundly offensive." *Id*. at ¶¶22-23.

Plaintiffs David "Allan" & Monette Bell (Ex. 26)

911.    "[W]e would be frustrated if this ministry were shut down in New Mexico. The very idea that the state might have this power is deeply troubling. It would deprive our family of a chosen form of Christian fellowship and worship. It would violate our right to religious freedom. And it would leave us with few if any alternatives." Bell Decl. (Ex. 26) at ¶14.

912.    "We members cannot abide insurance regulation any more than Samaritan can. It's not just the added costs, burdens, and complications of being regulated. It's a matter of conscience and obedience to Scripture. We members share burdens in a particular way, through Samaritan, to obey Scripture and to exercise our faith. [L]egal guarantees and requirements would displace or undermine the faith-foundation of what we do. And some of the legal requirements that govern insurance companies, and would govern Samaritan if it were treated as such, would contradict Scripture. For example, we cannot knowingly support some of the social policies and medical procedures, such as elective abortion and sex-reassignment, promoted or required by insurance regulation. It would violate Scripture and our conscience." *Id*. at ¶15.

## Samaritan's Ministry Is Constitutionally Protected

### Overview of Samaritan's Case for Constitutional Protection

913.    Defendant's application of New Mexico's insurance law to the Plaintiffs violates their fundamental rights guaranteed by the United States Constitution. These include the rights of free religious exercise, religious autonomy, free expression, expressive association, equal protection of the law, and due process of law.

914.    ***Defendant's threat to Samaritan gives it three options in New Mexico***:

 (a) Become a licensed insurer with an approved "insurance" contract or "health benefits plan," or both, as OSI has decided that a HCSM program is both. *See* OSI Liberty Decision (Jan. 20, 2023) (Ex. 49) at 74-76. As described throughout this Complaint,

that option effectively is a death sentence, since Samaritan's sharing ministry is wholly incompatible with the New Mexico insurance regulation and, additionally, compliance with those regulations would force noncompliance with federal and other state regulations of tax-exempt HCSMs like Samaritan. *See, e.g.*, ¶¶747-783.

(b) Leave New Mexico, severing its relationship with its New Mexico members, sacrificing the constitutional rights to free exercise, free expression, equal protection, and expressive association of both Samaritan and its members. Among the many harms associated with this option, it forces noncompliance with its ACA HCSM exemption to make its sharing ministry available in every state. *Id.* & ¶¶1700-1730.

(c) Stay in New Mexico with the threat of (i) an enforcement proceeding that ends in forced compliance (i.e., death) or expulsion, (ii) a potentially ruinous fine of over $18 Million ($20,000 times 918 existing memberships plus additional memberships "sold"),[465] (iii) and years of litigation (Liberty is well into its third year of litigation) with enormous legal fees and only a hope that once beyond the reach of New Mexico's legal system there will be some deference to the U.S. Constitution.

915.     Christian ministries like Samaritan cannot survive the Insurance Code.

916.     "The Free Exercise Clause of the First Amendment protects against '***indirect coercion*** or penalties on the free exercise of religion, not just ***outright prohibitions***.'"[466] But here it is much worse: the coercion is "**direct**" and amounts to "**out prohibition**."

917.     Even if Samaritan could survive the financial, reputational, and other harms of regulatory compliance, the attendant antidiscrimination and other legal mandates would compel such fundamental changes in Samaritan's membership policies and internal values and culture that Samaritan "as it currently identifies itself [would] cease to exist."[467]

918.     For example, the Insurance Code at NMSA 1978, §59A-16-12 provides:

---

[465] This is over 40% of Samaritan's Fiscal 2023 gross revenue.

[466] *Carson*, 142 S.Ct. at 1996 (emphasis).

[467] *CLS*, 453 F.3d at 863; *accord Slattery*, 61 F.4th at 290; *FCA Panel*, 46 F.4th at 1099.

N. M. S. A. 1978, § 59A-16-12

## § 59A-16-12. Discrimination in insurance

No insurer shall, on the basis of the race, color, religion or national origin of any individual or group of persons:

A. refuse to make insurance available to any applicant for insurance; or

B. treat any such applicant or insured differently than any other applicant or insured with respect to the terms, conditions, rates, benefits or requirements of any such insurance contract.

This section shall not apply to life insurance contracts or annuities entered into prior to the section's effective date. This section shall not be construed to affect criteria for acceptance into membership of any fraternal benefit society.

919. Samaritan is not a "fraternal benefit society" under NMSA 1978, §59A-44-1, since, among other things, it is not "operated on a lodge system." Thus, Samaritan is not exempt from this antidiscrimination mandate. This result is unacceptable for at least two reasons.

920. **First**, it is another instance of secular entities being treated more favorably than religious ones. **Second**, the harm here is severe. This antidiscrimination mandate would destroy Samaritan's distinctive Christian ministry. It would compel Samaritan to enroll all comers, of any or no religion, eviscerating its purpose to promote and serve a specific religious community.

921. The individual Plaintiffs have explained this harm quite plainly.

922. "[T]his communal activity is itself a powerful form of worship, pleasing to God." Heath Decl. (Ex. 27) at ¶15 (quoting supporting Scriptures). "Fellowship among Christians is true worship to God and unleashes His power, even as it nurtures the faith of all who participate. That is what Samaritan means to us—authentic Christian fellowship and worship—because that is what it means to God and to our fellow members." *Id*. at ¶18. "[S]amaritan is a uniquely Christian ministry that provides for healthcare consistently with Scriptural morality." *Id*. at ¶20. "We want and need this Biblical ministry called Samaritan. We want and need it because of its

unique ability to express our Biblical, Christian faith in all the ways described above." *Id*. at ¶22.

923.    "Our Samaritan membership is as essential to our free exercise of religion, and our spiritual well-being, as church membership. In fact, Samaritan operates very much like a Christian church or fellowship [and] does so in a way compatible with our Christian beliefs on morality. We could never join an insurance or other healthcare program that supports activity that clearly violates Scripture." O'Neill Decl. (Ex. 28) at ¶8.

924.    "We are Christians[.] Each Christian is part of the 'Body of Christ,' also known as 'the Church.' This global body of Christians is made up of smaller denominations, churches, and fellowships that adhere to various creeds, emphasizing various aspects of Christianity. We Samaritan members form a body of Christians emphasizing the bearing, carrying, and sharing of burdens that accompany sickness and accidents. We are like congregants in a church called Samaritan. We act like congregants in a church called Samaritan." Bell Dec. (Ex. 26) at ¶13.

925.    "We all remain devoted to each other as part of our common faith in Jesus Christ. This Christian devotion plays out in many practical ways[.]" Bienhoff Decl. (Ex. 29) at ¶8.

926.    "As devout Christians, we believe in the power of prayer…. The God in whom we trust, and to whom we pray, hears those prayers and acts on them." Cordel Decl. (Ex. 25) at ¶13. "There is additional power in communal prayer and Christian fellowship….This communal activity is vital to Christians." *Id*. at ¶14. "Samaritan for us is about the Biblical duty and blessing of mutual burden-sharing … with the giving as important as the receiving. We and all our fellow Samaritan members are a Christian family, bearing and sharing the burdens of one another, taking care of each other, and encouraging each other in the faith. These activities are deeply spiritual and have profound impacts in this life and for all eternity." *Id*. at ¶15. "[W]e want and need Samaritan's ministry. We need it because of its unique ability to express our

Christian faith through … mutual burden sharing [which] includes spiritual and emotional burdens as well as financial. We also need it because there is no secular substitute. Even if a substitute existed, it would require supporting activities contrary to our faith." *Id*. at ¶19.

927.   Plaintiffs do not just share medical expenses. They do so as an expression of love and obedience to God and each other, to and through God's Word (Jesus Christ) and the Body of Christ (all Christians), including specific Scriptural commands, such as to love "neighbor" as self (*Mattew* 22:39; *Luke* 10:27), to do good "especially to those who belong to the family of believers" (*Galatians* 6:10), and to "bear" one another's "burdens" (*id*. at 6:2).

928.   "Participation in Samaritan is a classic exercise of religion for several reasons[.] First, it fulfills the commands of Scripture. Galatians 6:2 tells us to '[c]arry each other's burdens, and in this way you will fulfill the law of Christ.' Galatians 6:10 continues this theme: 'Therefore, as we have opportunity, let us do good to all people, especially to those who belong to the family of believers.' James 5:16 tells us to 'pray for each other so that you may be healed. The prayer of a righteous person is powerful and effective.' All followers of Christ act as His hands and feet in service to the whole body of Christians, giving 'rest' to those 'who are weary and burdened' (Matthew 11:28), helping them enjoy freedom in Christ, relief from the bondage and burdens of this world. (Galatians 5:1)." Heath Decl. (Ex. 27) at ¶¶11-12.

929.   In sum, this kind of Christian ministry is borne of a profound sense of Christian commitment and love, and it has profound benefits for member wellbeing—physically, mentally, and spiritually. *See, e.g.*, Member Sharing Example (Ex. 14).

930.   In addition to destroying this close religious community called *Samaritan*, the "reserve" and "indemnification" requirements of the Insurance Code would contradict or undermine two Christian principles on which Samaritan operates.

931.     **First**, "Jesus Christ is our Provider for every need." Foundational Principle #1, Sharing Guidelines (Ex. 2) at 5. Samaritan and its members are engaged in in a continual faith-building exercise. They must trust God monthly to provide for their needs just as the children of Israel trusted God daily to provide for their needs (rather than storing up for the next day). *See Exodus* 16; *see also Matthew* 6:11. **Second**, the mutual trust and reliance on fellow members is how they carry one another's burdens "and so fulfill the law of Christ." *Galatians* 6:2.

932.     The individual Plaintiffs have addressed this point as well.

933.     "Health-care-sharing through Samaritan depends on faith rather than legal guarantees. Participation strengthens our faith…. We members share burdens in a particular way [to] obey Scripture and to exercise our faith. Imposing legal guarantees and requirements would displace or undermine the faith-foundation of what we do." Bell Dec. (Ex. 26) at ¶¶10, 15.

934.     "[T]he essential caretaking activity of Samaritan members is an exercise of [our] faith in God … rather than the promises of men or guarantees of government. This is in stark contrast to insurance. We Samaritan members depend on God for our needs, trusting that He will move upon the hearts of our fellow members and provide them sufficient resources to contribute to the care of fellow members. We trust that our mutual commitment to God and our fellow members will see us through difficult times of accident or illness. To replace this faith-reliance with reliance on a legal … guarantee would destroy the spiritual foundation and purpose of the faith-building, fellowship-driven exercise of Samaritan's ministry." Heath Decl. (Ex. 27) at ¶19.

935.     "Unlike any insurance, Samaritan requires its members to rely on their faith in God and their fellow members to contribute to needs as they arise, since Samaritan never guarantees any reimbursement. Samaritan also is unlike any insurance in how Samaritan involves giving as much as receiving." Cordel Decl. (Ex. 25) at ¶7.

936.    "Even if Samaritan was willing to be regulated like insurance, it would not just waste our financial contributions with needless regulations but would actually destroy what Samaritan is and what it does. It would turn the Samaritan sharing model into a legal guarantee. It would rob us of our Christian healthcare fellowship and our First Amendment rights." Bienhoff Decl. (Ex. 29) at ¶13.

937.    The Insurance Code requires *reserves* and *guarantees* that would contravene Samaritan's associational religious exercise. It requires "Minimum Reserve Standards"[468] for such items as "Claim Reserves,"[469] "Premium Reserves,"[470] and "Contract Reserves."[471]

938.    Additionally, calculating such reserves is an ambiguous application of various attributes that would make no sense applied to a religious charity like Samaritan. For example: "All such reserves for prior valuation years are to be tested for adequacy and reasonableness along the lines of claim runoff schedules in accordance with the statutory financial statement including consideration of any residual unpaid liability."[472] "The insurer may employ suitable approximations and estimates; including, but not limited to groupings, averages and aggregate estimation; in computing premium reserves. Such approximations or estimates should be tested periodically to determine their continuing adequacy and reliability."[473]

939.    As explained at ¶¶553-556, Samaritan's role in its regular monthly ministry is limited to soliciting its members to send notes, prayers, and financial support directly to fellow members in need, without exercising any ownership or even control over that financial support.

---

[468] N.M. Admin. Code 13.10.14.1 et seq.

[469] N.M. Admin. Code 13.10.14.9.

[470] N.M. Admin. Code 13.10.14.13.

[471] N.M. Admin. Code 13.10.14.16.

[472] N.M. Admin. Code 13.10.14.9(C).

[473] N.M. Admin. Code 13.10.14.15.

940. Since Samaritan does not receive or control the money members send to each other to assist with medical bills, it has no surplus of funds to keep for "reserves," nor any use for such reserves since it has no liability for members' need. That is: unless Samaritan agrees to be converted into an insurance company contrary to (and abandoning) its religious mission.

941. Samaritan's sharing ministry operates on a national, even international, scale, with relatively few members in places like Hawaii, Vermont, and overseas. Each month every Samaritan household is intentionally randomly connected to a medically-needy fellow Christian household somewhere in the United States or beyond.

942. Every Samaritan member, regardless of location, is treated the same both *on principle* and to comply with the (a) ACA exemption, (b) comparable state mandate exemptions, and (c) various state safe harbors that mirror or model the ACA exemption requirements.

943. Thus, Samaritan does **not** have **separate state operations**, nor could it, feasibly.

944. This unitary operation of Samaritan is most important to achieve its **stated mission to the Body of Christ**—which has **no geographical boundaries**.

945. For Samaritan to become a licensed insurer in New Mexico (or anywhere else) would risk forfeiture of Samaritan's mission and its safe-harbor protections in all 31 safe-harbor states. *See* footnote 329 (citing all 31 laws). Those safe-harbor laws require disavowal of guarantees and other earmarks of non-insurance. None is compatible with insurance licensure.

946. Thus, for Samaritan to submit to insurance regulation in Nex Mexico likely would forfeit Samaritan's automatic protections from insurance regulation in 31 states: almost two-thirds of the United States and almost two-thirds of Samaritan's nationwide ministry.

947. In sum, for Samaritan—a unitary ministry ministering in all 50 states—to minister to its **members in New Mexico** by becoming a **licensed insurer in New Mexico** would mean:

(a) By engaging in "commercial insurance" IRC §501(m),[474] Samaritan forfeits its IRC §501(c)(3) tax-exempt status, a loss that by itself cripples or ends its ministry.

(b) By losing its IRC §501(c)(3) status, it would lose its IRC §5000A HCSM status.[475]

(c) By losing its IRC §501(c)(3) status, it also would lose its similar mandate-exemption status in the three states that require the ACA terms of IRC §5000A(d)(2)(B).[476]

(d) By losing its IRC §501(c)(3) status, it would lose its safe-harbor status in 23 (of 31) states whose safe-harbor laws require IRC §501(c)(3) tax-exempt status.[477]

(e) By submitting to insurance regulation in New Mexico, Samaritan would forfeit its safe-harbor protection in the 26 (of 31) states whose safe harbors require HCSMs to publicly disclaim any assumption of risk or promise to pay. *See* Disclaimers, below.

(f) By submitting to such regulation, Samaritan would forfeit its safe-harbor protection in the three (of 5) safe-harbor states without disclaimers. *See* **Disclaimers**, below.

948.    **Disclaimers**. Of the 31 states with safe harbors, only five (Iowa, Kansas,

---

[474] "**(m) Certain organizations providing commercial-type insurance not exempt from tax.—(1) Denial of tax exemption where providing commercial-type insurance is substantial part of activities.**—An organization described in paragraph (3) or (4) of subsection (c) shall be exempt from tax under subsection (a) *only if no substantial part* of its activities consists of providing *commercial-type insurance*." IRC §501(m) (bold retained; italics added).

[475] "**(ii) Health care sharing ministry.**—The term 'health care sharing ministry' means an organization—**(I)** which is described in section *501(c)(3) and is exempt from taxation under section 501(a)*[.]" IRC §5000A(d)(2)(B)(ii)(I) (bold retained; italics added).

[476] Cal. Gov't Code §100705(c)(2) ("[HCSM] has the same meaning as [in] §5000A(d)(2)(B) of the [IRC]."); *accord* 44 R.I. Gen. Laws §44-30-101(a)(1); N.J. Stat. §54A:11-2. *See* 956 Mass. Code Regs. 5.03(3)(d) and D.C. Mun. Regs. 26-A, §8901.1(f) (not mandating §5000A(d)(2)(B)).

[477] **Total of 23**: **21 require 501(c)(3)**: Ala. Code §22-6A-2(a); Alaska Stat. §21.03.021(k)(1); Ark. Code §23-60-104(b)(2)(A); Fla. Stat. §624.1265(1)(a); Ga. Code §33-1-20(a); Idaho Code §41-121(2); 215 Ill. Comp. Stat. 5//4 (b)(i); Ind. Code §27-1-2.1-1(1)(a)(2); Iowa Code §505.22(1); La. Stat. §22:318; Me. Rev. Stat. tit. 24-A, §704(3); Miss. Code. §83-77-1(3); Mo. Stat. §376.1750(2); Mont. Code §50-4-111(1); Neb. Rev. Stat. §44-311(2); N.H. Rev. Stat. §126-V:1(II); N.C. Gen. Stat. §58-49-12(1); S.D. Codified Laws §58-1-3.3; Tex. Ins. §1681.001; Va. Code §38.2-6300; Wyo. Stat. §26-1-104(a)(v). **Two states** require §501(c)(3) status via §5000A: Rev. Code of Wash. §48.43.009; Ariz. Stat. §20-122(B)(2). Arizona is counted here, but does it both ways. *Id*. ("(B) '[HCSM] means a nonprofit … that is exempt from federal income tax under §501 of the [IRC and] (2) Meets the requirements of … §5000A(d)(2)(B) … (ii)(I)").

Oklahoma, Utah, and Washington) do not require a specific public disclaimer.[478]

949.    Of these five, three forbid any legal assumption of risk or promise to pay.[479]

950.    The ***remaining 26 state*** safe harbors ***do*** require public disclaimers by all HCSMs operating in their states.[480] Some of these states forbid any legal assumption of risk or promise to pay ***both in their text and in their disclaimers***.[481] But the focus here is the *disclaimers*.

951.    For example, Tex. Ins. Code §1681.002 requires this disclaimer:

> "Notice: This health care sharing ministry facilitates the sharing of medical expenses and is not an insurance company, and neither its guidelines nor its plan of operation is an insurance policy. Whether anyone chooses to assist you with your medical bills will be totally voluntary because no other participant will be compelled by law to contribute toward your medical bills. As such, participation in the ministry or a subscription to any of its documents should never be considered to be insurance. Regardless of whether you receive any payment for medical expenses or whether this ministry continues to operate, you are always personally responsible for the payment of your own medical bills. Complaints concerning this health care sharing ministry may be reported to the office of the Texas attorney general."

---

[478] **Five state safe harbors do *not* require a disclaimer**: Iowa Code §505.22(1); Kan. Stat. §40-202(j); Okla. Stat. tit. 36, §110(11); Utah Code §31A-1-103(3)(c); Wash. Rev. Code §48.43.009.

[479] Okla. Stat. tit. 36, §110(11)(e) ("suggests amounts that participants may voluntarily give with ***no assumption of risk or promise to pay*** either among the participants or between the participants and the organization") (emphasis added); Iowa Code §505.22(5) (***same***); Utah Code §31A-1-103(3)(c)(ii) ("does ***not incur a legal obligation to pay***") (emphasis added).

[480] **Twenty-six state safe harbors *do* require a disclaimer**: Ala. Code §22-6A-2(d); Alaska Stat. §21.03.021(k)(8); Ariz. Rev. Stat. §20-122(B)(7); Ark. Code §23-60-104(b)(2)(G); Fla. Stat. §624.1265(3); Ga. Code §33-1-20(a)(6); Idaho Code §41-121(2)(f); 215 Ill. Comp. Stat. 5//4 (b)(viii); Ind. Code §27-1-2.1-1(1)(a)(7); Ky. Rev. Stat. §304.1-120(7)(d); La. Stat. §22:318(4); Me. Rev. Stat. tit. 24-A, §704(3)(H); Md. Code, Ins. §1-202(a)(4)(xii); Mich. Comp. Laws §550.1867(7)(g); Miss. Code. §83-77-1(3)(f); Mo. Stat. §376.1750(2)(6); Mont. Code §50-4-111(2); Neb. Rev. Stat. §44-311(2)(f); N.H. Rev. Stat. §126-V:1(III)(g); N.C. Gen. Stat. §58-49-12(6); 40 Pa. Stat. §23(b)(10); S.D. Codified Laws §58-1-3.3(6); Tex. Ins. Code §1681.002; Va. Code §38.2-6300(6); Wis. Stat. §600.01(b)(9)(f); Wyo. Stat. §26-1-104(a)(v)(C).

[481] E.g., Md. Code, Ins. §1-202(a)(4)(vi) ("suggests amounts to give that are voluntary … with no assumption of risk or promise to pay"); *id.* at (xii) (disclaimer); Mich. Comp. Laws §550.1867(7)(d) ("Provide amounts that participants may contribute with no assumption of risk or promise to pay among its participants."); *id.* at (g) (disclaimer).

952.     Most states use language modeling the above. Another example is Md. Code, Ins. §1-202(a)(4)(xxi),[482] requiring the "following verbatim written disclaimer as a separate cover sheet for any and all documents distributed by or on behalf of the exempt arrangement, including applications, guidelines, promotional, or informational material and all periodic publications:"

> This publication is not issued by an insurance company nor is it offered through an insurance company. It does not guarantee or promise that your medical bills will be published or assigned to others for payment. No other subscriber will be compelled to contribute toward the cost of your medical bills. Therefore, this publication should never be considered a substitute for an insurance policy. This activity is not regulated by the State Insurance Administration, and your liabilities are not covered by the Life and Health Guaranty Fund. Whether or not you receive any payments for medical expenses and whether or not this entity continues to operate, you are always liable for any unpaid bills.";

953.     As a third example, Neb. Rev. Stat. §44-311(2)(f) requires this disclaimer:[483]

> IMPORTANT NOTICE. This organization is not an insurance company, and its product should never be considered insurance. If you join this organization instead of purchasing health insurance, you will be considered uninsured. By the terms of this agreement, whether anyone chooses to assist you with your medical bills as a participant of this organization will be totally voluntary, and neither the organization nor any participant can be compelled by law to contribute toward your medical bills. Regardless of whether you receive payment for medical expenses or whether this organization continues to operate, you are always personally responsible for the payment of your own medical bills. This organization is not regulated by the Nebraska Department of Insurance. You should review this organization's guidelines carefully to be sure you understand any limitations that may affect your personal medical and financial needs;

954.     ***In all, 26 states require disclaimers similar to the above examples.***

955.     ***In short, by submitting to insurance regulation in New Mexico, Samaritan would forfeit its safe-harbor status in at least 26, and up to 31, other states.***

956.     To summarize, by submitting to insurance regulation in New Mexico, Samaritan would **(a)** forfeit its federal tax-exempt status under IRC §501(c)(3) (life-threatening); **(b)** lose

---

[482] Disclaimers modeling Maryland's: 40 Pa. Stat. §23(b)(10) and Wis. Stat. §600.01(b)(9)(f).

[483] *Accord* N.H. Rev. Stat. §126-V:1(III)(g) (same).

its federal HCSMs status under IRC §5000A (devasting); **(c)** lose its similar mandate exemption in three states that incorporate the ACA requirements of IRC §5000A(d)(2)(B) (harmful); **(d)** forfeit its safe-harbor status in the 23 (of 31) states whose safe harbors require federal-tax exempt status under IRC §501(c)(3) (devastating); and, independently, **(e)** forfeit its safe-harbor status in all 29 (of 31) states whose safe harbors forbid any legal assumption of risk or promise to pay via either statutory text or required disclaimer. ¶¶913-955 & 1700-1730 for details.

### Defendant Provides Samaritan a Hobson's Choice

957.    Defendant confronts Samaritan with a Hobson's choice: <u>**either**</u> (a) succumb to the illegal pressure of the State, obtain an insurance license, restructure its ministry to replace faith with legal guarantees and to comply with antidiscrimination requirements, all while drowning in new noncompliance with IRC §501(c)(3), with IRC §5000A, and with at least 29 state safe harbors, all while dying die a slow death, first here and then everywhere, all while enduring, and allowing its members to endure, egregious violations of their constitutional rights; <u>**or**</u> (b) depart New Mexico, suffer the loss of memberships, of constitutional freedoms, and of reputation, all while inviting similar actions by private litigators and public regulators everywhere and defending itself from the stigma and the Pandora's Box from fleeing New Mexico, including, for example, possible forfeiture of its ACA-certified HCSM status due to its inability to serve and share with its members in New Mexico equally with those in all other states. ¶¶903-956.

958.    The harms to Samaritan's members are real, imminent, and grave.

959.    The individual Plaintiffs have described these harms well.

960.    "We feel our participation is a direct line into their lives, to support them materially and spiritually, just as much as if they were members of our church or discipleship group or Bible study…. This whole experience was very meaningful to us. It was a Christian

community [sharing burdens just] like a Christian church." Cordel Decl. (Ex. 25) at ¶¶8, 10.

961.    "[S]amaritan is not just *a* Christian ministry; it *is* Christian ministry. [I]t is nothing like 'insurance' [and we] do not want insurance." Heath Decl. (Ex. 27) at ¶21. "We want and need this Biblical ministry called Samaritan." *Id*. at ¶22. "If Samaritan were shut down in New Mexico … we would be deeply disappointed. If the state were the cause of Samaritan's demise in New Mexico, we would be severely distressed. Any such action by the state would contradict the very purpose of the state—which is to 'secure' and protect our God-given rights to the free exercise of religion and free expression guaranteed by the federal and state constitutions. Any such state action would add insult to injury and be profoundly offensive. To help ensure this does not happen we have joined this lawsuit as plaintiffs." *Id*. at ¶23.

962.    "We are like congregants in a church called Samaritan. We act like congregants in a church called Samaritan. [W]e would be frustrated if this ministry were shut down in New Mexico. The very idea that the state might have this power is deeply troubling. It would deprive our family of a chosen form of Christian fellowship and worship. It would violate our right to religious freedom [and] leave us with few if any alternatives." Bell Decl. (Ex. 26) at ¶¶13-14.

963.    "We were upset to learn of the actions of [Defendant]. The loss of Samaritan would be a very big loss for us, our family, and our whole community. It would feel like losing a family member or our fellowship. It would be like showing up at our longtime church one Sunday morning to find the doors barred and a notice posted that the state has shut it down." Cordel Decl. (Ex. 25) at ¶20. "Any action by the state to shut down Samaritan or force it out of New Mexico would harm us and our family in very serious and ongoing ways…. Any such action by the state, even the threat of such action, would tarnish the name of Samaritan, including our own names, and cause some of our fellow members to leave the membership, out

of worry or confusion. The loss of members would impoverish this Christian fellowship both spiritually and financially, and diminish the freedoms of New Mexicans." *Id*. at ¶21.

964.    Thus, subjection to OSI regulation would not just infringe the rights of Samaritan and its members. It would terminate this ministry, as it now exists, in New Mexico first and eventually nationwide, for all the reasons explained above. ¶¶913-956.

965.    Against these threats, OSI cannot be viewed as a "neutral and detached" tribunal. Defendant acts as police, prosecutor, and judge, and the "overlap between prosecutorial and adjudicative functions" "raises a greater concern about bias." ¶1270-1272, below. That combination of powers, together with the evidence of prejudgment and protectionism discussed above, make it impossible for OSI to avoid the appearance or "probability of unfairness." *Id*.

966.    Christian ministries like Samaritan simply cannot survive OSI regulation.

967.    Samaritan presumably would be put the choice of either enrolling all comers, and facilitating all prevailing medical or therapeutic treatments, or closing down.

968.    As explained, Samaritan and its members operate very much like a classic Christian ministry and their shared faith is based on applicable Scripture from the Holy Bible.

969.    Members do not simply share their medical expenses. They do so as an expression of love and obedience to God and each other, to and through God's Word (Jesus Christ) and the Body of Christ (all Christians), including specific Scriptural commands, such as to love "neighbor" as self (*Matthew* 22:39; *Luke* 10:27), to do good "especially to those who belong to the family of believers" (*Galatians* 6:10), and to "bear" one another's "burdens" (*Gal*. 6:2).

970.    Such ministry dates from 16th Century Protestant Reformation and its modern practice has occurred continually for at least the last 100 years,[484] including at Samaritan.

---

[484] *See Bethel Mennonite*, 746 F.2d at 392.

971.     It is Samaritan's sole Mission and the way it executes its only reason to exist.

972.     It is done out of a profound sense of Christian commitment and love, and it has profound benefits for member wellbeing—physically, mentally, and spiritually. *See, e.g.*, Member Sharing Example (Ex. 14); and ¶¶402-488 (Declarations).

973.     The health needs shared through Samaritan include the gravest burdens experienced by members and their loved ones in their lifetimes. ¶¶402-488 (Declarations).

974.     This ministry of Samaritan is of immense importance to its members, including those in New Mexico, and including the ten named individual Plaintiffs. *Id*.

975.     By attempting to halt Samaritan's operations in New Mexico, OSI threatens to punish every current Samaritan member (and prevent every future member) in New Mexico. *Id*.

976.     For some of these New Mexico residents, such an action is equivalent to barring them from attending Sunday worship, Sunday School, or Bible studies. *Id*.

977.     Subjection to OSI regulation would not just infringe the First and Fourteenth Amendment rights of Samaritan and its New Mexico members; it would terminate the ministry first in New Mexico and then, by tipping the first domino, everywhere. ¶¶743-983.

978.     Such a prejudged outcome defies the law and common sense.

979.     The purpose of non-insurance status is to prevent the State from interfering with the mutual assistance work of a church-like religious ministry like Samaritan.[485]

980.     "[I]t is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. The line is hardly a bright one, and an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission. ***Fear of potential liability might***

---

[485] *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327 (1987) ("***Amos***").

*affect the way an organization carried out what it understood to be its religious mission*."[486]

981.     As applied to religious non-insurers like Samaritan, recognition of non-insurance status serves the "legitimate purpose of *alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions*."[487]

982.     "For many individuals, religious activity derives meaning in large measure from participation in a *larger religious community*. Such a community represents an ongoing tradition of *shared beliefs*, an organic entity *not reducible to a mere aggregation of individuals*. Determining that certain activities are in furtherance of [its] religious mission, and that *only those committed to that mission should [participate]*, is thus a means by which a religious community *defines itself*. *Solicitude* for [its] ability to do so reflects the idea that furtherance of the *autonomy* of religious organizations often *furthers individual religious freedom as well*."[488]

983.     Defendant would have done well here to heed this good advice. The purpose of non-insurance status is to keep non-insurers safe. Defendant did just the opposite.

## Applicable Constitutional Standards (Tests)

### Strict Scrutiny (Balancing Test)

984.     "[I]t is still true that '[t]he essence of all that has been said and written on the subject is that only those interests of the *highest order* ... can *overbalance* legitimate claims to the free exercise of religion.'"[489] Thus, the state must justify any "inroad on religious liberty by

---

[486] *Amos*, 483 U.S. at 336 (emphasis added).

[487] *Amos*, 483 U.S. at 339 (emphasis added).

[488] *Amos*, 483 U.S. at 342 (Brennan & Marshall, JJ., concurring) (emphasis added).

[489] *Thomas*, 450 U.S. at 718 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("*Yoder*")).

***showing that it is the least restrictive means of achieving some compelling state interest***."[490]
This is the same test imposed by the Religious Freedom Restoration Act of 1993 ("RFRA").[491]

985.    This "strict scrutiny" is the default test to protect individual rights under the First and Fourteenth Amendments. "Under the Free Exercise Clause, a government entity ***normally*** must satisfy ***at least*** '***strict scrutiny***'[.]"[492] "Our review [of these restrictions on Free Speech] was conducted using ***strict scrutiny***, [the] '*most demanding test known to constitutional law*.'"[493]

986.    OSI "policy can survive strict scrutiny only if it advances '***interests of the highest order***' and is 'narrowly tailored to achieve those interests.' Put another way, ***so long as [OSI] can achieve its interests in a manner that does not burden religion***, ***it must do so***."[494]

987.    This test, in its most common formulation, requires the state to prove that its challenged action was the "least restrictive means" to achieve a "compelling state interest."[495] Since 1981, *when* strict scrutiny applies, the state must justify any "inroad on religious liberty by ***showing that it is the least restrictive means of achieving some compelling state interest***."[496]

988.    **First Prong**. The first prong of this test requires OSI to prove that its interest is not only compelling in general but compelling in context, because "context matters" when applying the "compelling … interest standard."[497] It is well established that "the government

---

[490] *Thomas*, 450 U.S. at 718.

[491] 42 U.S.C. §§2000bb *et seq*. Congress evidently drew its test wholesale from *Thomas*.

[492] *Kennedy*, 142 S.Ct. at 2426 (citing *Lukumi*, 508 U.S. at 533 n.1) (emphasis added).

[493] *Twitter, Inc. v. Garland*, 61 F.4th 686, 709 (9th Cir. 2023) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997) ("***Flores***")).

[494] *Fulton*, 141 S.Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546) (emphasis added).

[495] *Thomas*, 450 U.S. at 718. Again, this same test appears in RFRA and in most "state RFRAs."

[496] *Thomas*, 450 U.S. at 718 (8-1).

[497] *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) ("***Cutter***"). Even "[o]utside the Free Exercise area … 'context matters' in applying the compelling interest test." *Gonzales v. O Centro Espirita*

cannot discharge this burden by pointing to 'broadly formulated interests.'"[498]

989.   **Second Prong**. The second prong requires OSI to prove that its particular restriction on the particular religious exercise of Samaritan is the "least restrictive means" to achieve any compelling state interest. This is the most rigorous judicial scrutiny ever created.

990.   **Result**. In practice, "courts must scrutinize the asserted harm of granting *specific exemptions to particular religious claimants*."[499] "Put another way, so long as the government can achieve its interests in a manner that *does not burden religion*, it *must do so*."[500]

991.   The object of this test is to require the government agency involved to grant exemptions to particular religious claimants whenever the government can "do so" without completely sacrificing its "interests of the highest order" (if it has any).

992.   This test, where it applies—e.g., to Free Exercise claims involving non-neutral or non-generally applicable laws—is applied the same way to claims under the Constitution[501] as to claims under the federal RFRA[502] and state RFRAs such as the New Mexico RFRA.[503] *See* Sixteenth Cause of Action (NMRFRA) at ¶¶1742-1763.

993.   "'RFRA challenges should be adjudicated in the same manner as constitutionally

---

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) ("***O Centro***") (citing *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) (equal protection)).

[498] *Ramirez v. Collier*, 595 U.S. 411, 427 (2022) ("***Ramirez***") (quoting *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 726-27 (2014)) ("***Hobby Lobby***").

[499] *Fulton*, 141 S.Ct. at 1881 (citations and internal punctuation omitted).

[500] *Fulton*, 141 S.Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546) (emphasis added).

[501] *Thomas*, 450 U.S. at 718 (8-1) (state must justify "inroad on religious liberty by ***showing that it is the least restrictive means of achieving some compelling state interest***") (emphasis added).

[502] 42 U.S.C. §§2000bb *et seq*. *See e.g., Singh*, 56 F.4th 88 (D.C. Cir.) (applying federal RFRA).

[503] NMSA 1978, §§28-22-1 *et seq*. *See, e.g., TMAA*, 83 F.4th at 930-32 (applying Alabama RFRA). "To survive strict scrutiny under ARFA, the City must carry its burden to demonstrate that its planning decision is the least restrictive means to achieve a compelling government interest." *Id*. The court cited federal constitutional cases to hold the City failed strict scrutiny.

mandated applications of [strict scrutiny].'"[504] "This [First Amendment test] applies with equal force to the violation of [RFRA] because [RFRA] enforces First Amendment freedoms."[505]

994.   This strict-scrutiny test "*is the most demanding test known to constitutional law*."[506] However it may be formulated in any specific case, "*it 'really means what it says*.'"[507]

995.   This scrutiny is *strict* in theory but usually *fatal* in fact, requiring an *exemption*: either as offered by the public agency involved or as ordered by a court via injunctive relief.

996.   Three recent circuit cases involving the military illustrate the rigor of this scrutiny in the face of *national security* interests—as *compelling* as government interests usually get. Two involved Covid-19, the worst pandemic in a century—a most compelling interest. These cases, which pose the highest of hurdles for religious claimants, illustrate the *strict* in *strict scrutiny*.

997.   In the **first** case, after analyzing Marine Corps grooming policies as applied to several specific Sikh recruits, the D.C. Circuit reversed the district court and ruled that these specific recruits were entitled to relief from those policies.[508] In *66 paragraphs* of *merits analysis*, the court closely examined, and rejected, each Marine Corps argument. Not all federal courts spend 66 paragraph scrutinizing government arguments, but strict scrutiny is *strict*.

998.   "But even giving the widest berth to the Corps' compelling interest in enforcing [its] policies generally, RFRA requires us to ask the *more particularized question* of whether the

---

[504] *Singh*, 56 F.4th at 92 (quoting *O Centro*, 546 U.S. at 429-430). "Because RFRA claims should be adjudicated 'in the same manner as constitutionally mandated applications' of the strict scrutiny test, we need not address the Plaintiffs' … First Amendment claim[.]" *Id*. at 107.

[505] *Navy Seals*, 27 F.4th at 348 (citations omitted).

[506] *Flores*, 521 U.S. at 534; *accord Braidwood Mgt. v. EEOC*, 70 F.4th 914, 939 (5th Cir. 2023) (quoting *Flores*, 521 U.S. at 534) ("***Braidwood***").

[507] *Tandon*, 141 S.Ct. at 1298 (quoting *Lukumi*, 508 U.S. at 546) (emphasis added). Accord *Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.) ("***Yellowbear***").

[508] *Singh*, 56 F.4th at 91-110 (Millett, Rao, & Childs, JJ.). This decision is the ***best recent example*** of strict scrutiny. But it contain far too many quotable passages to make use of here.

Corps 'has such an interest in *denying an exemption' to these specific plaintiffs*."[509] "In meeting that standard, the Marine Corps cannot rely on 'broadly formulated interests.' Instead, [it] must demonstrate the specific harm that **'would'—not could**—result from '*granting specific exemptions to particular religious claimants*.'"[510] "*[T]hat is [the] point*: Government *must, if able, afford religious exercise equal stature with other interests that it accommodates*."[511]

999.    After its 66 paragraphs of analysis, the court ruled for the religious claimants. It did so despite (a) their high burden for injunctive relief, (b) the Corps' arsenal of national-security arguments, and (b) the district court's contrary ruling. Moreover, the court found their case almost irrefutable. "They have shown not just a likelihood of success, but an overwhelming one, on the merits of their RFRA claim."[512] "[I]t is difficult to imagine them losing."[513] "To sum up, Plaintiffs have demonstrated not just a likely, but an overwhelming, prospect of success[.]"[514] Thus, the D.C. Circuit remanded "for the prompt entry of a preliminary injunction."[515]

1000.    In the **second case**, the Fifth Circuit affirmed a preliminary injunction against the Navy and enjoined it from enforcing its vaccine mandate against Navy Seals who had sincere religious objections, resulting in their exemption.[516] "By pitting their consciences against their livelihoods, the vaccine requirements would crush Plaintiffs' free exercise of religion."[517] The government faces a high bar to justify infringement. "This already high bar is raised even higher

---

[509] *Singh*, 56 F.4th at 99 (emphasis added).

[510] *Singh*, 56 F.4th at 97 (quoting *O Centro*, 546 U.S. at 431 several times) (emphasis added).

[511] *Singh*, 56 F.4th at 100 (citing *Tandon*, 141 S.Ct. at 1297) (emphasis added).

[512] *Singh*, 56 F.4th at 97.

[513] *Singh*, 56 F.4th at 97.

[514] *Singh*, 56 F.4th at 106.

[515] *Singh*, 56 F.4th at 110.

[516] *Navy Seals*, 27 F.4th at 347-53.

[517] *Navy Seals*, 27 F.4th at 348.

'[w]here a regulation already provides an exception from the law for a particular group[.]'"[518]

1001.   The Navy argued that it "has an extraordinarily compelling interest in requiring that service members generally—and these plaintiffs in particular—be vaccinated against COVID-19, both (1) to reduce the risk that they become seriously ill and jeopardize the success of critical missions and (2) to protect the health of their fellow service members."[519]

1002.   "But that general interest is nevertheless insufficient under [strict scrutiny]. The Navy must instead 'scrutinize the asserted harm of granting specific exemptions to particular religious claimants.' 'The question, then, is not whether [the Navy has] a compelling interest in enforcing its [vaccination] policies generally, but whether it has such an interest in denying an exception to [each Plaintiff].' [T]hat is because 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation' on the free exercise of religion."[520]

1003.   "[The Navy has] not demonstrated 'paramount interests' that justify vaccinating these 35 Plaintiffs [in] violation of their religious beliefs. [The Navy insists] that 'given the small units and remote locations in which special-operations forces [operate, it] determined that unvaccinated [Seals] are at significantly higher risk of becoming severely ill from COVID-19 and are therefore medically unqualified to deploy."[521] But this and every other Navy argument seeking deference to military judgment failed ***strict scrutiny***. "The Navy's alleged compelling interest is further undermined by other salient facts."[522] The court analyzed these facts.

1004.   After analyzing, and rejecting, each "salient" fact and argument, the court ruled

---

[518] *Navy Seals*, 27 F.4th at 350.

[519] *Navy Seals*, 27 F.4th at 351.

[520] *Navy Seals*, 27 F.4th at 351 (quoting *O Centro*, 546 U.S. at 431, then *Fulton*, 141 S.Ct. at 1881, then *Sherbert v. Verner*, 374 U.S. 398, 406 (1963) ("***Sherbert***")) (cleaned up).

[521] *Navy Seals*, 27 F.4th at 351.

[522] *Navy Seals*, 27 F.4th at 352.

for the Seals "Considering the record as a whole, we agree with the district court that Defendants have not shown a compelling interest to deny religious accommodations to each of these 35 Plaintiffs. Indeed, the 'marginal interest' in vaccinating each Plaintiff appears to be negligible; consequently, Defendants lack a sufficiently compelling interest to vaccinate Plaintiffs."[523]

1005.   In the **third case**, the Sixth Circuit affirmed a class action against the Air Force and enjoined it from enforcing a vaccine mandate against certain religious service members, resulting in their exemption. "Once plaintiffs [show a burden on their religion, the] government [must] 'demonstrate'—in other words, satisfy the 'burdens' of production and 'persuasion'—that the challenged government action falls within [strict scrutiny's] narrow exception to its ban on burdening religion. This exception [is] what the Supreme Court has called the 'most demanding test known to constitutional law': strict scrutiny."[524]

1006.   "The government will successfully run this strict-scrutiny gauntlet only in 'rare cases.'"[525] "The government must rely on interests that serve the 'highest order,' or seek to stop 'the gravest abuses.' The interests that the government cites in court also must be the *true* reasons for its action; it may not rely on made-for-litigation interests."[526]

1007.   "The government next must prove that its action qualifies as the *least restrictive means* to further its interest. This test represents the most rigorous type of 'means-ends' scrutiny. It requires the government [to] show that every other possible 'alternative will be ineffective to achieve its goals'; if any less-restrictive alternative exists, the government 'must use it.'"[527]

---

[523] *Navy Seals*, 27 F.4th at 352.

[524] *Doster*, 54 F.4th at 419 (quoting *O Centro*, 546 U.S. at 429-430 then *Flores*, 521 U.S. at 534).

[525] *Doster*, 54 F.4th at 419 (quoting *Lukumi*, 508 U.S. at 546).

[526] *Doster*, 54 F.4th at 419-20 (quoting *Yoder*, 406 U.S. at 215 then *Sherbert*, 374 U.S. at 406).

[527] *Doster*, 54 F.4th at 420 (quoting *Hobby Lobby*, 573 U.S. at 728 then *U.S. v. Playboy Ent. Grp.*

1008.   Strict scrutiny "prohibits the government from relying on *generalities* to meet either [prong] of this test. The government instead must show that its 'marginal interest' in enforcing a mandate against a *specific* 'person' is compelling and that it cannot further its interest in another way that imposes less of a burden on that person's religious exercise. When considering compelling interests and alternative means, the government has often lost sight of this individualized focus."[528] For example, "when considering alternatives to a mandate that all employers (including those with religious objections) provide employees with insurance for contraception, the government should consider paying for this coverage itself."[529]

1009.   It all boils down to this. As-applied First Amendment law is now exemptions-focused. Government cannot treat "*any* comparable secular activity more favorably than religious exercise."[530] Instead, it must grant an exemption to the specific religious claimant.

1010.   In our case, OSI must "satisfy the 'burdens' of production and 'persuasion'"[531] to prove that—after allowing Samaritan to operate freely as non-insurance since 1996 (for 27 years), without a single consumer complaint against Samaritan—subjecting Samaritan suddenly to the Insurance Code, which "will crush Plaintiffs' free exercise of religion,"[532] is an interest of the "highest order"[533] and the sole means available to stop the "gravest abuses."[534] OSI must do all this while somehow excusing its exemptions for fraternals and other secular groups.

---

529 U.S. 803, 815-16 (2000)).

[528] *Doster*, 54 F.4th at 420 (citing *Hobby Lobby*, 573 U.S. at 726-27; *O Centro*, 546 U.S. at 431).

[529] *Doster*, 54 F.4th at 420 (citing *Hobby Lobby*, 573 U.S. at 728-30).

[530] *Tandon*, 141 S.Ct. at 1296 (emphasis in the original).

[531] *Doster*, 54 F.4th at 419 (citing *O Centro*, 546 U.S. at 429).

[532] *Navy Seals*, 27 F.4th at 348.

[533] *Singh*, 56 F.4th at 101 (quoting *Lukumi*, 508 U.S. at 547).

[534] *Navy Seals*, 27 F.4th at 351.

1011.   If the national security and pandemic concerns of the U.S. government could not satisfy strict scrutiny on the facts before those three courts, surely the insurance-regulation interests cannot satisfy it on the facts before this Court. For OSI to satisfy this test is impossible.

## Categorical Protection (No Scrutiny/Balancing)

1012.   Some constitutional rights may not be infringed at all. Certain state actions are categorically barred as intolerable and never justifiable, no matter what the state's interests or means may be. For example, the state must never punish belief.[535] It must never discriminate among religions under the Establishment Clause.[536] Two other examples are critical here. **First**, the State must never invidiously discriminate against religion.[537] **Second**, the State must never "interfere" with the "autonomy" of religious groups "to define their own *doctrine*, *membership*, organization, and *internal requirements*."[538] OSI must do neither; both are flatly barred.

## No Substantial Burden Requirement

1013.   Defendant's actions toward HCSMs like Samaritan have been *anything but* neutral and generally applicable, as explained throughout this Complaint. Thus, Samaritan need not show a ***substantial*** burden, but only ***a burden***, to qualify for strict-scrutiny protection under the Constitution. "Under this Court's precedents, a plaintiff may [prove] a free exercise violation in various ways, including by showing that a government entity has ***burdened*** his sincere

---

[535] "The First Amendment obviously excludes all 'governmental regulation of religious *beliefs* as such.'" *Emp. Div. v. Smith*, 494 U.S. 872, 877 (1990) ("**Smith**"). *Smith* lists other examples.

[536] It is "usually flatly forbidden without reference to" strict scrutiny. *Colo. Christian*, 534 F.3d at 1266 (McConnell, J.) (citing, *inter alia*, *Larson*, 456 U.S. 228).

[537] "To be sure, where [states] discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional." *Colo. Christian*, 534 F.3d at 1260. "Religious animus is not a permissible government interest[.]" *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3.

[538] *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 975 (7th Cir. 2021) (**en banc**) (McConnell citation omitted; emphasis added) (collecting Supreme Court cases) ("**Demkovich**").

religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"[539]

1014.   "When we are considering government policies that are not neutral and generally applicable—that is, policies that discriminate against religion rather than burden it incidentally—there is no justification for requiring a plaintiff to make a threshold showing of substantial burden. 'The indignity of being singled out [on] the basis of one's religious calling is so profound that the concrete harm produced can never be dismissed as insubstantial.'"[540]

1015.   Where government action is non-neutral or non-generally applicable—i.e., where it discriminates under the rule of *Smith*—no post-*Smith* precedent of the United States Supreme Court requires more than a simple *burden* (or *restriction*). "Under *Smith* and *Lukumi* ... there is no substantial burden requirement when government discriminates against religious conduct."[541] "In the context of a §1983 claim for a violation of the First Amendment, there is no requirement to show that the governmental burden on religious beliefs was 'substantial.'"[542]

1016.   RFRA is different. Under RFRA,[543] and the pre-*Smith* jurisprudence that RFRA codified, even "a valid and neutral law of general applicability"[544] is subject to strict scrutiny but only **if** the religious claimant can show a ***substantial burden*** on its religious exercise.[545] That's

---

[539] *Kennedy*, 142 S.Ct. at 2421 (emphasis added); *Fulton*, 141 S.Ct. at 1876 ("the City's actions have **burdened** CSS's religious exercise[.] Our task is to decide whether the **burden** the City has placed on the religious exercise of CSS is ***constitutionally permissible***") (emphasis added).

[540] *Kravitz*, ___ F.4th ___, 2023 WL 8177114, at *9 (2d Cir. Nov. 27, 2023).

[541] *Lighthouse Inst. for Evangelism v. Long Branch*, 510 F.3d 253, 263 (3d Cir. 2007) (quoting *Tenafly Eruv Ass'n v. Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002)). *Accord Bronx Household of Faith v. Bd. of Educ.*, 750 F.3d 184, 207 (2d Cir. 2014) (citing *Brown*, 35 F.3d at 849-50).

[542] *Kravitz*, 2023 WL 8177114, at *11 (2d Cir.).

[543] 42 U.S.C. §§2000bb *et seq.*

[544] *Smith*, 494 U.S. at 879; *accord U.S. v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002) (**en banc**) (explaining *Smith*); *Darren,* 2023 WL 7270874, at *16 (D.Colo. Oct. 20, 2023).

[545] 42 U.S.C. §2000bb-1.

the whole point of RFRA: to restore strict scrutiny even to actions that are neutral and generally applicable—i.e., nondiscriminatory—but only when their burden on religion is "substantial."

1017.    With *discriminatory* actions, there is no such need nor requirement.

1018.    The same is true under the New Mexico RFRA ("NMRFRA"). *See* Sixteenth Cause of Action (NMRFRA) at ¶¶1742-1763. **Unlike** the **federal RFRA**, the NMRFRA does **not** require a **substantial** burden or restriction to trigger its protections but only **_a restriction_**.[546]

1019.    Defendant's actions, particularly as alleged in Causes of Action One through Four below, violate the NMRFRA because those actions have restricted, and will continue in escalating severity to restrict, the religious exercise of Samaritan and the ten individual Plaintiffs.

1020.    Thus, under each and every Cause of Action herein, the law affords maximum protection to Plaintiffs against any OSI action that restricts or proposes to restrict their religion.

1021.    In sum, the **substantial-burden requirement** that appears in some religious-freedom cases has **no application to this case**. A simple burden or restriction suffices.[547]

1022.    There is only one way the "substantial burden" requirement could enter this case.

1023.    Since the "substantial burden" requirement applies **only to claims under the federal RFRA** (which applies only to *federal* law, actions, and actors),[548] the only way it could enter this case is if the *federal RFRA* became applicable by the entry of a *federal* action or actor, such as, for example, *federal* intervention in this case by the U.S. Justice Department.

---

[546] *See* NMSA 1978, §28-22-3 and §28-22-4.

[547] While a substantial burden is unnecessary in the face of discrimination, the existence of discrimination constitutes a substantial burden. Under RFRA's twin, RLUIPA, a "'substantial burden' on a religious assembly might also be discriminatory in violation of subsection (b)(2)." *River of Life Kingdom Ministries v. Vill. of Hazel Crest*, 611 F.3d 367, 382 (7th Cir. 2010).

[548] *Flores*, 521 U.S. 507 (holding RFRA inapplicable to the States).

## Non-Neutrality (Discrimination) Violates Four Constitutional Clauses

### Free Exercise, Establishment, Speech, and Equal Protection

1024.   Some of the following is repetitious, but nevertheless bears repeating here.

1025.   "The *Free Exercise Clause*, *like the Establishment Clause*, extends beyond facial discrimination [to] *forbid subtle departures from neutrality* and covert suppression of particular religious beliefs."[549] "[Defendant's] action that targets religious conduct for *distinctive treatment* cannot be shielded by mere compliance with the requirement of facial neutrality."[550]

1026.   "[T]he Religion Clauses [and] the Equal Protection Clause as applied to religion [all] speak with one voice on this point: Absent the most unusual circumstances, one's religion ought not affect one's legal rights or duties or benefits."[551] "[State actions] involving discrimination on the basis of religion [are] subject to heightened scrutiny whether they arise under the *Free Exercise Clause*, the *Establishment Clause*, or the *Equal Protection Clause*."[552]

1027.   The same is true for the Free Speech Clause. "Government discrimination based on religion violates the *Free Exercise Clause* of the First Amendment, the *Free Speech Clause* of the First Amendment, and the *Equal Protection Clause* of the Fourteenth Amendment."[553]

1028.   Thus, non-neutrality constitutes discrimination in violation of the Free Exercise Clause, Establishment Clause, and Free Speech Clauses of the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.

---

[549] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[550] *Lukumi*, 508 U.S. at 534 (citations & internal punctuation omitted; emphasis added).

[551] *Hassan v. City of New York*, 804 F.3d 277, 290 (3d Cir. 2015) ("*Hassan*").

[552] *Colo. Christian*, 534 F.3d at1266 (10th Cir.) (citations omitted; cleaned up).

[553] *Peter*, 155 F.3d at 996 (citing Supreme Court cases).

### Religious Discrimination Violates Three First Amendment Clauses

1029.   "The neutrality commanded of the State by the [three] separate Clauses of the First Amendment was compromised by the University's course of action" that amounted to discrimination against religious speech.[554]

1030.   Under the **Free Exercise Clause**, all government action ("state action") must "be applied in a manner that is neutral toward religion"—i.e., "proceed in a manner neutral toward and tolerant [of] religious beliefs."[555] "The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, 'protects religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'"[556]

1031.   Under the **Establishment Clause**, state action must be "neutral toward religion."[557] The "organizing principle of the Establishment Clause is 'governmental neutrality' —between 'religion and nonreligion,' as well as among religions."[558] "The Establishment Clause 'mandate[s] … neutrality between religion and non-religion.'"[559] To disfavor expressive religious activity "undermine[s] the very neutrality the Establishment Clause requires."[560] "[I]t violates that central Establishment Clause value of official religious neutrality.[561] Additionally,

---

[554] *Rosenberger v. Rector & Visitors of U.Va.*, 515 U.S. 819, 845 (1995) ("***Rosenberger***").

[555] *Masterpiece*, 138 S.Ct. at 1732, 1731; accord *Kennedy*, 142 S.Ct. at 2422; *Cuomo*, 141 S.Ct. at 66. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S.Ct. at 1877.

[556] *Espinoza*, 140 S.Ct. at 2254 (quoting *Trinity Lutheran*, 582 U.S. at 460-61.

[557] *Trump*, 138 S.Ct. at 2418 (must be "neutral toward religion" under Establishment Clause); *accord Colo. Christian*, 534 F.3d at 1257-60 (10th Cir.).

[558] *Perrier-Bilbo v. U.S.*, 954 F.3d 413, 422 (1st Cir. 2020) ("***Perrier***") (quoting *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005) ("***McCreary***").

[559] *Am. Atheists v. Davenport*, 637 F.3d 1095, 1119 (10th Cir. 2010) (on denial of reh'g).

[560] *Rosenberger*, 515 U.S. at 846.

[561] *McCreary*, 545 U.S. at 860.

the Establishment Clause forbids state entanglement with religion. "Good intentions by government [cannot] avoid entanglement with the religious mission of [Plaintiffs].[562]

1032.   Under the **Free Speech Clause**, state action must be "neutral toward religion" both as to content (subject matter) and particular viewpoint.[563] "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination."[564] "Government discrimination among viewpoints [is] a 'more blatant' and 'egregious form of content discrimination.' But it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'"[565]

### Religious Discrimination Also Violates Equal Protection Clause

1033.   Under the **Equal Protection Clause**, state action must meet the "constitutional requirement of *neutrality toward religion*," as "court have frequently" found.[566] Thus, the "Equal Protection Clause likewise prohibits the Government from impermissibly discriminating among persons based on religion."[567] "[G]overnmental discrimination against religion …

---

[562] *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 502 (1979) ("**Catholic Bishop**").

[563] *Rosenberger*, 515 U.S. at 839-40.

[564] *Rosenberger*, 515 U.S. at 829 (citation omitted). "The First Amendment prohibits viewpoint discrimination [.]" *Frederick Douglass Found. v. D.C.*, 82 F.4th 1122, 1144 (D.C. Cir. 2023).

[565] *Reed*, 576 U.S. at 168-69 (quoting first *Rosenberger*, 515 U.S. at 829 and then *Consolidated Edison v. Public Serv. Com'n*, 447 U.S. 530, 537 (1980)).

[566] *Hunt Valley Baptist Church v. Baltimore*, 2020 WL 618662, at *7 (D.Md. Feb. 10, 2020) ("**Hunt Valley**") (citing *Lukumi*, 508 U.S. at 539, etc.) (emphasis added). "When adjudicating First Amendment challenges, courts have frequently invoked the Equal Protection Clause as a separate rationale for the constitutional requirement of neutrality toward religion." *Id*.

[567] *Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) (emphasis added).

violates [the] Equal Protection Clause."[568] "[R]eligious discrimination claims can arise under [the] Equal Protection Clause."[569] "Government discrimination based on religion violates [the] Equal Protection Clause of the Fourteenth Amendment."[570]

1034.   "The 'injury in fact' [is] the denial of equal treatment[.]"[571] "Plaintiffs' personal interest[s] in religious equality … certainly strike at the heart of the Equal Protection Clause[.]"[572] "Equality before the law is of the very essence of liberty, whether civil or religious."[573] "From the beginning, this nation's conception of religious liberty included, at a minimum, the equal treatment of all religious faiths without discrimination or preference."[574]

1035.   The Equal Protection Clause provides ***two additional grounds*** for strict scrutiny. The Supreme Court has long "treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'"[575]

1036.   **First**, any state action that interferes with a "fundamental right" is subject to strict scrutiny.[576] "Unquestionably, the free exercise of religion is a fundamental constitutional right."[577] **Second**, any state action that discriminates against a "suspect class" is subject to strict

---

[568] *Ashaheed v. Currington*, 7 F.4th 1236, 1249 n.11 (10th Cir. 2021).

[569] *Ashaheed*, 7 F.4th at 1249 n.11 (citing *Colo. Christian*, 534 F.3d at 1266-67).

[570] *Peter*, 155 F.3d at 996 (citing Supreme Court cases).

[571] *Hassan*, 804 F.3d at 290 (quoting *NEFCAGC. v. Jacksonville*, 508 U.S. 656, 657 (1993)).

[572] *Hassan*, 804 F.3d at 290 n.2.

[573] *Hassan*, 804 F.3d at 290 n.2 (citation & internal punctuation omitted).

[574] *Hassan*, 804 F.3d at 290 n.2 (quoting *Colo. Christian*, 534 F.3d at 1257 "(McConnell, J.)").

[575] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) ("***Plyler***").

[576] *Plyler*, 457 U.S. at 216-17.

[577] *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) ("***Johnson***"); *accord Jesus Christ Is the Answer*, 915 F.3d at 265 (quoting *Johnson*, 415 U.S. at 375 n.14).

scrutiny.[578] "Religion is a suspect class."[579]

### Invidious Discrimination Is Flatly Forbidden Under All Four Clauses

1037.   "Under the Free Exercise Clause, a government entity *normally* must satisfy *at least* '*strict scrutiny*,' showing that its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end."[580] "A similar standard *generally* obtains under the Free Speech Clause."[581] Strict scrutiny is the default rule.

1038.   But the government does not always get a chance to pass strict scrutiny.

1039.   If animus motivated OSI's anti-HCSM campaign, those actions are egregious and receive no judicial scrutiny. Such actions are simply "'*set aside*' … *without further inquiry*."[582] "To be sure, where governmental bodies discriminate out of 'animus' against particular religions, such decisions are *plainly unconstitutional*,"[583] as "religious animus [is] *not a permissible government interest*."[584] "Because *government actions intentionally discriminating against religious exercise a fortiori serve no legitimate purpose*, no balancing test is necessary[.]"[585]

1040.   If Defendant here *is* motivated by animus to the religious activities or views of Samaritan, for any or no reason, such invidious discrimination is "odious to our Constitution."[586]

---

[578] *Plyler*, 457 U.S. at 216-17.

[579] *Al Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022) ("*Al Saud* ") (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("*Dukes*")).

[580] *Kennedy*, 142 S.Ct. at 2426 (citing *Lukumi*, 508 U.S. at 533 n.1) (emphasis added).

[581] *Kennedy*, 142 S.Ct. at 2426 (citing *Reed*, 576 U.S. at 171) (emphasis added).

[582] *Kennedy*, 142 S.Ct. at 2422 n.1 (quoting *Masterpiece*, 138 S.Ct. at 1732) (emphasis added).

[583] *Colo. Christian*, 534 F.3d at 1260 (emphasis added).

[584] *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3. "Religious animus is not a permissible government interest, much less a compelling one." *Id*.

[585] *Brown*, 35 F.3d at 850 (emphasis added).

[586] *Carson*, 142 S.Ct. at 1996; *Espinoza*, 140 S.Ct. at 2263; *Trinity Lutheran*, 582 U.S. at 467.

1041.   Such animus might arise in reaction to the deeply religious, and perhaps deeply unpopular, Biblical views of Samaritan and its members on such social issues as life, marriage, and sexuality. Such views also are associated, fairly or unfairly, with the deeply polarizing politics of our times. Such views, openly expressed by Samaritan, *see, e.g.*, Nov. 2022 Newsletter (Ex. 3), at 1, 2-4, could infect OSI process with animus or induce retaliation.

1042.   Such discrimination is categorically barred, without any scrutiny or balancing.

### Even Well-Intended Discrimination Is Flatly Forbidden Here

1043.   Not all "intentional" discrimination is "invidious"—tainted with bad motives.

1044.   An action is intentional if the actor intended "to act," regardless of motive.

1045.   Under Tenth Circuit law, it is "merely the intent to treat differently"[587] that constitutes non-neutrality, i.e., discrimination. It is immaterial whether OSI was motivated by animus.[588] It makes no difference if "faith-based bigotry did not motivate [OSI here because the] constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[589] The mere intent to treat differently triggers strict scrutiny.

1046.   Thus, even if not invidious, intentional discrimination may be "flatly forbidden without reference to" strict scrutiny or any other balancing test.[590]

1047.   It is clear that Defendant has "intended" to treat these religious ministries, which include Samaritan, "differently." The resulting discrimination is "flatly forbidden" and must be "set aside" "without reference to" strict scrutiny or any other balancing test.

---

[587] *Colo. Christian*, 534 F.3d at 1260.

[588] *Colo. Christian*, 534 F.3d at 1260 n.7.

[589] *Neace*, 958 F.3d at 415 (quoting *Colo. Christian*, 534 F.3d at 1260).

[590] *Colo. Christian*, 534 F.3d at 1266 (collecting cases).

1048.   The Constitution demands *strictly* neutral and equal treatment.[591] That's why state actions "are not neutral and generally applicable … whenever they treat *any* comparable secular activity more favorably than religious exercise" without regard to motive.[592] Thus, **any** non-neutral or non-generally applicable **action by OSI** that harms Samaritan discriminates against Samaritan "no matter how well-intentioned,"[593] "regardless of design or intent,"[594] and "even in the absence of any motive to do so,"[595] and will be "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus.'"[596]

### The Minimum Constitutional Requirement Here Is Strict Scrutiny

1049.   "Under the Free Exercise Clause, a government entity **normally** must satisfy **at least '*strict scrutiny,*'**" advancing "***interests of the highest order***"[597] by the "least restrictive means."[598] The same test applies to Plaintiffs' other First Amendment claims. ¶¶1024-1036.

1050.   Even if Defendant is afforded an opportunity to pass strict scrutiny, that test is the "is the most demanding test known to constitutional law,"[599] "survive[d] only in rare cases.[600]

---

[591] *Espinoza*, 140 S.Ct. at 2254 (quoting *Trinity Lutheran*, 582 U.S. at 458).

[592] *Tandon*, 141 S.Ct. at 1296 (emphasis in original) (citing *Cuomo*, 141 S.Ct. 63). *Cuomo* "put … aside" evidence of ill motive, 141 S.Ct. at 66, while *Tandon* disregarded motive altogether.

[593] *FCA En Banc*, 82 F.4th at 689.

[594] *FCA En Banc*, 82 F.4th at 689.

[595] *FCA En Banc*, 82 F.4th at 672.

[596] *FCA En Banc*, 82 F.4th at 686 n.8 (quoting *Reed*, 576 U.S. at 165).

[597] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[598] *Fulton*, 141 S.Ct. at 1881 and *Thomas*, 450 U.S. at 718 (emphasis added).

[599] *Flores*, 521 U.S. at 534.

[600] *Lukumi*, 508 U.S. at 546.

## Non-General Applicability (Discrimination) Violates Same Rules

### Uneven Enforcement (Discrimination) Violates the First Amendment

1051.   The other half of this nondiscrimination principle prohibits the uneven, or non-generally applicable, enforcement of the law.

1052.   "Under this Court's precedents, a plaintiff may [prove] a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice *pursuant to a policy that is not 'neutral'* **or** *'generally applicable.*'"[601]

1053.   "A government [will] *fail* the *general applicability* requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's *asserted interests in a similar way*,' **or** if it *provides 'a mechanism for individualized exemptions*.'"[602]

1054.   Thus, general applicability focuses neither on religion (*per se*) nor intent, but on mechanisms and process. In other words, "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."[603]

1055.   "This Court's decisions have made the following points clear. First, government regulations are **not** neutral and **generally applicable**, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* **comparable secular activity more favorably than religious exercise**…. Second, whether **two activities are comparable** for purposes of the Free Exercise Clause must be judged against the **asserted government interest** that justifies the regulation at issue. **Comparability** is concerned with the **risks various activities pose**[.]"[604]

1056.   Thus, even without an exemption system or mechanism, a state cannot treat any

---

[601] *Kennedy*, 142 S.Ct. at 2421 (emphasis added); *Fulton*, 141 S.Ct. at 1876.

[602] *Kennedy*, 142 S.Ct. at 2422 (emphasis added).

[603] *Neace*, 958 F.3d at 413.

[604] *Tandon*, 141 S.Ct. at 1296 (bold added; italicized *any* is in the original).

religious activity less favorably than any comparable secular activity, without surviving strict scrutiny. Obviously, then, "a regulation that burdens religiously motivated conduct will 'trigger strict scrutiny' even if contains just *one* comparable secular exception to its restrictions."[605]

1057.   As for the risk/comparability analysis, it is discussed briefly in the next section but in greater detail elsewhere in this Complaint. *See, e.g.*, ¶¶1343-1360.

### OSI's Exemption-Ridden Policies Are Not Generally Applicable

1058.   The Insurance Code allows "categorical and individualized exemptions that would undermine the government asserted interests, and thereby trigger strict scrutiny."[606]

1059.   "***No provision of the Insurance Code shall apply to***: '***fraternal benefit societies*** … nonprofit health care plans … health maintenance organizations … prepaid dental plans … motor clubs [etc.].'"[607] "Charitable gift annuities [also are] exempt from regulation as insurance company."[608] "***In addition to*** organizations and businesses ***otherwise exempt***, the Insurance Code shall not apply to [certain] labor organization[s]" and "risk management division[s]."[609]

1060.   There are still other examples of exemptions. *E.g.*, ¶1161(many subsections).

1061.   But the aptest of the above exemptions may be that for "fraternals," which, unlike Samaritan, provide the actual "insurance" that OSI accuses HCSMs like Samaritan of providing.

1062.   Under §59A-44-16 of the "Fraternal Benefit Societies" Article of the Insurance Code, any fraternal "authorized to do business in this state may provide the ***following contractual benefits*** in ***any form***: (1) life insurance, endowment benefits and annuity benefits as

---

[605] *Pleasant View Baptist v. Beshear*, 78 F.4th 286, 303 (6th Cir. 2023) (Murphy, J., concurring).

[606] *Darren*, 2023 WL 7270874, at *16 (citing *Fulton*, 141 S.Ct. at 1877).

[607] NMSA 1978, §59A-1-15 (emphasis added).

[608] NMSA 1978, §59A-1-16.1.

[609] NMSA 1978, §59A-1-16 (emphasis added).

defined in Section 59A-7-2[;] (2) *health insurance benefits as defined in Section 59A-7-3*[;] (3) monument or tombstone benefits to the memory of deceased members; *and* (4) *such other benefits as authorized for* life, accident and *health insurers* and which are *not inconsistent* with Chapter 59A, Article 44[,] *as approved by the superintendent*."[610]

1063.   By exempting fraternals (NMSA 1978, §59A-1-15) to provide "health insurance benefits" as defined in NMSA 1978, §59A-7-3, the Insurance Code, as administered by the Defendant Superintendent, lacks generally applicable, obviously, in at least three ways.

1064.   **First**, it provides a formal, individualized, categorical exemption to fraternals to "provide the following *contractual benefits in any form* … (2) *health insurance benefits as defined in Section 59A-7-3* ['Accident and health insurance'],"[611] which includes any or all of the following 18 categories of "accident and health insurance" benefits:

(1) accident;

(2) accidental death and dismemberment;

(3) blanket accident and sickness;

(4) credit disability;

(5) critical illness;

(6) dental;

(7) disability income;

(8) home health care;

(9) hospital indemnity;

(10) long-term care;

(11) major medical;

(12) medical expense;

(13) medicare supplement;

(14) prescription drug;

---

[610] NMSA 1978 §59A-44-16 (emphasis added).

[611] NMSA 1978 §59A-44-16 (emphasis added), referring to NMSA 1978, §59A-7-3.

(15) sickness;

(16) specified disease;

(17) vision; and

(18) similar products relating to accident and health matters."[612]

1065.    **Second**, it provides pure discretion to Defendant Superintendent to approve for fraternals "***such other benefits as authorized for*** … ***health insurers*** and which are ***not inconsistent*** with Chapter 59A, Article 44 NMSA 1978, ***as approved by*** the ***superintendent***."[613]

1066.    **Third**, it provides Defendant Kane with all the usual discretion to determine which entities qualify as fraternals, which don't, and how, when, and why either to recognize the fraternal exemption or to apply the Code and any and all of its requirements and penalties.

1067.    Since the Code provides such formal, "individualized exemptions" to secular entities to offer actual health insurance, OSI must recognize a comparable exemption for Samaritan. This is true whether or not such exemptions are considered "discretionary," and how "discretionary," as further explained elsewhere. ¶¶270-301.

1068.    But the Code worsens matters by providing even discretionary exemptions.[614]

1069.    Furthermore, the entire OSI enterprise is discretionary. ¶¶500-513.

1070.    Further still, OSI's sudden U-Turn in HCSM policy shows that OSI actions against HCSMs have been entirely discretionary. ¶¶114-137, 708-760.

1071.    Indeed, every OSI assessment of "insurance" subject its authority is an exercise of unbridled discretion. This is proven beyond all doubt by OSI's actions in the *Liberty* case.

1072.    Though such discretion is not required to invoke the First Amendment, every such

---

[612] NMSA 1978, §59A-7-3.

[613] NMSA 1978 §59A-44-16 (emphasis added).

[614] *E.g.*, NMSA 1978, §59A-15-16 (upon conditions "satisfactory to the superintendent").

instance of discretion only bolsters the case for exemption here.

<div align="center">**A Closer Look at Fraternals**</div>

1073.    Fraternals and HCSMs both exist for associational purposes and both offer a means for their members to address medical bills. But HCSMs are by definition and practice "religious" whereas many (if not most, if not the vast majority) of fraternals are not. And HCSMs, unlike fraternals, do not offer insurance. Yet, fraternals are treated very differently.

1074.    Under the 46-section Fraternal Benefit Societies Article of the Insurance Code,[615] *some* fraternals are subject only to *some* parts of the Insurance Code.[616]

1075.    But broad categories of fraternals are totally exempt from insurance regulation.

1076.    **First**, certain fraternals are totally exempt from the FBS Article of the Insurance Code. "Nothing [in this FBS Article] shall be so construed as to effect or apply to: (1) grand or subordinate lodges of societies, orders or associations …; (2) orders, societies or associations that admit … only persons engaged in …; (3) domestic societies that limit their membership to …; or (4) domestic societies [that] provide for a death benefit of not more than …."[617]

1077.    **Second**, these same fraternals are exempt from *all* state "insurance law." "F. Societies exempted under the provisions of this section shall also be exempt from all other provisions of the general insurance laws of this state."[618] "Since 1905 the New Mexico statutes have [treated fraternals as] exempt from all provisions of the insurance laws of this state."[619]

1078.    In addition, the Code favors or privileges fraternals in many more ways. As just

---

[615] NMSA 1978, §§59A-44-1 to 44-46 ("Article 44" or **FBS Article**").

[616] *See, e.g.*, NMSA 1978, §59A-44-1 (fraternals defined); §59A-44-2 ("Lodge system").

[617] NMSA 1978, §59A-44-40(A) ("Exemption of certain societies").

[618] NMSA 1978, §59A-44-40(F) (emphasis added).

[619] *Woodmen I*, 15 F.Supp. at 484-85.

one example here, fraternals are completely exempt from the nondiscrimination requirements of Section 59A-16-12 of the Insurance Code, which provides in its entirety:

## § 59A-16-12. Discrimination in insurance

No insurer shall, on the basis of the race, color, religion or national origin of any individual or group of persons:

A. refuse to make insurance available to any applicant for insurance; or

B. treat any such applicant or insured differently than any other applicant or insured with respect to the terms, conditions, rates, benefits or requirements of any such insurance contract.

This section shall not apply to life insurance contracts or annuities entered into prior to the section's effective date. This section shall not be construed to affect criteria for acceptance into membership of any fraternal benefit society.

1079.   Compliance with these antidiscrimination requirements would harm or destroy Samaritan in at least three ways. **First**, it would prevent Samaritan from limiting membership to likeminded Christians: its entire purpose. **Second**, it would prevent Samaritan's compliance with the ACA's requirement that HCSM "members [must] share a common set [of] religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides[.]"[620] **Third**, and relatedly, it would prevent compliance with state exemptions and safe-harbors that model the ACA. ¶¶947-983.

1080.   Yet, these requirements apply not at all to "***any fraternal benefit society***," many of which exist partly, if not largely, to provide actual, real, conventional "insurance."

1081.   And this is just one more example of the lack of general applicability.

1082.   Under judicial scrutiny, all the above exemptions reflect the kind of uneven law enforcement repeatedly condemned as lacking "general applicability."

### The Constitutionally Mandated Result Here: Exemption

1083.   "A government [will] fail the ***general applicability*** requirement if it 'prohibits

---

[620] IRC §5000A(d)(2)(B)(ii)(II). *See also* 1251-1262 & 1700-1730 (discussing applicable laws).

religious conduct while permitting secular conduct that undermines the government's *asserted interests in a similar way*,' or if it provides '*a mechanism for individualized exemptions*.'"[621]

1084.    "[OSI] policy can survive strict scrutiny only if it advances '*interests of the highest order*' and is narrowly tailored to achieve those interests.'"[622] "Rather than rely on 'broadly formulated interests, courts must 'scrutinize the *asserted harm of granting specific exemptions* to *particular religious claimants*.' The question, then, is not whether [OSI] has a compelling interest in enforcing its [insurance] policies generally, but whether it has such an *interest in denying an exception to [Samaritan]*."[623] "Put another way, so long as [OSI] can achieve its interests in a manner that does not burden religion, *it must do so*."[624]

1085.    "First, government regulations are not neutral and generally applicable … whenever they treat *any* **comparable secular activity more favorably than religious exercise**…. Second, whether two activities are **comparable** for purposes of the Free Exercise Clause must be judged against the **asserted government interest that justifies the regulation** at issue. Comparability is concerned with the **risks various activities pose**[.]"[625]

1086.    What is the "asserted government interest" here? It is to maintain fair and honest insurance markets and protect the public from insurance fraud.

1087.    Thus, for purposes of the First Amendment analysis—i.e., "the *asserted government interests* [at stake and] *risks various activities pose*"—fraternals represent not just "comparable" secular activity, but "identical" secular activity, to that of Samaritan, only worse

---

[621] *Kennedy*, 142 S.Ct. at 2422 (emphasis added).

[622] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[623] *Fulton*, 141 S.Ct. at 1881 (citations omitted; cleaned up; emphasis added).

[624] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[625] *Tandon*, 141 S.Ct. at 1296 (citations omitted; italics on *any* retained; other emphasis added).

because fraternals are actually providing real insurance.

1088.   The point here is this. Under binding Supreme Court precedent—which scrutinizes the state's ***asserted interest*** in its regulation and the ***asserted harm to that interest of granting a specific exemption*** from the regulation to a ***particular religious claimant*** such as Samaritan—fraternals and Samaritan are not just comparable but ***identical***.

1089.   In OSI's own words, its "paramount role" is to ensure the "best interests of New Mexicans," especially the interests of the "consumers of insurance," primarily "by investigating and prosecuting fraud to "protect[] customers" and "enforcing fair and competitive pricing of insurance products." ¶¶643-644. Against these asserted interests of consumer protection, the asserted interest in regulating fraternals and HCSMs is identical.

1090.   Thus, unless **(a)** OSI has a public ***interest of the highest order*** in enforcing its insurance policies ***against Samaritan***, and **(b)** OSI cannot achieve that public interest ***without subjecting Samaritan*** to the its insurance policies, then **(c)** OSI does not have such an ***interest in denying an exception to Samaritan***. "Put another way, so long as [OSI] can achieve its interests in a manner that does not burden [the Plaintiffs'] religion, ***it must do so***."[626]

1091.   New Mexico exempted fraternals (and a host of other entities and activities). It can and must do the same for Samaritan. That is the principal required outcome in this case.

1092.   The State, acting through the Defendant, *could* recognize an exemption for Samaritan. But Defendant has not shown the slightest interest in exempting any HCSM, nor even pumping the breaks on OSI's anti-HCSM campaign.

1093.   Since "the State has not shown that 'public health would be imperiled' by employing less restrictive measures"—i.e., exempting Samaritan—Plaintiffs "are entitled to an

---

[626] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

injunction"[627] that restrains Defendant from enforcing its policy against Samaritan (and, if necessary to prevent private actions against Samaritan, enjoins the faulty policy altogether).

1094. ***Exempting Samaritan from the Insurance Code is mandatory***.

### Samaritan's Success Is Highly Likely, Requiring Relief Now

1095.   OSI's drive to oust all HCSMs threatens the federal rights of Plaintiffs under the Constitution and the ACA. Samaritan, whose reputation remains untarnished by even a single member complaint filed at any time anywhere in its years of nationwide ministry, is not required to wait until it is tarnished by a C&D, as its peers have done, and subjected to biased agency process, as Liberty has done, before it can assert its federal rights to minister to its members.

1096.   As the Supreme Court recently held concerning the Free Exercise of Religion: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[628] "This principle applies in pre-enforcement cases as well."[629]

1097.   OSI will come for Samaritan, and "awaiting proceedings violating the Constitution is a 'risk the [ministry] ought not to be required to take.'"[630]

1098.   Samaritan is "***likely to suffer irreparable harm***" because OSI is "likely to shut down [its] membership program which would result in the loss of [its members] and employees, damages that could not be remedied by money damages. ***Besides, the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury***.'"[631]

1099.   Even if OSI has pure motives for its enforcement campaign against HCSMs, OSI

---

[627] *Tandon*, 141 S.Ct. at 1297 (quoting *Cuomo*, 141 S.Ct. at 68).

[628] *Cuomo*, 141 S.Ct. at 67 (enjoining NY pandemic restrictions on churches and synagogues).

[629] *Bella*, 2023 WL 6996860, at *20 (citing cases); *Darren*, 2023 WL 7270874, at *17 (same).

[630] *Air Evac*, 37 F.4th at 103.

[631] *Air Evac*, 37 F.4th at 103 (emphasis added). *Air Evac* is discussed in detail below.

*must* exempt **Samaritan** from the Insurance Code if its operation against Samaritan lacks either strict neutrality or general applicability. The Supreme Court has been clear on this point.[632]

1100.   The First Amendment test is this: (1) whether "*any* comparable secular activity [is being treated] more favorably than religious exercise,"[633] and, if so, (2) what is "the asserted government interest that justifies the regulation,"[634] and (3) what is "the asserted harm of granting *specific exemptions* to *particular religious claimants*,"[635] since, (4) absent a *compelling "interest in denying [such] an exception*,"[636] (5) it "*must*" be granted.[637]

1101.   Thus, religious exercise *must* be treated at least as well as *any* comparable secular exercise—with comparability judged by the asserted interests of the law at issue. The mere "*favoring [of] comparable secular activity is sufficient to trigger strict scrutiny* under *Tandon*."[638] *And if a "specific exemption" for a "particular religious claimant" will harm the state's goals no more than a secular exemption, the religious exemption must be granted*.

1102.   As noted above, the Insurance Code exempts actual health insurance offered by certain secular entities. Every such exemption available to a secular entity invokes the above mandate for strict scrutiny. Every such exemption for a secular entity, whether such exemption is full or partial, undermines the Insurance Code's interests to prevent "insurance fraud" and protect "consumers from unsafe and unsound insurance companies,"[639] in the same way an

---

[632] *Tandon*, 141 S.Ct. 1294 (2021); *Fulton*, 141 S.Ct. 1868 (2021).

[633] *Tandon*, 141 S.Ct. at 1296 (emphasis by the Supreme Court).

[634] *Tandon*, 141 S.Ct. at 1296.

[635] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[636] *Fulton*, 141 S.Ct. at 1881 (emphasis added).

[637] *Fulton*, 141 S.Ct. at 1881.

[638] *Bella*, 2023 WL 6996860, at *17 (quoting *FCA En Banc*, 82 F.4th at 686) (citation omitted).

[639] *Liberty II*, 2023 WL 6686684, at *7.

exemption for Samaritan would. Strict scrutiny is triggered for two distinct but related reasons.

1103.  **First**, OSI's interests in enforcing the Code "are undermined by the disparate treatment of comparable secular activity."[640] **Second**, the mere existence of the exemptions "undercut the State's expressed interests."[641] In either case, OSI "treats some comparable secular [activity] more favorably than [Samaritan's] religiously motivated [activity]."[642]

1104.  Samaritan is emphasizing the "discretionary" nature of OSI's anti-HCSM campaign only because it makes Samaritan's case that much easier. The existence of official discretion in applying the law and exemptions presents the worst case for OSI under *Fulton*.[643]

1105.  ***Regardless*** of OSI's ***motives or discretion***, its C&D against Samaritan will violate neutrality and general applicability. It may "not typically [be] a problem" for OSI to "singl[e] out" certain activity "for strict regulation, even if comparable activity goes unregulated. But doing so in a way that burdens religious activity triggers strict scrutiny."[644]

1106.  In fact, with multiple First Amendment rights at stake here—both for Samaritan and its New Mexico members, including the ten individual Plaintiffs—the Court must apply "at least" "strict scrutiny,"[645] and exempt Samaritan when that test is not met.

1107.  Animus or no animus, the law ***compels a "specific exemption" for a "particular religious claimant"—Samaritan***.

1108.  Any attempt by OSI to impose the Insurance Code on Samaritan and its members

---

[640] *Bella*, 2023 WL 6996860, *19 (citing *Tandon*, 141 S.Ct. at 1296; *Fulton*, 141 S.Ct. at 1877).

[641] *Bella*, 2023 WL 6996860, at *15 (citing *Fulton*, 141 S.Ct. at 1877).

[642] *Bella*, 2023 WL 6996860, at *16 (citing *Tandon*, 141 S.Ct. at 1296).

[643] Some have argued *Fulton* requires the existence of "unfettered discretion," but the Ninth Circuit just rejected such an "overly narrow" view of *Fulton*. *FCA En Banc*, 82 F.4th at 687.

[644] *Bella*, 2023 WL 6996860, at *17 (citing *Lukumi*, 508 U.S. at 545; *FCA*, 82 F.4th at 686).

[645] *Kennedy*, 42 S.Ct. at 2426.

will be both unconstitutional and offensive. The law requires that Samaritan be exempted.

1109.   In this case, Samaritan seeks injunctive, declaratory, and monetary relief. In cases like this, "both compensatory and punitive damages are available upon proper proof."[646]

1110.   "Compensatory damages [are] mandatory; once liability is found, the jury is required to award compensatory damages … appropriate to compensate [plaintiffs]."[647] Even if no actual damages are proven, and even if all personal-capacity claims against Defendant are dismissed, "nominal damages" are still available here.[648]

1111.   Punitive damages, are "permitted … when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."[649] For Defendant Kane "to be eligible for punitive damages, it [is] not necessary that [she] engage in any intentional misconduct beyond that required for [her] to be liable for compensatory damages."[650] In both cases, qualified immunity is unavailable for violating "clearly established" First Amendment rights.[651]

1112.   "Regardless of the interests that the State may have, those interests cannot outweigh the Plaintiffs' interest in protecting their First Amendment rights."[652] OSI "has not, and likely cannot, provide an interest sufficiently compelling to justify an infringement on Plaintiff's Free Exercise rights. [A C&D] therefore likely would not survive strict scrutiny[.]"[653]

---

[646] *Thurairajah*, 3 F.4th at 1026 (citing *Smith v. Wade*, 461 U.S. at 52).

[647] *Thurairajah*, 3 F.4th at 1026 (citing *Smith v. Wade*, 461 U.S. at 52).

[648] *Uzuegbunam*, 141 S.Ct. at 799-802.

[649] *Eisenhour*, 897 F.3d at 1280 (10th Cir) (quoting *Smith v. Wade*, 461 U.S. at 56).

[650] *Eisenhour*, 897 F.3d at 1281 (10th Cir.).

[651] *Littlefield*, 2023 WL 6962087, at *10-11 (denying qualified immunity).

[652] *Bella*, 2023 WL 6996860, *20 (citing *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)).

[653] *Darren*, 2023 WL 7270874, at *16 (relying on *Fulton*, 141 S.Ct. 1878-82).

1113.   And Free Exercise is just one of Samaritan's sixteen legal claims here, each one sufficient, independently, to defeat any OSI defense and require an exemption for Samaritan.

==Religious Freedom from Invidious Discrimination: Absolutely Protected==

1114.   If animus motivated OSI's anti-HCSM campaign, those actions are egregious and receive no judicial scrutiny. Such actions are simply "*set aside* … without further inquiry."[654] "To be sure, where governmental bodies discriminate out of 'animus' against particular religions, such decisions are ***plainly unconstitutional***,"[655] as "religious animus [is] ***not a permissible government interest***."[656] "Because ***government actions intentionally discriminating against religious exercise a fortiori serve no legitimate purpose***, no balancing test is necessary[.]"[657]

1115.   Such discrimination is categorically barred, without any scrutiny or balancing.

1116.   "Popular religious views are easy enough to defend. It is in protecting unpopular religious beliefs that we prove [our] commitment to serving as a refuge for religious freedom."[658]

1117.   In this case, evidence of animus abounds.

1118.   Defendant, acting through OSI and in concert with other State actors, has done, among other things, the following to facilitate its anti-HCSM campaign.

1119.   **First**, OSI abruptly abandoned all universally accepted requirements of *insurance* to facilitate its anti-HCSM campaign. ¶¶686-707.

1120.   **Second**, OSI has publicly denigrated HCSMs ever since its March 26, 2020 U-Turn against HCSMs. ¶¶738-816.

---

[654] *Kennedy*, 142 S.Ct. at 2422 n.1 (quoting *Masterpiece*, 138 S.Ct. at 1732).

[655] *Colo. Christian*, 534 F.3d at 1260 (emphasis added).

[656] *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3. "Religious animus is not a permissible government interest, much less a compelling one." *Id.*

[657] *Brown*, 35 F.3d at 850 (emphasis added).

[658] *Masterpiece*, 138 S.Ct. at 1737 (Gorsuch & Alito, JJ., concurring).

1121.   **Third**, OSI boasted to the nation's insurance regulators that it has "been working proactively to steer consumers away from HCSMs and scam plans with webinars and advertising," ¶¶227-228 & 811-812, revealing its own animus while inciting it in other regulators (and in private litigators, especially of the class-action variety, ¶¶754-765).

1122.   **Fourth**, OSI has actively promoted, and continues to promote, its anti-HCSM animus in webinars, "encore presentation[s]," and advertising. ¶¶204-246, 840-856.

1123.   **Fifth**, OSI's live presentations of its webinars provide less guarded, less filtered evidence of OSI's disdain for these health sharing "ministries." ¶¶848-849.

1124.   **Sixth**, former Superintendent Toal, originator of OSI's anti-HCSM campaign, authored the sole "negative" (even hostile) response from current insurance regulators to positive news from a former insurance regulator about HCSM self-regulation. ¶¶803-810.

1125.   **Seventh**, OSI, after allowing HCSMs to operate freely for decades, has offered no real reason for its sudden, hostile shift in policy toward HCSMs—i.e., its anti-HCSM campaign.

1126.   **Eighth**, OSI is insisting that Liberty—in the midst of a court battle to determine its legal rights and those of its members—shut down *immediately*, depriving its New Mexico members of their constitutional rights while their rights are being determined, a posture that, in the words of this Court, is "unnecessarily aggressive." ¶107.

1127.   **Ninth**, this "unnecessarily aggressive" posture has baffled this Court, which has "been wondering about [it] since the inception of this case frankly." ¶107. "What is the urgency?", this Court asked OSI. *Id*. "What is the urgency from OSI's perspective?" *Id*. "Why is it that OSI is unwilling to let the substantive legal issues be decided before taking these collective enforcement actions against [Liberty]?" *Id*. "Why can't you just let those legal issues get decided before—I just don't understand the urgency." *Id*. OSI's response? Two consumer

complaints. OSI received two complaints. So, it had to act fast. Now. Now. Right now. This Court was right: It sure feels like OSI is telling Liberty, and telegraphing to Samaritan, "you know[,] you've been in operation for years, but now we're coming for you." *Id*. Indeed.

1128.  **Tenth**, OSI threatened to impose an exorbitant fine on Liberty. *See* OSI Liberty C&D (Ex. 41). "[T]he Superintendent intends to order Liberty to pay a fine in an amount not over [$5,000] for each violation of [the Code], except that if the violation is to be found willful and intentional, the penalty may be up to [$10,000] for each violation." *Id*. at 9. This threatened fine, which could total over $20 million, was preposterous in the circumstances. Any fine would be unjustified, given that OSI had allowed Liberty and all other HCSMs to operate freely as non-insurance for years—as had the rest of the nation's insurance regulators. But threatening to double the fine due to "willful" (criminal) violations? When Liberty had not been under the slightest suggestion that its operations in New Mexico might be illegal? Really?

1129.  **Eleventh**, OSI's actual fine of Liberty of $2,510,000, Final Order (Ex. 50) at 7— reduced from $10,040,000 in the Liberty Decision (Ex. 49) at 98—is still inexplicably harsh in light of the many years OSI allowed Liberty (and all other HCSMs) to operate freely.

1130.  **Twelfth**, OSI's fine of Liberty of $2,510,000 (Ex. 50 at 7) is nearly as great as the $2,680,000 penalty that OSI imposed on the notorious scoundrel Aliera, *see* Trinity/Aliera Final Order (Ex. 36) at 2. That comparison is outrageous.

1131.  **Thirteenth**, OSI has fueled the State's hostility to HCSM members receiving further tax benefits. ¶¶774-800. The AG Letter New Mexico co-signed accuses these "ministries" of (a) destroying the "landmark" reforms of the ACA by (b) "incentivizing consumers to buy into" these "ministries"—which (c) provide "junk coverage," (d) "cause harm to our residents," (e) "inflict fiscal harm on the States and providers," and (f) cause "the broader

insurance market to become smaller, sicker, and more expensive," causing (g) crippling medical debt whose "ripple effects" cause (h) "long-term economic deprivation, bankruptcy, housing instability, and even homelessness." ¶¶779-781. Wow. The Letter further warns against allowing these ministries to (i) "ramp up fraudulent marketing practices," (j) "continue to elude [law] enforcement," and (k) "increase consumer confusion and fraud" "by mimicking traditional health insurance," (l) all of which "is not without a human toll." *Id. Hostile* is too gentle a term.

1132.    **Fourteenth**, in this same AG Letter—amidst its 26 mentions of the Aliera entities and its 23 mentions of words associated with predatory shams, scams, and frauds—co-signer New Mexico mentioned "Samaritan Ministries International" by name. The Letter did not mention any other actual HCSM: just Samaritan. ¶¶794-800. That is the definition of animus.

1133.    **Fifteenth**, OSI's hostile campaign against HCSMs has complemented its efforts to protect the local, ACA-governed, OSI-regulated marketplace. ¶¶832-839.

1134.    **Sixteenth**, OSI's sudden foul mood on HCSMs is inexplicable apart from animus. For over two decades, OSI allowed HCSMS to operate freely. In fact, OSI did so until the hyper-partisan and divisive health, social, and economic politics of recent years soured the State badly on these socially and economically conservative *ministries* whose views the State disdains.

1135.    **Seventeenth**, in OSI's rush to oust HCSMs it has tripped itself badly with its repeated public warnings that HCSMs are "not insurance." ¶¶708-812. This constant contradiction-in-terms, disturbing in its own right, has confused consumers while steering them away from HCSMs. The only logical way to explain this cognitive dissonance is animus.

### Religious Autonomy under Both Religion Clauses: Absolutely Protected

1136.    As noted above, the state must never "interfere" with the "autonomy" of religious

groups "to define their own *doctrine*, *membership*, organization, and *internal requirements*."[659] "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government **intrusion**. State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or **even to influence** such matters would constitute [an] establishment of religion. The First Amendment **outlaws** such **intrusion**."[660] All such state action is categorically barred.

1137. The Supreme Court always bars, never balances, such **intrusive** actions. In *Hosanna*, "[w]e held that her **suit** was **barred** [because] it 'concern[ed] government interference with an internal church decision that affects the faith and mission of the church.'"[661] "[W]e held in [*Hosanna*] that the First Amendment **barred** a court **from entertaining**" such a suit.[662]

1138. OSI's policy to impose the Insurance Code interferes with the autonomy of Samaritan and its members to define their own *doctrine*, *membership*, and *internal requirements*.

1139. The Code requires *reserves* and *guarantees* that would contravene Samaritan's First Amendment rights. ¶¶937-940 & 1161 (many sections). It also imposes antidiscrimination requirements that not only would impair Samaritan's governance, membership, and sharing requirements, but would force Samaritan, as it defines itself, to cease to exist. ¶¶913-983. Many other intrusions are identified by the six Declarations attached to this Complaint.

1140. As just one more example, a key internal governance, membership, and sharing requirement of Samaritan is the manner in which conflicts and disputes with/among members are resolved. ¶560. A typical instance is application of the Guidelines to determine whether a

---

[659] *Demkovich*, 3 F.4th at 975 (**en banc**) (citation to McConnell omitted; emphasis added).

[660] *Our Lady*, 140 S.Ct. at 2060 (quoting *Hosanna*, 565 U.S. at 186) (emphasis added).

[661] *Our Lady*, 140 S.Ct. at 2062 (emphasis added).

[662] *Our Lady*, 140 S.Ct. at 2055 (emphasis added).

medical bill is shareable amongst the members. *Id* Since members send shares (money) directly to each other—and Samaritan has neither liability nor "reserves" to "cover" such "claims"—it matters little to Samaritan whether a medical bill is shareable. What matters to Samaritan is fealty to the Guidelines and the Biblical dispute-resolution requirement it imposes. ¶¶553-640.

1141.   For example, any member dispute with Samaritan staff over whether a specific medical bill is shareable among the members—according to the Guidelines—goes to an arbitration panel of randomly chosen members. That arbitration decision of the members is governed by Biblical principles, as detailed in the Guidelines (Ex. 2) at §XII ("Reconciling Disagreements") and the Membership Application (Ex. 4) at §3(18-19). That decision is not subject to civil authorities; it must be resolved internally as required by Scripture. *Id*.

1142.   Defendant would impose the State's own multilayer grievance procedure[663] on top of Samaritan's Biblical dispute-resolution procedure. The mandated procedure interjects an "Independent review organization (IRO),"[664] defined as "an entity that is appointed by the superintendent to conduct independent external reviews of adverse determinations and final adverse determinations pursuant to this rule; and which renders an independent and impartial decision."[665] This Defendant-appointed IRO would impose a "binding decision"[666] on Samaritan and ultimately a full blown evidentiary hearing (trial) presided over by the Defendant.[667]

1143.   These Samaritan dispute-resolution requirements, like all its other internal

---

[663] N.M. Admin. Code §13.10.17.12(a)(2) (applicable to "health benefit plans").

[664] N.M. Admin. Code §13.10.17.19 ("**IRO review of an adverse determination**").

[665] N.M. Admin. Code §13.10.17.7(X) ("**Definitions**").

[666] N.M. Admin. Code §13.10.17.23(E) ("**Binding decision**. The decision of the IRO is binding upon the health care insurer except to the extent that the health care insurer may pursue other remedies under applicable state and federal law.").

[667] N.M. Admin. Code §13.10.17.24 ("**Superintendent's hearing procedures for adverse determinations**"). These detailed procedures are virtually indistinguishable from a court trial.

requirements, originate in the Biblical doctrine held by Samaritan and its members. *See* ¶¶557-560. This doctrine includes the mutual Biblical responsibility, obedience, and love of members and the supernatural power of Christ, the Divine Healer, that it unleashes. Defendant would override all such internal governance, membership, and sharing requirements.

1144.    The Tenth Circuit prohibited such intrusion into a religious organization's internal affairs long before *Our Lady*.[668] In the 2002 *Bryce* case, a youth minister (Bryce) sued her church employer under Title VII "for remarks" related to her same-sex union.[669] The Tenth Circuit ruled that her claims were "***barred***" by the "***broader church autonomy doctrine***."[670] Under that doctrine, personnel decisions are insulated where "***the alleged misconduct is 'rooted in religious belief.*'"[671] Since Bryce suffered for "violating" the church's "***Episcopal doctrine***" on same-sex unions,[672] "***the courts will not intervene***."[673] "Thus, plaintiffs' claims are ***barred*** by the church ***autonomy doctrine*** [and b]ecause we find that the ***church is protected from this suit*** by the church autonomy doctrine, we need not address the other defenses[.]"[674]

1145.    The 2017 *Medina* case also provides a useful autonomy analysis.[675] Applying that Tenth Circuit precedent to our case, the Insurance Code, as applied to Samaritan, "would require [a] religious organization[], in order to [comply with reserve, grievance, and other requirements], to ***adopt a particular structure***, thus ***interfering in the internal organization of a religious***

---

[668] *Our Lady of Guadalupe*, 140 S.Ct. 2049 (2020).

[669] *Bryce*, 289 F.3d at 651-53. *Bryce* was cited with approval in *Hosanna*, 565 U.S. at 188 n.2.

[670] *Bryce*, 289 F.3d at 658 n.2 (emphasis added).

[671] *Bryce*, 289 F.3d at 657 (quoting *Yoder*, 406 U.S. at 215) (emphasis added).

[672] *Bryce*, 289 F.3d at 652 (emphasis added).

[673] *Bryce*, 289 F.3d at 660 (emphasis added).

[674] *Bryce*, 289 F.3d at 659 (emphasis added). Again, no scrutiny: the suit is simply barred.

[675] *Medina v. Catholic Health*, 877 F.3d 1213 (10th Cir. 2017) ("***Medina***").

*institution*. And *that is precisely what Supreme Court precedent forbids*: the Religion Clauses jurisprudence 'radiates ... a spirit of freedom for religious organizations, an *independence* from *secular control or manipulation*—in short, power to *decide for themselves*, *free from state interference*, matters of church *government* as well as those of *faith and doctrine*.'"[676]

1146.   Since compliance with the substance and procedures of the Insurance Code, as imposed by Defendant on Samaritan, would "*violate*" Samaritan's internal Biblical "*doctrine*"[677] in a host of ways, "*the courts will not intervene*."[678]

1147.   The ongoing threat of OSI's enforcement action, including the eventual subjection of Samaritan to antidiscrimination and other Insurance Code requirements discussed herein, is accelerating, irreparable, and categorically barred.

1148.   Samaritan "*is protected from [any OSI action]* by the church autonomy doctrine."[679] Defendant's intrusion is simply "*barred*."[680]

### Entanglement Under Establishment Clause: Absolutely Prohibited

1149.   For similar but independent reasons, applying the substance and procedures of the Insurance Code to Samaritan and its members violates the Establishment Clause. "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government *intrusion*. *[A]ny attempt by government to dictate or even to influence* such matters would constitute [an] *establishment of religion*. The First

---

[676] *Medina*, 877 F.3d at 1234 (quoting *Hosanna*, 565 U.S. at 186) (emphasis added).

[677] *Bryce*, 289 F.3d at 652 (emphasis added).

[678] *Bryce*, 289 F.3d at 660 (emphasis added). State intrusion is simply barred.

[679] *Bryce*, 289 F.3d at 659 (emphasis added). State intrusion is simply barred.

[680] *Bryce*, 289 F.3d at 659 (emphasis added). State intrusion is simply barred.

Amendment *outlaws* such *intrusion*."[681] For the all reasons discussed in the preceding (autonomy) section, Samaritan "*is protected from this*" proposed intrusion by Defendant.[682]

1150.   If subjected to the Insurance Code, Samaritan would be under continuous OSI monitoring as OSI reviewed, approved, or rejected Samaritan's religious sharing programs (and any changes thereto), checked its "reserves," overrode Samaritan's Biblical dispute-resolution procedure, and imposed whatever reporting requirements it wished. ¶¶489-518, 1151-1178.

### Code Section Titles Alone Prove Constitutional Violations

1151.   The very categories of regulation are self-evident violations of religious entanglement, religious autonomy, and religious antidiscrimination principles.

1152.   It is only necessary to list their Section titles to demonstrate the entanglement with Samaritan's internal governance structure/polity membership, and sharing requirements.

1153.   It is only necessary to list their Section titles to demonstrate the autonomy-invading intrusion into Samaritan's internal governance, membership, and sharing requirements.

1154.   It is only necessary to list their Section titles to demonstrate the non-neutral, discriminatory law enforcement currently aimed at Samaritan.

1155.   It is only necessary to list their Section titles to demonstrate the uneven, non-generally applicable, discriminatory law enforcement currently aimed at Samaritan.

1156.   Moreover, it is only necessary to list their Section titles to demonstrate the absurdity of trying force Samaritan's ministry (to morph) into this insurance mold.

1157.   The latter absurdity of trying to force a square peg into a round hole also suggests improper motive (animus) toward these religious sharing ministries such as Samaritan.

1158.   There are **91** Articles in the Insurance Code, including the initial **62** Articles plus

---

[681] *Our Lady*, 140 S.Ct. at 2060 (quoting *Hosanna*, 565 U.S. at 186) (emphasis added).

[682] *Bryce*, 289 F.3d at 659 (emphasis added).

29 new ones added by alphabetic character, e.g., "Article 12A," "Article 12B," "Article 12C."

1159.   Most of these Articles, by their very titles, have no meaning or application to Samaritan's ministry—demonstrating how *unlike insurance* Samaritan's *non-insurance* truly is.

1160.   Most of these Articles, if applied to Samaritan, would bulldoze and bury it.

1161.   The intrusive, entangling, autonomy-piercing, non-neutral, non-generally applicable, discriminatory requirements of the Insurance Code include the following:

(1)   "**ARTICLE 1. INSURANCE CODE**." Includes <u>18</u> Sections (2 repealed), e.g., "**Insurance**," "Insurance Department," "**Transacting Insurance**," "**Compliance Required**," **none of which describes what Samaritan is or what it does**.[683]

(2)   "**ARTICLE 2. OFFICE OF THE SUPERINTENDENT OF INSURANCE**." Includes <u>17</u> Sections (2 repealed) (plus subsections), e.g., "General Powers," "Producer Licensing," "Regulations," "Additional Powers," "Rulemaking," "Enforcement," "Reporting," "Records Inspection."[684]

(3)   "**ARTICLE 3. STATE INSURANCE BOARD [REPEALED]**."

(4)   "**ARTICLE 4. EXAMINATIONS, HEARINGS, AND APPEALS**." Includes <u>21</u> Sections, e.g., "Investigations," "Inquiries by Superintendent," Power of Examination," "Examination of Insurers," "Conduct of Examination," "Examination Report" (including many separate requirements, e.g., "Public Inspection"); "Hearings," "Hearing Procedure," "Testimony Compelled."[685]

(5)   "**ARTICLE 5: AUTHORIZATION OF INSURERS**[.]" Includes <u>33</u> Sections, **none of which describes or applies to Samaritan**, e.g., "Domestic Insurer Defined," "Certificate of Authority Required," "General Eligibility for Certificate of Authority," "Capital Funds, Deposits, Required," "Insuring Powers Without Basic Capital," "Issuance, Refusal of authority," "Expiration, Reinstatement of Certificate of Authority," "Suspension or Revocation of Certificate; Mandatory Grounds," "Impairment as Grounds for Suspension or Revocation," "Duration of

---

[683] NMSA 1978, §§59A-1-1 to 1-18. **Red font** has been added for emphasis.

[684] NMSA 1978, §§59A-2-1 to 2-17.

[685] NMSA 1978, §§59A-4-1 to 4-21.

Suspension; Insurer's Obligations During Suspension," "Annual Statement," "Quarterly Reports," "Penalties for Late, False Annual Statements."[686]

(6)     "**ARTICLE 5A. RISK-BASED CAPITAL**." Includes 13 Sections. This is New Mexico's "Risk-Based Capital Act," which has **no application to Samaritan**. Sections include, e.g., "Risk-Based Capital Reports," "Company Action Level Event," "Regulatory Action Level Event," "Authorized Control Level Event," "Mandatory Control Level Event," "Challenge Hearings," "Prohibition on Announcements; Prohibition on Use in Ratemaking," "Supplemental Provisions; Rules; Exemption," "Immunity," "Notices."[687]

(7)     "**ARTICLE 6. FEES AND TAXES**." Includes 8 Sections (3 repealed) (plus subsections), e.g., "Fee Schedule," "Surcharge Imposed; Appropriation," "Dishonored Checks and Other Forms of Payment; Penalty," "Insurer Must Pay Tax on Withdrawal from State," "Penalty for Failure to Pay Fees," "Distribution of Office Collections," "**Preemption** and in Lieu Provision,"[688] "Superintendent Shall Provide Information to the Taxation and Revenue Department Necessary to Administer the Insurance Premium Tax Act."[689]

(8)     "**ARTICLE 7. KINDS OF INSURANCE; LIMITS OF RISK**[.]" Includes 11 Sections (4 repealed), with **no application to Samaritan**.[690]

(9)     "**ARTICLE 8. ASSETS AND LIABILITIES**." Includes 16 Sections (plus 1 subsection), with **no application to Samaritan**, e.g., "Disallowance of 'Wash' Transactions," "Continued Liability After Assumption **Reinsurance** Transactions," "Loss **Reserves**," "Unearned **Premium Reserve**," "Mortgage Guaranty Contingency Reserve," "Valuation of Bonds," "Valuation of Other

---

[686] NMSA 1978, §§59A-5-1 to 33.

[687] NMSA 1978, §§59A-5A-1 to 5A-13.

[688] "[N]ew Mexico **preempts the field** of taxation of insurers, nonprofit health care plans, health maintenance organizations, … and insurance producers as such. The payment of the taxes, licenses and fees provided for in the Insurance Premium Tax Act and the Insurance Code shall be in lieu of all other taxes, licenses and fees of every kind now or hereafter imposed by this state … on any of the foregoing specified entities, excepting …." §59A-6-6 (emphasis added).

[689] NMSA 1978, §§59A-6-1 to 6-8.

[690] NMSA 1978, §§59A-7-1 to 7-11.

Securities," "Valuation of Purchase Money Mortgages."[691]

(10)   "**ARTICLE 8A. STANDARD VALUATION LAW**." Includes <u>12</u> Sections. This is New Mexico's "Standard Valuation Law," which has **no application to Samaritan**. Sections include, e.g., "**Reserve** Valuation," "Actuarial Opinion Prior to Operative Date of Valuation Manual," "Actuarial Opinion After Operative Date of Valuation Manual," "Rule-Based **Reserve Valuation** Methods," "Minimum Standards for Accident and Health Insurance Contracts," "Valuation Manual for Policies Issued on or After Operative Date of Valuation Manual," "Requirements of a Principle-Based Valuation," "Single State Exemption."[692]

(11)   "**ARTICLE 9. INVESTMENTS**." Includes <u>27</u> Sections placing myriad limits on investments, which appear to have **little or no application to Samaritan**.[693]

(12)   "**ARTICLE 10. ADMINISTRATION OF DEPOSITS; TRUSTED ASSETS**." Includes <u>19</u> Sections, having **little or no application to Samaritan**, e.g., "Authorized Deposits," "Securities Eligible for Deposit," State Treasurer as Depository," "Depositories Designated by Treasurer," "Excess Deposits," "Insurer's Rights During Solvency" "Replenishment of Deposit," "Release of Deposit," "Special Deposit Bond in," "Trusteed Assets of Alien Insurer," "Trust Agreement," 'Title; Separation; Accounting," "Examination of Assets," "Withdrawal of Assets," "Substitution of Trustee," "Levy upon Deposit."[694]

(13)   "**ARTICLE 11. LICENSING PROCEDURES FOR PRODUCERS**[.]" Includes <u>24</u> Sections, having **no application to Samaritan**, e.g., "Examination of Applicant," "Character Evaluation," "Suspension, Revocation, Refusal," "Procedure for Suspension, Revocation, Refusal," "Duration of Suspension," "Administrative Fine," "Penalties," "Duty to Report."[695]

---

[691] NMSA 1978, §§59A-8-1 to 8-16.

[692] NMSA 1978, §§59A-8A-1 to 8A-12. "Single State Exemption. The superintendent may exempt from [Section 59A-8A-8] the specific product forms or product lines of a domestic company that is licensed and doing business only in New Mexico if …." §59A-8A-12(A).

[693] NMSA 1978, §§59A-9-1 to 9-27.

[694] NMSA 1978, §§59A-10-1 to 10-19.

[695] NMSA 1978, §§59A-11-1 to 11-24.

(14)   "**ARTICLE 11A. INSURANCE CONSULTANTS**." Includes <u>8</u> Sections (7 repealed) (plus subsections), having **no application to Samaritan**, e.g., "Insurance Consultant; License Required," "Insurance Consultant License; Exemptions," "Application; Requirements for Issuance; Fee; Renewal," "License; Suspension or Revocation; Appeal; Penalty," "Contracts and Agreements," "Required Acknowledgments," "Payment from Insurers or Insurance Producers for Sale of Insurance Prohibited; Penalty," "Acting as Insurance Consultant Without a License Prohibited; Penalty."[696]

(15)   "**ARTICLE 12. INSURANCE PRODUCERS**." Includes <u>29</u> Sections, having **no application to Samaritan**—which involves **<u>no</u>** "brokers" or other "producers." Sections include, e.g., "'**Broker' Defined**," "License Required," "NO License Where Shares or Interest Used as Inducement," "Application and General Qualifications for Individual Insurance Producer," "Licensing Business Entities," "Examination for License," "Scope of License," "Temporary Licenses," "Records of Insurance Producer," "Fiduciary Funds; Insurance Producers," "Insurance Vending Machines," "Sharing of **Commissions**," "Nonresident Insurance Producers; Retaliation," "**Commissions**," "Compensation Disclosure."[697]

(16)   "**ARTICLE12A. INSURANCE ADMINISTRATORS**." Includes <u>17</u> Sections, applicable to "third-party" and other "administrators who "provide administrative services in connection with insurance or alternatives to insurance," **having no application to Samaritan**.[698]

(17)   "**ARTICLE 12B. MANAGING GENERAL AGENTS**." Includes <u>8</u> Sections. This is New Mexico's "Managing General Agents Law," defining and applying

---

[696] NMSA 1978, §§59A-11A-1 to 11A-8.

[697] NMSA 1978, §§59A-12-1 to 12-29.

[698] NMSA 1978, §§59A-12A-1 to 12A-17. This Article "shall apply to all administrators who provide administrative services in connection with insurance or alternatives to insurance or who, in a fiduciary capacity or otherwise, manage or handle funds, money, premiums, fees or other forms of consideration in connection with insurance or alternatives to insurance. That article shall also apply to the claims practices of insurers or alternatives to insurance, whether or not they are administered by a third party." §59A-12A-1.

terms such as "actuary," "insurer," and "underwrite."[699]

(18) "**ARTICLE 12C. BROKER CONTROLLED INSURERS**." Includes <u>7</u> Sections. This is New Mexico's "Broker Controlled Insurer Law," which has **no application to Samaritan**.[700]

(19) "**ARTICLE 12D. REINSURANCE INTERMEDIARIES**." Includes <u>12</u> Sections. This is New Mexico's "Reinsurance Intermediary Law," which has **no application to Samaritan**.[701]

(20) "**ARTICLE 12E. CREDIT FOR REINSURANCE ACT**." Includes <u>18</u> Sections. This is New Mexico's "Credit for Reinsurance Act," which as **no application to Samaritan**.[702]

(21) "**ARTICLE 13. ADJUSTERS**." Includes <u>17</u> Sections (plus 1 subsection), **having no application to Samaritan**.[703]

(22) "**ARTICLE 14. SURPLUS LINE INSURANCE**." Includes <u>19</u> Sections (3 repealed) (plus 1 subsection), **having no application to Samaritan**.[704]

(23) "**ARTICLE 14A. SURPLUS LINES INSURANCE … [REPEALED]**."

(24) "**ARTICLE 15. UNAUTHORIZED INSURERS**." Includes <u>21</u> Sections. This is New Mexico's "Unauthorized Insurers Law," and it has **no proper relation to Samaritan**. Sections include, e.g., "Representing or Aiding **Unauthorized Insurer** Prohibited," "Inclusion of **Unauthorized Insurer** in Coverage," "Duty to File Returns," "Service of Process on **Unauthorized Insurer**," "Defense of Action by **Unauthorized Insurer**; Bond," "Enforcement of Foreign Decrees," "Penalty for Violation," "**Unauthorized Insurers** False Advertising Process Law," "Action by Superintendent," "Jurisdiction over Health Care Benefits

---

[699] NMSA 1978, §§59A-12B-1 to 12B-8.

[700] NMSA 1978, §§59A-12C-1 to 12C-7.

[701] NMSA 1978, §§59A-12D-1 to 12D-12.

[702] NMSA 1978, §§59A-12E-1 to 12E-18.

[703] NMSA 1978, §§59A-13-1 to 13-17.

[704] NMSA 1978, §59A-14-1 to 14-19.

Providers Presumed," "Examination."[705]

(25)    "**ARTICLE 16. TRADE PRACTICES AND FRAUDS**." Includes <u>30</u> Sections (plus subsections), **having no proper relation to Samaritan**, e.g., "Practices Prohibited," "**Misrepresentation, False Advertising**," ""**Twisting**' Prohibited," "**Falsification**, Omission of Records, **Misleading** Financial Statements," "Defamation," "**Unfair Discrimination** Prohibited [in] Life and Health Insurance," "**Unfair Referral**," "**Discrimination in Insurance**,"[706] "**Discrimination** on the Basis of Deterioration in Health," "Prohibiting **Sex Discrimination**,"[707] "**Discrimination** on the Basis of Blindness," "**Coercion of Business** Prohibited," "**Discrimination**; Rebates and Certain Inducements Prohibited," "Exceptions to **Discrimination** … Prohibition," "**Discrimination**; Other Coverages," "Receipt of Rebates and Inducements; Penalty," "**Monopolistic Practices** Prohibited," "**Unfair Claims** Practices Defined and Prohibited," "Payment of Claim by Check, Draft or [EFT]; **Failure to Pay**," "Unlicensed **Health Benefits Plans**; Unapproved **Health Benefits Plans**," "**Surprise Billing** Prohibited," "Health Benefits Plan Disclosure," "**Record of Complaints** Required," "**False Applications**, Claims, Proofs of Loss," "**Illegal Dealing in Premiums**; Excess Charges for Coverage," "Knowledge of Insurer of Prohibited Acts," "Insurer Name; **Deceptive Use** Prohibited," "**Desist Orders** for Prohibited Practices," "Procedure as to **Undefined Practices**," "**Penalties**,"

---

[705] NMSA 1978, §§59A-15-1 to 15-21. This Article's "purpose [is] protection of residents [and] authorized insurers [from] unfair competition [and protection against] against the *evasion* of the insurance regulatory laws[.] In so doing, the state exercises its powers [to] *define what constitutes* transacting an insurance *business* in this state [by] virtue [the *McCarran Ferguson* Act, 15 U.S.C. §§1011 *et seq.*], which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states." §59A-15-1 (emphasis added).

[706] "No *insurer* shall, on the basis of the race, color, *religion* or national origin of any individual or group of persons: A. refuse to make insurance available to any applicant for insurance; or B. treat any such applicant or insured differently than any other applicant or insured with respect to the terms, conditions, rates, benefits or requirements of any such insurance contract…. *This section shall not be construed to affect criteria for acceptance into membership* of *any fraternal benefit society*." NNSA 1978, §59A-16-12 (emphasis added).

[707] "**Prohibiting sex discrimination in insurance**. No insurer shall refuse to insure, refuse to continue to insure or limit the amount of coverage available to an individual because of the sex of the individual." §59A-16-13.

**Private Right of Action**."[708]

(26)   "**ARTICLE 16A. INSURANCE FRAUD … IMMUNITY [REPEALED]**."

(27)   "**ARTICLE 16B. DOMESTIC ABUSE INSURANCE PROTECTION**." Includes <u>10</u> Sections. This is New Mexico's "Domestic Abuse Insurance Protection Act," and it has **no application to Samaritan**.[709]

(28)   "**ARTICLE 16C. INSURANCE FRAUD ACT**." Includes <u>17</u> Sections. This is New Mexico's "Insurance Fraud Act," and it has **no application to Samaritan**. Sections include, e.g., "Superintendent's Authority," "Notice and Cooperation Required," "Immunity from Civil Liability," "Private Insurance **Fraud** Reports and Enforcement Actions," Warning Required," "Report of Conviction," "Insurer Anti-**Fraud** Initiatives; Special Investigative Units," "Investigators' Powers," "**Attorney General's Duties**," "Insurance **Fraud** Policy Advisory Group," "**Application of Act to Other Acts**," "Rules," "Automobile Theft Prevention Authority; Created; Board; Powers; Duties."[710]

(29)   "**ARTICLE 17. INSURANCE RATES AND RATING**." Includes <u>36</u> Sections (6 repealed) (plus subsections). This is New Mexico's "Insurance Rate Regulation Law," having **no application to Samaritan**. Sections include, e.g., "Administration of Insurance Rate Reg. Law," "**Underwriting** Guidelines," "**Rate Standards**," "Competitive Market," "Reverse Competitive Market," "**Rating Methods**," "Making of Rates," "Filing of Rates," "Filings Open to Inspection," "Consumer Information," "Insurer **Must Adhere to Rates**,"

---

[708] NMSA 1978, §§59A-16-1 to 16-30. "A purpose of this article is to regulate trade practices in the insurance business and related businesses in accordance [with] the intent of Congress [in the ***McCarran Ferguson*** Act, 15 U.S.C. §§1011 *et seq.*] by defining [the practices] which constitute ***unfair methods*** of competition or ***unfair or deceptive acts*** [.]" §59A-16-2 (emphasis added).

[709] NMSA 1978, §§59A-16B-1 to 16B-10. This Article prohibits "insurers from unlawfully discriminating on the basis of domestic abuse by using the fact of domestic abuse or the insurer's determination of a person's abuse status as an insurance criterion or rating factor." §59A-16B-2.

[710] NMSA 1978, §§59A-16C-1 to C-17. "[I]nsurance ***fraud is pervasive*** and expensive[.] Therefore, the legislature believes that the state must ***aggressively confront*** the problem of insurance fraud. B. The purpose of the Insurance Fraud Act is to permit the ***full utilization*** of the ***expertise*** of the superintendent of insurance to investigate and detect insurance fraud more effectively, to halt insurance fraud and to work with state, local and federal law enforcement and regulatory agencies against the commission of insurance fraud." 59A-16C-2 (emphasis added).

"Grounds and Procedures for **Disapproval of Rates**," "Large Commercial Policyholders," "Requirement for Supporting Information," "Experience Modification Factor," "Advisory Organizations; Licensing," "Suspension, Revocation of License," "Conduct of Advisory Organization," "Joint **Underwriting**, Joint **Reinsurance** Pool," "**Binding Agreements by Insurers**," "Cooperative Activities Authorized," "Recording, Reporting of Experience," "Exchange of Data, Consultation Authorized," "Information to be Furnished Insureds; **Hearings and Appeals** of Insureds," **False or Misleading** Information," "Examination of Advisory and Joint **Underwriting** Organizations," "**Enforcement; Cease and Desist**, **Injunctions**; **Penalties**," "**Hearings**," "**Appeals** from Superintendent," "**Failure to Submit Data**; **Penalty**."[711]

(30)   "**ARTICLE 17A. PERSONAL INSURANCE CREDIT INFORMATION**." Includes <u>11</u> Sections. This is New Mexico's "Personal Insurance Credit Information Act," which has **no application to Samaritan**.[712]

(31)   "**ARTICLE 18. THE INSURANCE CONTRACT**." Includes <u>33</u> Sections (2 repealed) (plus subsections), having **no proper relation to Samaritan**. Sections include, e.g., "'**Policy**' Defined," "'**Premium**' Defined," "'Block of Business' Defined," "**Insurable Interest**; Personal Insurance," "Power to Contract for Insurance, "Consent of Insured; Life, Health Insurance," "Alteration of Application; Life, Health Insurance," "Application as Evidence," "Representation in Application," "Filing of Forms and Classifications; Review of Effect upon Insured," "**Approval or Disapproval of Health Insurance Forms**," "Adjusted Community Rating," "Health Insurance; **Health Care Plan Rates Filing Requirements**," "Health Insurance Filings; Grounds and Procedure for **Approval or Disapproval**," "**Review of Health Insurance or Plan Rates**; **Appeal to Court** of Appeals from Superintendent," "Pooling of Closed Blocks of Business," "Grounds, **Procedure for Disapproval**," "Continuation of **Coverage** and

---

[711] NMSA 1978, §§59A-17-1 to 17-36. To protect the public against "*excessive*, inadequate or *unfairly discriminatory rates*," to "permit and *encourage … price competition*," "*prevent* practices tending [to] *lessen or destroy competition*," and "regulate [the] insurance business [in] a *manner to preclude application of federal antitrust laws*." §59A-17-3 (emphasis added).

[712] NMSA 1978, §§59A-17A-1 to 17A-11.

Conversion Rights; Accident and Health Insurance Policies; Notice," "Group **Coverage** Discontinuance and Replacement," "Health Insurance or Health Plan Form and Rate Filings; **Superintendent**; **Rulemaking**; **Compliance with Federal Law**,"[713] "Standard Provisions, in General," "Charter, Bylaw Provisions," "Execution of Policies," "**Underwriters'** and Combination Policies," "Validity, Construction of **Noncomplying** Forms," "Binders," "Insurance **Producers**; Whom They Represent," "Allowance for Inflation," "**Payment Discharges Insurer**," Forms of Proof of Loss to be Furnished," "**Universal Claim Forms**," "Notice; Waiver," "**Cancellation of Certain Policies**," "Disclosure of **Premium** and **Claim** Data," "Accident and Health Policy or Certificate Provisions Relating to Individuals Who Are Eligible for Medical Benefits Under the Medicaid Program," "Notice."[714]

(32)    "**ARTICLE 19. POLICY LANGUAGE SIMPLIFICATION**." Includes 7 Sections. This is New Mexico's "**Policy Language Simplification Law**." Sections include, e.g., "**Minimum Language** Simplification Standards," "**Superintendent May Allow Lower** Reading Ease Score,"[715] "**Approval of Forms**," "Effective Date of Approval Requirement."[716] Is the Superintendent empowered to **dictate changes** to religious language in **Samaritan's "policies"** or "materials," e.g., **passages from the King James Version** of the Bible?

(33)    "**ARTICLE 20. LIFE INSURANCE AND ANNUITY CONTRACTS**." Includes 36 Sections (3 repealed).[717]

(34)    "**ARTICLE 20A. VIATICAL SETTLEMENTS**." Includes 11 Sections. This

---

[713] *See* NMSA 1978, §59A-18-16.2(H)-(L) (committing not to contradict or exceed federal law).

[714] NMSA 1978, §§59A-18-1 to 18-33.

[715] §59A-19-5. While the Superintendent exercises discretion in virtually everything OSI does, some Code provisions, like this one, make explicit the unbridled nature of the discretion. "The superintendent *may*, in *his sole discretion*, authorize use of a policy form having a lower score … if he finds that a lower score: A. will provide a more accurate reflection of the readability of a policy form; B… or C...." §59A-19-5 (emphasis added).

[716] NMSA 1978, §§59A-19-1 to 19-7.

[717] NMSA 1978, §§59A-20-1 to 20-36.

New Mexico "Viatical Settlements Act" has **no application to Samaritan**.[718]

(35)    "**ARTICLE 21. GROUP LIFE INSURANCE**." Includes <u>28</u> Sections. This New Mexico "Group Life Insurance Law" has **no application to Samaritan**.[719]

(36)    "**ARTICLE 22. HEALTH INSURANCE CONTRACTS**." Includes <u>61</u> Sections (one repealed) (plus subsections), which have **no application to Samaritan** and if they did would **dictate its Guidelines** and **gut its ministry**. Sections include, e.g., "**Form and Content of Policy**," "**Required Provisions**," "Entire Contract; Changes," "Time Limit on Certain Defenses," "Grace Period," "Reinstatement," "Notice of Claim," "**Claim Forms**," "Proofs of Loss," "Time of Payment of Claims," "Payment of Claims," "Legal Actions," "**Optional Provisions**,"[720] "Misstatement of Age," "Insurance with Other Insurance Companies," "Relation of **Earnings** to **Insurance**," "Unpaid **Premium**," "Cancellation," "**Conformity with State Statutes**," "**Order** of Certain Policy Provisions," "Requirements of Other Jurisdictions,"[721] "Conforming to Statute," "Maximum Age of Dependent," "Freedom of Choice of Hospital and Practitioner," "Freedom of Choice," "**Newly Born Children Coverage**," "**Coverage for Adopted Children**," "**Coverage of Children**," "Childhood **Immunization** Coverage Required," "Coverage of **Circumcision** for Newborn Males," "Coverage for Mammograms," "Mastectomies and Lymph Node Dissection," "Prior Authorization for Gynecological or Obstetrical Ultrasounds Prohibited," "Coverage for **Cytologic and Human Papillomavirus** Screening," "Coverage for the Human **Papillomavirus Vaccine**," "Coverage for Prescription **Contraceptive Drugs or Devices**," "Coverage for Smoking Cessation Treatment," "Coverage for Autism Spectrum Disorder Diagnosis and Treatment," "Health Insurers; Direct Services," "Dental Insurance Plan," "Pharmacy Benefits," "Prescription Drug Coverage,"

---

[718] NMSA 1978, §§59A-20A-1 to 20A-11.

[719] NMSA 1978, §§59A-21-1 to 21-28.

[720] Including "different wording [if] approved by the superintendent." §59A-22-16.

[721] In §59A-22-28, In this Section, New Mexico recognizes the need to allow programs of both domestic and out-of-state "providers" to include "policy" provisions that are consistent with home "state or country" law. This is what the Constitution requires OSI to do with Samaritan, which operates freely everywhere else, consistently with state and federal law everywhere else.

"Calculating an Insured's Cost–Sharing Obligation for Prescription Drug Coverage," "**Provider** Credentialing," "**Coverage** Exclusion," "Behavioral Health Services; Elimination of Cost Sharing," "Anatomical Gift Nondiscrimination," "**Sexually Transmitted** Infection Care."[722]

(37)      "**ARTICLE 22A. PREFERRED PROVIDER ARRANGEMENTS**." Includes 7 Sections. This New Mexico "Preferred Provider Arrangements Law" has **no application to Samaritan**, where members choose their own providers. Sections include, e.g., "Preferred Provider Arrangements," "Health Benefit Plans," "Preferred Provider Participation Requirements," "General Requirements."[723]

(38)      "**ARTICLE 22B. PRIOR AUTHORIZATION ACT**." Includes 8 Sections. This New Mexico "Prior Authorization Act" **should have no application to Samaritan**, because it would displace Samaritan's own Biblically based, member-embraced Sharing Guidelines for "adjudicating" which health care burdens are shareable and on what basis.[724]

(39)      "**ARTICLE 23. GROUP AND BLANKET HEALTH INSURANCE**." Includes 31 Sections (one repealed) (plus subsections). This Article imposes most of the same requirements as "**Article 22. Health Insurance Contracts**," which, to the extent they might apply to Samaritan, have the **same intrusive effect on Samaritan**. Some new or different Sections include, e.g., "**Alcohol Dependency** Coverage," "**Exceptions**."[725]

(40)      "**ARTICLE 23A. LONG-TERM CARE INSURANCE**." Includes 13 Sections. This New Mexico "Long-Term Care Insurance Law" appears to have **little or no application to Samaritan**. Sections include, e.g., "Preexisting Condition; Definition; Coverage," "Incontestability Period."[726]

(41)      "**ARTICLE 23B. MINIMUM HEALTHCARE … [REPEALED]**."

---

[722] NMSA 1978, §§59A-22-1 to 61.

[723] NMSA 1978, §§59A-22A-1 to 22A-7.

[724] NMSA 1978, §§59A-22B-1 to 22B-8.

[725] NMSA 1978, §§59A-23-1 to 23-31.

[726] NMSA 1978, §§59A-23A-1 to 23A-13. "[P]urpose [is] to … protect applicants … from **unfair or deceptive** sales or enrollment **practices**[.]" §59A-23A-2 (emphasis added).

(42)   "**ARTICLE 23C. SMALL GROUP RATE AND RENEWABILITY**." Includes 10 Sections (plus subsections). This New Mexico "Small Group Rate and Renewability Act" has **no application to Samaritan**.[727]

(43)   "**ARTICLE 23D. MEDICAL CARE SAVINGS ACCOUNTS**." Includes 7 Sections. This New Mexico "Medical Care Savings Account Act" has **no application to Samaritan**.[728]

(44)   "**ARTICLE 23E. HEALTH INSURANCE PORTABILITY**." Includes 20 Sections (4 repealed). This Nex Mexico "Health Insurance Portability Act" would **destroy Samaritan**. Sections include, e.g., "**Prohibiting Discrimination** Based on Health Status Against Individual Participants and Beneficiaries,"[729] "**Prohibiting Discrimination** Based on Health Status Against Individual Participants and Beneficiaries in **Premium** Contributions," "Health Insurance Issuers; **Guaranteed** Availability of Coverage; Exceptions for **Network** Plans; **Insufficient Financial Capacity**; Employer Contribution Rules," "**Guaranteed** Availability of Coverage," "Disclosure of Information by Health Insurance Issuers," "**Exclusions, Limitations and Exceptions** for Certain Group Health Plans and Insurance," "Treatment of Partners and Self-Employed Individuals," "Requirement for Mental Health Benefits," **Guaranteed** Renewability; **Exceptions**," "Certification of **Coverage** by Issuers in the Individual Market."[730]

(45)   "**ARTICLE 23F. NEW MEXICO HEALTH INSURANCE EXCHANGE**." Includes 12 Sections. This "New Mexico Health Insurance Exchange Act" has **little or no application to Samaritan**, though it creates key incentives for OSI **bias against HCSMs** in favor of its own regulated health care sector. Sections include, e.g., "Board of Directors; Powers," "Plan of Operation," "Board; Additional Duties and Powers," "Superintendent; Rulemaking," "Funding,"

---

[727] NMSA 1978, §§59A-23C-1 to 23C-10. This Article's "purpose [is to] prevent *abusive* rating *practices* [and] improve the efficiency and fairness[.]" §59A-23C-2 (emphasis added).

[728] NMSA 1978, §§59A-23D-1 to 23D-7.

[729] "[No] health insurance [can discriminate on] the following factors in relation to the individual or a dependent of the individual: … (I) *gender*; … (K) *sexual orientation*; *or any other* health status-related *factor that the superintendent specifies*[.]" §59A-23E-11 (emphasis added).

[730] NMSA 1978, §§59A-23E-1 to 23E-20.

"Standardized Health Plans," "Reporting," "Health Care Affordability Fund," "Health Care Affordability Plan; Rulemaking; Reporting Requirements."[731]

(46)      "**ARTICLE 23G. SHORT-TERM HEALTH PLAN/EXCEPTED BENEFIT**." Includes 12 Sections. This New Mexico "Short-Term Health Plan and Excepted Benefit Act" has **little or no application to Samaritan except** to suggest that it "**exists for purposes other than the business of insurance**."[732] Sections, e.g.: "Short-Term Plans; Excepted Benefits; Standards for Policy Provisions," "Benefits; Minimum Standards," "Rates; Medical Loss Ratios," "Exclusion Prohibition Not Applicable to Excepted Benefit Plans or Policies."[733]

(47)      "**ARTICLE 23H. EASY ENROLLMENT ACT**." Includes 6 Sections. This New Mexico "Easy Enrollment Act" has **little or no application to Samaritan**. Sections, e.g.: "Easy Enrollment Program; Establishment; Purpose," "Taxation and Revenue Department Duties; Taxpayer Consent," "Human Services Department Duties," "New Mexico Health Insurance Exchange Duties."[734]

(48)      "**ARTICLE 24. HEALTH INSURANCE FOR SENIORS [REPEALED]**."

(49)      "**ARTICLE 24A. MEDICARE SUPPLEMENTS**." Includes 16 Sections (2 repealed). This New Mexico "Medicare Supplement Act" has **little or no relevance to Samaritan**.[735]

(50)      "**ARTICLE 25. CREDIT LIFE AND CREDIT HEALTH INSURANCE**." Includes 14 Sections. This New Mexico "Law for Regulation of Credit Life Insurance & Credit Health Insurance" has **no relevance to Samaritan**.[736]

(51)      "**ARTICLE 26. CASUALTY INSURANCE CONTRACTS**." Includes 1

---

[731] NMSA 1978, §§59A-23F-1 to 23F-12.

[732] NMSA 1978, §59A-23G-2(A) ("'bona fide association' means an association that … exists for purposes other than the business of insurance").

[733] NMSA 1978, §§59A-23G-1 to 23G-12.

[734] NMSA 1978, §§59A-23H-1 to 23K-6.

[735] NMSA 1978, §§59A-24A-1 to 24A-16.

[736] NMSA 1978, §§59A-25-1 to 25-14. "***Nothing*** in this article is intended [to] ***discourage reasonable competition***." §59A-25-2 (emphasis added).

Section, and has **no relevance to Samaritan**.[737]

(52)     "**ARTICLE 27. MARINE AND TRANSPORTATION INSURANCE**." Includes 1 Section, and has **no relevance to Samaritan**.[738]

(53)     "**ARTICLE 28. MORTGAGE GUARANTY INSURANCE CONTRACTS**." Includes 1 Section, and has **no relevance to Samaritan**.[739]

(54)     "**ARTICLE 29. PROPERTY INSURANCE CONTRACTS; FAIR PLAN**." Includes 12 Sections (3 repealed). This New Mexico "'FAIR Plan Act' (fair access to insurance requirements)" has **no relevance to Samaritan**.[740]

(55)     **ARTICLE 30. TITLE INSURANCE**." Includes 15 Sections (plus subsections). This "New Mexico Title Insurance Law" has **no relevance to Samaritan**.[741]

(56)     "**ARTICLE 30A. TITLE INSURANCE GUARANTY**." Includes 18 Sections. This N.M. "Title Insurance Guaranty Act" has **no relevance to Samaritan**.[742]

(57)     "**ARTICLE 31. SURETY INSURANCE CONTRACTS**." Includes 1 Section and has **no relevance to Samaritan**.[743]

(58)     "**ARTICLE 32. MOTOR VEHICLE INSURANCE**." The 23 Sections of this N.M. "Motor Vehicle Assigned Risks Law" have **no relevance to Samaritan**.[744]

(59)     "**ARTICLE 32A. RENTAL CAR INSURANCE … PRODUCER LICENSE**." The 9 Sections of this New Mexico "Rental Car Insurance Limited Producer License Act" have **no relevance to Samaritan**.[745]

(60)     "**ARTICLE 33. WORKERS COMPENSATION INSURANCE CONTRACTS, ASSIGNED RISKS**." The 15 Sections (plus subsections) of

---

[737] NMSA 1978, §59A-26-1.

[738] NMSA 1978, §59A-28-1.

[739] NMSA 1978, §59A-28-1.

[740] NMSA 1978, §§59A-29-1 to 29-12.

[741] NMSA 1978, §§59A-30-1 to 30-15. "The purpose of [this] Law is to provide a comprehensive body of law for the effective regulation [of] title insurance [in] *accordance with the McCarran-Ferguson Act*[,] 15 U.S.C. §§1011-1015)." §59A-30-2 (emphasis added).

[742] NMSA 1978, §§59A-30A-1 to 30A-18.

[743] NMSA 1978, §59A-31-1.

[744] NMSA 1978, §§59A-32-1 to 32-23.

[745] NMSA 1978, §§59A-32A-1 to 32A-9.

New Mexico's "Workers' Compensation Assigned Risk Pool Law" have **no relevance to Samaritan**.[746]

(61) "**ARTICLE 34. DOMESTIC STOCK AND MUTUAL INSURERS**." These <u>46</u> Sections have **no relevance to Samaritan**.[747]

(62) "**ARTICLE 35. SALE OF INSURANCE SECURITIES**." The <u>18</u> Sections of this N.M. "Sale of Insurance Securities Law" have **no relevance to Samaritan**.[748]

(63) "**ARTICLE 36. INSIDER TRADING … OF DOMESTIC INSURER**." These <u>8</u> Sections have **no relevance to Samaritan**.[749]

(64) "**ARTICLE 37. INSURANCE HOLDING COMPANIES**." The <u>32</u> Sections of this NM "Insurance Holding Company Law" have **no relevance to Samaritan**.[750]

(65) "**ARTICLE 38. LLOYDS PLAN AUTOMOBILE INSURANCE**." These <u>14</u> Sections have **no relevance to Samaritan**.[751]

(66) "**ARTICLE 39. RECIPROCAL INSURERS**." These <u>26</u> Sections have **little or no relevance to Samaritan**.[752]

(67) "**ARTICLE 40. MEXICAN CASUALTY INSURERS**." These <u>9</u> Sections have **no relevance to Samaritan**.[753]

(68) "**ARTICLE 41. CONSERVATION, REHABILITATION, LIQUIDATION**." The <u>57</u> Sections (plus subsections), of this New Mexico "Insurers Conservation, Rehabilitation, and Liquidation Law" have **no proper relevance to Samaritan** and if they did, **would intrude profoundly on Samaritan's internal structure, governance, and management**. Sections, e.g.: "'Delinquency Proceeding' Defined," "'Impairment' Defined," "'Insolvency' Defined," "'Receiver' Defined," "Conduct of Delinquency Proceedings Against Domestic Insurers,"

---

[746] NMSA 1978, §§59A-33-1 to 33-15.

[747] NMSA 1978, §§59A-34-1 to 34-46.

[748] NMSA 1978, §§59A-35-1 to 35-18.

[749] NMSA 1978, §§59A-36-1 to 36-8.

[750] NMSA 1978, §§59A-37-1 to 37-32.

[751] NMSA 1978, §§59A-38-1 to 38-14.

[752] NMSA 1978, §§59A-39-1 to 39-26.

[753] NMSA 1978, §59A-40-1 (West)

"Conduct of Delinquency Proceedings Against Nondomestic Insurers," "Filing, Proving Claims of Nonresidents," "Filing, Proving Claims of Residents," "Attachment, Garnishment of Assets," "Requirements of Insurer in Hazardous Financial Condition," "Impoundment of Assets," "Grounds for Rehabilitation, Liquidation of Domestic Insurer," "Order of Rehabilitation; Termination," "Order of Liquidation; Rights, Liabilities," "Grounds for Conservation of Assets of Foreign Insurer," "Order of Conservation or Ancillary Liquidation of Foreign or Alien Insurer," "Commencement of a Delinquency Proceeding," "Sale, Disposition of Assets and Compromise of Certain Claims," "Time to File Claims," "Fraudulent Transfers Prior to Petition," "Fraudulent Transfer After Petition," "Voidable Preferences and Liens," "Liability for Participation in Fraudulent Transfer or Voidable Preference," "Claims of Holders of Void or Voidable Rights," "Priorities in Distribution," "Offsets," "Levy of Assessment; Domestic Mutual, Reciprocal Insurers," "Order for Payment of Assessment; Domestic Mutual, Reciprocal Insurers," "Assessment Order, Publication and Transmittal," "Judgment upon the Assessment," "Summary Proceedings; Superintendent," "Summary Proceedings; appeal from Superintendent," "Summary Proceedings; Enforcement; Penalty," "Summary Proceedings; Seizure Under Court Order," "Summary Proceedings; Seizure Under Superintendent," "Summary Proceedings; Conduct of Administrative and Judicial Hearings," Summary Proceedings; Penalty for Refusal to Deliver Property, Records."[754]

(69)   "**ARTICLE 42. LIFE & HEALTH INSURANCE GUARANTY ASS'N.**" These <u>17</u> Sections of the New Mexico ""Life and Health Insurance Guaranty Association Act" have <span style="color:red">**little or no relevance to Samaritan**</span>. Section, e.g.: "Coverage; Limitations," "Organization of Association; Participation," "Board of Directors," "Powers and Duties of the Association," "Assessments," "Plan of Operation," "Duties and Powers of the Superintendent," "Prevention of Insolvencies," "Appeals," "Miscellaneous Provisions," "Examination of Association; Annual Report," "Immunity," "Stay of Proceedings; Reopening

---

[754] NMSA 1978, §§59A-41-1 to 41-57.

Default Judgments," "Prohibited Advertisement; Notice to Policy Owners."[755]

(70)   "**ARTICLE 42A. PROVIDER SERVICE NETWORKS**." These 9 Sections of the New Mexico "Provider Service Network Act" have **little or no relevance to Samaritan**, which uses no such network. Sections, e.g.: "Provider Service Networks; Insurance Code Applicability," "Guaranty Association," "Plan of Operation," "Board; Powers, Duties," "Examination," "Assessments; Fund Created," "Notification to Pay Claims or Provide Services."[756]

(71)   "**ARTICLE 43. PROPERTY AND CASUALTY INSURANCE GUARANTY FUND**." These 18 Sections of the New Mexico "Property and Casualty Insurance Guaranty Law" have **no relevance to Samaritan**.[757]

(72)   "**ARTICLE 44. FRATERNAL BENEFIT SOCIETIES**." The 46 Section (2 repealed) of the Fraternal Benefit Societies Article ("FBS Article"), many or most of which are **secular**, are **highly relevant to Samaritan for comparison purposes to show how New Mexico discriminates against HCSMs like Samaritan**. Sections, e.g.: "Fraternal Benefit Societies," "Lodge System," "Representative Form of Government," "Purposes and Powers," "**Qualifications for Membership**," "Communications to Members; **Grievance Procedures**," "**NO Personal Liability**," "Waiver," "Amendments to Laws," "Institutions," "Consolidations and Mergers," "Conversion of Society into a Mutual Life Insurance Company," "Benefits," "**Benefits Not Attachable**," "The Benefit Contract," "Nonforfeiture Benefits; Cash Surrender Values; Certificate Loans and Other Options," "Investments," "Funds," "**Exemptions**," "Taxation," "Valuation," "Reports," "Certificates of Authority," "Examination of Societies; **NO Adverse Publications**," "Foreign or Alien Society," "Injunction; Liquidation; Receivership of Domestic Society," "Suspension, Revocation or Refusal of License of Foreign or Alien Society," "Injunction," "Licensing of Agents," "**Unfair Methods** of Competition and Unfair and **Deceptive Acts** and Practices," "Service of Process," "Fee Schedule," "Review," "Penalties,"

---

[755] NMSA 1978, §§59A-42-1 to 42-17.

[756] NMSA 1978, §§59A-42A-1 to 42A-9.

[757] NMSA 1978, §§59A-43-1 to 43-18.

"**Exemption of Certain Societies**," "Applicability of Insurance Code."[758]

(73)   "**ARTICLE 45. PREMIUM FINANCING**." These 16 Sections of the New Mexico "Insurance Premium Financing Law" have **little or no relevance to Samaritan**." Sections, e.g.: "Licensing Requirements," "Bonding Requirements for Licensees," "**Exemptions**,"[759] "Books and Records," "Form of **Premium** Finance Agreement," "Additional Requirements," "Assignee Subject to Defenses," "Delinquency Charges," "Cancellation of Insurance Contract upon Default," "**Exemption** from Any Filing Requirement," "Revocation and Suspension of Licenses," "**Cease and Desist Order from the Superintendent**," "Civil Penalties," "Other Code Provisions Applicable."[760]

(74)   "**ARTICLE 46. HEALTH MAINTENANCE ORGANIZATIONS**." These 71 Sections (2 repealed) (plus subsections) of the New Mexico "Health Maintenance Organization Law" have **little or no relevance to Samaritan**. This detailed HMO Article includes **most of the same Section titles listed above**.[761]

(75)   "**ARTICLE 47. NONPROFIT HEALTH CARE PLANS**." Includes 65 Sections (1 repealed) (plus subsections). This detailed Article includes **most of the same Section titles and provisions listed above**. It **has little or no relevance to Samaritan**, because it only governs entities "duly incorporated as a *health care plan*,"[762] it disqualifies §501(c)(3) entities like Samaritan from being a "health care plan,"[763] OSI does not rely on it,[764] and, despite some creative

---

[758] NMSA 1978, §§59A-44-1 to 44-46 (Fraternal Benefit Societies) ("*FBS Article*").

[759] "A. The provisions of this article shall not … apply to: (1) any life insurer …; (2) any national banking institution; (3) any state bank; (4) any savings and loan association; (5) any small loan company; or (6) any credit union. B. The licensing and bonding provisions of this article shall not apply to: (1) any insurer, other than those exempt from this article pursuant to Paragraph A(1); and (2) any insurance agent licensed by this state. C. This article shall not apply to the financing of insurance premiums in connection with a transaction under the Motor Vehicle Sales Finance Act, or under Sections 56-1-1 to 56-1-15[.]" §59A-45-5.

[760] NMSA 1978, §§59A-45-1 to 45-16.

[761] NMSA 1978, §§59A-46-1 to 46-71.

[762] NMSA 1978, §59A-47-5(A) (emphasis added).

[763] "'[H]health care plan' means an organization that demonstrates to the superintendent that it has been granted exemption [by the IRS under] 501(c)(3) of the [IRC]." §59A-47-3(J). But such

terminology, it still governs only "insurance."[765] Sections, e.g.: "**Reserves**," "Joint **Coverage**; **Reinsurance**," "**Coverage** Period," "**Premium** Rates," "Coverage for Service of Chiropractor," "Coverage for Service of Certified Nurse-Midwives and Registered Lay Midwives," "Doctor of Oriental Medicine Discrimination Prohibited," "Provider Discrimination Prohibited," "**Settlement of Disputes**," "**Licensed Insurance Producers,**" "Coverage for **Contraception**," "**Sexually Transmitted** Infection Care," "**Network** Adequacy," "**Exceptions**."[766]

(76)    "**ARTICLE 48. PREPAID DENTAL PLANS**." These <u>19</u> Sections (1 repealed) of the N.M. "Prepaid Dental Plan Law" have **no relevance to Samaritan**.[767]

(77)    "**ARTICLE 49. PREARRANGED FUNERAL PLANS**." These <u>8</u> Sections of the New Mexico "Prearranged Funeral Plan Regulatory Law" have **no relevance to Samaritan**.[768]

(78)    "**ARTICLE 50. MOTOR CLUBS**." These <u>21</u> Sections of the New Mexico ""Motor Club Law" have **no relevance to Samaritan**.[769]

(79)    "**ARTICLE 51. BAIL BONDSMEN LICENSING**." These <u>19</u> Sections (1 repealed) (plus 1 subsection) of the New Mexico "Bail Bondsmen Licensing Law" have **no relevance to Samaritan**.[770]

(80)    "**ARTICLE 52. STATE FIRE MARSHAL**." These <u>27</u> Sections (plus

---

status is ***prohibited*** by IRC §501(m) to any entity engaged in "commercial insurance."

[764] OSI relies exclusively on "health benefits plans" in §59A-16-21.2. OSI's 100-page Liberty Decision ruled that Liberty's "HCSMs fall within the New Mexico ***definition of insurance*** [as] ***health benefits plans*** as defined by Section ***59A-16-21.2***" Liberty Decision (Ex. 49) at 1-2 (emphasis added). This Decision cites 59A-16-21.2 eleven times and 59A-47 ***not at all***.

[765] This Nonprofit Health Care Plan Article uses "insurance," "insurer," "Insurance Code," and other insurance terminology throughout. Of course, if a "health care plan" was not intended to be "insurance," the Superintendent of *Insurance* would have no jurisdiction.

[766] NMSA 1978, §§59A-47-1 to 47-65.

[767] NMSA 1978, §§59A-48-1 to 48-19.

[768] NMSA 1978, §§59A-49-1 to 49-8.

[769] NMSA 1978, §§59A-50-1 to 50-21.

[770] NMSA 1978, §§59A-51-1 to 51-19.

subsections) have **no relevance to Samaritan**.[771]

(81)     "**ARTICLE 53. FIRE PROTECTION FUND**." These <u>19</u> Sections (1 repealed) (plus subsections) of the New Mexico "Fire Protection Fund Law" have **little or no relevance to Samaritan**.[772]

(82)     "**ARTICLE 54. MEDICAL INSURANCE POOL**." These <u>21</u> Sections (plus subsections) of the New Mexico "Medical Insurance Pool Act" have **little or no relevance to Samaritan**.[773]

(83)     "**ARTICLE 55. RISK RETENTION AND PURCHASING GROUPS**." These <u>26</u> Sections (1 repealed) of the New Mexico "Risk Retention and Purchasing Group Act" have **no relevance to Samaritan**.[774]

(84)     "**ARTICLE 56. HEALTH INSURANCE ALLIANCES [REPEALED]**."

(85)     "**ARTICLE 57. PATIENT PROTECTION**." These <u>11</u> Sections (plus 1 subsection) of the New Mexico "Patient Protection Act" have **no relevance to Samaritan**, as the Act governs only "managed care plans."[775]

(86)     "**ARTICLE 57A. SURPRISE BILLING PROTECTION**." These <u>13</u> Sections of the New Mexico "Surprise Billing Protection Act" should **have no relevance to Samaritan**, since it doesn't meet the definitions and other criteria. Sections, e.g.: "Emergency Care; Reimbursement; Limitation on Charges," "Non-Emergency Care; Limitation on Charges," "Credit Against Maximum Out-of-Pocket Cost-Sharing Amount; Communication by Hospitals; Advance

---

[771] NMSA 1978, §§59A-52-1 to 52-27.1.

[772] NMSA 1978, §§59A-53-1 to 53-19.

[773] NMSA 1978, §§59A-54-1 to 54-21. "The purpose of the Medical Insurance Pool Act is to provide access to health insurance coverage to all residents of New Mexico who are denied adequate health insurance and are considered uninsurable." §59A-54-2.

[774] NMSA 1978, §§59A-55-1 to 55-26. "The purpose of the Risk Retention and Purchasing Group Act is to regulate the formation and operation of risk retention groups and purchasing groups in New Mexico formed pursuant to the provisions of the federal Liability Risk Retention Act of 1986 to the extent permitted by that act." §59A-55-2.

[775] NMSA 1978, §§59A-57-1 to 57-11. "The purpose of the Patient Protection Act is to regulate aspects of health insurance by specifying patient and provider rights and confirming and clarifying the authority of [OSI] to adopt regulations to provide protections to persons enrolled in managed health care plans. The insurance protections should ensure that managed health care plans treat patients fairly and arrange for the delivery of good quality services." §59A-57-2.

Notification of Charges," "Covered Persons; Providers; Overpayment," "Nonparticipating Providers; Rebates and Inducements; Prohibition," "Provider Reimbursement Rates; Surprise Billing," "Reasonable Health Cost Management Permitted," "**Private Cause of Action**," "Information from Provider **Networks**," "Applicability," "Providers; Reimbursement for a Surprise Bill."[776]

(87)  "**ARTICLE 58. SERVICE CONTRACT REGULATION**." These <u>18</u> Sections of the "Service Contract Regulation Act" have **no relevance to Samaritan**[777]

(88)  "**ARTICLE 59. PRESCRIPTION DRUG UNIFORM INFO[] CARD**." These <u>4</u> Sections of the New Mexico "Prescription Drug Uniform Information Card Act" **should have no relevance to Samaritan**.[778]

(89)  "**ARTICLE 60. PORTABLE ELECTRONICS INSURANCE**." These <u>7</u> Sections of the New Mexico "Portable Electronics Insurance Act" have **no relevance to Samaritan**.[779]

(90)  "**ARTICLE 61. PHARMACY BENEFITS MANAGER REGULATION**." These <u>9</u> Sections of the New Mexico "Pharmacy Benefits Manager Regulation Act" **should have no relevance to Samaritan**.[780]

(91)  "**ARTICLE 62. SELF—SERVICE STORAGE INSURANCE LICENSE**." These <u>11</u> Sections of the New Mexico "Self-Service Storage Insurance License Act" have **no relevance to Samaritan**.[781]

---

[776] NMSA 1978, §§59A-57A-1 to 57A-13.

[777] NMSA 1978, §§59A-58-1 to 58-18. "M. "'[S]ervice contract' means a contract pursuant to which a provider [is] obligated for a specified period [to] repair, replace or perform maintenance on, or indemnify or reimburse the holder for the costs [thereof], property that is described in the service contract and that has an operational or structural failure as a result of a defect in materials, workmanship or normal wear and tear[.]" §59A-58-2(M).

[778] NMSA 1978, §§59A-59-1 to 59-4. "It is the intent of the legislature to improve care for patients by enacting the Prescription Drug Uniform Information Card Act to minimize confusion, eliminate unnecessary paperwork, decrease administrative burdens and streamline dispensing of prescription products paid for by third party payors." §59A-59-2.

[779] NMSA 1978, §§59A-60-1 to 60-7. "'[P]ortable electronics insurance' means insurance providing coverage for the repair or replacement of portable electronics[.]" §59A-60-2(E).

[780] NMSA 1978, §§59A-61-1 to 61-9.

[781] NMSA 1978, §§59A-62-1 to 62-11. "'[S]elf-service storage insurance' means personal or

1162.   These 91 Articles of the Insurance Code do not even include the other New Mexico statutes, regulations, and court decisions that interact with or implement the Code.

1163.   These 91 Articles would be enough to bury Samaritan's ministry many times over. Just one of these, Article 22, by itself, would doom Samaritan.

1164.   Article 22 ("Health Insurance Contract") is 61 Sections and 19 Subsections of "coverage" mandates[782] that would replace Samaritan's Sharing Guidelines that implement the seven pages of "Doctrinal Positions" that constitute one-third of its Bylaws. ¶1161(36).

1165.   These Article 22 mandates also would coerce Samaritan's support for views that may contradict its Biblical views of life, family, and sexuality. Examples include mandates regarding care for "sexually transmitted infections" without consideration of "the gender identity of the insured";[783] "Coverage of vasectomy and male condoms";[784] contraception coverage;[785] defining "child" for purposes of one coverage as "newly born";[786] coverage for children who are "born out of wedlock" or do not "reside with the parent," and only "from birth through three years of age";[787] "medically necessary" vaccinations;[788] "shall provide coverage for circumcision for newborn males";[789] and "shall provide coverage for the human papillomavirus vaccine."[790]

---

commercial property insurance offered to an occupant in connection with and incidental to the rental of storage space at a self-service storage facility[.]" §59A-62-2(F).

[782] NMSA 1978, §§59A-22-1 to 61.

[783] NMSA 1978, §59A-22-60(B); *accord* §59A-23-21(B) ("gender identity"); §59A-46-60 (same); §59A-47-55 (same).

[784] NMSA 1978, §59A-22-55.

[785] NMSA 1978, §59A-22-42 (its limited religious exemption cannot satisfy judicial precedent).

[786] NMSA 1978, §59A-22-34(B).

[787] NMSA 1978, §59A-22-34.2(A).

[788] NMSA 1978, §59A-22-34.3(A).

[789] NMSA 1978, §59A-22-34.4.

[790] NMSA 1978, §59A-22-40.1.

1166.   That last item alone is a thorn. "One of the main controversies surrounding the cervical cancer vaccine is the issue of pediatric decision-making…. In many states, reproductive care is considered confidential for adolescents and does not require parental consent. Since HPV is sexually transmitted, questions arise as to whether this may cause children to engage in high-risk sexual activity since there is a perceived protection from some of the ramifications."[791]

1167.   Moreover, under Article 23E, no "health insurance issuer [shall] establish rules … based on any of the following factors in relation to the individual or a dependent of the individual: … (I) gender; … (K) sexual orientation; or any other health status-related factor that the superintendent specifies in rules of the office of superintendent of insurance."[792]

1168.   The problem is not just with recent social or so-called "culture war" issues. The Insurance Code's primary antidiscrimination provision forbids discrimination on the basis of "religion,"[793] an obvious and praiseworthy effort to ***protect*** religious liberty.

1169.   No doubt all these antidiscrimination mandates are well intentioned. Nevertheless, they ***discriminate*** against the deeply held religious convictions of Samaritan and its members.

1170.   "In the name of protecting religious liberty, [OSI] would have us suppress it."[794] "[OSI] cannot—and does not—advance its interest in non-discrimination by discriminating."[795]

1171.   "There would, moreover, be pervasive monitoring to determine whether the

---

[791] Available at https://med.nyu.edu/departments-institutes/population-health/divisions-sections-centers/medical-ethics/education/high-school-bioethics-project/learning-scenarios/ethics-the-hpv-vaccine (accessed 11/13/2023).

[792] NMSA 1978, §59A-23E-11.

[793] NMSA 1978, §59A-16-12 ("Discrimination in insurance").

[794] *Kennedy*, 142 S.Ct. at 2431.

[795] *FCA Panel*, 46 F.4th at 1099.

church or church-associated entity was complying with" the Insurance Code.[796]

1172.   One need only imagine that just-described regulatory morass being allowed to swallow a local Christian church or Jewish synagogue. It would be so intrusive as to be comical.

1173.   That is what Defendant would do to Samaritan here. Samaritan is a religious institution like a church, especially to the ten individual Plaintiffs, who have so sworn.

1174.   The religious autonomy doctrine of *Our Lady (2020)* and *Hosanna (2012)*, borne of both Religion Clauses, "bars" such "unlawful" "intrusion."[797]

1175.   The Establishment Clause alone bars it. Even long before *Our Lady (2020)*, and even *Hosanna (2012)*, the Tenth Circuit rejected balancing and "flatly" prohibited such intrusive state action. "***Establishment Clause violations*** [are] usually ***flatly forbidden*** without reference to the strength of governmental purposes."[798] Subjecting Samaritan to the requirements of the Code, under OSI's discretionary authority, would override the internal, Biblical governance (polity), membership, and sharing requirements of Samaritan and its members. That is "***flatly forbidden***."

1176.   The Free Exercise Clause alone also bars it. The very attempt to foist those 91 Articles, and all the associated laws and mandates, on an HCSM like Samaritan would violate strict neutrality and general applicability coming and going, all subject to strict scrutiny. It also would leave little doubt about motive. Animus is illegitimate, odious, and flatly barred.

1177.   Such religious discrimination is also barred by the Establishment Clause, Free Speech Clause, and Equal Protection Clause.

1178.   Defendant's expected action against Samaritan is "flatly forbidden without reference to" strict scrutiny, and Samaritan is entitled to the relief it seeks.

---

[796] *Medina*, 877 F.3d at 1233 (10th Cir.) (emphasis added).

[797] *Our Lady*, 140 S.Ct. at 2060 (quoting *Hosanna*, 565 U.S. at 186).

[798] *Colo. Christian*, 534 F.3d at 1266 (McConnell, J.) (emphasis added).

## Free Exercise of Religion: Protected by Strict Scrutiny

1179.   These freedoms are precious. Protecting them requires the very best of judicial expertise—present in most federal judges and not multi-hatted insurance regulators.[799]

1180.   Some repetition is inevitable here but also necessary to frame the delicacy and significance of the legal issues and the need for urgent, expert, federal judicial review and relief.

1181.   Defendant's attempt to close the doors of all HCSMs in New Mexico and orphan their New Mexico members is an even greater violation of free religious exercise than state actions recently condemned by the United States Supreme Court during the pandemic.[800]

1182.   The reason is that Defendant's closure of HCSMs would impose *permanent* restrictions on religious freedoms, and for reasons far less substantial than the worst pandemic in one hundred years. In 2020, the Supreme Court entered an emergency injunction against temporary COVID restrictions on houses of worship, due to likely violations of the Free Exercise Clause. In so doing, the Supreme Court was unequivocal. "There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"[801]

1183.   That's why "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."[802]

1184.   The First Amendment bars state action based "on hostility to a religion or

---

[799] *See Smith*, 494 U.S. 872; *Lukumi*, 508 U.S. 520; *Masterpiece*, 138 S.Ct. 1719; *Cuomo*, 141 S.Ct. 63; *Tandon*, 141 S.Ct. 1294; *Fulton*, 141 S.Ct. 1868; *Kennedy*, 142 S.Ct. 2407.

[800] *See Cuomo*, 141 S.Ct. 63 and *Tandon*, 141 S.Ct. 1294.

[801] *Cuomo*, 141 S.Ct. at 67.

[802] *Tandon*, 141 S.Ct. at 1296 (emphasis in original) (citing *Cuomo*, 141 S.Ct. 63).

religious viewpoint."[803] State actions are not "neutral [when] they single out houses of worship for especially harsh treatment."[804] Even benign discrimination is subject to strict scrutiny.

1185.   Based on all evidence discussed herein, Defendant has treated at least some secular groups as beyond OSI authority—either as non-insurance or as exempt from that inquiry.

1186.   OSI has violated the Free Exercise Clause, and the rights of Samaritan and its members guaranteed thereunder, by (a) basing its action "on hostility to a religion or religious viewpoint,"[805] (b) "singl[ing] out" HCSMs for "especially harsh treatment,"[806] (c) treating "*any* comparable secular activity more favorably than religious exercise,"[807] and (d) lacking any "compelling reason why it has a particular interest in denying an exception to [HCSMs] while making them available to others."[808] Simply put, "so long as [OSI] can achieve its interests in a manner that does not burden religion, it must do so."[809]

1187.   "The failure to meet any one of these [is subject to] strict scrutiny."[810]

1188.   As for the fraternal exemption and many other individualized exemptions from the Insurance Code, ¶¶1058-1082, the reason for strict scrutiny "is obvious: if [OSI] can easily grant an exemption, then the law stops being applied neutrally or generally."[811]

1189.   This would be true even of exemptions that may not appear "individualized" or "discretionary," such as those in Title VII. *See* 42 U.S.C §2000e(b) (15-employee threshold);

---

[803] *Masterpiece*, 138 S.Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 540).

[804] *Cuomo*, 141 S.Ct. at 66.

[805] *Masterpiece*, 138 S.Ct. at 1731.

[806] *Cuomo*, 141 S.Ct. at 66.

[807] *Tandon*, 141 S.Ct. at 1296.

[808] *Fulton*, 141 S.Ct. at 1882.

[809] *Fulton*, 141 S.Ct. at 1881.

[810] *FCA En Banc*, 82 F.4th at 686 (citing *Fulton*, *Tandon*, *Masterpiece*, *Lukumi*, & *Smith*).

[811] *FCA Panel*, 46 F.4th at 1093 (applying *Tandon* and *Fulton*).

§2000e-2(f) (Communist affiliation); §2000e-2(i) (Indian Heritage). "Title VII is not a generally applicable statute due to the **existence** of [these] **individualized exemptions**[.]"[812]

1190.   While unfettered discretion is not required to show a violation,[813] the breadth of Defendant's discretion in applying the Insurance Code is breathtaking: OSI waited about twenty-five years before suddenly deciding to subject HCSMs to the Code.

1191.   Defendant violated the free-exercise rights of Samaritan and its members by intentionally treating them differently from secular entities. It is "merely the intent to treat differently"[814] that constitutes non-neutrality, i.e., discrimination. Whether Defendant was motivated by animus is immaterial.[815] It makes no difference if "faith-based bigotry did not motivate [OSI's treatment of Samaritan]. The constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[816] Under binding Tenth Circuit precedent, the "mere[] intent to treat differently" is what triggers strict scrutiny.[817]

## Free Speech, Assembly, Expressive Association: Protected by Strict Scrutiny

1192.   For different but analogous reasons, Defendant's policy to impose the Code on Samaritan violates the Free Speech and Assembly Clauses of the First Amendment, and the expressive and associational rights of Samaritan and its members guaranteed thereunder.

## Content and Viewpoint Discrimination

1193.   Defendant's enforcement policy and action here amount to non-neutral content

---

[812] *Bear Creek Bible Church & Braidwood Mgt. v. EEOC*, 571 F.Supp.3d 571, 613 (N.D.Tex. 2021), *aff'd on other grounds*, 70 F.4th 914 (5th Cir. 2023) ("*Bear Creek*").

[813] *See, e.g.*, *FCA En Banc*, 82 F.4th at 687 (rejecting such an "overly narrow" view of *Fulton*).

[814] *Colo. Christian*, 534 F.3d at 1260.

[815] *Colo. Christian*, 534 F.3d at 1260 n.7.

[816] *Neace*, 958 F.3d at 415 (quoting *Colo. Christian*, 534 F.3d at 1260).

[817] *Colo. Christian*, 534 F.3d at 1260 (McConnell, J.).

and viewpoint restrictions on Samaritan's and its members' Free Speech rights.[818]

1194.   Under the Free Speech Clause, state action must be "neutral toward religion" <u>both</u> as to content (subject matter) <u>and</u> particular viewpoint (on a subject matter).[819] "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination."[820] "Government discrimination among viewpoints [is] a 'more blatant' and 'egregious form of content discrimination.' But it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'"[821]

### Compelled Speech and Compelled Silence

1195.   Defendant's policy, as applied to Samaritan and its members, will silence, or at least suppress, their religious expression and expressive religious activities borne of particular Christian doctrine, which conflicts with OSI's economic, health, and social policy views. Compelled speech or compelled silence both are anathema to the First Amendment.[822]

1196.   Applying the antidiscrimination mandate of the Insurance Code to Samaritan would compel Samaritan and its members to take or support actions or views, e.g., on issues of life and sexuality, contrary to their own views. It would compel Samaritan and its members to affirm certain views and to refrain from affirming (or remaining silent on) other views.

1197.   In *303 Creative*, the Supreme Court recently upheld the preenforcement action of

---

[818] *See, e.g.*, *Shurtleff v. City of Boston*, 596 U.S. 243, 142 S.Ct. 1583 (2022) ("**Shurtleff**").

[819] *Rosenberger*, 515 U.S. at 839-40.

[820] *Rosenberger*, 515 U.S. at 829 (citation omitted). "The First Amendment prohibits viewpoint discrimination[.]" *Frederick Douglass Found. v. D.C.*, 82 F.4th 1122, 1144 (D.C. Cir. 2023).

[821] *Reed*, 576 U.S. at 168-69 (quoting *Rosenberger*, 515 U.S. at 829; *Con. Ed.*, 447 U.S. at 537).

[822] *See, e.g.*, *303 Creative*, 600 U.S. 570, 143 S.Ct. 2298.

Christian web designer Lorie Smith, who "worrie[d] that, if she enters the wedding website business, the State will force her to convey messages inconsistent with her belief that marriage should be reserved to unions between one man and one woman."[823]

1198.    "[T]he government may not compel a person to speak *its own preferred messages*."[824] "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to *remain silent* or to force an individual to *include other ideas* with his own speech that he would *prefer not to include*. All that offends the First Amendment just the same."[825] "No government may affect a 'speaker's message' by 'forcing' her to 'accommodate' other views; no government may 'alter' the 'expressive content' of her message; and no government may 'interfere with' her 'desired message.'"[826]

1199.    Nor may the government "deny speakers the right 'to *choose the content* of their *own messages*.'"[827] Nor may it "*conscript*[ a speaker] to *disseminate the government's preferred messages*."[828] "[A]pproving a government's effort to 'eliminate' disfavored 'ideas' [is] emblematic of an unfortunate tendency by some to defend First Amendment values only when they find the speaker's message sympathetic. But 'if liberty means anything at all, it means the right to tell people what they do not want to hear.'"[829] "When a state ... *law and the Constitution collide*, there can be *no question which must prevail*."[830]

---

[823] *303 Creative*, 600 U.S. at 580.

[824] *303 Creative*, 600 U.S. at 586 (emphasis added).

[825] *303 Creative*, 600 U.S. at 586–87 (emphasis added).

[826] *303 Creative*, 600 U.S. at 596 (cleaned up).

[827] *303 Creative*, 600 U.S. at 592 (cleaned up; emphasis added).

[828] *303 Creative*, 600 U.S. at 592 (emphasis added).

[829] *303 Creative*, 600 U.S. at 602) (cleaned up).

[830] *303 Creative*, 600 U.S. at 592 (emphasis added).

1200.    Just like the Christian web designer in *303 Creative*, Samaritan "faces a ***credible threat of sanctions unless [it] conforms [its] views to the State's***."[831]

1201.    "In the past, other States in *Barnette*, *Hurley*, and *Dale* have similarly tested the First Amendment's boundaries by seeking to compel speech they thought vital at the time. But, as this Court has long held, the opportunity to think for ourselves and to express those thoughts freely is among our most cherished liberties and part of what keeps our Republic strong…. The First Amendment envisions the United States as a rich and complex place where all persons are free to think and speak as they wish, not as the government demands. Because Colorado seeks to deny that promise, the judgment is ***Reversed***."[832]

1202.    Even before *303 Creative*, the Ninth Circuit held that a state cannot force speakers to accommodate the views of others by forcing them to promote views on sexuality contrary to their beliefs. "Green seeks to use the power of the state to force Miss [USA] to express a message contrary to what it desires to express. The First Amendment says no."[833]

## Association, Solicitation, and Expressive Association

1203.    Defendant also threatens to destroy the "associational" and "expressive association" rights of Samaritan and its members, guaranteed by the First Amendment.

1204.    The Supreme "Court has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'"[834]

---

[831] *303 Creative*, 600 U.S. at 597 (emphasis added).

[832] *303 Creative*, 600 U.S. at 603.

[833] *Green v. Miss USA*, 52 F.4th 773, 803 (9th Cir. 2022).

[834] *Americans for Prosperity Found. v. Bonta*, 141 S.Ct. 2373, 2382 (2021) ("***Bonta***") (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("***Roberts***" or "***Jaycees***")). *Accord Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ("***Hurley***"); *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ("***Boy Scouts***" or "***Dale***").

1205.   This freedom to associate prohibits "intrusion into the internal structure or affairs of an association,"[835] and "plainly presupposes a freedom not to associate."[836]

1206.   Courts defer to a group's explanation of the "nature of its expression [and its] view of what would impair its expression."[837]

1207.   This freedom "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[838]

1208.   "[T]here is [no] doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity [such as] the right 'to engage in association for the advancement of beliefs and ideas.'"[839] That is precisely the sort of "orderly group activity" and "association for the advancement of beliefs and ideas" in which Samaritan and its membership engage.

1209.   Such activity by Samaritan represents precisely the "modes of expression and association protected by the [U.S. Constitution] which [New Mexico] may not prohibit, under its power to regulate the [insurance] profession, as improper solicitation of [insurance] business."[840]

1210.   Surely, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights."[841]

---

[835] *Roberts*, 468 U.S. at 623.

[836] *Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623).

[837] *Dale*, 530 U.S. at 653.

[838] *Hosanna*, 565 U.S. at 200 (Alito & Kagan, JJ., concurring) ("**Alito/Kagan**").

[839] *NAACP v. Button*, 371 U.S. 415, 430 (1963) ("***Button***").

[840] *Button*, 371 U.S. at 428-29. "We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business[.]" *Id*.

[841] *Button*, 371 U.S. at 439.

1211.   Nor may a State "foreclose the exercise of constitutional rights by mere labels."[842]

1212.   Essentially, that is exactly what Defendant has done to Samaritan: OSI has mislabeled Samaritan's unique Christian sharing model as "insurance."

1213.   Nor may a State infringe on First Amendment rights of charitable organizations, especially religious ministries, to engage in solicitation of financial and spiritual contributions.[843]

1214.   Samaritan's various expressive religious activities and associational purposes are implemented as described above, ¶¶583-608 & 402-488, and in the attached Declarations.

1215.   A key vehicle for Samaritan's ministry to conduct religious expressive association is its Newsletter: its monthly communication and solicitation to its members for exhortation, prayer, notes, and gifts to and for their fellow members in need. ¶¶583-608.

1216.   Samaritan uses its monthly newsletter to seek, serve, and solicit its community of Christians to share directly in one another's spiritual, emotional, and financial needs arising from illness and injury. The transmission of this newsletter each month to each member household communicates and solicits in a variety of ways, including the following examples.

1217.   **First**, this monthly communication includes a monthly "share slip," which has several aims. (1) It solicits from each member three kinds of financial gifts, contributing: (a) the member's monthly "share" directly to a member in need; (b) any amount to a "Special Prayer Need" by sending the gift directly to one or more named members who had medical needs that were ineligible for sharing; and (c) any donation to Samaritan itself to meet special needs, including "Special Prayer Needs" and member needs that were only partially shared in the past because needs for the month were greater than the monthly shares available. (2) It describes the

---

[842] *Button*, 371 U.S. at 429.

[843] *Bonta*, 141 S.Ct. at 2382-89 (analyzing cases before invalidating state regulations that limited certain rights of charitable entities soliciting funds in California).

physical challenge of the person in need and solicits prayers, exhortations, and notes of encouragement for that member. ¶¶553-556, 583-608.

1218.   **Second**, this monthly communication includes a detailed Prayer Guide to transmit members prayer requests. To accommodate the volume of prayer requests, Samaritan creates and distributes up to 48 versions of each monthly Prayer Guide. *Id.*

1219.   **Third**, this monthly communication includes a unique 16-page newsletter, with articles (a) sharing Samaritan's religious views on various topics of mutual interest to members, (b) spotlighting various members' religious ministries, and (c) imparting information on health care issues. ¶¶583-608; *see also* Nov. 2022 Newsletter (Ex. 3).

1220.   All this expressive religious activity is to carry out the Biblical command of Galatians 6:2—"Bear one another's burdens and so fulfill the law of Christ"—and related Foundational Principles of Samaritan, as explained in detailed above. ¶¶402-488, 583-608.

## Equal Protection: Protected by Strict Scrutiny

1221.   For separate but similar reasons, Defendant is violating the Equal Protection Clause of the Fourteenth Amendment, and the rights of Samaritan and its members guaranteed thereunder, by violating antidiscrimination principles. The same "intent to treat differently" that violates the *First* Amendment violates the *Fourteenth*, and likewise is ***flatly forbidden***.

1222.   In any case, such discriminatory treatment is subject to strict scrutiny because it either harms a "suspect class" or burdens a "fundamental right." Defendant is doing both.

1223.   "Unquestionably, the free exercise of religion is a fundamental constitutional right."[844] That alone triggers strict scrutiny under the Equal Protection Clause. In addition:

---

[844] *Jesus Christ Is the Answer*, 915 F.3d at 265 (quoting Supreme Court precedent).

1224.   "Religion is a suspect class."[845] So, differential treatment due to "religious beliefs and practices would result in classifying them based on membership in a suspect class, and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[846]

1225.   Defendant may attempt to satisfy strict scrutiny (a very tall order) only if OSI's actions were free from animus. But if motivated by animus, such actions are flagrantly unconstitutional and flatly prohibited.

<span style="background-color:cyan">**Samaritan's Expressive Religious Activities: Protected Many Times Over**</span>

1226.   To protect against such meddling or even hijacking of a religious group's internal affairs, the First Amendment offers extra protection.

1227.   Samaritan and its members are entitled not just to "special solicitude,"[847] but to "double protection for religious expression,"[848] since Samaritan's ministry is expressive religious activity "doubly protected by the Free Exercise and Free Speech Clauses."[849]

1228.   "That the First Amendment doubly protects religious speech is no accident. It is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent."[850] That's why "the Free Exercise and Free Speech Clauses … work in tandem. Where the Free Exercise Clause protects religious exercises, whether communicative or not, the Free Speech Clause provides overlapping protection for expressive religious activities."[851]

1229.   This "double protection" is more like *quintuple protection* here.

---

[845] *Al Saud*, 50 F.4th at 710 (citing *Dukes*, 427 U.S at 303).

[846] *Al Saud*, 50 F.4th at 710.

[847] *Hosanna*, 565 U.S. at 189 (unanimous).

[848] *Kennedy*, 142 S.Ct. at 2431.

[849] *Kennedy*, 142 S.Ct. at 2433.

[850] *Kennedy*, 142 S.Ct. at 2421.

[851] *Kennedy*, 142 S.Ct. at 2421.

1230.   In addition to the double protection above, the First Amendment separately protects the "right to associate with others" for the purpose of engaging in First Amendment activity,[852] and this right "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[853]

1231.   In addition, this freedom to associate also prohibits "intrusion into the internal structure or affairs of an association,"[854] particularly a religious association, which enjoys "special solicitude"[855] and overlapping protections for its religious "autonomy."[856]

1232.   In addition, the "First Amendment protects [the] right to solicit charitable contributions."[857] "[C]haritable appeals for funds … involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment."[858]

1233.   In addition, the Fourteenth Amendment (like the First) separately protects religious groups from discrimination and other violations of neutrality.[859]

1234.   Even *quintuple protection* fails to express the math. The constitutional protection here exists "sixteen times over" for each of the sixteen Causes of Action of this Complaint.

### **Defendant's Policy Fails Strict Scrutiny**

1235.   "Under the Free Exercise Clause, a government entity **normally** must satisfy **at**

---

[852] *Bonta*, 141 S.Ct. at 2382 (quoting *Roberts*, 468 U.S. at 622).

[853] *Hosanna*, 565 U.S. at 200 (Alito/Kagan).

[854] *Roberts*, 468 U.S. at 623.

[855] *Hosanna*, 565 U.S. at 189 (2012) (unanimous).

[856] *Our Lady*, 140 S.Ct. at 2060.

[857] *Bonta*, 141 S.Ct. at 2389.

[858] *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980).

[859] ¶¶1221-1225, 1195-1220, 1600-1644.

least '**strict scrutiny**'[,]"[860] the default test for most rights asserted in this case. ¶¶984-1011.

1236.   "[I]t is still true that '[t]he essence of all that has been said and written on the subject is that only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion.'"[861] Thus, the state must justify any "inroad on religious liberty by *showing that it is the least restrictive means of achieving some compelling state interest*."[862] This two-part balancing test "is the *most demanding test known to constitutional law*."[863]

1237.   The first prong of this two-part strict scrutiny test requires that OSI's interest be not only compelling in general but "compelling in context," because "context matters" when applying the "compelling ... interest standard."[864]

1238.   Moreover, "[t]he government cannot discharge this burden by pointing to 'broadly formulated interests.'"[865] "*Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants.*"[866] "That standard 'is not watered down'; it '*really means what it says*.'"[867] Put another way, *so long as the government* can achieve its interests in a manner *that does not burden religion*, it *must do so*."[868]

1239.   Defendant has no interest of the highest order in forbidding Samaritan's religious community from associating together as a HCSM—twice recognized by the U.S. Government

---

[860] *Kennedy*, 142 S.Ct. at 2426 (citing *Lukumi*, 508 U.S. at 533 n.1) (emphasis added).

[861] *Thomas*, 450 U.S. at 718 (quoting *Yoder*, 406 U.S. at 215).

[862] *Thomas*, 450 U.S. at 718.

[863] *Flores*, 521 U.S. at 534.

[864] *Cutter*, 544 U.S. at 723 (2005); *accord O Centro*, 546 U.S. at 431.

[865] *Ramirez*, 595 U.S. at 427 (quoting *Hobby Lobby*, 573 U.S. at 726-27).

[866] *Fulton*, 141 S.Ct. at 1881 (citations and internal punctuation omitted; emphasis added).

[867] *Tandon*, 141 S.Ct. at 1298 (quoting *Lukumi*, 508 U.S. at 546) (emphasis added).

[868] *Fulton*, 141 S.Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546) (emphasis added).

(first as a tax-exempt religious charity and then a HCSM) and recognized by 49 states and D.C. (either as non-insurance or as exempt)—for the purpose of voluntarily sharing medical expenses among its members in accordance with its religious beliefs. This is so for the following reasons.

1240. **First**, Defendant is seeking to regulate as insurance a religious community relationship that falls outside the McCarran-Ferguson zone of federal delegation (or preservation) of insurance regulation to the states. ¶¶160-169, 686-707, 1680-1730.

1241. **Second**, Defendant is interfering in the federal sphere of HCSMs recognized by Congress by forbidding their operation in New Mexico. ¶¶151-159, 944-983, 1680-1730.

1242. **Third**, Defendant has departed from all accepted insurance law. ¶¶686-707.

1243. **Fourth**, Defendant has departed—without explanation or reason (other than animus and/or protectionism)—from OSI's own long-established practice of acquiescing in the non-insurance status of HCSMs like Samaritan. ¶¶708-742.

1244. **Fifth**, Defendant has departed from all accepted practice. Fifty jurisdictions—49 states plus D.C.—allow Samaritan to operate free from insurance regulation. This result is produced explicitly in 33 jurisdictions: by safe-harbor statute (31), legal decision (1), and HCSM-reporting statute (1). It is produced implicitly in seven jurisdictions via exemption from insurance mandates for their resident HCSM members and college students. It is produced implicitly in the remaining jurisdictions (12) through acquiescence. ¶¶667-685.

1245. **Sixth**, Defendant allows certain fraternal societies to sell actual risk-shifting, legally-indemnifying health *insurance* totally free of Code. The State's interest in protecting consumers from "unsafe and unsound insurance companies" applies at least as much to fraternals as to HCSMs like Samaritan. That interest is not diminished simply because the primary purpose of some fraternals is something other than selling health insurance. ¶¶1058-1082.

1246.   **Seventh**, Defendant has no impetus (other than animus/protectionism) to seek to regulate a religious ministry that has not incurred a single consumer complaint filed with anyone anywhere in the ministry's nearly 30 years of nationwide operations. ¶¶204-246, 840-856.

1247.   "After [Samaritan] demonstrates [a] burden on its religious liberty, [OSI] must establish that its ***interpretation of [insurance]*** advances a 'compelling government interest' and that its interpretation is the 'least restrictive means of furthering that compelling governmental interest.' That is 'the most demanding test known to constitutional law.'"[869]

1248.   Defendant fails both prongs of strict scrutiny.

1249.   **First Prong**. Defendant fails the first prong for at least two reasons. (a) OSI's general, abstract, or broadly formulated interest in regulating insurance is insufficiently compelling as a matter of law.[870] (b) OSI's interest in regulating *Samaritan* is not even *rational*, much less compelling, *in this context*, with Samaritan having never incurred a consumer complaint anywhere ever and with every other jurisdiction relying on other regulators like the IRS or the state AG to regulate HCSMs the same way they regulate any religious nonprofit.

1250.   **Second Prong**. Defendant's interest in regulating Samaritan is addressable by less restrictive means than destroying its ministry or imposing on it the chains of the Insurance Code. That every other jurisdiction has seen fit to free Samaritan from insurance regulation is proof of less restrictive means. All those jurisdictions rely on legal actions by their own AGs (and private litigators), and by the IRS and FTC, for fraud, deceptive trade practice, abuse of charitable status, etc., regulate HCSMs. OSI obviously can do, and actually did do, the same. That OSI allowed Samaritan to operate freely for decades without harm to New Mexicans is proof positive.

---

[869] *Braidwood*, 70 F.4th at 939 (quoting *Flores*, 521 U.S. at 534) (emphasis added).

[870] *Braidwood*, 70 F.4th at 939; *Fulton*, 141 S.Ct. at 1881.

## Defendant's Insurance Test Is Preempted by the ACA

1251.   "Put simply, federal law preempts contrary state law. [A]mong the three types of preemption, the one relevant here is called *conflict preemption*. In that species[,] a state-law provision will be preempted if it conflicts with federal law, either because (1) *compliance with both* federal and state regulations is a *physical impossibility*, <u>or</u> because the provision (2) *stands as an obstacle* to the accomplishment and execution of the full *purposes and objectives* of federal law."[871] And preemption challenges are proper in this preenforcement context.[872]

1252.   Defendant's policy of applying the Insurance Code to HCSMs like Samaritan is "conflict preempted" on both grounds: (1) impossibility and (2) obstacle.

1253.   The ACA provides HCSM members with an exemption from the minimum coverage requirement's shared responsibility payment (individual mandate). ¶¶671-685.

1254.   Under the ACA, "'health care sharing ministry' means an organization—

(i)   which is described in *§501(c)(3)* and is exempt from taxation under §501(a) [and] members of which *share a common set* of ethical or *religious beliefs* <u>and</u> *share* medical expenses among members *in accordance with those beliefs* <u>and</u> *without regard to the State in which a member resides* or is employed[.]"[873]

1255.   *Compliance with the Insurance Code*, as currently interpreted by Defendant, would disqualify Samaritan from ACA HCSM status in at least the following ways.

1256.   **First**, it would cost Samaritan its IRC §501(c)(3) status because IRC §501(m)(1) strictly prohibits §501(c)(3) status for any entity that even "substantially" provides any kind of

---

[871] *Supreme Court of New Mexico*, 839 F.3d at 917-18 (10th Cir.) (citations & internal punctuation omitted; emphasis added). *Accord Club Madonna*, 42 F.4th at 1256.

[872] *LWV v. Sullivan*, 5 F.4th 714, 729 (7th Cir. 2021) ("*Arizona v. U.S.*, 567 U.S. 387 (2012) … largely upheld a preenforcement preemption challenge to multiple provisions of [Arizona] law").

[873] IRC §5000A(d)(2)(B)(ii)(I)&(II) (emphasis added).

"commercial insurance." ¶947. Loss of §501(c)(3) status, devastating in its own right, would also destroy Samaritan's ACA HCSM status under §5000A(d)(2)(B)(ii)**(I)**. Ironically, New Mexico itself foists this Hobson's choice, or absurdity, on HCSMs, since some provisions of the Insurance Code require §501(c)(3) status even though that status is positively prohibited to any entity that even "substantially" provides any kind of "commercial insurance." *E.g.*, ¶1161(75).

1257.   **Second**, it would prevent Samaritan's membership from sharing medical expenses (uniformly, nationwide) in accordance with their common religious beliefs, as required by §5000A(d)(2)(B)(ii)**(II)**. The Code's antidiscrimination mandates would achieve this in at least two ways. (a) The Code forbids distinctions (discrimination) based on *religion*, which is central to Samaritan's ministry. (b) The Code also forbids discrimination based on certain social policy factors—e.g., contraception, reproductive rights, sexual orientation, gender identity—that inhere in Samaritan's common set of Biblical religious beliefs. ¶¶1079, 1165-1178.

1258.   **Third**, it would prevent Samaritan's membership from sharing medical expenses (uniformly, nationwide) "without regard to the State in which a member resides." Samaritan currently operates free of insurance regulation everywhere. If Samaritan is subjected to any of the many New Mexico requirements that conflict with Samaritan's core beliefs, it would have to gerrymander its sharing program for New Mexico, adopting policies/practices solely for New Mexico. This would prevent the uniform sharing required by the ACA and also automatically destroy Samaritan's HCSM status under §5000A(d)(2)(B)(ii)**(II)**. ¶¶151-59, 944-83, 1700-1730.

1259.   **Fourth**, Samaritan's supposed "option" of simply exiting New Mexico also would destroy Samaritan's ACA HCSM status under §5000A(d)(2)(B)(ii)**(II)** since Samaritan's absence in New Mexico would preclude Samaritan from serving members equally nationwide "without regard to the State in which a member resides or is employed." *Id.*

1260.   Subjecting Samaritan to the Insurance Code creates an irreconcilable conflict with the ACA, (a) making it "impossible" for Samaritan to comply with both laws and (b) standing as an "obstacle to the accomplishment [of] the full purposes and objectives" of the ACA.[874]

1261.   Under either or both grounds, subjecting Samaritan to the Code stymies the clear intent of the ACA that HCSMs be available to Americans on an equal basis nationwide.

1262.   Thus, Defendant's application of the Insurance Code to Samaritan is "conflict preempted" under the Supremacy Clause of the United States Constitution.

### Due Process: Test of Basic Fairness

1263.   Defendant's anti-HCSM campaign, as applied here, will violate the Due Process Clause of the Fourteenth Amendment and the rights it guarantees to Samaritan and its members.

1264.   Defendant's enforcement regime will act as police, prosecutor, and judge in an action that could amount to a death sentence for Samaritan's ministry in New Mexico. Such an action likely would have spillover effects nationwide. Adverse publicity from a C&D can result in rapid loss of members, regulatory actions in other states, and private lawsuits. All three of those ills have accompanied similar enforcement actions against HCSMs.[875] ¶¶754-765.

1265.   As a tribunal, OSI is neither adequate, particularly to adjudicate complex constitutional issues, nor fair, particularly in view of evidence of prejudgment and protectionist bias. OSI's anti-HCSM campaign has exhibited hostility to the entire HCSM sector, which OSI clearly intends to shove out of New Mexico. There is nothing fair or neutral about that.

1266.   Agency adjudication that blurs separation of powers is facing rapidly diminishing

---

[874] *Supreme Court of New Mexico*, 839 F.3d at 917-18.

[875] *See OneShare v. Com'r Kreidler*, Case 3:20-cv-06207 (W.D.Wash., filed Dec. 15, 2020) (docket filings). Such follow-on results can even be intended by a commissioner. *See id*.

deference from Supreme Court precedent holding the administrative state more accountable.[876]

1267.   Depending on further precedential developments, Samaritan reserves its right to challenge OSI's multi-hatted roles, including using in-house judges (e.g., putting a robe on an agency lawyer), and its home-field advantage.

1268.   Regardless, constitutional powers of government have constitutional limits, and, at a minimum, any public agency's process must provide fundamental fairness.

1269.   The blending of legislative, executive, and judicial powers only heightens the need to assure and maintain fundamental fairness through other means.

1270.   "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[877] "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent *even the probability of unfairness*.'"[878]

1271.   The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[879] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a

---

[876] *See* Joel Seligman, *The Judicial Assault on the Administrative State*, 100 WASH. U.L. REV. 1687 (2023); *Loper Bright v. Raimondo*, 45 F.4th 359 (D.C. Cir. 2022), *cert. granted*, 143 S.Ct. 2429 (2023) (www.supremecourt.gov/docket/docketfiles/html/public/22-451.html) (whether to over-rule *Chevron*); https://www.scotusblog.com/case-files/cases/loper-bright-enterprises-v-raimondo; *Axon Enter. v. FTC*, 143 S.Ct. 890 (2023). "*Axon* held 'the review schemes [in the SEC Act and FTC] Act do not displace district court jurisdiction over' certain constitutional challenges." *Smith v. Bd. of Gov's*, 73 F.4th 815, 823 (10th Cir. 2023) ("***Smith v. Bd.***").

[877] *Caperton v. A.T. Massey Coal*, 556 U.S. 868, 876 (2009) ("***Caperton***"); *accord William Jefferson & Co. v. Bd. of Assess'mt*, 695 F.3d 960, 963 (9th Cir. 2012) ("***William Jefferson***").

[878] *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (citation omitted; emphasis added) ("***Withrow***"); *accord Cox v. Com'r*, 514 F.3d 1119, 1126 (10th Cir. 2008) ("***Cox***").

[879] *Harline v. D.E.A.*, 148 F.3d 1199, 1205 (10th Cir. 1998) ("***Harline***").

greater concern about bias."[880] "Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'"[881]

1272.    OSI cannot be viewed as a "neutral and detached" tribunal here. Defendant acts as police, prosecutor, and judge, and the "overlap between prosecutorial and adjudicative functions" "raises a greater concern about bias." That combination of powers, together with the evidence of prejudgment and protectionism discussed above, make it impossible for OSI to avoid the appearance or "probability of unfairness."

1273.    In short, Plaintiffs in any government tribunal must have "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker."[882]

1274.    Due process requires judicial-like process, especially in a quasi-criminal case like this where Samaritan faces prosecution, fines, and expulsion.[883] This includes basic discovery procedures to find and confront evidence and prepare for trial, i.e., "a fair opportunity to rebut the Government's" case, in an unbiased adjudication in a fair tribunal.

1275.    All these basic due process protections apply to any action against Samaritan.

### Plaintiff's Right to Immediate Federal Intervention and Relief

1276.    Samaritan is entitled to the judicial process and relief of this Court. Samaritan is not required to wait until its ministry is irreparably harmed or destroyed by OSI action—as a federal appeals court recently ruled in a case very much like this one.[884]

---

[880] *William Jefferson*, 695 F.3d at 965.

[881] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

[882] *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) ("***Hamdi***"); *accord Hicks v. Com'r of Soc. Sec.*, 909 F.3d 786, 799 (6th Cir. 2018) (applying *Hamdi* to administrative agency adjudication).

[883] NMSA 1978, §59A-1-18 (criminal prosecution and penalties).

[884] *Air Evac EMS v. McVey, Ins. Com'r*, 37 F.4th 89 (4th Cir. 2022), *aff'g*, *Air Evac EMS, Inc. v. Dodrill, Ins. Com'r*, 523 F.Supp.3d 859 (S.D.W.Va. 2021) ("***Air Evac***").

1277.   In *Air Evac*, the Fourth Circuit upheld a preliminary injunction against West Virginia Insurance Commissioner Allan McVey that enjoined him from pursuing an enforcement action against the air-ambulance membership program of Air Evac, a secular, but otherwise quasi-Samaritan-like, health care burden sharing program.

1278.   Here, as there, an insurance commissioner is "likely to shut down [Samaritan's] membership program which would result in the loss of customers and employees[.] ***Besides, the prospect of an unconstitutional enforcement supplies the necessary irreparable injury. [A]waiting proceedings violating the Constitution is a risk the [ministry] ought not to be required to take***."[885] Samaritan has a similar but much stronger case than Air Evac.

1279.   Here, as there, the inadequacy of agency proceedings to protect federal rights is evident. The evidence shows that OSI (1) "has prejudged the outcome of the state administrative proceeding," and (2) has been motivated by "protectionism," i.e., "favoritism towards an in-state competitor."[886] As Air Evac argued there, the state's "purported interest in regulating insurance should likewise be recharacterized as a protectionist measure."[887]

1280.   Here, as there, evidence suggests the agency will "not provide a disinterested tribunal."[888] "Allegations of a protectionist measure and a prejudged outcome are not run-of-the-mill defenses in an enforcement proceeding."[889] As shown, these concerns apply fully to OSI.[890]

---

[885] *Air Evac*, 37 F.4th at 103 (citations & internal punctuation omitted; emphasis added).

[886] *Air Evac*, 37 F.4th at 101-102, 98 (citation omitted). "And in such cases of protectionism, [we have] held that the state interest is narrower, making abstention less warranted." *Id*. at 98.

[887] *Air Evac*, 37 F.4th at 98.

[888] *Air Evac*, 523 F.Supp.3d at 868.

[889] *Air Evac*, 37 F.4th at 102.

[890] Though *Air Evac* focused on abstention under *Younger v. Harris*, 401 U.S. 37 (1971), its determination that federal judicial intervention was proper necessarily foreclosed other abstention doctrines such as *Rooker-Feldman*. In any event, in another recent case against West

1281.   Samaritan should not be "required to *wait until it is faced with penalties or a final order to shut down its Membership Program to seek to vindicate its asserted rights under federal law*."[891] Samaritan "is *imminently threatened* [with] enforcement measures that would reduce its revenue and interfere with its relationship with customers. [OSI's] proposed enforcement measures … would cause the harm at issue, and a favorable *decision finding state enforcement [precluded] by federal law would redress the imminent injury*."[892]

1282.   Evidence the Fourth Circuit found persuasive included the relative lack of consumer complaints, the failure of the regulatory agency to adequately explain "what exactly Air Evac was doing wrong," and the apparent bias of the agency, including its "expressed [] interest in shut[ting] down Air Evac."[893] In Samaritan's case, there is not just a relative lack of consumer complaints; *there are none*. Instead of explaining "what exactly [Samaritan is] doing wrong," OSI is campaigning to "shut down" all HCSMs, including Samaritan.

1283.   The harm to Samaritan, even in *non*-constitutional terms, is irreparable. It "would likely suffer irreparable harm if an injunction preserving its federal rights is not entered. Shutting down the Membership Program could cause it to lose [members] … while it awaits consideration of its [federal] claims, and rebuilding those relationships [afterward] could be impossible."[894]

1284.   Without injunctive relief from this Court, Samaritan "will be forced to submit to further state investigation of and enforcement against its Membership Program. In the event

---

Virginia, the Fourth Circuit explained that *Rooker-Feldman* applied only to federal court review of state *court* actions, not "state administrative and executive actions." *Jonathan R. v. Justice*, 41 F.4th 316, 340 (4th Cir. 2022) (decided before *Air Evac*).

[891] *Air Evac*, 523 F.Supp.3d at 866-67 (emphasis added).

[892] *Id*. (emphasis added). "Thus, the Court finds that Air Evac has sufficiently established standing. For the same reasons, the Court finds that Air Evac's claim is ripe for adjudication." *Id*.

[893] *Air Evac*, 37 F.4th at 95-104.

[894] *Air Evac*, 523 F.Supp.3d at 870. Of course, the forced loss of members in a sharing ministry, like forced loss of members in a church, inflicts *constitutional harm* on ministry *and* members.

[OSI] concludes that [Samaritan] has violated the [Insurance Code]—which [is] likely given the progress of the investigation to date and [OSI's] positions herein—[Samaritan] could be subject to fines and a [final C&D]. Any interruption in its ability to offer the program will cause the loss of revenue and damage its relationships with [members, and staff] responsible for marketing and managing [the] Program would likely be laid off. Regaining [members] for a program that was previously shut down by the state, even if improperly, would likely prove difficult."[895]

1285.  "While [OSI] and the public have an interest in the appropriate regulation of insurance, [Samaritan's] interest in the uninterrupted continuation of its Membership Program and in protecting its [federal rights] *heavily outweighs* that interest."[896]

1286.  Arguments the Fourth Circuit found persuasive apply here: "[Samaritan's] interest in an uninterrupted membership program and in preserving the company's preemption rights [which] outweigh [the state's] interest in the appropriate regulation of insurance. [A]n injunction merely delays any enforcement efforts pending resolution of whether [the state's] interest is appropriate in the first place. [Stopping Samaritan's] membership program would leave its customers to foot the entire bill for … services despite having signed up for and paid for the membership program. [T]he public interest favors an injunction to preserve the status quo."[897]

1287.  The harms to Samaritan are not only analogous to those to Air Evac; they are more acute. Like Air Evac, Samaritan is being forced to spend precious resources defending itself against an imminent, illegally conducted enforcement action by an insurance commissioner that will cause irreparable harm to its *economic* interests.

1288.  Unlike Air Evac, Samaritan is a Christian ministry with 918 Christian members in

---

[895] *Air Evac*, 523 F.Supp.3d at 873-74.

[896] *Air Evac*, 523 F.Supp.3d at 874 (emphasis added).

[897] *Air Evac*, 37 F.4th at 103 (citations omitted).

New Mexico. The federal rights asserted by Air Evac were preemption rights under the Airline Deregulation Act. Not to diminish such rights (which also apply to Samaritan's preemption claims), but they are hardly on par with the first sixteen words of the federal Bill of Rights.

1289.   Whereas Air Evac and its members claimed no individual constitutional rights, Samaritan and its members are entitled not just to "special solicitude,"[898] and not just to "double" First Amendment protection,[899] but to *triple* First Amendment protection, since the Free Exercise Clause, Free Speech Clause, and Expressive Association Doctrine all provide "overlapping protection for expressive religious activities."[900] Add the structural protections of the Establishment Clause and Religious Autonomy Doctrine, and Samaritan has *quintuple* First Amendment protection and "*at least* strict scrutiny" applies.[901]

1290.   Defendant's threat injures the religious freedom of both ministry and members. Each day it continues, it threatens their much-protected "First Amendment freedoms," whose loss, "for even minimal periods of time, unquestionably constitutes irreparable injury."[902] OSI seeks to "*crush Plaintiffs' free exercise* of religion."[903] This threat must be enjoined.

1291.   "Even if a state appellate court could *eventually rectify* such abuses under de novo review, the district court [would] not abuse its discretion in finding the administrative *enforcement itself problematic*."[904] Such would be the case even if "judicial review, de novo or

---

[898] *Hosanna*, 565 U.S. at 189 (unanimous).

[899] *Kennedy*, 142 S.Ct. at 2421.

[900] *Kennedy*, 142 S.Ct. at 2421.

[901] *Kennedy*, 42 S.Ct. at 2426 (internal punctuation omitted; emphasis added).

[902] *Cuomo*, 141 S.Ct. at 67.

[903] *Navy Seals*, 27 F.4th at 348 (emphasis added).

[904] *Air Evac*, 37 F.4th at 102 n.5 (emphasis added). *Air Evac* is right: Samaritan is entitled to federal court. Regardless, state court is not even available to Samaritan until some future date,

otherwise, would be forthcoming at the conclusion of the administrative proceedings."[905]

1292.   The harms in this case are irreparable, accelerating, and widespread. These harms are and will be incurred not just by an organization named "Samaritan," but by every one of its New Mexico members, including the ten individual Plaintiffs. Their written testimony has certified the harm to them, as individuals, even as this case will determine the level of culpability of the Defendant. The loss of this ministry to many of its New Mexico members will have profoundly negative effects on their physical, mental, and spiritual wellbeing. This ministry is not "health insurance" to them. It is biblically commanded love in action, a duty and form of worship to God, with eternal consequences for every member. Sharing burdens together is a form of worship that "fulfills the law of Christ." *Galatians* 6:2. For the ten individual Plaintiffs, the loss of this ministry would be equivalent to the loss of their churches. ¶¶402-488.

1293.   The loss of these triply/quintuply protected First Amendment rights exceeds the immediate harm from OSI action. If OSI wins its "longstanding campaign to assert regulatory dominance over" these sharing ministries,[906] Plaintiffs will be coerced to comply with all the intrusive mandates of the Code. That coerced compliance will violate their sincerely held and shared religious beliefs. Such regulations would, for example, compel Samaritan to conform to prevailing social policies on issues such as life, marriage, and sexuality. ¶¶1164-1178.

1294.   "As an initial matter, it is plain that [OSI's] actions [will] have burdened [Samaritan's] religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs."[907] Even if coerced changes in Samaritan's ministry is

---

after months/years in OSI proceedings, as precious rights and resources are lost every day.

[905] *Air Evac*, 37 F.4th at 102 n.5 (citation & internal punctuation omitted).

[906] *Air Evac*, 37 F.4th at 94.

[907] *Fulton*, 141 S.Ct. at 1876.

manageable financially, the impact of such regulation would destroy Samaritan's religious purpose, character, and freedom and cause it, as it defines itself, to cease to exist. ¶¶402-488.

1295.   Coerced compliance with the Insurance Code also would destroy Samaritan's federal tax-exempt status, its federal ACA/HCSM status, its state safe-harbor status, and invite legal actions from state regulators and class-action lawyers alike. ¶¶754-765, 944-983.

1296.   Like socially conscious investors, many Samaritan members, including the ten individual Plaintiffs, joined Samaritan to reinforce their deeply held convictions. ¶¶402-488. Closing Samaritan in New Mexico will deprive those New Mexicans of their chosen way to provide for their health needs consistently with their deeply held beliefs. Those residents will be forced to provide for their health needs by joining or subscribing to organizations or plans that undermine or even flatly contradict their beliefs. This the state may not force them to do.

1297.   The evidence thus far suggests close scrutiny of Defendant's motives. It appears Defendant and OSI sought to achieve social policy—whether securing ACA reforms, protecting domestic insurance providers, stabilizing the domestic insurance market, or expanding the reach of antidiscrimination policy to conscientious objectors like Samaritan, or all of these—at the expense of individual rights enshrined in the U.S. Constitution. This they had no authority to do.

1298.   Prevailing social policies have always harmed deeply held beliefs of individuals. Fortunately, our Constitution "***distrust[s] government attempts to regulate religion and suppress dissent***."[908] It should never be infringed "based on perceptions or discomfort,"[909] or "for **no better reason** than promoting an **approved message or discouraging a disfavored one**,

---

[908] *Kennedy*, 142 S.Ct. at 2421 (emphasis added).

[909] *Kennedy*, 142 S.Ct. at 2427.

however enlightened either purpose may [be]."[910] "A government that roams the land, … scrubbing away any reference to the divine will strike many as aggressively hostile to religion. Militantly secular regimes have carried out such projects in the past[.]"[911]

1299.  Defendant here would punish Plaintiffs for engaging in "religious observance doubly protected by the Free Exercise and Free Speech Clauses."[912] "The ***Constitution neither mandates nor tolerates that kind of discrimination***."[913] "Respect for religious expression is indispensable to life in a free and diverse Republic[.]"[914]

1300.  This lawsuit seeks an injunction against any OSI enforcement action, as well as damages in amounts to be determined, against the Defendant in her personal capacity. Defendant should have known better. Defendant acted intentionally or with deliberate indifference for Plaintiffs' rights under well-established federal law.[915] If discovery or other evidence in this lawsuit proves animus, punitive damages may be appropriate.

1301.  "Resolving a claim founded solely upon a constitutional right is ***singularly suited to a judicial forum and clearly inappropriate to an administrative [agency]***. This is especially so when a plaintiff's claims are founded on infringement of ***specific constitutional rights***. Plaintiffs allege specific, and far from frivolous, violations of their free exercise rights[.] Plaintiffs also face ***irreparable harm if judicial review is denied***. '[L]oss of First Amendment

---

[910] *Hurley*, 515 U.S. at 579 (unanimous) (emphasis .

[911] *American Legion v. American Humanist Ass'n*, 139 S.Ct. 2067, 2084–85 (2019).

[912] *Kennedy*, 142 S.Ct. at 2433.

[913] *Kennedy*, 142 S.Ct. at 2433 (emphasis added).

[914] *Kennedy*, 142 S.Ct. at 2432-33.

[915] *Wiggins v. Griffin*, ___F.4th ___, 2023 WL 8009312 (2d Cir. Nov. 20, 2023) (denying qualified immunity in Free Exercise case) ("***Wiggins***").

freedoms, ***for even minimal periods*** of time ***unquestionably constitutes irreparable injury***."[916]

1302.   A key to *Air Evac* bears repeating. OSI is "likely to shut down [Samaritan's] membership program which would result in the loss of customers and employees…. ***Besides, the prospect of an unconstitutional enforcement [is intolerable and] awaiting proceedings violating the Constitution is a 'risk the [ministry] ought not to be required to take.***"[917] Samaritan's need is urgent and warrants the prompt intervention of this Court.

<mark>FIRST CAUSE OF ACTION: VIOLATION OF
THE FREE EXERCISE CLAUSE:
NON-NEUTRAL TREATMENT (Without Animus) (Strict Scrutiny)</mark>

1303.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1304.   State action must be "neutral toward religion,"[918] as required by three separate clauses of the Constitution: the Free Exercise Clause,[919] the Establishment Clause,[920] and the Equal Protection Clause.[921] The analysis under these three clauses is interrelated, but the commands of each are independent and distinct.

1305.   Under the non-neutrality aspect of the Free Exercise Clause, in this First Cause of Action, the Court's "task is to decide whether the burden [OSI] has placed on the religious

---

[916] *Navy Seals*, 27 F.4th at 348 (citations & punctuation omitted; cleaned up; emphasis added).

[917] *Air Evac*, 37 F.4th at 103 (quoting Supreme Court; emphasis added). As explained, *Air Evac*, in a setting identical to the present case, found no bar to federal court intervention. No abstention doctrine prevents this Court from acting. *See, e.g.*, *Jonathan R. v. Justice*, 41 F.4th at 340 ("state administrative and executive actions are not covered by [Rooker-Feldman] doctrine").

[918] *Masterpiece*, 138 S.Ct. at 1732 ("hostility was inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is neutral toward religion").

[919] *Masterpiece*, 138 S.Ct. at 1732 (Free Exercise case).

[920] *Trump*, 138 S.Ct. at 2418 (must be "neutral toward religion" under Establishment Clause); *accord Colo. Christian*, 534 F.3d at 1257-60 (10th Cir.).

[921] *Lukumi*, 508 U.S. at 540.

exercise of [Samaritan and its members] is constitutionally permissible."[922]

1306.   "First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."[923]

1307.   "Neutrality and general applicability are interrelated [and] failure to satisfy one requirement is a likely indication that the other has not been satisfied."[924]

1308.   But "neutral" and "generally applicable" are distinct requirements (with separate analytical rules)—*both* of which government action must meet to avoid strict scrutiny.[925]

1309.   Under either or both of these distinct requirements (or doctrines), "so long as [OSI] can achieve its interests in a manner that does not burden religion, it must do so."[926]

1310.   In contrast to the neutrality requirement, government action "will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'"[927] General applicability focuses neither on religion (*per se*) nor intent, but on mechanisms and process. Thus, "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."[928]

1311.   But neutrality focuses on religion and demands close scrutiny of any official conduct aimed at religion, for any reason. Neutrality scrutinizes official rules or actions that

---

[922] *Fulton*, 141 S.Ct. at 1876.

[923] *Tandon*, 141 S.Ct. at 1296 (emphasis in original) (citing *Cuomo*, 141 S.Ct. at 67).

[924] *Lukumi*, 508 U.S. at 531.

[925] *Fulton,* 141 S.Ct. at 1877 (citations omitted).

[926] *Fulton*, 141 S.Ct. at 1881.

[927] *Kennedy*, 142 S.Ct. at 2422 (quoting *Fulton*, 141 S.Ct. at 1877).

[928] *Neace*, 958 F.3d at 413.

target or are expressly aimed at religion, even for benign reasons, as well as for improper demeanor or motivations, even if not animus, bigotry, or other forms of invidious intent.

1312.  "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature,"[929] or otherwise targets religion or religious activity, even for what it may view as honorable reasons. Government actions also "cannot be viewed as neutral" where they result in harsh results for religion or for religious believers or communities, even though not motivated by malice.[930]

1313.  Non-neutral state action means "intentional" action (not incidental, accidental, or simply negligent) that is non-neutral *toward religion*.[931] This includes any official intent to treat religiously motivated conduct differently. All such intentional state actions that treat religion differently are constitutionally suspect and require strict judicial scrutiny.

1314.  The "intent" that triggers strict scrutiny here is "merely the intent to treat differently."[932] This intent need not be malicious or invidious. This is so because government action aimed at religion, regardless of what motivated it, must be examined carefully to secure and effectuate the constitutional guarantees of freedom in matters of religion.

1315.  The Constitution demands *strictly* neutral and equal treatment.[933] That's why state actions "are not neutral and generally applicable … whenever they treat *any* comparable secular activity more favorably than religious exercise,"[934] without regard to motive. Even when indications of hostility are "put … aside," state actions "cannot be viewed as neutral [if] they

---

[929] *Fulton*, 141 S.Ct. at 1877.

[930] *Cuomo*, 141 S.Ct. at 66.

[931] *Kennedy*, 142 S.Ct. at 2423 (state policies concededly not "not neutral toward religion").

[932] *Colo. Christian*, 534 F.3d at 1260.

[933] *Espinoza*, 140 S.Ct. at 2254 (quoting *Trinity Lutheran*, 582 U.S. at 458).

[934] *Tandon*, 141 S.Ct. at 1296 (emphasis in original) (citing *Cuomo*, 141 S.Ct. 63).

single out" religious institutions for unfavorable treatment.[935]

1316.   When state actions fail either neutrality or general applicability, there is "no need to consult [the categorical] test" against "official expressions of hostility," since, "in cases like that we have 'set aside' such policies without further inquiry."[936]

1317.   Thus, ***any*** non-neutral or non-generally applicable ***OSI action*** that harms Samaritan discriminates against Samaritan "***no matter how well-intentioned***,"[937] "***regardless of design or intent***,"[938] and "***even in the absence of any motive to do so***,"[939] and is "subject to strict scrutiny ***regardless of*** the government's ***benign motive***, ***content-neutral justification***, or ***lack of 'animus.'***"[940] Such strict neutrality has long been the law of this Circuit.[941]

1318.   Thus, for purposes of non-neutrality here, it is immaterial whether Defendant was motivated by animus, bigotry, or other invidious intent.[942] Here, "the constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[943]

1319.   Therefore, it makes no difference if "faith-based bigotry did not motivate [OSI's treatment of Samaritan]." The mere intent to treat Samaritan and its members differently suffices to require strict scrutiny of Defendant's actions.

1320.   Non-neutral actions toward religion discriminate against religion. Non-generally

---

[935] *Cuomo*, 141 S.Ct. at 66. *Cuomo* "put … aside" evidence of ill motive, 141 S.Ct. at 66, while *Tandon* disregarded motive altogether.

[936] *Kennedy*, 142 S.Ct. at 2422 n.1 (citing *Masterpiece*, 138 S.Ct. at 1732).

[937] *FCA En Banc*, 82 F.4th at 689 (citing Supreme Court precedent) (emphasis added).

[938] *FCA En Banc*, 82 F.4th at 689 (emphasis added).

[939] *FCA En Banc*, 82 F.4th at 672 (emphasis added).

[940] *FCA En Banc*, 82 F.4th at 686 n.8 (quoting *Reed*, 576 U.S. at 165) (emphasis added).

[941] *Colo. Christian*, 534 F.3d at 1260.

[942] *Colo. Christian*, 534 F.3d at 1260 n.7.

[943] *Neace*, 958 F.3d at 415 (quoting *Colo. Christian*, 534 F.3d at 1260); *Cuomo*, 141 S.Ct. at 66.

applicable actions do the same. Discrimination is discrimination, no matter how well intentioned.

1321.   "In the name of protecting religious liberty, [OSI] would have us suppress it."[944]
"[OSI] cannot—and does not—advance its interest in non-discrimination by discriminating."[945]

1322.   To begin, OSI's actions toward HCSMs like Samaritan have not been accidental,
incidental, or merely negligent toward religion or its exercise. These actions have been
intentional and aimed expressly at "religious" health care sharing "ministries."

1323.   For purposes of the federal and state HCSM-protection laws, an HCSM must not
just claim that particular religious status (as the Aliera entities falsely did) but must meet a
specific religious definition. This HCSM sector targeted by OSI was and remains an expressly
and exclusively *religious* sector. Thus, OSI's conduct has not been "neutral toward religion."

1324.   Each intentional act by Defendant against HCSMs was directed at a thoroughly
religious ministry, composed of a thoroughly religious membership that is defined and protected
by facially religious laws. Accordingly, none of these acts was "neutral toward religion."

1325.   Worse yet, Defendant has repeatedly shown actual hostility toward these
ministries, the worst (or least acceptable) form of state action under the neutrality doctrine here.

1326.   Any form of official "hostility [i]s inconsistent with the First Amendment's
guarantee that our laws be applied in a manner that is *neutral toward religion*."[946]

1327.   The State of New Mexico, including OSI and Defendant, has applied disparaging
and demeaning descriptions to heath care sharing ministries in general, and to Plaintiff Samaritan
in particular, evidently prompted by the misconduct of a single entity, Aliera, that is not a health
care sharing ministry and that is not religious. Such actions are not "neutral toward religion."

---

[944] *Kennedy*, 142 S.Ct. at 2431.

[945] *FCA Panel*, 46 F.4th at 1099.

[946] *Masterpiece*, 138 S.Ct. at 1732 (emphasis added).

1328.   This hostile anti-HCSM campaign—inherited, embraced, and escalated by Defendant—is "not neutral toward religion."

1329.   OSI's anti-HCSM campaign, including (without limitation) OSI's Consumer Advisory, Press Releases, PPTs, Webinars, "encore" presentations, Email, and "unnecessarily aggressive" litigation against Liberty, *see* ¶¶204-246 & 840-856, is not "neutral toward religion."

1330.   Defendant and OSI have not engaged in routine law enforcement (e.g., state police enforcing a speed trap uniformly against all speeders) but rather have targeted for enforcement an entirely religious sector that is not only religious by character and conduct but also by definition under federal and state law: Health Care Sharing Ministries.

1331.   OSI has fueled and/or implemented actions by the New Mexico government that demonstrate open hostility toward religion generally, and Samaritan's religion specifically, such as the 2020 AG Letter, with that letter even calling out Samaritan by name.

1332.   Such hostility is not "neutral toward religion" and requires strict scrutiny, regardless of whether this hostility toward religion generally, or Samaritan's religion specifically, was motivated by religious animus, bigotry, or invidious intent.

1333.   OSI's own enforcement history is further evidence of non-neutral targeting.

1334.   After more than 20 consecutive years of treating HCSMs as non-insurance, Defendant in 2020 suddenly began to interpret New Mexico insurance law to target religious health care sharing ministries as insurance subject to the Insurance Code. ¶¶708-742.

1335.   OSI's sudden U-Turn in interpretation from non-insurance to insurance flatly and inexplicably contradicts OSI's own long enforcement history, which was consistent with federal and state law everywhere else. This sudden change in pattern is not "neutral toward religion."

1336.   To again quote this Court, OSI is telling Samaritan, just as it has told Liberty and

the other HCSMs, "well you know[,] you've been in operations [here] for years, ***but now we're coming for you***." ¶107 above (emphasis added).

1337.   To accomplish this goal of ousting all of these health-sharing ministries, OSI has had to manipulate the law and its own enforcement policies and practices, resulting in a vicious cycle of nonsensical contradictions between state and federal law, within state law, and within OSI's own enforcement policies and practices. ¶¶174-246, 708-742.

1338.   This chaotic approach has resulted from OSI's predetermined goal to target a specific religious sector. This preordained goal and result are not "neutral toward religion."

1339.   Even where a state's actions "can be viewed as targeting" a particular religious community, and that evidence is "put … aside" for some reason,[947] such actions still "cannot be viewed as neutral" where they result in harsh results for that religious community.[948]

1340.   Banishing Samaritan from the State of New Mexico and permanently depriving its entire New Mexico membership of their chosen religious ministry are harsh results.

1341.   Each of the above-described actions of OSI is non-neutral toward religion and thus each instance requires, and cannot survive, strict scrutiny.

1342.   Under this strict scrutiny test, "only those interests of the highest order [can] overbalance legitimate claims to the free exercise of religion."[949]

1343.   The test has two parts. Defendant must prove that the burdensome OSI action "is the least restrictive means of achieving some compelling state interest."[950]

---

[947] *Cuomo*, 141 S.Ct. at 66.

[948] *Cuomo*, 141 S.Ct. at 66.

[949] *Thomas*, 450 U.S. at 718 (quoting *Yoder*, 406 U.S. at 215).

[950] *Thomas*, 450 U.S. at 718.

1344.   This two-part test "is the most demanding test known to constitutional law."[951]

1345.   The first prong of this two-part strict scrutiny test requires that OSI's interest be not only compelling in general but "compelling in context," because "context matters" when applying the "compelling … interest standard."[952]

1346.   Moreover, "[t]he government cannot discharge this burden by pointing to 'broadly formulated interests.'"[953] "Rather than rely on broadly formulated interests, courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants."[954]

1347.   "Once properly narrowed, [OSI's] asserted interests are insufficient," and in no case can "speculation … satisfy strict scrutiny."[955]

1348.   On these facts, OSI can offer "no compelling reason why it has a particular interest in denying an exception to [Samaritan] while making them available to other[]" groups as discussed above.[956] ¶¶281-313, 1058-1113, 1235-1250.

1349.   Defendant's inconsistent, contradictory, and results-drive actions from early 2020 to the present, as catalogued above, ¶¶708-812, undercut any argument that OSI's interest in regulating insurance in this case, in context, is even "important," much less compelling.[957]

1350.   The second prong of strict scrutiny requires that OSI use the "least restrictive means" to achieve its state interest in regulating Samaritan and its members. It has not done so.

---

[951] *Flores*, 521 U.S. at 534.

[952] *Cutter*, 544 U.S. at 723; *accord O Centro*, 546 U.S. at 431.

[953] *Ramirez*, 595 U.S. at 427 (quoting *Hobby Lobby*, 573 U.S. at 726-27).

[954] *Fulton*, 141 S.Ct. at 1881 (citations and internal punctuation omitted).

[955] *Fulton*, 141 S.Ct. at 1881-82.

[956] *Fulton*, 141 S.Ct. at 1882.

[957] *See Air Evac* (court found regulation of insurance to be insufficiently "important" in that context to justify federal court abstention, i.e., deferring to the state insurance commissioner).

1351.   The means that Defendant has chosen to achieve OSI goals of fining HCSMs like Samaritan and ousting their ministries and members forever from the State of New Mexico are not the "least" restrictive means, but the "most" restrictive means, that Defendant could have chosen to achieve any legitimate state goals regarding insurance regulation.

1352.   For this reason also, Defendant fails strict scrutiny.

1353.   In sum, Defendant doubly fails strict scrutiny because OSI actions are not the means *least restrictive* of religious exercise to further *any* governmental interest.

1354.   Simply put, "so long as [OSI] can achieve its interests in a manner that does not burden religion, it must do so."[958] In this case, as regards Samaritan, OSI has not done so.

1355.   While regulating insurance may achieve "important goals" in the abstract, OSI cannot "show that granting [Samaritan] an exception will put those goals at risk. If anything[, allowing Samaritan to operate as before] seems likely to increase, not reduce, the number of" health care options available to New Mexicans, including its Samaritan members.[959] This result would not just support the physical, emotional, and spiritual health of New Mexicans, but also secure their religious exercise, as the Constitution guarantees and requires.

1356.   As "courts must scrutinize the asserted harm of granting specific exemptions to particular religious claimants,"[960] Samaritan is entitled to an exemption, whether it takes the form of a proper analysis of insurance law or an exemption mandated by federal law.

1357.   Given that OSI allowed Samaritan to operate freely as non-insurance for 25 years, that during that time Samaritan caused not the slightest harm to New Mexicans (or anyone else), and that during that time fraternals (and other "insurers") were privileged under the Insurance

---

[958] *Fulton*, 141 S.Ct. at 1881.

[959] *Fulton*, 141 S.Ct. at 1881-82.

[960] *Fulton*, 141 S.Ct. at 1881 (citations and internal punctuation omitted).

Code, Defendant cannot possibly prove that it cannot (a) return Samaritan to its non-insurance status or (b) disavow any intent to enforce the Insurance Code against Samaritan (i.e., assuring Samaritan in writing that OSI will not enforce the Insurance Code against it).

1358.   For 25 years, OSI achieved its regulatory goals *without* subjecting Samaritan to the Insurance Code. Clearly, OSI can continue to do so.

1359.   The law is plain. "[S]o long as [OSI] can achieve its interests in a manner that does not burden religion, it must do so."[961]

1360.   Thus, OSI must do so here.

1361.   OSI can do so formally through rulemaking that clearly indicates HCSMs such as Samaritan are not insurance subject to the Insurance Code. Or OSI can do so less formally by fashioning a specific exception for Samaritan. Or OSI can do so informally by disavowing in writing any intent to "come for" Samaritan the way it has Liberty, OneShare, and the other HCSMs. Or OSI can dig in its heels until it is enjoined to do so by court order.

1362.   Given all of the above, in context, Defendant does not even have a rational basis to "come for" Samaritan and thus cannot survive any form or sort of judicial scrutiny.

1363.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including the individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm.

1364.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1365.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

---

[961] *Fulton*, 141 S.Ct. at 1881.

1366.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1367.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1368.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**SECOND CAUSE OF ACTION: VIOLATION OF THE FREE EXERCISE CLAUSE: NON-GENERALLY APPLICABLE TREATMENT (Without Animus) (Strict Scrutiny)**

1369.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1370.   "[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."[962]

1371.   Even where, as here, evidence suggests violation of the *neutrality* standard, it may be "more straightforward to resolve [such] case under the rubric of general applicability."[963]

1372.   Government action "will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way," or if it provides "a mechanism for individualized exemptions."[964]

1373.   Whereas here, "the State has in place a system of individual exemptions, it may

---

[962] *Tandon*, 141 S.Ct. at 1296 (emphasis in original) (citing *Cuomo*, 141 S.Ct. at 67).

[963] *Fulton,* 141 S.Ct. at 1877.

[964] *Kennedy*, 142 S.Ct. at 2422 (quoting *Fulton,* 141 S.Ct. at 1877).

not refuse to extend that system to cases of religious hardship without compelling reason."[965]

1374.   Unlike neutrality, general applicability focuses neither on religion nor intent. It focuses on mechanisms and process. Thus, "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities."[966]

1375.   The question under general applicability is whether the law or regulation, on its face or in practice, applies *generally* to similarly situated persons, or does not. If it does not, and if the uneven result is due to a system of exceptions, strict scrutiny applies. Such settings may mask hidden bias or may invite considerations regarding religion to play a hidden role.

1376.   But general applicability does not rely on discerning motive, an often-challenging judicial enterprise. Instead, it examines any mechanism that invites or results in an uneven application of the law in a way that burdens or has a disparate impact on religion.

1377.   "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law."[967]

1378.   The reason for strict scrutiny "is obvious: if [Defendant] can easily grant an exemption, then the law stops being applied neutrally or generally."[968]

1379.   Here, Defendant does not apply the Insurance Code *generally* to similarly situated persons, but rather operates under a "mechanism for individualized exemptions."

1380.   This situation requires, and fails, strict scrutiny.

1381.   "[The Supreme Court has] made the following points clear. First, government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the

---

[965] *Fulton,* 141 S.Ct. at 1877 (all citations and internal punctuation omitted).

[966] *Neace*, 958 F.3d at 413.

[967] *Neace*, 958 F.3d at 413.

[968] *FCA Panel*, 46 F.4th at 1093 (applying *Tandon* and *Fulton*).

Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise…. Second, whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue. Comparability is concerned with the risks various activities pose[.]"[969]

1382.   Obviously, "a regulation that burdens religiously motivated conduct will 'trigger strict scrutiny' even if contains just *one* comparable secular exception to its restrictions."[970]

1383.   The Insurance Code, as interpreted by Defendant, treats *some* (at least *one*) "comparable secular activity more favorably than religious exercise."

1384.   Defendant's agency has provided far more than "just *one* comparable secular exception" and has contradicted the above Free Exercise Clause principles in a variety of ways.

1385.   Defendant and OSI have interpreted and applied the Insurance Code to allow *many* secular groups providing *actual insurance* to operate free of the Code, and/or certain onerous requirements of the Code, while disallowing *all* HCSMs, including Samaritan, under a new and creative interpretation of "insurance." ¶¶1051-1113.

1386.   Defendant and OSI have thus treated some (at least one) secular groups more favorably than HCSMs generally and Samaritan specifically.

1387.   The very existence of the exemption system requires strict scrutiny.

1388.   The discretion that system provides Defendant also requires strict scrutiny.

1389.   In other words, since Defendant can easily grant an exemption under one of these twelve statutory categories, "the law is not being applied neutrally or generally applicable."[971]

1390.   In addition, the way Defendant has actually applied the statutory exemption

---

[969] *Tandon*, 141 S.Ct. at 1296 (bold added; italicized *any* is in the original).

[970] *Pleasant View Baptist*, 78 F.4th at 303 (Murphy, J., concurring).

[971] *FCA Panel*, 46 F.4th at 1093 (applying *Tandon* and *Fulton*).

categories over the past twenty-plus years requires strict scrutiny.

1391.   OSI considered HCSMs to be non-insurance from the early 1990s until early 2020, when OSI suddenly changed its interpretation of insurance to capture HCSMs.

1392.   In other words, HCMSs operated freely in New Mexico as non-insurance for nearly three decades until OSI abruptly and inexplicably reversed course.

1393.   This is paradigmatic evidence of "unfettered discretion." OSI not only changed course but did a U-turn, suddenly, after nearly three decades of consistent enforcement behavior.

1394.   Thus, Defendant's history of enforcement—its established policy and practice— triggers strict scrutiny under the general applicability doctrine.

1395.   OSI's new policy and practice, including its new and creative interpretation of "insurance" that bears little resemblance to "insurance," are internally inconsistent, incoherently overlapping, and mutually contradictory, resulting in anything but generally applicable law enforcement regarding similarly situated parties. ¶¶270-313, 1051-1113.

1396.   Finally, Defendant's interpretation and application of the Insurance Code was in part to protect local domestic "producers" in the health insurance market who view HCSMs as competitors for their business or disruptors of their market position under the ACA.

1397.   Such favoritism and protectionism toward the domestic ACA-governed insurance market and providers, and related efforts to restrict competition or disruption by HCSMs, caused Defendant to apply the law unevenly and non-generally to Samaritan and its members.

1398.   Strict scrutiny of each state action above is required here by each aspect of the general applicability doctrine under the Free Exercise Clause.

1399.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to

further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1400.    In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[972]

1401.    For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1402.    Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1403.    Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1404.    As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1405.    Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1406.    Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1407.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## THIRD CAUSE OF ACTION: VIOLATION OF THE FREE EXERCISE CLAUSE: ESPECIALLY HARSH TREATMENT (Flagrant But Without Animus) (Strict Scrutiny)

1408.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

---

[972] *Flores*, 521 U.S. at 534.

set forth in this Cause of Action.

1409.   Under the First Amendment, the free exercise of religion can never be "singled out" for "especially harsh treatment."[973] This doctrine focuses more intently on the regulatory mechanism itself than on any particular official actions taken thereunder.

1410.   Thus, "regulations cannot be viewed as neutral [when] they single out houses of worship for especially harsh treatment."[974]

1411.   This doctrine treats the harshness of state regulatory regimes and/or their results, without regard to motive, as conditions that compel close judicial examination.

1412.   Defendant's anti-HCSM campaign has "singled out" HCSMs like Samaritan for "especially harsh treatment" in many ways. Most of Defendant's actions alleged herein have been independent of other state actors; a few have been in concert with other state regulators such as the AG. In all such actions, Defendant and the agency she leads have been at the center as ring leader or as crucial supporter. Examples follow.

1413.   **First**, from the beginning of its anti-HCSM campaign, OSI dedicated itself to expelling from New Mexico all religious health care sharing ministries, which includes Plaintiff Samaritan. ¶¶103-113, 204-246, 840-856. Both goal and result are especially harsh.

1414.   **Second**, this *most* restrictive and destructive *means* by which Defendant has achieved OSI's general public interest in regulating the domestic market is especially harsh.

1415.   **Third**, Defendant singled out health care sharing ministries, including Plaintiff Samaritan and its New Mexico members, by attacking them publicly, by criticizing them to the federal government, and by seeking to block or prevent tax benefits and other advantages to HCSM members (among other things). ¶¶215-246, 774-816. This was especially harsh.

---

[973] *Cuomo*, 141 S.Ct. at 66.

[974] *Cuomo*, 141 S.Ct. at 66.

1416.   **Fourth**, Defendant attacked health care sharing ministries, especially Samaritan, as "fraudulent" and "deceptive" marketers of "junk insurance plans" and disruptors of New Mexico's insurance market under the ACA. ¶¶208-214, 738-816. This was especially harsh.

1417.   Defendant sought to achieve all the above goals by targeting and attempting to expel all HCSMs—including Samaritan and its members—from the State of New Mexico. Defendant's goals were especially harsh. Their results have been, and will be, no less harsh.

1418.   Defendant's harsh treatment of HCSMs such as Samaritan in these and other ways violates the free-exercise rights of Samaritan and its members.

1419.   Whether Defendant was motivated by animus is immaterial.[975]

1420.   It makes no difference whether "faith-based bigotry did not motivate [OSI's treatment of Samaritan, because the] constitutional benchmark is 'government neutrality,' not 'governmental avoidance of bigotry.'"[976] ¶¶116-125, 264-269, 857-889, 1043-1048, 1179-1191.

1421.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1422.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[977]

1423.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1424.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to

---

[975] *Cuomo*, 141 S.Ct. at 66 ("put[ting] aside"; *Tandon*, 141 S.Ct. at 1296-97 (disregarding).

[976] *Neace*, 958 F.3d at 415 (quoting *Colo. Christian*, 534 F.3d at 1260); *Cuomo*, 141 S.Ct. at 66.

[977] *Flores*, 521 U.S. at 534.

suffer imminent and irreparable harm as described in the First Cause of Action above.

1425.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1426.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1427.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1428.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1429.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

<div align="center">

**FOURTH CAUSE OF ACTION: VIOLATION OF THE FREE EXERCISE CLAUSE: INVIDIOUS TREATMENT (Discrimination With Animus) (Categorical Bar)**

</div>

1430.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1431.   Any form of official "hostility [i]s inconsistent with the First Amendment's guarantee that our laws be applied in a manner that is *neutral toward religion*."[978]

1432.   The state must never act out of invidious intent (animus) against religion.

1433.   Any such hostility or animus is "odious to our Constitution,"[979] and is simply "*set aside* … without further inquiry."[980]

---

[978] *Masterpiece*, 138 S.Ct. at 1732 (emphasis added).

[979] *Carson*, 142 S.Ct. at 1996.

[980] *Kennedy*, 142 S.Ct. at 2422 n.1 (2022) (quoting *Masterpiece*, 138 S.Ct. at 1732).

1434.   "To be sure, where governmental bodies discriminate out of 'animus' against particular religions, such decisions are plainly unconstitutional."[981] "Such animus is not a *permissible* government interest, much less a compelling one."[982]

1435.   Defendant's anti-HCSM campaign has "singled out" HCSMs like Samaritan for adverse treatment. Most of Defendant's actions alleged herein have been independent of other state actors; a few have been in concert with other state regulators such as the AG. In all such actions, Defendant and the agency she leads have been at the center as ring leader or as crucial supporter. ¶¶176-186, 204-246, 325-335, 767-816 (esp. 794-800), 840-889, 1151-1160, 1176.

1436.   Defendant, alone and in concert with other state officials, has singled out health care sharing ministries like Samaritan and its members, to expel them all from New Mexico.

1437.   To quote this Court one last time, Defendant is telling Samaritan, just as it has told Liberty and the other HCSMs, "well you know[,] you've been in operations [here] for years, ***but now we're coming for you***." ¶107 above (emphasis added).

1438.   Samaritan is utterly harmless. Yet, without the slight threat of harm or provocation from Samaritan, Defendant seeks to "***crush Plaintiffs' free exercise*** of religion."[983]

1439.   Defendant, alone and in concert with other state officials, has publicly attacked these ministries, especially Samaritan, by disparaging them to the U.S. government and the general public, by seeking to block tax benefits for HCSM members, and by discouraging consumers from considering HCSMs. ¶¶204-246, 325-335, 767-816 (esp. 794-800), 840-889.

1440.   Defendant, alone and in concert with others, has attacked HCSMs, especially Plaintiff Samaritan, as "fraudulent" and "deceptive" marketers of "junk insurance" preying upon

---

[981] *Colo. Christian*, 534 F.3d at 1260 (citation omitted).

[982] *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3.

[983] *Navy Seals*, 27 F.4th at 348 (emphasis added).

innocent "consumers" and disrupting traditional insurance markets. ¶¶767-816 (esp. 794-800).

1441.   Defendant took all the above actions against health care sharing ministries, especially Samaritan and its New Mexico members, without the slightest evidence of just cause.

1442.   Instead of pursuing just and fair insurance regulation, Defendant and OSI turned insurance law upside down and inside out in order to pursue HCSMs. ¶¶708-856.

1443.   Even if Defendant and OSI might have been pursuing legitimate goals, by taking the "most" restrictive and destructive means available to them, their actions suggest illegitimate, ulterior motives. ¶¶176-246, 325-335, 767-816, 840-889, 1151-1160, 1176, 1235-1250.

1444.   The suddenness and inexplicability of OSI's U-Turn on HCSMs suggests illegitimate, ulterior motives. ¶¶176-246, 767-816, 840-889.

1445.   The laughably broad definition that OSI concocted to fuel its anti-HCSM campaign suggests illegitimate, ulterior motives. ¶¶233-246, 876-889.

1446.   The mere citation above of just some of the hundreds of Section titles within the Insurance Code demonstrated the absurdity of trying force Samaritan's ministry (to morph) into this insurance mold. That very absurdity of trying to force a square peg into a round hole also suggests improper motive (animus) toward these religious sharing ministries such as Samaritan.

1447.   It appears that Defendant's anti-HCSM campaign results at least in part from invidious intent or animus against the religious beliefs and expressive religious activities of religiously conservative Christian ministries like Samaritan. ¶¶199-203, 331-343, 370-488, 552-612, 840-856, 1134, 1162-1178.

1448.   It appears that Defendant's anti-HCSM campaign results at least in part from invidious intent or animus against the expressive religious beliefs and activities of Samaritan perceived as out of step with prevailing social policies and cultural norms. *Id*.

1449.   Defendant's actions evince general animus toward a centuries-old form of religious exercise embraced during the Protestant Reformation by Mennonites and other Anabaptist Protestants dreadfully persecuted for their unpopular beliefs. *Id.* & ¶¶535-540.

1450.   Any decisions or actions of Defendant that are motivated by animus toward the religious beliefs or religious exercise of Samaritan or its members constitute invidious discrimination that is "odious to our Constitution."[984]

1451.   Such discrimination is flatly barred, without any scrutiny or balancing, because such animus and resulting actions are "plainly unconstitutional,"[985] and simply "set aside."[986]

1452.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1453.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[987]

1454.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1455.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1456.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

---

[984] *Carson*, 142 S.Ct. at 1996.

[985] *Colo. Christian*, 534 F.3d at 1260; *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3.

[986] *Kennedy*, 142 S.Ct. at 2422 n.1 (2022).

[987] *Flores*, 521 U.S. at 534.

1457.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1458.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1459.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1460.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**FIFTH CAUSE OF ACTION: VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT: DISCRIMINATION AGAINST & AMONG RELIGIONS (Categorical Bar)**

1461.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1462.   The Establishment Clause—the other Religion Clause of the First Amendment—demands the strictest neutrality toward and among religions such that it categorically bars discrimination against or among religions or particular faiths or exercise.

1463.   Under the Establishment Clause, state action must be "neutral toward religion."[988]

1464.   The "organizing principle of the Establishment Clause is 'governmental neutrality'—between 'religion and nonreligion,' as well as among religions."[989] "The Establishment Clause 'mandate[s] … neutrality between religion and non-religion.'"[990] To disfavor expressive religious activity "undermine[s] the very neutrality the Establishment Clause

---

[988] *Trump*, 138 S.Ct. at 2418 (must be "neutral toward religion" under Establishment Clause); *accord Colo. Christian*, 534 F.3d at 1257-60 (10th Cir.).

[989] *Perrier*, 954 F.3d at 422 (quoting *McCreary*, 545 U.S. at 860).

[990] *Am. Atheists v. Davenport*, 637 F.3d 1095, 1119 (10th Cir. 2010) (on denial of reh'g).

requires."[991] "[I]t violates that central Establishment Clause value of official religious neutrality,"[992] which is the "clearest command of the Establishment Clause."[993]

1465.   For the same reasons that Defendant's discriminatory (non-neutral and/or non-generally applicable) actions violate the Free Exercise Clause above, they also independently violate this strictest of antidiscrimination principles embodied in the Establishment Clause.

1466.   Defendant has discriminated *against* HCSMs like Samaritan based on their shared religious faith and sharing commitments and *in favor of* comparable secular entities that embrace and pursue different religious faiths or no religious faith.[994] ¶¶270-313, 1051-1113.

1467.   Defendant has discriminated *against* HCSMs like Samaritan based on their shared religious views on sensitive social issues and *in favor of* comparable secular entities that embrace and pursue views approved by the State. ¶¶199-203, 331-343, 840-856, 1134.

1468.   Defendant has discriminated *against* HCSMs like Samaritan based on their perceived, or potential for, competition with domestic "insurers" and their perceived harm to the ACA-regulated domestic insurance market and *in favor of* comparable secular and/or domestic New Mexico entities. *See id*. & ¶¶832-839.

1469.   All such discrimination under the Establishment Clause is "usually flatly forbidden without reference to" strict scrutiny or any other balancing test.[995]

---

[991] *Shurtleff*, 596 U.S. at 274 (quoting *Rosenberger*, 515 U.S. at 846).

[992] *McCreary*, 545 U.S. at 860.

[993] *Larson*, 456 U.S. at 244.

[994] *Larson*, 456 U.S. at 244; *Colo. Christian*, 534 F.3d at 1266. Free Exercise protections—e.g., religious exemptions—obviously do not violate the First or Fourteenth Amendments. *See, e.g.*, *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99 (4th Cir. 2013) (rejecting constitutional challenges to the ACA safe harbor in IRC §5000A(d)(2)(B)). "A natural reading of [the First Amendment] suggest[s its] Clauses have 'complementary' purposes[.]" *Kennedy*, 142 S.Ct. at 2426.

[995] *Colo. Christian*, 534 F.3d at 1266 (collecting Supreme Court cases).

1470.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1471.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[996]

1472.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1473.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1474.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1475.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1476.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1477.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1478.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

---

[996] *Flores*, 521 U.S. at 534.

### SIXTH CAUSE OF ACTION: VIOLATION OF BOTH RELIGION CLAUSES OF THE FIRST AMENDMENT: ENTANGLEMENT AND INTRUSTION ON AUTONOMY (Categorical Bar)

1479.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1480.   This Cause of Action for religious independence or "autonomy" in certain religious matters arises equally under both Religion Clauses of the First Amendment.

1481.   But this Cause of Action for autonomy is further bolstered by anti-entanglement principles of the Establishment Clause that seemed more appropriate as part of this "autonomy" Cause of Action than as a standalone Cause of Action for entanglement.

1482.   "[T]he Religion Clauses protect religious institutions [in] matters 'of faith and doctrine' [and "internal management decisions" against] government intrusion. ***State interference in that sphere*** would ***obviously*** violate the ***free exercise*** of religion, and ***any attempt*** by government to dictate or ***even to influence*** such matters would constitute [an] ***establishment*** of religion. The First Amendment ***outlaws such intrusion***."[997]

1483.   Religious institutions have the right "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."[998]

1484.   The state must never "interfere" with the "autonomy" of religious groups "'to define their own *doctrine*, *membership*, organization, and *internal requirements*.'"[999]

1485.   Such state action is categorically barred.

1486.   Anti-entanglement concerns of the Establishment Clause achieve the same result.

1487.   "Good intentions by government [cannot] avoid entanglement with the religious

---

[997] *Our Lady*, 140 S.Ct. at 2060 (citations omitted; emphasis added).

[998] *Our Lady*, 140 S.Ct. at 2060 (citing *Kedroff v. St. Nicholas*, 344 U.S. 94, 116 (1952)).

[999] *Demkovich*, 3 F.4th at 975 (***en banc***) (citation to McConnell omitted; emphasis added).

mission of [Plaintiffs].[1000] "It is not only the conclusions that may be reached by [OSI] which may impinge on rights guaranteed by the Religion Clauses, but also the very [OSI investigative] process of inquiry leading to findings and conclusions."[1001]

1488.   Supreme Court precedent will not permit OSI "jurisdiction over religious [HCSMs] because there [is] a significant risk of excessive entanglement with religion."[1002]

1489.   That is the law of this Circuit as well. "Even assuming that it might, in some circumstances, be permissible for states to pick and choose among eligible religious institutions, a second line of Supreme Court precedents precludes their doing so on the basis of intrusive [interference with] religious belief or practice… Most often, this principle has been expressed in terms of a prohibition of 'excessive entanglement' between religion and government."[1003]

1490.   Defendant's anti-HCSM campaign violates these principles.

1491.   Defendant's application of the Insurance Code to Samaritan would interfere with its and its members' ability to define their own *doctrine*, *membership*, and *internal requirements*.

1492.   These demands imposed on Samaritan interfere not only with its ability to manage its membership rolls but also with its rights to define, as a membership ministry, its own doctrine and internal requirements, which originate in the biblical doctrine held by Samaritan and its members, and include the mutual biblical responsibility, obedience, and love of members.

1493.   As detailed above, it was only necessary to list some of the hundreds of Section titles within the 91 Articles of the Insurance Code (i.e., the initial 62 Articles plus 29 additions)

---

[1000] *Catholic Bishop*, 440 U.S. at 502.

[1001] *Catholic Bishop*, 440 U.S. at 502.

[1002] *Belya v. Kapral*, 59 F.4th 570, 576 (2d Cir. 2023) (five-judge dissent from denial of reh'g en banc) (citing *Catholic Bishop*, 440 U.S. at 502).

[1003] *Colo. Christian*, 534 F.3d at 1261 (citing *Catholic Bishop*, 440 U.S. at 502 and *Agostini v. Felton*, 521 U.S. 203, 232-35 (1997)).

to demonstrate their obvious and inevitable entanglement with Samaritan's internal governance structure/polity membership, and sharing requirements. ¶¶132-137, 1149-1178.

1494.    It was only necessary to list those Section titles to prove the autonomy-invading intrusion into Samaritan's internal governance, membership, and sharing requirements. *See id*.

1495.    It was only necessary to list those Section titles at ¶1161 to demonstrate the absurdity of trying force Samaritan's ministry (to morph) into this insurance mold, of trying to force a square peg into a round hole.

1496.    The Insurance Code would dictate most governance, management, personnel, policy, and planning decisions of Samaritan, *see* ¶¶1149-1178, all of which Samaritan and its members together have determined will be dictated by their shared, Biblically-based faith.

1497.    Defendant's threatened subjection of Samaritan to the Insurance Code would impermissibly second-guess Samaritan's chosen polity for its religious sharing ministry.[1004]

1498.    Defendant's actions violate the religious autonomy rights of Samaritan and its members protected under both the Free Exercise and Establishment Clauses and improperly entangle the government in the internal affairs of the Samaritan ministry.

1499.    The Code's demands on Samaritan would interfere not only with its ability to manage its membership rolls but also with its rights to define, as a membership ministry, its own doctrine and internal requirements, which originate in the shared Biblical doctrine of Samaritan and its members and include the mutual Biblical responsibility, obedience, and love of members.

1500.    Defendant would make impermissible judgments about the religious beliefs of Samaritan and its members, such as whether the primary purpose in joining Samaritan is to seek financial benefits or to seek spiritual benefits, such as, for example, "fulfill[ing] the law of

---

[1004] *Bethel Mennonite*, 746 F.2d at 392.

Christ," receiving prayers and spiritual encouragement from other members, and receiving the supernatural intervention of "Christ, the Divine Healer." *See* Plaintiffs' attached Declarations.

1501.   All such actions are categorically barred. The Supreme Court does not apply any kind of balancing test. Actions that violate these principles are simply and flatly barred.[1005]

1502.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1503.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1006]

1504.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1505.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1506.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1507.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1508.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1509.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

---

[1005] *E.g., Our Lady*, 140 S.Ct. at 2060 (relying on *Hosanna*, 565 U.S. 171 (unanimous)).
[1006] *Flores*, 521 U.S. at 534.

1510.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**SEVENTH CAUSE OF ACTION: VIOLATION OF THE FREE SPEECH CLAUSE: CONTENT DISCRIMINATION (Strict Scrutiny)**

1511.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1512.   Defendant has threatened to violate the Free Speech Clause of the First Amendment, and the rights of Samaritan and its members guaranteed thereunder, by violating neutrality principles enshrined in that Clause.

1513.   Samaritan and its members engage in shared religious and communicative exercise—"expressive religious activities"[1007]—including, for example, the voluntary sharing of health care needs, practices, expenses, and other burdens. ¶¶351-488, 552-612, 1203-1220.

1514.   Samaritan and its members organize and worship around Biblical Christian faith and principles that apply to everyday life, including, but not limited to, physical health needs. ¶¶351-488, 552-612, 1203-1220, and all six attached Declarations. Their well published and publicly accessible views tend toward the conservative end of the religious, social, and political spectrum. *See id.* & ¶¶199-203, 331-343, 840-856, 1134, 1162-1178.

1515.   Samaritan and its members associate around and express their shared faith by congregating and communicating traditionally through cards and notes, virtually through forums such as their monthly newsletter, spiritually through prayer, and physically through member appreciation dinners. *See id.* (all paragraph references from previous allegation).

1516.   The threats of Defendant described herein have infringed these rights of

---

[1007] *Kennedy*, 142 S.Ct. at 2421.

Samaritan and its members to freely express themselves based upon the content of their speech.

1517.   The same expressive rights Defendant has honored for similarly situated groups Defendant now threatens to deny forever to Samaritan and its 918 New Mexico members.

1518.   For the same reasons described in the first four Causes of Action above, Defendant's enforcement policy and threat against Samaritan and its members amount to non-neutral content restrictions on their Free Speech rights. For example, Defendant has targeted the Plaintiffs at least in part because of their views on certain religious, social, economic, and/or health care topics and/or for daring to disagree with the State's preferred views. At a minimum, Defendant clearly disagrees with the message that HCSMs like Samaritan send about alternative health care options that are outside of, or that compete with or potentially undermine, the ACA. Defendant is attempting to suppress public discussion or advocacy of the entire topic of ACA-alternative health care. ¶¶195-199, 653, and esp. 821-831.

1519.   "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."[1008]

1520.   Content-based restrictions of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[1009]

1521.   The entire class of content-based restrictions on speech—whether or not they also discriminate according to viewpoint—must undergo strict scrutiny.[1010]

1522.   Even facially content-neutral laws constitute content-based regulations of speech if a law cannot be "justified without reference to the content of speech" or was adopted "because

---

[1008] *Rosenberger*, 515 U.S. at 828.

[1009] *Reed*, 576 U.S. at 163 (citations omitted).

[1010] *Rosenberger*, 515 U.S. at 828; *Reed*, 576 U.S. at 163-64.

of disagreement with the message [the speech] conveys."[1011]

1523. In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1524. In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1012]

1525. For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1526. Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1527. Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1528. As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1529. Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1530. Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1531. WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

---

[1011] *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

[1012] *Flores*, 521 U.S. at 534.

## EIGHTH CAUSE OF ACTION: VIOLATION OF THE FREE SPEECH CLAUSE: VIEWPOINT DISCRIMINATION (Strict Scrutiny)

1532.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1533.   The First Amendment prohibits official action based "on hostility to a religion or *religious viewpoint*."[1013] As above, hostility is egregious, but not necessary to prove a claim.

1534.   For the same reasons described in the Free Exercise and Free Speech Causes of Action above, Defendant's enforcement policy and threat here amount to non-neutral viewpoint restrictions on Samaritan's and its members' Free Speech rights.[1014]

1535.   Content-based restrictions limit speech based on its subject matter, while viewpoint-based restrictions limit speech based on ideology and perspective. In addition to attempting to suppress public discussion or advocacy of the entire topic of ACA-alternative health care, ¶¶195-199, 653, and esp. 821-831, Defendant is attempting to suppress particular viewpoints on that topic and related topics. For example, Defendant has targeted the Plaintiffs at least in part because of their views on certain religious, social, economic, and/or health care topics and/or for daring to disagree with the State's preferred views on those topics.

1536.   "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is *all the more blatant*. Viewpoint discrimination is thus an *egregious form* of content discrimination.[1015] As noted above, the well published and publicly accessible views of the Plaintiffs tend toward the conservative end of the religious, social, and political spectrum. *See id*. & ¶¶199-203, 331-343, 840-856, 1134, 1162-

---

[1013] *Masterpiece*, 138 S.Ct. at 1731.

[1014] *Shurtleff*, 142 S.Ct. 1583; *Reed*, 576 U.S. 155; *Rosenberger*, 515 U.S. 819.

[1015] *Rosenberger*, 515 U.S. at 829 (citation omitted; emphasis added).

1178. Defendant has targeted HCSMs like Samaritan at least in part because their viewpoint on social, economic, and health care subjects varies from that of the Defendant and/or the State.

1537.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1538.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1016]

1539.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1540.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1541.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1542.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1543.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1544.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1545.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

---

[1016] *Flores*, 521 U.S. at 534.

## NINTH CAUSE OF ACTION: VIOLATION OF THE FREE EXERCISE, SPEECH, AND ASSEMBLY CLAUSES: EXPRESSIVE ASSOCIATION DOCTRINE (Strict Scrutiny)

1546.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1547.   Defendant has threatened violations of the associational rights of Samaritan and its members derived from their collective, expressive activity guaranteed by Free Exercise, Free Speech, and Assembly Clauses of the First Amendment.

1548.   The Supreme "Court has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others" in First Amendment activities or for First Amendment purposes[1017]

1549.   This freedom to associate also prohibits "intrusion into the internal structure or affairs of an association" and "plainly presupposes a freedom not to associate."[1018]

1550.   Courts defer to a group's explanation of the "nature of its expression [and its] view of what would impair its expression."[1019] Plaintiffs have exhaustively explained their expressive association and what would impair it. ¶¶351-488, 552-612, and attached Declarations.

1551.   The First Amendment's protection of expressive association and speech "applies with special force [to] religious groups, whose very existence is dedicated to the collective expression and propagation of shared religious ideals."[1020]

1552.   The First Amendment prohibits regulations that might (a) "affect the way an

---

[1017] *Bonta*, 141 S.Ct. at 2382 (quoting *Roberts*, 468 U.S. at 622).

[1018] *Boy Scouts v. Dale*, 530 U.S. at 648 (quoting *Roberts*, 468 U.S. at 623).

[1019] *Dale*, 530 U.S. at 653.

[1020] *Hosanna*, 565 U.S. at 200 (**Alito/Kagan** concurrence).

organization carried out what it understood to be its religious mission,"[1021] (b) prevent it from "defin[ing] itself" by limiting its staff to "those committed to [its] mission,"[1022] or (c) cause it "as it currently identifies itself to cease to exist."[1023]

1553.   Samaritan and its members are entitled not just to "special solicitude,"[1024] and not just to "double" First Amendment protection,[1025] but to *quadruple* First Amendment protection, since the Free Exercise, Speech, and Assembly Clauses—plus the Expressive Association Doctrine—all provide "overlapping protection for expressive religious activities."[1026] Add the structural protections of the Establishment Clause and Religious Autonomy Doctrine, and Samaritan has *quintuple* First Amendment protection and "*at least* strict scrutiny" applies.[1027]

1554.   Defendant would effectively take over Samaritan's management of its own membership rolls by dictating who could be admitted, excluded, and expelled, through Defendant's application of the Insurance Code. ¶¶1149-1178.

1555.   The same associational rights Defendant has honored for similarly situated groups Defendant now threatens to deny forever to Samaritan and its 918 New Mexico members.

1556.   At the same time, Defendant also would subject Samaritan and its members to antidiscrimination requirements and prevailing social policy contrary to the religious faith that Samaritan and its members all share and that is the basis for their sharing of their health care burdens, forcing Samaritan either to secularize or close its doors. ¶¶199-203, 331-343, 351-488,

---

[1021] *Amos*, 483 U.S. at 336.

[1022] *Amos*, 483 U.S. at 342 (Brennan & Marshall, JJ., concurring).

[1023] *CLS*, 453 F.3d at 863; *accord FCA Panel*, 46 F.4th at 1099.

[1024] *Hosanna*, 565 U.S. at 189 (unanimous).

[1025] *Kennedy*, 142 S.Ct. at 2421.

[1026] *Kennedy*, 142 S.Ct. at 2421.

[1027] *Kennedy*, 42 S.Ct. at 2426 (internal punctuation omitted; emphasis added).

840-856, 1134, 1162-1178, and attached Declarations.

1557.   As discussed in the Causes of Action above, Free Exercise, Free Speech, and Free Association are all protected by strict scrutiny. Unsurprisingly, so is Expressive Association.[1028]

1558.   Plaintiff Samaritan and its past, current, and prospective members (including the individual Plaintiff members) constitute an expressive association that desires to associate for the purpose of engaging in shared religious and communicative exercise, including but not limited to the voluntary sharing of health care needs, practices, expenses, and other burdens.

1559.   These deeply held shared beliefs include Biblical teaching on such religious and social policies as life, marriage, and sexuality. *See* all Plaintiffs' attached Declarations.

1560.   Defendant's actions and threats as described herein have and will infringe these rights of Samaritan and its members, especially its New Mexico members, to freely express themselves and associate together for all the deeply held religious purposes described herein.

1561.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1562.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1029]

1563.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1564.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

---

[1028] "'[E]xpressive association [also invokes] strict scrutiny." *Slattery*, 61 F.4th at 286.
[1029] *Flores*, 521 U.S. at 534.

1565.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1566.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1567.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1568.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1569.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

**TENTH CAUSE OF ACTION: VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS: COMPELLED SPEECH; SOLICITATION; LABELING (Strict Scrutiny)**

1570.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1571.   Rather than create several additional Causes of Action, Plaintiffs allege here several more Causes of Action that are related to but distinct from those coming before.

1572.   **<u>First</u>**, Defendant may not compel the speech (or silence) of the Plaintiffs.

1573.   By forcing Samaritan's compliance with the antidiscrimination mandates of the Insurance Code, Defendant would compel Samaritan and its members, including the ten individual Plaintiffs, to convey the state's preferred messages, which messages Plaintiffs not only prefer not to convey but believe would contradict their deeply held religious convictions.

1574.   Applying the antidiscrimination mandates of the Insurance Code to Samaritan would compel Samaritan and its members to take or support actions or views, e.g., on issues of

life and sexuality, contrary to their own views. It would compel Samaritan and its members to affirm certain views and to refrain from affirming (or remaining silent on) other views. ¶¶199-203, 331-343, 351-488, 552-612, 840-856, 1134, 1162-1178, and attached Declarations.

1575.    Defendant may not do this. ¶¶1195-1220.

1576.    "[T]he government may not compel a person to speak *its own preferred messages*."[1030] "Nor does it matter whether the government seeks to compel a person to speak its message when he would prefer to *remain silent* or to force an individual to *include other ideas* with his own speech that he would *prefer not to include*."[1031] ¶¶1195-1220.

1577.    Nor may the government "deny speakers the right 'to *choose the content* of their *own messages.*'"[1032] Nor may it "*conscript*[ a speaker] to *disseminate the government's preferred messages*."[1033] "When a state … *law and the Constitution collide*, there can be *no question which must prevail*."[1034] ¶¶1195-1220.

1578.    Just like the Christian web designer in *303 Creative*, Samaritan "faces a *credible threat of sanctions unless [it] conforms [its] views to the State's*."[1035] ¶¶1195-1220.

1579.    **Second**, Defendant may not infringe the Plaintiffs' First Amendment right of expressive association for the added reason that it is protected by the Fourteenth Amendment.

1580.    "[T]he First and Fourteenth Amendments protect certain forms of orderly group

---

[1030] *303 Creative*, 600 U.S. at 586 (emphasis added).

[1031] *303 Creative*, 600 U.S. at 586–87 (emphasis added).

[1032] *303 Creative*, 600 U.S. at 592 (cleaned up; emphasis added).

[1033] *303 Creative*, 600 U.S. at 592 (emphasis added).

[1034] *303 Creative*, 600 U.S. at 592 (emphasis added).

[1035] *303 Creative*, 600 U.S. at 597 (emphasis added).

activity [like] the right 'to engage in association for the advancement of beliefs and ideas.'"[1036]

1581.   Samaritan and its members engage in such "orderly group activity" and "association for the advancement of beliefs and ideas."[1037] ¶¶1195-1220.

1582.   Samaritan's expressive religious activities and associational purposes are implemented as detailed above. ¶¶199-203, 331-343, 351-488, 552-612, 840-856, 1134, 1162-1178, and attached Declarations.

1583.   Indeed, such association and activity are central, integral, organizing elements of Samaritan's health care sharing ministry, as described herein. ¶¶370-488, 552-612.

1584.   Such association and activity by Samaritan and its members represent precisely the "modes of expression and association protected by the [U.S. Constitution] which [New Mexico] may not prohibit, under its power to regulate the [insurance] profession, as improper solicitation of [insurance] business."[1038]

1585.   **Third**, Defendant may not infringe Samaritan's First Amendment right to engage in solicitation of financial and spiritual contributions.[1039]

1586.   Samaritan solicits its members primarily through its monthly Newsletter—its monthly communication and solicitation to its members for exhortation, prayer, notes, and gifts to and for their fellow members in need. *See  id*. & esp. ¶¶583-608.

1587.   Samaritan uses its monthly newsletter to seek, serve, and solicit its community of Christians to share directly in one another's spiritual, emotional, and financial needs arising from illness and injury. The transmission of this newsletter each month to each member household

---

[1036] *Button*, 371 U.S. at 430.

[1037] *Button*, 371 U.S. at 430.

[1038] *Button*, 371 U.S. at 428-29.

[1039] *Bonta*, 141 S.Ct. at 2382-89.

communicates and solicits in a variety of ways. *See id*.

1588.   **Fourth**, Defendant may not infringe the Plaintiffs' rights through the use or misuse (manipulation) of mere *labels*.

1589.   Under the First and Fourteenth Amendments, "a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights,"[1040] nor may it "foreclose the exercise of constitutional rights by *mere labels*."[1041]

1590.   Fundamentally, that is what Defendant is threatening to do to Samaritan and its members: mislabel Samaritan's unique sharing model as "insurance" to prevent Samaritan and its members from engaging in constitutionally protected activities in New Mexico.

1591.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1592.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1042]

1593.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1594.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1595.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

---

[1040] *Button*, 371 U.S. at 439.

[1041] *Button*, 371 U.S. at 429 (emphasis added).

[1042] *Flores*, 521 U.S. at 534.

1596.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1597.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1598.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1599.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

### ELEVENTH CAUSE OF ACTION: VIOLATION OF THE EQUAL PROTECTION CLAUSE: DISCRIMINATION INVOLVING FUNDAMENTAL RIGHT (Strict Scrutiny)

1600.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1601.   Discrimination is analyzed much the same under the Fourteenth Amendment as it is under the First Amendment.

1602.   Religious "neutrality in its application" under the First Amendment "requires an equal protection mode of analysis."[1043] Thus: "When adjudicating First Amendment challenges, courts have frequently invoked the Equal Protection Clause as a separate rationale for the constitutional requirement of neutrality toward religion."[1044]

1603.   For the same reasons the Defendant's non-neutral and non-generally applicable actions violate the First Amendment, they also violate the Fourteenth Amendment.

1604.   But the Fourteenth Amendment has additional protections.

---

[1043] *Lukumi*, 508 U.S. at 540.

[1044] *Hunt Valley*, 2020 WL 618662, at *7 (citing *Lukumi*, 508 U.S. at 539 and other cases).

1605.   The Equal Protection Clause requires that any government action that interferes with a "fundamental right" be subject to strict scrutiny.[1045]

1606.   As the Supreme Court has long held: "Unquestionably, the free exercise of religion is a fundamental constitutional right."[1046]

1607.   "In addition," Fourteenth Amendment-protected "liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs."[1047]

1608.   Although the protection of liberties by the Fourteenth Amendment arises more from its Due Process Clause than its Equal Protection Clause,[1048] it may be more appropriate for this protection to bolster this Cause of Action than to serve as its own Cause of Action.

1609.   The religious understanding of Samaritan and its members is that associating to bear one another's burdens is a key aspect of their identity as a Christian. ¶¶370-488, 552-612.

1610.   The Fourteenth Amendment protects the rights of individuals to worship and serve God according to the dictates of their own consciences, thereby allowing them to make the decisions that define their personal identity and inseparable religious beliefs.[1049]

1611.   Defendant's threatened actions interfere directly with Plaintiffs' liberty interests under the Fourteenth Amendment and separately with their Free Exercise interest under the First

---

[1045] *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982).

[1046] *Johnson*, 415 U.S. at 375 n.14; *accord Jesus Christ Is the Answer*, 915 F.3d at 265.

[1047] *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015) ("***Obergefell***").

[1048] *Obergefell*, 576 U.S. at 663.

[1049] *Obergefell*, 576 U.S. at 679-80. "Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered." *Id*.

Amendment. Both infringements violate the Fourteenth Amendment to the Constitution.

1612.   The same "mere[] intent to treat differently"[1050] that violates the Free Exercise Clause violates the Equal Protection Clause because it burdens a "fundamental right," which the free exercise of religion "[u]nquestionably" is."[1051]

1613.   If motivated by animus, Defendant's actions are flagrantly unconstitutional, as "[r]eligious animus is not a permissible government interest, much less a compelling one."[1052]

1614.   Defendant and OSI's inexplicably sudden and hostile campaign against HCSMs, their "unnecessarily aggressive" treatment of Liberty, their differential treatment of HCSMs versus comparable sector entities, and other actions described herein, *see* Fourth Cause of Action above, are likely motivated by animus, at least in part, and are inexplicable otherwise.

1615.   Such actions egregiously violate the Fourteenth Amendment.

1616.   Even if not motivated by animus, the actions of Defendant hereunder are subject to strict scrutiny both because they infringe the fundamental right of free exercise of religion and because they infringe Plaintiffs' liberty interests under the Fourth Amendment, as alleged above.

1617.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1618.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1053]

1619.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that

---

[1050] *Colo. Christian*, 534 F.3d at 1260 (10th Cir.) (McConnell, J.).

[1051] *Johnson*, 415 U.S. at 375 n.14); *accord Jesus Christ Is the Answer*, 915 F.3d at 265.

[1052] *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3.

[1053] *Flores*, 521 U.S. at 534.

test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1620.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1621.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1622.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1623.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1624.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1625.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## TWELFTH CAUSE OF ACTION: VIOLATION OF THE EQUAL PROTECTION CLAUSE: DISCRIMINATION INVOLVING SUSPECT CLASS (Strict Scrutiny)

1626.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1627.   For the same reasons the Defendant's non-neutral and non-generally applicable actions violate the First Amendment, they also violate the Fourteenth Amendment, as described in the previous Cause of Action. But the Fourteenth Amendment has additional protections.

1628.   The Equal Protection Clause of the Fourteenth Amendment requires that any

government action that discriminates against a "suspect class" be subject to strict scrutiny. [1054]

1629.   "Religion is a suspect class."[1055]

1630.   The differential treatment of Samaritan due to its "religious beliefs and practices would result in classifying them based on membership in a suspect class, and would violate the Equal Protection Clause unless the classification satisfies strict scrutiny."[1056]

1631.   For all the reasons stated in the previous Cause of Action, and in the Free Exercise Causes of Action, the threatened actions of Defendant discriminate against Samaritan and its members, including the individual Plaintiffs, in violation of the Fourteenth Amendment.

1632.   If motivated by animus, Defendant's actions are flagrantly unconstitutional, as "[r]eligious animus is not a permissible government interest, much less a compelling one."[1057]

1633.   Defendant and OSI's inexplicably sudden and hostile campaign against HCSMs, their "unnecessarily aggressive" treatment of Liberty, their differential treatment of HCSMs versus comparable sector entities, and other actions described herein, *see* Fourth Cause of Action above, are likely motivated by animus, at least in part, and are inexplicable otherwise.

1634.   Such actions egregiously violate the Fourteenth Amendment.

1635.   Even if not motivated by animus, Defendant's actions are subject to strict scrutiny both because they interfere with the suspect class of religion and because they burden the fundamental right of free exercise of religion.

1636.   In any event, Defendant has no rational, much less compelling, reason for OSI's actions and, regardless, those actions are not the means least restrictive of religious exercise to

---

[1054] *Plyler*, 457 U.S. at 216-17.

[1055] *Al Saud*, 50 F.4th at 710 (citing *Dukes*, 427 U.S. at 303).

[1056] *Al Saud*, 50 F.4th at 710.

[1057] *Jesus Christ Is the Answer*, 915 F.3d at 262 n.3.

further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1637.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1058]

1638.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1639.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1640.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1641.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1642.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1643.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1644.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## THIRTEENTH CAUSE OF ACTION: VIOLATION OF THE DUE PROCESS CLAUSE: FUNDAMENTALLY UNFAIR AGENCY PROCESS (Functional Test)

1645.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

---

[1058] *Flores*, 521 U.S. at 534.

1646.    Defendant is violating the Due Process Clause of the Fourteenth Amendment with respect to other HCSMs, and is threatening to do the same to Samaritan. ¶¶1263-1275.

1647.    "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'"[1059] "This applies to *administrative agencies which adjudicate as well as to courts*. Not only is a biased decisionmaker constitutionally unacceptable but 'our system of law has always endeavored to prevent *even the probability of unfairness*.'"[1060]

1648.    The process for "agency adjudication" should be "characterized by the same degree of procedural integrity and independence as the judicial process."[1061] Thus, an agency tribunal's "overlap" "between prosecutorial and adjudicative functions … potentially raises a greater concern about bias."[1062] "Even the most minimal guarantees of procedural due process require that the decision be issued by 'a neutral and detached hearing body[.]'"[1063]

1649.    The blending of powers within OSI, including the "overlap between prosecutorial and adjudicative functions," "raises a greater concern about bias." That combination of powers, together with the evidence of prejudgment and protectionism discussed above, make it impossible for OSI to avoid the appearance or "probability of unfairness."[1064]

1650.    Under the Fourteenth Amendment, the bare minimum that "due process requires

---

[1059] *Caperton*, 556 U.S. at 876; *accord William Jefferson*, 695 F.3d at 963 (applying *Caperton*).

[1060] *Withrow*, 421 U.S. at 47 (citation omitted; emphasis added); *accord Cox*, 514 F.3d at 1126 (10th Cir.); *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014).

[1061] *Harline*, 148 F.3d at 1205 (10th Cir.).

[1062] *William Jefferson*, 695 F.3d at 965.

[1063] *Victory v. Pataki*, 814 F.3d 47, 63 (2d Cir. 2016) (citation omitted) (parole board hearing).

[1064] Samaritan reserves its right to challenge OSI's multi-hatted roles and home-field advantage that blur separation of powers. See Seligman and cases discussed in footnote 876.

is notice and opportunity to be heard by a 'disinterested decisionmaker.'"[1065]

1651.   Defendant and the OSI administrative process deny this bare minimum of due process to Plaintiff Samaritan and its members, including all of its New Mexico members, including the ten individual Plaintiffs herein.

1652.   Defendant Kane will serve as ultimate judge in any OSI enforcement action against Plaintiff Samaritan.

1653.   Defendant Kane is not a disinterested, neutral, and impartial decisionmaker in this matter and with regard to Plaintiffs.

1654.   Defendant has collaborated with the state AG and others to bring about the specific outcome in this matter of seeking to expel Samaritan and other religious health care sharing ministries from providing health care sharing to members in New Mexico.

1655.   Defendant has prejudged this case with demonstrated hostility to religious health care sharing ministries and the obvious intention to shut down their operations in New Mexico.

1656.   Defendant has used OSI's anti-HCSM campaign to institutionalize favoritism and protectionism to insulate New Mexico's own producers in its own ACA-governed market.

1657.   Defendant, OSI, and the administrative trial process that they control may deny Plaintiff Samaritan full and fair judicial-like pretrial process to probe witnesses or other evidence for inconsistency, illegality, motive, or other irregularities, and to take other discovery necessary to pursue and develop evidence of animus by Defendant and OSI against Samaritan and other religious health care sharing ministries and their members and other evidence necessary for the protection of their constitutional rights and support of their defenses.

1658.   Defendant and the OSI administrative trial process that she controls will force

---

[1065] *ClearOne, Inc. v. Shure Acquisition Holdings*, 35 F.4th 1345, 1352 (Fed. Cir. 2022).

Plaintiff Samaritan to face prosecution, substantial penalties, and potential expulsion of Plaintiff and all of its operations from New Mexico and deprive Samaritan's New Mexico members of any opportunity to participate in health care sharing as their religious beliefs and exercise direct.

1659.   The OSI administrative trial forum that Defendant Kane controls is inadequate, particularly to adjudicate complex constitutional questions necessary to protect the Plaintiffs' constitutional rights. ¶¶1263-1275.

1660.   "Resolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board. This is especially so when a plaintiff's claims are founded on infringement of specific constitutional rights. Plaintiffs allege specific, and far from frivolous, violations of their free exercise rights[.] Plaintiffs also face irreparable harm if judicial review is denied…. 'The loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury.'"[1066]

1661.   "In addition" to the above process-oriented rights, the Fourteenth Amendment's Due Process Clause also protects "liberties [to] certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs."[1067]

1662.   The religious understanding of Samaritan and its members is that associating to bear one another's burdens is a key aspect of their identity as a Christian. ¶¶1263-1275.

1663.   It may be more appropriate for this protection to bolster this Cause of Action than to stand alone as its own Cause of Action.

1664.   Under any and all of the above principles, Defendant violates the Fourteenth Amendment Due Process Clause and the rights of Plaintiffs guaranteed thereunder.

1665.   In any event, Defendant has no rational, much less compelling, reason for OSI's

---

[1066] *Navy Seals*, 27 F.4th at 348 (citations & internal punctuation omitted; cleaned up).

[1067] *Obergefell*, 576 U.S. at 663.

actions and, regardless, those actions are not the means least restrictive of religious exercise to further *any* governmental interest. Defendant fails both prongs of strict scrutiny.

1666.   In the end, Defendant's anti-HCSM campaign cannot survive any form of judicial scrutiny, let alone "the most demanding test known to constitutional law."[1068]

1667.   For the reasons stated in the First Cause of Action above, OSI cannot satisfy that test and therefore must grant an exemption to Samaritan, whether willingly or under court order.

1668.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1669.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

1670.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1671.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1672.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1673.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## FOURTEENTH CAUSE OF ACTION: FEDERAL PREEMPTION

1674.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

---

[1068] *Flores*, 521 U.S. at 534.

1675.   "Put simply, federal law preempts contrary state law."[1069]

1676.   Preemption challenges are proper in this preenforcement context.[1070]

1677.   Plaintiffs profoundly disagree with Defendant's new policy and practice of applying the Insurance Code to health care sharing ministries like Samaritan. But that OSI policy and practice exists, and it threatens the legal rights of Plaintiffs every day.

1678.   In yet another way this policy and practice of Defendant violates federal law.

1679.   Defendant's new policy and practice of applying the Insurance Code to health care sharing ministries like Samaritan conflicts with governing federal laws in a manner that requires preemption under the Supremacy Clause of the United States Constitution.

1680.   The McCarran Ferguson Act ("MFA")[1071] helps reserve "insurance regulation" to the states by protecting such regulation from "federal preemption."

1681.   Only regulations of "insurance," as defined by the MFA, qualify for this protection.[1072] Federal cases control the meaning of "insurance" purposes of preemption.[1073] To qualify for MFA protection, OSI must define "insurance" consistently with federal cases.

1682.   In other words, the MFA reserves "insurance regulation" to the states by protecting such regulation from "federal preemption."[1074] But only state regulations that regulate "insurance" as federally defined by the MFA qualify for this protection from federal preemption.

1683.   Because the MFA is a **federal** law, "how the ***States may have ruled is not***

---

[1069] *Supreme Court of New Mexico*, 839 F.3d at 917-18 (10th Cir.).

[1070] *LWV*, 5 F.4th at 729 ("*Arizona v. U.S.*, 567 U.S. 387 (2012) … largely upheld a preenforcement preemption challenge to multiple provisions of [Arizona] law").

[1071] 15 U.S.C. §§1011 *et seq*.

[1072] *See Variable Annuity*, 359 U.S. at 67-72.

[1073] *Variable Annuity*, 359 U.S. at 69.

[1074] *Variable Annuity*, 359 U.S. at 67.

*decisive*."[1075] In such "***federal statutes*** …'***insurance***' and 'annuity' are ***federal terms***."[1076] Thus, under the MFA, "the ***meaning of 'insurance'*** … is a ***federal question***."[1077]

1684.    Thus, to qualify for MFA protection, ***states must define "insurance" consistently with federal cases***. For example, *Air Evac* held that an insurance commissioner's "enforcement threat against" a "Membership Program" like Samaritan's did not "involve regulation of the business of insurance" as defined by the MFA.[1078] "The Defendant has presented nothing to counter Air Evac's evidence that the Membership Program provides … ***no indemnification***. The McCarran Ferguson Act applies ***only to regulation of the business of insurance***. Air Evac is likely to prevail in demonstrating that its Membership Program is ***not insurance***, and therefore that ***any state regulation of it is preempted***[.] The Defendant's ***efforts to employ a broad definition of 'insurance'*** to reach Air Evac's program … is unlikely to alter that outcome."[1079]

1685.    If New Mexico wants the preemption benefits of federal law (i.e., MFA), it must define "insurance" consistently with federal cases. Like *Air Evac*, federal cases have been clear about the key requirements of "insurance," as a few more examples will show.

1686.    Insurance always requires ***assumption*** of "***true risk***."[1080] "'[I]nsurance' involves a guarantee that at least some fraction of the benefits will be ***payable in fixed amounts***. The companies that issue these annuities [do] take the risk of failure. ***But they guarantee nothing***[.]

---

[1075] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[1076] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[1077] *Variable Annuity*, 359 U.S. at 69 (emphasis added).

[1078] *Air Evac*, 523 F.Supp.3d at 872, *aff'd on other grounds*, 37 F.4th 89.

[1079] *Air Evac*, 523 F.Supp.3d at 873 (emphasis added).

[1080] *Variable Annuity*, 359 U.S. at 71 (emphasis added).

There is no true underwriting of risks, ***the one [real] earmark of insurance***[.]"[1081] For this reason alone, Samaritan's ministry cannot constitute "insurance" under federal law.

1687.   "[If risk] is not shifted [to] others, there can be ***neither insurance nor indemnity***. Insurance also … involves distribution of the risk, but ***distribution without assumption hardly can be held to be insurance***. These are ***elemental conceptions and controlling ones***."[1082] For this other reason alone, Samaritan's ministry cannot constitute "insurance" under federal law.

1688.   The earmarks of insurance have always included the related concepts of indemnity, promise to pay, and assumption of risk.[1083]

1689.   In short, a contract for insurance ***always*** requires a ***legally enforceable*** promise or "***ultimate obligation to indemnify the insured***."[1084] Only one "***compelled to pay*** another party ***due to a legal obligation*** [fulfills] ***indemnification***,[1085] because an "***obligation to indemnify*** [arises from a] ***legal obligation to pay***."[1086] To "***shift [the] entire responsibility***" "is ***exactly what indemnity means***."[1087] Samaritan's ministry clearly is not insurance under federal law.

1690.   All such terms must be given their ***plain meaning***. "This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration."[1088]

---

[1081] *Variable Annuity*, 359 U.S. at 71-73 (citations omitted; emphasis added).

[1082] *Jordan*, 107 F.2d at 245 (D.C. Cir.) (emphasis added).

[1083] *See, e.g.*, *Kinkaid*, 321 F.Supp.2d at 1098.

[1084] *Marathon*, 243 F.3d at 1244 (emphasis added).

[1085] *Stewart*, 2005 WL 300420, at *5 (10th Cir.) (emphasis added).

[1086] *In re Wallace*, 385 F.3d at 831 (emphasis added).

[1087] *ERC*, 603 F.Supp.2d at 825 (emphasis added), *aff'd*, 602 F.3d 597 (4th Cir. 2010).

[1088] *Bostock*, 140 S.Ct. at 1749.

1691. To the extent New Mexico law, as interpreted or as applied by Defendant, disagrees, New Mexico law is preempted.

1692. New Mexico is acutely aware of its risk of losing MFA protection, as a few excerpts from the Insurance Code (with emphasis added) will demonstrate.

1693. "The purpose of [this] Law is to provide a comprehensive body of law for the effective regulation [of] insurance [in] accordance with the ***McCarran-Ferguson Act***[.]"[1089]

1694. "[Here, the] state exercises its powers [to] ***define what constitutes*** transacting an ***insurance business*** [by] virtue of [the ***MFA***], which declares that the business of insurance and every person engaged therein shall be ***subject to the laws of the several states***."[1090]

1695. "A purpose of this article is to regulate trade practices in the insurance business [in] accordance [with] the intent of Congress [in the ***McCarran Ferguson Act***, by defining [the practices] which constitute ***unfair methods*** of competition or ***unfair or deceptive acts***[.]"[1091]

1696. Defendant's policy and practice of applying the Insurance Code to HCSMs like Samaritan exceeds or contradicts the federal law of insurance under the MFA.

1697. As a result, Defendant loses any anti-preemption benefits of the MFA in this case and Defendant's interpretation of insurance is preempted by at least two provisions of the Internal Revenue Code—IRC §5000A and IRC §501(m)(1)—as further described below.

1698. "[A]mong the three types of preemption, the one relevant here is called ***conflict preemption***. In that species of preemption, a state-law provision will be preempted if it conflicts with federal law, either because (1) ***compliance with both*** federal and state regulations is a ***physical impossibility***, **or** because the provision (2) ***stands as an obstacle*** to the accomplishment

[1089] NMSA 1978, §59A-30-2 (title insurance) (citing the MFA at 15 U.S.C. §§1011-1015).

[1090] NMSA 1978, §59A-15-1 (citing the MFA at 15 U.S.C. §§1011 *et seq.*).

[1091] NMSA 1978, §59A-16-2 (citing the MFA at 15 U.S.C. §§1011 *et seq.*).

and execution of the full **_purposes and objectives_** of federal law."[1092]

1699.   Defendant's policy and practice of applying the Insurance Code to HCSMs like Samaritan is "conflict preempted" on both grounds: (1) **_impossibility_** and (2) **_obstacle_**.

**Conflict with IRC §5000A(d)(2)(B)**

1700.   The ACA provides HCSM members with an exemption from the minimum coverage requirement's shared responsibility payment (individual mandate). ¶¶1251-1262.

1701.   Under the ACA, "'health care sharing ministry' means an organization—

(ii)    which is described in **_§501(c)(3)_** and is exempt from taxation under §501(a) [and]

(iii)   members of which **_share a common set_** of ethical or **_religious beliefs_** **and** **_share_** medical expenses among members **_in accordance with those beliefs_** **and** **_without regard to the State in which a member resides_** or is employed[.]"[1093]

1702.   One of the obvious goals of this exemption is to ensure that all Americans have access to HCSMs, in every state. When CMS recognized Samaritan as compliant with the ACA exemption, *see* ACA-Certified HCSM List (Ex. 20) (Samaritan is No. 3), it was ensuring equal access to the exemption's benefits for all Samaritan members nationwide.

1703.   Subjecting Samaritan to the Code stymies the clear intent of the ACA that HCSMs be available to all Americans, on an equal basis nationwide, and that all Americans share in the exemption's benefits on an equal basis nationwide.

1704.   Subjecting Samaritan to the Code thus violates conflict-preemption principles on both impossibility and obstacle grounds, as explained below.

1705.   Unlike the federal authorities at IRS and CMS and the insurance regulators in

_____

[1092] *Sup. Ct. of N.M.*, 839 F.3d at 917-18 (10th Cir.) (citations & internal punctuation omitted; emphasis added). *Accord Club Madonna*, 42 F.4th at 1256 (upholding "conflict preemption").

[1093] IRC §5000A(d)(2)(B)(ii)(I)&(II) (emphasis added).

every other state,[1094] Defendant has interpreted "insurance" contrary to federal law. Using that interpretation to subject Samaritan to the Insurance Code, Defendant would disqualify Samaritan from ACA HCSM status in at least the following ways.

1706.    **First**, it would cost Samaritan its IRC §501(c)(3) status because IRC §501(m)(1) strictly prohibits §501(c)(3) status for any entity that even "substantially" provides any kind of "commercial insurance." ¶¶944-983. The loss of §501(c)(3) status would automatically destroy Samaritan's ACA HCSM status under §5000A(d)(2)(B)(ii)(**I**). Ironically, New Mexico itself foist this Hobson's choice, or absurdity, on HCSMs, since some provisions of the Insurance Code require §501(c)(3) status even though that status is prohibited to any entity that even "substantially" provides any kind of "commercial insurance." *Id*. & ¶¶1251-1262.

1707.    **Second**, it would prevent Samaritan's membership from sharing medical expenses (uniformly, nationwide) in accordance with their common religious beliefs, because the antidiscrimination requirements of the Insurance Code forbid discrimination on the basis of religion.[1095] This would automatically destroy Samaritan's ACA HCSM status under §5000A(d)(2)(B)(ii)(**II**). ¶¶944-983; 1251-1262.

1708.    **Third**, it would prevent Samaritan's membership from sharing medical expenses (uniformly, nationwide) "without regard to the State in which a member resides." Samaritan currently operates freely everywhere as non-insurance. If Samaritan is subjected to any of the many New Mexico requirements that conflict with Samaritan's core beliefs and practices, it would have to gerrymander its sharing program for New Mexico, adopting policies and practices

---

[1094] ¶¶944-983 above (discussing applicable laws).

[1095] The Insurance Code also forbids discrimination based on certain social policy factors—e.g., contraception, reproductive rights, sexual orientation, gender identity—that inhere in Samaritan's common set of Biblical religious beliefs. ¶¶1165-1167. Such social policy factors are additional obstacles to uniform, nationwide sharing according to common "religious beliefs."

solely for New Mexico. This would prevent the uniform sharing required by the ACA and also automatically destroy Samaritan's HCSM status under §5000A(d)(2)(B)(ii)(**II**).

1709.   **Fourth**, and alternatively, Samaritan's supposed "option" of simply exiting New Mexico also would destroy Samaritan's ACA HCSM status under §5000A(d)(2)(B)(ii)(**II**) since Samaritan's absence in New Mexico would prevent it from serving members equally, nationwide, "without regard to the State in which a member resides or is employed."

1710.   Thus, Defendant's actions would deprive members of Samaritan (and all HCSMs) in the other 49 states of equal treatment by preventing Samaritan (and all HCSMs) from serving any member who *moves* to New Mexico,[1096] violating the uniformity requirement.

1711.   Defendant's exclusion of *all* HCSMs also would deprive *all New Mexicans*, as individual members of Samaritan and beneficiaries of the ACA mandate-exemption, of the benefits of that exemption to which they are entitled by federal law, again violating uniformity.

1712.   Defendant's action also would render the ACA HCSM exemption meaningless.

1713.   In enacting the ACA, including IRC §5000A(d)(2)(B), Congress necessarily defined HCSM membership as non-insurance. That is why members of HCSMs are exempt from penalties imposed by the ACA for not having insurance.[1097] If Samaritan's programs *were* insurance, they would satisfy the ACA without any need for the IRC §5000A(d)(2)(B) mandate exemption. The federal exemption would be meaningless.

**Conflict with IRC §501**

1714.   In addition, and at the same time, Defendant's actions prevent Samaritan from complying with its IRC §501(c)(3) duties under IRC §501(m)(1), which prohibits engaging even

---

[1096] Again, since what Samaritan does is not "insurance" as defined by the MFA, OSI's attempt to regulate what Samaritan does would not be spared federal preemption under the MFA.

[1097] Congress "zeroed out" such penalties in 2018. But Congress can reimpose them at any time and, in any case, the "individual mandate" remains law.

substantially in the commercial insurance business.

1715.   The IRS may recognize the §501(c)(3) status of an entity "*only if no substantial part* of its activities consists of providing *commercial-type insurance*." §501(m)(1) (emphasis added). "Congress intended a broad definition of the term 'commercial-type insurance.'"[1098]

1716.   This federal definition was intended to capture anything even like insurance. Samaritan clearly is not "insurance" within the meaning of this definition, as the IRS has recognized Samaritan's §501(c)(3) status continually since first formally recognizing it in 2005.

1717.   In short, enforcing Samaritan's compliance with the Insurance Code would force Samaritan to violate Section 501 of the Internal Revenue Code.

**Reasons for Preemption**

1718.   Viewed in any of the above ways, state law, as interpreted by Defendant, would make "compliance with both federal and state regulations" impossible, requiring preemption.[1099]

1719.   Subjecting Samaritan to the Insurance Code creates irreconcilable conflicts with Sections 5000A(d)(2)(B), 501(c)(3), and 501(m)(1) of the Internal Revenue Code, not only making it "impossible" for Samaritan to comply with both federal and state law but also standing as an "obstacle to the accomplishment [of] the full purposes and objectives" of Congress.[1100]

1720.   Defendant's policy and practice of subjecting HCSMs like Samaritan to the Insurance Code is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," including its intent to treat HCSMs as "not insurance"—requiring

---

[1098] *Paratransit*, 102 T.C. at 752; *accord FHTF*, 103 T.C. at 158, *aff'd on other grounds*, 71 F.3d 808. The IRS follows *Paratransit* and *FHTF* to enforce §501(m). *See, e.g.*, I.R.S. P.L.R. 201218017 (May 4, 2012). Because it "provides commercial-type insurance under the meaning of 26 U.S.C. §501(m)(1)," the IRS "appropriately determined that FICURMA is not eligible for exemption." *FICURMA*, 850 F.Supp.2d at 132 (D.D.C.) (relying on *Paratransit* and *FHTF*).

[1099] *Johnson*, 781 F.3d at 707.

[1100] *Supreme Court of New Mexico*, 839 F.3d at 917-18.

preemption by §5000A[1101]—and its intent to prohibit 501(c)(3) charities from engaging in any kind of commercial insurance activity—requiring preemption by §501(c)(3) and §501(m)(1).

1721.   By interpreting state insurance law to create an irreconcilable conflict with IRC §5000A, IRC §501(c)(3), and IRC §501(m)(1), Defendant also contradicted the proper federal authorities in their own determinations under those laws, which will "impede the [CMS's and IRS's] authority, again ensuring preemption.[1102]

1722.   In addition, by interpreting state law to "interfere[] with the *methods* by which [§5000A and §501 were] designed to reach [their] goal," Defendant's interpretation must be preempted by those sections of the Internal Revenue Code.[1103]

1723.   In sum, Defendant's unlawful policy and practice concerning HCSMs ruptures the otherwise reasonably uniform national regulatory environment—led by the ACA exemption— that allows Samaritan to operate freely as non-insurance nationwide. It renders New Mexico the lone, hostile outlier, a sharp departure from its own longstanding regulatory policy prior to 2020.

1724.   Thus, Defendant's application of the Insurance Code to Samaritan is "conflict preempted" under the Supremacy Clause of the United States Constitution.

1725.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including individual Plaintiffs, have suffered and will continue to suffer imminent and irreparable harm as described in the First Cause of Action above.

1726.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' constitutional and civil rights pursuant to 42 U.S.C. §1983.

---

[1101] *Columbia*, 604 F.3d at 829 ("Obstacle preemption … applies 'where state law stands as an obstacle [to] accomplishment and execution of the full purposes and objectives of Congress.'").

[1102] *Johnson*, 781 F.3d at 706.

[1103] *Id*. ("Obstacle preemption … occurs where state law 'interferes with the methods by which the federal statute was designed to reach [its] goal.'") (citations omitted; emphasis in original).

1727.   As a proximate result of Defendant's actions, Plaintiffs have been damaged and will continue to be damaged by Defendant.

1728.   Plaintiffs are entitled to injunctive and declaratory relief against Defendant, restraining Defendant from violating their constitutional and civil rights.

1729.   Plaintiffs also are entitled to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings, and attorney fee recovery.

1730.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## FIFTEENTH CAUSE OF ACTION: DECLARATORY JUDGMENT UNDER 28 U.S.C. §2201

1731.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1732.   As alleged above, Plaintiff Samaritan is non-insurance under federal law as determined pursuant to the McCarran Ferguson Act (15 U.S.C. §§1011 *et seq*.).

1733.   As alleged above, Plaintiff Samaritan also continues to qualify as a tax-exempt public charity under 26 U.S.C. §501(c)(3) because it does not engage in the business of commercial "insurance" as prohibited by 26 U.S.C. §501(m)(1).

1734.   As alleged above, Plaintiff Samaritan also qualifies as a "health care sharing ministry" under 26 U.S.C. §5000A(d)(2)(B), which is incompatible with "insurance" and would render meaningless the ACA's treatment of HCSMs as non-insurance.

1735.   Defendant denies all these federal statuses to HCSMs like Samaritan, having determined that such ministries are "insurance" under the Insurance Code and having subjected Samaritan to the threat of a C&D and to the OSI trial process.

1736.   Federal courts may grant declaratory relief under the Declaratory Judgment Act,

28 U.S.C. §2201 and 28 U.S.C §2202, and here there is a real and actual controversy between Plaintiffs and Defendant regarding whether Defendant may undertake to act as described herein.

1737.   Plaintiff Samaritan's request for a declaration that its ministry is non-insurance under 15 U.S.C. §§1011 *et seq*. and 26 U.S.C. §501(m)(1) and that its ministry is a health care sharing ministry under 26 U.S.C. §5000A(d)(2)(B), "arises under" federal law. 28 U.S.C. §1331.

1738.   This issue is substantial: Proper interpretation of these questions affects not just Samaritan and its 918 New Mexico members (including the ten individual Plaintiffs), but also whether thousands of other New Mexicans can engage in constitutionally protected religious exercise by participating in health care sharing ministries.

1739.   A declaration of this Court can stop, not just an illegal enforcement action here, but follow-on consequences both inside and outside of New Mexico, including (a) jeopardizing Samaritan's federal tax-exempt status; (b) jeopardizing Samaritan's federal HCSM status; (c) jeopardizing Samaritan's treatment as non-insurance and ability to operate freely throughout the United States, (d) instigating other unwarranted regulatory actions against Samaritan in other states; and (e) instigating unwarranted lawsuits against Samaritan. ¶¶708-1178.

1740.   Plaintiffs are entitled to a declaration that Samaritan is entitled to federal HCSM status under the ACA (26 U.S.C. §5000A(d)(2)(B)) and to federal non-insurance status under the MFA (15 U.S.C. §§1011 *et seq*.) and the IRC (26 U.S.C. §501(m)(1)).

1741.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief, including (without limitation) this declaration.

### SIXTEENTH CAUSE OF ACTION: VIOLATION OF THE NEW MEXICO RELIGIOUS FREEDOM RESTORATION ACT (NMSA 1978, §28-22-4)

1742.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth in this Cause of Action.

1743.   As alleged above, Defendant's actions already have resulted in restrictions under the New Mexico Religious Freedom Restoration Act ("NMRFRA"), NMSA 1978, §28-22-3 and §28-22-4, over which this Court has original jurisdiction as well as and supplemental jurisdiction under 28 U.S.C. §1367(a), as alleged under Jurisdiction and Venue above at ¶¶520-534.

The NMRFRA, at NMSA 1978, §28-22-2, provides that:

> As used in the New Mexico Religious Freedom Restoration Act: A. "free exercise of religion" means an act or a refusal to act that is substantially motivated by religious belief; and B. "government agency" means the state or any of its political subdivisions, institutions, departments, agencies, commissions, committees, boards, councils, bureaus or authorities.

1744.   The NMRFRA, at NMSA 1978, §28-22-3, provides that:

> A government agency shall not restrict a person's free exercise of religion unless: A. the restriction is in the form of a rule of general applicability and does not directly discriminate against religion or among religions; and B. the application of the restriction to the person is essential to further a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

1745.   The NMRFRA, at NMSA 1978, §28-22-4, provides that:

> A. A person whose free exercise of religion has been restricted by a violation of the New Mexico Religious Freedom Restoration Act may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government agency, including: (1) injunctive or declaratory relief against a government agency that violates or proposes to violate the provisions of the New Mexico Religious Freedom Restoration Act; and (2) damages pursuant to the Tort Claims Act, reasonable attorney fees and costs. B. Immunity from liability of the government agency and its employees is waived for an action brought pursuant to this section.

The NMRFRA, at NMSA 1978, §28-22-5, provides that:

Nothing in the New Mexico Religious Freedom Restoration Act authorizes a government agency to burden a person's free exercise of religion. The protection of the free exercise of religion granted in that act is in addition to the protections granted by federal law and the state and federal constitutions. The New Mexico Religious Freedom Restoration Act does not affect the grant of benefits or tax exemptions to religious organizations nor does it impair any other exemptions granted by law.

1746.   As Superintendent of Insurance and head of the Office of Superintendent of Insurance, Defendant leads a "government agency" as defined by NMSA 1978, §28-22-2(B).

1747.   Plaintiffs begin from the premises established in NMSA 1978, §28-22-5 that (a) "[n]othing" in the NMRFRA "authorizes a government agency to burden a person's free exercise of religion" and (b) the "protection of the free exercise of religion granted in [the NMRFRA] is in addition to the protections granted by federal law and the state and federal constitutions."

1748.   Defendant's anti-HCSM campaign and other actions alleged in this Complaint, particularly in Causes of Action One through Four above, violate the NMRFRA because those actions have already restricted, and will continue in escalating severity to restrict, the sincere and free religious exercise of Plaintiff Samaritan and the ten individual Plaintiffs.

1749.   As alleged throughout this Complaint, e.g., ¶¶370-488 & 552-612, and as shown by the attached Declarations, Plaintiffs' Chrisitan sharing ministry is substantially motivated by their sincerely held religious beliefs, in compliance with NMSA 1978, §28-22-2(A).

1750.   Although Plaintiffs have alleged herein (a) substantial burdens and (b) intentional discrimination throughout this Complaint, neither is necessary under the NMRFRA, which does not require a person to demonstrate a "substantial burden" or any form of "discrimination."

1751.   Defendant's restrictive actions against Plaintiffs' free exercise of religion violate the NMRFRA in a number of ways.

1752.   **First**, Defendant's restrictive actions were not in "the form of a rule of general applicability" as required by NMSA 1978, §28-22-3(A).

1753.   **Second**, Defendant's restrictive actions *did* "directly discriminate against the religion" and expressive religious activities of the Plaintiffs, contrary to §28-22-3(A).

1754.   **Third**, even if Defendant's restrictions somehow were both (a) in "the form of a rule of general applicability" and (b) not discriminatory against Plaintiffs' religious exercise, as required by §28-22-3(A), Defendant's "application" of the restrictions to Plaintiffs was not (c) "essential to further a compelling governmental interest," as required by §28-22-3(B). Specifically, Defendant's application of restrictions neither (i) served a "compelling government interest" nor (ii) was "essential" to "further" any such interest, failing in each respect.

1755.   **Fourth**, even if Defendant's restrictive actions somehow were both (a) in "the form of a rule of general applicability" and (b) not discriminatory against Plaintiffs' religious exercise, as required by §28-22-3(A), and (c) the application of those restrictions somehow was "essential to further a compelling governmental interest," as required by §28-22-3(B), Defendant's "application" of the restrictions to Plaintiffs still was not (d) the "least restrictive means" of "furthering that compelling governmental interest," as required by §28-22-3(B).

1756.   This two-part strict scrutiny test "is the most demanding test known to constitutional law,"[1104] "survive[d] only in rare cases.[1105]

1757.   Defendant's actions also are not a rational or even minimally acceptable means to

---

[1104] *Flores*, 521 U.S. at 534.

[1105] *Lukumi*, 508 U.S. at 546. A good example of this test in action is *Singh*, 56 F.4th 88 (D.C. Cir.) (exempting Sikh recruits from the Marine Corps' grooming policies). *See also TMAA*, 83 F.4th at 930-32 (ruling for religious landowner under Alabama state RFRA).

further *any* governmental interest, much less a compelling one.

1758.   Plaintiffs assert these violations of NMRFRA under NMSA 1978, §28-22-4, and request all "appropriate relief" against Defendant available under NMSA 1978, §28-22-4, including: (a) injunctive relief against Defendant's actions that violate or propose to violate the provisions of the NMRFRA; (b) declaratory relief against Defendant's actions that violate or propose to violate the provisions of the NMRFRA; (c) damages pursuant to the Tort Claims Act; and (d) reasonable attorney fees and costs.

1759.   Absent injunctive and declaratory relief against Defendant, Plaintiffs Samaritan and its New Mexico members, including the ten individual Plaintiffs, will continue to suffer imminent and escalating irreparable harm.

1760.   Defendant's conduct, undertaken under color of state law, constitutes a violation of Plaintiffs' civil rights under the NMRFRA.

1761.   As a proximate result of Defendant's actions, Plaintiffs were damaged and continue to be damaged.

1762.   Plaintiffs are entitled to an injunction prohibiting Defendant from violating their constitutional and civil rights and to monetary damages, compensatory and punitive, in an amount to be established during discovery and pretrial proceedings in this case.

1763.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## PRAYER FOR RELIEF

1764.   Plaintiff Samaritan Ministries and ten of its members from the State of New Mexico, namely, Zachary & Rachel Cordel, David Allan & Monette Bell, Rev. Andrew & Heather Heath, Jay & Amy O'Neill, and Rev. Nathan & Rebekah Bienhoff, all individual

Plaintiffs herein, pray for judgment as follows:

1765.   That this Court issue a Preliminary and Permanent Injunction to enjoin the Defendant, Defendant's officers, agents, and employees, and all other persons acting in active concert with Defendant, from enforcing New Mexico insurance laws against, or exercising regulatory authority over, the Plaintiffs, including (without limitation) enjoining any OSI investigation, any Cease & Desist Order, and any other enforcement action against Plaintiffs, pending further Order of this Court;

1766.   That this Court render a Declaratory Judgment declaring that Defendant's likely enforcement actions against the Plaintiffs are unconstitutional as applied to the Plaintiffs, in violation of the First and Fourteenth Amendments to the United States Constitution, that Samaritan's ministry is entitled to federal HCSM status under the ACA (26 U.S.C. §5000A(d)(2)(B)), and that Samaritan's ministry is entitled to federal non-insurance status under the MFA (15 U.S.C. §§1011 *et seq*.) and the IRC (26 U.S.C. §501(m)(1));

1767.   That this Court award damages to Plaintiffs, against Defendant, in an amount to be determined, plus punitive damages if supported by the evidence;

1768.   That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiffs;

1769.   That this Court award Plaintiff Samaritan and the individual Plaintiffs their costs and expenses, including their attorneys' fees, pursuant to 42. U.S.C. §1988; and NMSA 1978, §28-22-4; and

1770.   For such other relief as the Court deems just and equitable.

/ / / /

/ / / /

Dated this <u>7th</u> day of December, 2023

Respectfully submitted,

<u>/s/ J. Matthew Szymanski, Esq.</u>
J. Matthew Szymanski, Esq.
Bar No. 23-267
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Tysons, VA 22182
(703) 761-5030 (telephone)
(703) 761-5030 (facsimile)
Email: JMS@gg-law.com


Scott J. Ward, Esq.
Bar No. 23-361
GAMMON & GRANGE, P.C.
1945 Old Gallows Road, Suite 650
Tysons, VA 22182
(703) 761-5012 (telephone)
(703) 761-5012 (facsimile)
Email: SJW@gg-law.com

## <u>VERIFICATION OF COMPLAINT</u>

I declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that I have read the foregoing Verified Complaint and that all facts alleged therein are true and correct to the best of my knowledge and belief.

Executed this <u>7th</u> day of December, 2023.

<div style="text-align:right">

*/s/ Anthony Hopp*
Anthony Hopp
Chief Purpose Officer
Samaritan Ministries International

</div>