**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| SAMARITAN MINISTRIES INTERNATIONAL, a religious Illinois non-profit corporation,     6000 N. Forest Park Drive     Peoria, Illinois 61614, | |
| and ten of its New Mexico members, namely, | **Case No. 1:23-cv-01091-MIS-SCY** |
| ZACHARY & RACHEL CORDEL, 662 CR F, Clovis, New Mexico 88101, | **Jury Trial Requested** |
| DAVID ALLAN & MONETTE BELL, 3 Mountain Vista Trail, La Luz, NM 88337, | |
| REV. ANDREW & HEATHER HEATH, 1310 Meadow Lane, Roswell, NM 88203, | |
| JAY & AMY O'NEILL, 275 Blue Sky Lane, Mesilla Park, NM 88047, and | **SAMARITAN AND INDIVIDUAL PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| REV. NATHAN & REBEKAH BIENHOFF, 3501 Highland Road, Roswell, NM 88201, | |
| *Plaintiffs*, | |
| v. | |
| ALICE T. KANE, in her personal capacity and in her official capacity as the Superintendent of Insurance for New Mexico, 1120 Paseo de Peralta 4th Floor, Santa Fe, NM 87501, | **ORAL ARGUMENT REQUESTED** |
| *Defendant*. | |

# Table of Contents

I.   INTRODUCTION. ........................................................................................................1

II.  PENDING QUESTION. .............................................................................................2

III. FOUNDATIONAL FACTUAL PREMISES. ............................................................2

   A.  The HCSM Sector Is Wholly Religious. ...............................................................2

      1.  *The HCSM sector exists to fulfill the law of Christ.* ................................2

      2.  *The HCSM sector is defined by the laws that protect it.*..........................3

      3.  *The HCSM sector comprises at least the 107 ACA-certified ministries.*.................3

      4.  *All 107 ACA-certified ministries are legally and factually religious.* ....................3

      5.  *All 107 ACA ministries must be religious to meet 31 state safe harbors.* ..............3

      6.  *Among the few non-ACA ministries, even Sedera is religious.*..............................3

      7.  *Even if Sedera were secular, the sector would be over 99% religious.* ....................4

   B.  Defendant's Policy Targets the Whole HCSM Sector. ...........................................4

      1.  *Defendant's policy labels all HCSMs "unauthorized insurance."* .........................4

      2.  *Defendant's all-HCSMs-are-insurers policy is her written policy.* ........................4

      3.  *Defendant applies her policy to HCSMs of all sizes and certifications.*...................5

   C.  Defendant Has Targeted and Threatened Samaritan..............................................5

   D.  Defendant Has Targeted the HCSM Sector with Animus.......................................5

      1.  *Defendant has disparaged the entire HCSM sector directly.*................................5

      2.  *Defendant has disparaged the entire HCSM sector indirectly.*..............................6

      3.  *Defendant disdains the sector's "religious and moral restrictions."* ......................6

   E.  Defendant Has Targeted Samaritan with Animus. .................................................6

      1.  *OSI opposed the 2015 HCSM bill: OSI v. Samaritan (2015).*................................6

      2.  *Defendant has embraced 2015: Defendant v. Samaritan (2024).* ..........................7

      3.  *Defendant is disparaging Samaritan with the Insurance Letter.*.............................8

IV. LEGAL STANDARDS.................................................................................................9

    A.  Plaintiffs Need Only Show Likelihood of Success and Irreparable Harm.........9

    B.  Likelihood of Success Considers All Applicable Factors and Theories.............9

    C.  Even Potential Irreparable Harm, However Small, Suffices for Relief...............9

    D.  The Injunction Plaintiffs Seek Is Prohibitory (Not Mandatory)........................10

    E.  Defendant Bears the Burden on the Constitutionality of Her Policy.................10

    F.  Plaintiffs Challenge Defendant's Policy Both Facially and As Applied............10

V.  ARGUMENT. ......................................................................................................10

    A.  Samaritan Ministered for 30 Years in New Mexico Without Incident...............10

    B.  Plaintiffs Exercise Both Religion and Expressive Religious Association. .........11

    C.  Defendant's Ongoing Harms to Plaintiffs Are Irreparable. ...............................12

    D.  Defendant's Imminent Future Harms to Plaintiffs Are Irreparable. .................13

    E.  Defendant's Imminent Threatened Harms to Samaritan Are Existential. ........14

    F.  Defendant's Policy Violates Plaintiffs' Rights Facially and As Applied. ..........15

    G.  Defendant Is Violating Plaintiffs' Free Exercise of Religion. .............................16

        1.  *Free exercise requires strict neutrality and strict general applicability.*................16

        2.  *Defendant's policy and actions toward Plaintiffs are not neutral.* ........................17

        3.  *Defendant's policy and actions also are not generally applicable.* ........................19

        4.  *Defendant's policy facially chills Plaintiffs' religious exercise.* .............................21

    H.  Defendant Is Violating Plaintiffs' Free Speech/Expression. ...............................21

        1.  *Defendant's non-neutrality discriminates against Plaintiffs' speech.* ...................21

        2.  *Defendant's policy chills Plaintiffs' speech facially and as applied.*.......................21

        3.  *Defendant's policy also is facially vague and overbroad.* ........................................22

    I.  Defendant Is Violating Plaintiffs' Association and Autonomy. ........................23

        1.  *Defendant's policy impairs expressive association facially and as applied.* ...........23

        2.  *Defendant's conduct intrudes on Plaintiffs' religious autonomy.* .........................24

    J.  Defendant Must Satisfy "At Least" Strict Scrutiny.................................................24

    K.  Defendant Cannot Satisfy Strict Scrutiny.................................................................25

VI. CONCLUSION. .....................................................................................................27

## Filing Timeline, ECF ("Doc.") Nos., & Abbreviations

- <u>Dec. 7, 2023</u>: Plaintiffs' Verified Complaint (Doc. 1) ("**VC**").

- <u>Jan. 9, 2024</u>: Defendant's Motion to Dismiss (Doc. 4) ("**MTD**").

- <u>Jan. 10, 2024</u>: Pls. Motion for Preliminary Injunction (Doc. 10) ("**MFPI**").

- <u>Feb. 19, 2024</u>: Defs. Opposition to MFPI (Doc. 18) ("**MFPI Opp.**").

- <u>Feb. 20, 2024</u>: Pls. Opposition to MTD (Doc. 19) ("**MTD Opp.**").

- <u>Mar. 11, 2024</u>: Defs. Reply Supporting MTD (Doc. 20) ("**MTD Reply**").

- <u>Mar. 11, 2024</u>: Pls. Reply Supporting MFPI (Doc. 21) ("**MFPI Reply**").

- <u>Apr. 9, 2024</u>: Pls. Sur-Reply Opposing MTD (Doc. 24) ("**MTD Sur-Reply**").

- <u>June 6, 2024</u>: *Sua Sponte* Order Striking the VC (Doc. 30) ("**Strike Order**").

- <u>July 8, 2024</u>: Pls. Verified First Amended Complaint (Doc. 32) ("**FAC**").

- <u>July 17, 2024</u>: Defs. Motion to Strike the FAC (Doc. 34) ("**MTS**").

- <u>July 22, 2024</u>: Pls. Opposition to MTS (Doc. 36) ("**MTS Opp.**").

- <u>Aug. 5, 2024</u>: Defs. Reply Supporting MTS (Doc. 37) ("**MTS Reply**").

- <u>Aug. 7, 2024</u>: Defs. Motion to Dismiss the FAC (Doc. 42) ("**MTD-II**").

- <u>Aug. 15, 2024</u>: Pls. Sur-Reply Opposing MTS (Doc. 43) ("**MTS Sur.**").

- <u>Aug. 27, 2024</u>: Order Striking the FAC (Doc. 48) ("**Strike Order II**").

- <u>Sept. 10, 2024</u>: Pls. Verified Second Amended Complaint (Doc. 50) ("**SAC**").

- <u>Oct. 2, 2024</u>: Defs. Motion to Strike the SAC (Doc. 51) ("**MTS-II**").

- <u>Oct. 2, 2024</u>: Defs. MTD the SAC (Doc. 52) ("**MTD-III**").

- <u>Oct. 9, 2024</u>: Pls. Opposition to MTS-II (Doc. 54) ("**MTS-II Opp.**").

- <u>Oct. 23, 2024</u>: Defs. Reply Supporting MTS-II (Doc. 56) ("**MTS-II Reply**").

- <u>Oct. 28, 2024</u>: Pls. Opposition to MTD-III (Doc. 59) ("**MTD-III Opp.**").

- <u>Oct. 30, 2024</u>: Pls. Sur-Reply Opposing MTS-II (Doc. 60) ("**MTS-II Sur.**").

- <u>Nov. 5, 2024</u>: Order Denying MTS-II (Doc. 61) ("**Strike Order III**").

## I.    INTRODUCTION.

Plaintiff Samaritan Ministries ("Samaritan") and its 270,000 members form one of the 107 religious charities recognized by the U.S. Government as health care sharing ministries ("HCSMs" or "ministries") under a "Religious Exemptions" provision in the Affordable Care Act ("ACA").[1] HCSMs are "non-insurance entities in which members 'share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs.'"[2] As HCSMs are *noninsurance*, their members needed exemption from the mandate to *have insurance*.

Defendant Kane and her Office ("OSI") have targeted this religious sector for extinction in New Mexico. OSI's anti-HCSM campaign began under former Superintendent Toal, who said of Christian Care Ministry: "While I respect the CCM business model, under the laws of New Mexico they must be licensed as an insurance company." SAC ¶146. By labeling them *insurance*, OSI has expelled five ministries[3] and presented Plaintiffs with a stark choice: **(1)** destroy their New Mexico ministry and First Amendment rights through Insurance Code compliance and intrusive oversight, **(2)** retain their ministry and First Amendment rights while facing ruinous fines for noncompliance, or **(3)** abandon their ministry and First Amendment rights by leaving New Mexico.

Defendant did not merely inherit this campaign; she intensified it. First, she adopted Toal's policy that makes every sharing ministry an unauthorized insurer. ¶¶160-68. Next, she embraced a hostile enforcement policy that Judge Garcia has described as "unnecessarily aggressive" toward

---

[1] ACA HCSM List (Doc. 50-1) (recognizing 107 nonprofit religious charities as compliant with the ACA's religious exemption at 26 U.S.C. §5000A(d)(2)(B)(ii)). Samaritan is No. 3.

[2] www.healthinsurance.org/glossary/health-care-sharing-ministry (visited 12/1/2024) (quoting 26 U.S.C. §5000A(d)(2)(B)(ii)(II)). Title 26 of the U.S. Code may be abbreviated herein as "**IRC**."

[3] Namely OneShare Health ("**OneShare**"), House of Prayer dba Jericho Share ("**Jericho**"), Trinity Healthshare/Aliera ("**Trinity/Aliera**"), Sedera Medical Cost Sharing Community ("**Sedera**"), and Gospel Light Mennonite Church dba Liberty Healthshare ("**Gospel Light**" or "**Liberty**"). OSI's case against each HCSM is available by searching https://edocket.osi.state.nm.us/home.

HCSMs, ¶154, saying in effect, "well you know[,] you've been in operations [here] for years, but now we're coming for you." *Id*. Plaintiffs sued to stop Defendant coming for them.

## II.    PENDING QUESTION.

This case concerns Defendant's "campaign to assert regulatory dominance over"[4] all HCSMs. Plaintiffs ask whether Defendant may, consistent with the First Amendment, halt their expressive religious ministry that "share[s] a common set [of] religious beliefs" and coordinates voluntary spiritual and financial support among its members—sent directly from one member to another—from "shar[ing] medical expenses among members in accordance with those beliefs"? IRC §5000A(d)(2)(B)(ii)(II). The question is not whether to *regulate* Samaritan, which, like other charities in New Mexico, is regulated by its attorney general ("AG"),[5] its tax officials, and the IRS. The question is whether Defendant may stretch the definition of insurance to *further* regulate Samaritan, which would destroy it if it submitted to such regulation.

## III.    FOUNDATIONAL FACTUAL PREMISES.

### A.    The HCSM Sector Is Wholly Religious.

#### 1.    *The HCSM sector exists to fulfill the law of Christ.*

The core mission of HCSMs like Samaritan is to obey *Galatians* 6:2: "Carry each other's burdens, and in this way you will fulfill the law of Christ." *Galatians* 6:2 (NIV). *Bethel Conserv. Mennonite Church v. Com'r*, 746 F.2d 388, 392 (7th Cir. 1984). To "fulfill the law of Christ" is the essence of Christianity. HCSMs help Christians fulfill this law by enabling them to "bear" (KJV), "share" (NLT), or "carry" (NIV) "each other's burdens" concerning health care.

---

[4] *Air Evac EMS v. McVey, Ins. Com'r*, 37 F.4th 89, 94 (4th Cir. 2022) (closely analogous case).

[5] The AG "is the state's most powerful litigant," *Consumer Data Assn. v. King*, 678 F.3d 898, 904 (10th Cir. 2012), who, "along with aggrieved consumers," enforces consumer-protection laws. *Id.* at 900. He may even deputize district attorneys for that purpose. *See* NMSA 1978, §57-12-15 (unfair trade practices); §57-15-8 (false advertising); *see also* §57-22-9 (charitable solicitation).

**2.**      *The HCSM sector is defined by the laws that protect it.*

The principal laws protecting HCSMs are the ACA's religious exemption, the five state-level insurance-mandate exemptions, and the 33 state-level safe-harbor laws. SAC ¶¶12-29.

**3.**      *The HCSM sector comprises at least the 107 ACA-certified ministries.*

The HCSM sector is mainly the 107 HCSMs certified by the U.S. Government as meeting all five requirements of the ACA's HCSM definition at IRC §5000A(d)(2)(B)(ii) and named in the HCSM List at Doc. 50-1. This List includes, e.g., Christian Care Ministry/CCM (No. 2), Samaritan (No. 3), Gospel Light (No. 6), and OneShare's parent Anabaptist Healthshare (No. 106).

**4.**      *All 107 ACA-certified ministries are legally and factually religious.*

All 107 ACA-certified ministries are religious. Doc. 50-1. **(a)** They are religious as a matter of law since the ACA defines them under a "religious exemption," IRC §5000A(d)(2)(B), that the U.S. Government has determined they meet. **(b)** They also are religious in fact. Indeed, at least 96 (or 90%) of these 107 are Anabaptist, including 56 (or 52%) with "Mennonite" in their name.

**5.**      *All 107 ACA ministries must be religious to meet 31 state safe harbors.*

Thirty-three states have safe-harbor laws that protect qualifying HCSMs from claims that they are insurance under the state insurance code. SAC ¶23 n.3 (all 33 safe harbors). In 31 of these 33 states (all but Kansas and North Carolina), HCSMs must be religious to qualify. ¶34.

**6.**      *Among the few non-ACA ministries, even Sedera is religious.*

Defendant says the sector cannot be 100% religious since Sedera is not religious. Doc. 18 at 8. That is untrue. **(a)** Sedera claims to be a "Healthcare Sharing Ministry" "united by a shared faith" in its "fundamental belief" and "commitment" to "Do under others as you would have them do unto you," https://sedera.com/member-principles (Sedera Ethical Beliefs at ¶3), quoting Christ from *Matthew* 7:12 and *Luke* 6:31. **(b)** Sedera invokes constitutional protection to "exercise our *faith* and values by coming together as a healthcare sharing *ministry* to *bear* each other's medical

*burdens*," *id*. at ¶9 (italics added), paraphrasing *Galatians* 6:2. **(c)** Biblical concepts permeate its

beliefs. *Id*. at ¶¶5-8. **(d)** That Sedera labels its beliefs *ethical* makes them no less religious.

### 7. *Even if Sedera were secular, the sector would be over 99% religious.*

Even if Sedera were somehow deemed secular, this sector comprising more than 107

sharing ministries would still be over 99% religious. And Defendant has targeted it.

### B. Defendant's Policy Targets the Whole HCSM Sector.

### 1. *Defendant's policy labels all HCSMs "unauthorized insurance."*

Defendant has adopted Toal's policy that all HCSMs are "unauthorized insurance." SAC

¶¶160-68. **(a)** OSI documented this policy in (i) three press releases, ¶¶96-168 & Ex. 14; and (ii)

an email about CCM, ¶146 & Ex. 16. **(b)** Defendant adopted this policy by certifying in discovery

that: (i) the press releases established that each "HCSM [is] unauthorized insurance," (ii) operating

one in New Mexico without a license is illegal, and (iii) any unlicensed HCSM must "come

forward to rectify its unauthorized status with OSI." ¶¶160-68.

### 2. *Defendant's all-HCSMs-are-insurers policy is her written policy.*

Defendant says there is "no written 'HCSM policy' for the court to review." Doc. 20 at 11.

**(a)** This is untrue. (i) Defendant advised this Court in writing that OSI's written materials

establish that HCSMs are "unauthorized insurance." SAC ¶160. (ii) She wrote that OSI's three

press releases put the world on notice that operating an HCSM in New Mexico without a license

was illegal. *Id*. (iii) She wrote that the 2020 release alone "specifically indicates that a HCSM is

an unauthorized insurance product," *id*., and that any HCSM that "did not come forward to rectify

its unauthorized status with OSI" would face coercive measures, *id*. (iv) All this is in writing.

**(b)** It also is irrelevant. This Circuit allows even "facial challenges to unwritten policies,"

*Faustin v. Denver, Colo.*, 423 F.3d 1192, 1196 n.1 (10th Cir. 2005), including First Amendment

"challenges to unwritten policies," *Jones v. Salt Lake Cnty.*, 503 F.3d 1147, 1158 n.13 (10th Cir.

2007). To the extent Defendant's HCSM "policy [may be] unwritten 'is irrelevant' to an analysis of its constitutionality.'" *Khan v. Barela*, 808 F.Appx. 602, 606 n.3 (10th Cir. 2020).

### 3. *Defendant applies her policy to HCSMs of all sizes and certifications.*

**(a)** OSI applied its policy to OneShare and Liberty and said it applies to CCM. All three are ACA-certified. **(b)** OSI applied it to Sedera, Jericho, and Trinity. All three are non-certified. **(c)** Defendant embraces these decisions and threatens the same for Samaritan. **(d)** Samaritan and CCM are two of the three largest HCSMs. **(e)** All HCSMs fit the target package. *Supra* §III.A-B.

### C.    Defendant Has Targeted and Threatened Samaritan.

In her filings in this case, Defendant said **(1)** OSI "has taken enforcement action against several entities operating programs similar to the Samaritan program," Doc. 18 at 8; **(2)** "the Samaritan program [is] harmful [to] the public interest," *id*. at 18; **(3)** "Samaritan['s] continued operations outside of the Insurance Code are harmful [to] the public interest," *id*.; **(4)** "Samaritan [is] an entity that engages in an activity that fits New Mexico's statutory definition of insurance," Doc. 20 at 2; and **(5)** she would countersue Samaritan to *prove* it fits that definition, *id*. at 6.

### D.    Defendant Has Targeted the HCSM Sector with Animus.

### 1. *Defendant has disparaged the entire HCSM sector directly.*

**(a)** OSI has equated HCSMs with: (i) "Insurance Scams" having "no proper use," (ii) "scammers trying to lure" and "hoodwink" "vulnerable" consumers, (iii) "scam plans," (iv) "junk insurance," and (v) a "form of garbage." SAC ¶¶96-149; Doc. 59 at 20 n.14. **(b)** On March 2, 2023, OSI declared to the nation's insurance regulators that it was "working proactively to steer consumers away from HCSMs and scam plans with webinars and advertising." *Id*. 148. **(c)** Those *webinars and advertising* evince animus. **(d)** They also evince "the evil of protectionism," *Hughes v. Okla.*, 441 U.S. 322, 337 (1979), favoring domestic producers and BeWellNM. **(e)** This evidence of animus surpasses that in most cases. **(f)** Defendant has never renounced it or even distanced

herself from it. **(g)** She has embraced it and features it on OSI's website. ¶¶107, 110, 122, 125-26.

### 2.    Defendant has disparaged the entire HCSM sector indirectly.

In August 2020, New Mexico joined a pro-ACA "Insurance Letter" opposing federal tax benefits for members of "healthcare sharing ministries." SAC ¶131. **(a)** Conceding "HSMs" fill a niche for "people with shared religious beliefs," the Letter accuses all HSMs of deceptive and predatory practices, "all in contravention of the reforms established by the ACA and to the great detriment of the States and their residents." ¶132. **(b)** This Letter exudes animus and protectionism. ¶¶132-39. **(c)** It is within Defendant's jurisdiction and signed by her co-regulator, the AG.

### 3.    Defendant disdains the sector's "religious and moral restrictions."

Like Toal, Defendant actively promotes views inimical to the religious beliefs of HCSMs like Samaritan. ¶¶52-57. These views include the State's role in health care, ¶¶96-157, and its protection of transgender care[6] and abortion: "'OSI supports … expanding access to reproductive health and reproductive rights,' said Superintendent of Insurance Alice Kane."[7] By adopting Toal's 2020 press release, ¶¶96, 160, including its warning that anyone joining an HCSM faces potential "religious or moral restrictions" on "any activity the ministry does not agree with," ¶96, and keeping it on her website to this day, ¶107, Defendant reveals disdain for such restrictions.

### E.    Defendant Has Targeted Samaritan with Animus.

#### 1.    OSI opposed the 2015 HCSM bill: OSI v. Samaritan (2015).

**(a)** In 2015, New Mexico considered a safe-harbor bill for HCSMs. ¶81 (excerpting bill's Fiscal Impact Report). This Report, citing the Alliance of HCSMs, explains that "HCSMs are not

---

[6] *See, e.g.*, www.osi.state.nm.us/wp-content/uploads/2020/06/Press-release-6.15.2020.pdf (Toal); https://a.storyblok.com/f/132761/x/208a6fbee6/2024-013-bulletin-sb273-implementation-final-atk-signed.pdf (Kane) at 3; https://a.storyblok.com/f/132761/x/069182dfb9/2025py-nm-qhp-issuer-attestation-final.pdf (Kane) at 3; (all accessed via www.osi.state.nm.us on 12/1/2024).

[7] www.osi.state.nm.us/news/press-releases/pr-2024-04-19 (visited 12/1/2024).

insurance companies" but are "not-for-profit religious organizations" that bring "committed Christian participants" together "to bear one another's burdens" according to "Biblical principles." *Id*. at 2. OSI provided most of the official comment for the Report, criticizing the bill as follows.

**(b)** After (i) acknowledging the "argument" that HCSMs "are not insurers, but rather act as facilitators helping others to fulfill their Christian duty," (ii) OSI blamed HCSMs for harming both insurers and insureds, *id*. at 2-4, (iii) lamenting HCSMs' lack of consumer "protections such as appeals and grievance procedures, required inclusion of legislated mandates, mental health parity and limits on out of pocket expenses [and] protections regarding … solvency … reserve and surplus requirements[,]" *id*. at 4. (iv) OSI then singled out and disparaged Samaritan as follows.

**(c)** After (i) citing Samaritan, its Application, and its Guidelines, OSI misrepresented that Samaritan: (ii) resembles a "contract of insurance" (it does not: ¶¶35-79); (iii) drops all members who fail to "keep their 'sharing' up to date" (it does not: ¶61); and (iv) deprives members of their civil right to litigate ineligibility decisions (it does not: *waiver* of this right is a matter of shared faith (¶47) and members can ask fellow members to overrule ineligibility decisions (¶78(g)).

**(d)** After (i) citing Samaritan as its sole example, OSI said this sector (ii) leaves "gravely ill [and] chronic patients in the regular insurance market," (iii) "skews that market and inflates costs," (iv) inhibits "insurance regulation [from] ensur[ing] a level playing field for the insurers," (v) "limits … benefits" (i.e., per its religion), and (vi) is "exempt[]" from "any oversight." ¶83.

**(e)** OSI blamed members' loss of secular benefits on their "sharing" (in quotes). ¶¶85-86. To OSI, evidently, there is no such thing as "sharing." In its view, Samaritan is merely a low-cost insurance substitute that evades insurance regulation. *See also infra* §V.G.2(h).

### 2.    *Defendant has embraced 2015: Defendant v. Samaritan (2024).*

Drawing on 2015, Defendant has attacked the Plaintiffs and their religion as follows.

**(a)** Defendant attributes the failure of the 2015 HCSM safe-harbor bill, not to public policy

or legislative process, but to *the Plaintiffs*. "Obviously, HB 480 did not pass" and "the Plaintiffs seek to judicially achieve [now] what they failed to accomplish legislatively in 2015." Doc. 4 at 2.

**(b)** Defendant attributes many harms to Plaintiffs' ministry. (i) Whether "Samaritan's members" have "unpaid medical bills" is "unknown" because "of its refusal to comply [with] any insurance regulation." Doc. 18 at 16. (ii) The "harms" to "members of the Samaritan program" include their loss of OSI-enforced "grievance" procedures and "financial reserves." *Id*. at 16-17. (iii) "Further, the members [of] Samaritan do not benefit from other provisions," *id*., such as protections against "surprise billing," "insurer insolvency," and "denial of coverage for essential health benefits." *Id*. (iv) "As noted above, the members [of] Samaritan do not currently benefit from a myriad of statutory provisions intended to protect them from suffering harm." *Id*. at 18.

**(c)** Defendant rejects individual Plaintiffs' choice of Samaritan over her "myriad" rules "to protect them from suffering," *id*., because she rejects their religion. (i) She ignores their repeated explanations, SAC ¶¶35-79, why they believe they must choose faith over loss reserves and legal guarantees, Biblical dispute resolution over secular grievance and litigation, and selective sharing for Biblical behavior over "coverage for essential health benefits" that contradict their beliefs. (ii) And she reveals her disdain for Plaintiffs' "religious and moral restrictions." *Supra* §III.D.3.

**(d)** Defendant evidently believes that only she can protect Samaritan's members from their own ignorant, foolish, or selfish choices. She disrespects Plaintiffs' religion and rues its perceived effects on the citizens and the insurance producers, regulators, and marketplace of New Mexico. At worst, Defendant views Plaintiffs' religion as "garbage." §III.D.1. At best, she views it as "insubstantial" compared to her weighty interests. Either way, it's animus. *See infra* §V.G.2(h).

### 3.    *Defendant is disparaging Samaritan with the Insurance Letter.*

The Insurance Letter, *supra* §III.D.2, singles out Samaritan for defamatory association with the Aliera scandal. ¶¶131-42. Whether or not OSI cleared this Letter at the time, Defendant has

acquiesced in its animus and protectionism, ¶143, reprising OSI's posture in 2015, *supra* §III.E.1.

## IV.    LEGAL STANDARDS.

### A.    Plaintiffs Need Only Show Likelihood of Success and Irreparable Harm.

Plaintiffs must show that **(1)** they are likely to succeed and **(2)** suffer irreparable harm **(3)** that outweighs any harm to Defendant and **(4)** an injunction is in the public interest. *Does 1-11 v. Bd. of Regents*, 100 F.4th 1251, 1267 (10th Cir. 2024). Here, the "third and fourth prongs merge," *id*., and with "state intrusions on religious liberty: 'it is always in the public interest to prevent the violation of a party's constitutional rights,'" *id*. at 1274-75. Once Plaintiffs "'have demonstrated a likely violation' of their constitutional rights, 'an injunction would be in the public interest.'" *id*.

### B.    Likelihood of Success Considers All Applicable Factors and Theories.

"[I]t is critical to consider all factors that may bear on the probability" of success. *Id*. "If [Plaintiffs are] likely to succeed on each of several theories, [their] argument for preliminary relief is stronger than [if] only one claim [is] likely to be viable." *Id*. "That said, [Plaintiffs] 'need only establish a likelihood of succeeding on the merits of any one of [their] claims[.]'" *Fellowship of Christian Athletes v. D.C.*, 2024 WL 3400104, at *4 (D.D.C. July 11, 2024).

### C.    Even Potential Irreparable Harm, However Small, Suffices for Relief.

"'[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Ortiz y Pino v. Toulouse Oliver*, 2024 WL 4591840, at *11 (D.N.M. Oct. 28, 2024) (Strickland, J.). Even "any *potential* loss of First Amendment freedoms—*however small*—also establishes irreparable injury." *Pryor v. Sch. Dist.*, 99 F.4th 1243, 1254 (10th Cir. 2024) (italics added). Samaritan also "shows that the Restrictions, by their [very] nature, *have* chilled [its] protected speech and [religious exercise]—again establishing irreparable injury." *Id*.

**D.      The Injunction Plaintiffs Seek Is Prohibitory (Not Mandatory).**

An injunction here would restore "the most recent peaceable status quo because it merely prevents [Defendant] from enforcing [her policy] and prohibits additional unconstitutional actions. It [would] not mandate additional actions. Thus, it is not a mandatory injunction[.]" 99 F.4th at 1255. Plaintiffs seek to maintain the decades-long status quo of nonenforcement against Samaritan.

**E.      Defendant Bears the Burden on the Constitutionality of Her Policy.**

Even at this "preliminary injunction stage," Defendant "'bears the burden of proof on the ultimate question of the challenged [policy's] constitutionality.'" *Does*, 100 F.3d at 1268.

**F.      Plaintiffs Challenge Defendant's Policy Both Facially and As Applied.**

Plaintiffs challenge Defendant's HCSM policy *facially* as **(1)** non-neutral on its face, **(2)** a threat to chill their rights, **(3)** incapable of valid application, **(4)** vague, or **(5)** overbroad. *Dias v. Denver, Colo.*, 567 F.3d 1169, 1179-80 (10th Cir. 2009). All other challenges here are *as applied*.

**V.      ARGUMENT.**

**A.      Samaritan Ministered for 30 Years in New Mexico Without Incident.**

Samaritan operates faithfully to its religious beliefs. SAC ¶¶35-79. It solicits its members to send a combined message of notes, prayers, and financial support *directly* to fellow members who have shared their physical, financial, and emotional burdens from sickness or disease. ¶¶38-41, 62-79. The receiving members also are ministered to by this combined message from fellow believers. For example, Plaintiffs Zachary and Rachel Cordel testified (*id*. at Ex. 8) as follows:

> Giving side. [In 10+] years with Samaritan, we have loved the giving to fellow members in need. Each month we send checks … to specific individuals who are believers and members of this Christian community, to share in their healthcare burdens. We always include notes of encouragement and our prayers. We … support them materially and spiritually, just as much as if they were members of our church or discipleship group or Bible study.
> Receiving side. For our own serious healthcare burdens, we have received [checks] from our Christian brothers and sisters in this ministry. Their physical

and electronic notes of encouragement and prayers have touched us deeply.

Samaritan does this *without exercising any ownership or control* over that support. *Id*. It is member-governed and maintains strict Biblical membership requirements. ¶¶50-61, 74. Members adhere to Biblical Christian faith, attend Bible believing churches, and live according to Biblical standards, all as verified annually by their spiritual leaders. *Id*. Samaritan is intensely religious, expressive, and associational. ¶¶62-74. In addition to its parachurch function, ¶¶35, 49, it operates like a church with worship and fellowship for its members and staff. ¶¶62-74 & Exs. 7-12. Above all, it believes in the "temporal and eternal benefits from 'Christ, the Divine Healer.'" ¶¶298, 46.

For 30 years, Samaritan has ministered as noninsurance in all 50 states and the District of Columbia without incurring a single complaint filed with any government regulator anywhere. ¶73. Samaritan is accredited by the Healthcare Sharing Accreditation Board and maintains an A+ rating with the Better Business Bureau. *Id*. Its unblemished record should reassure any regulator.

During this time, Samaritan was welcome as the expressive religious association that it is, even in New Mexico, until OSI launched its "campaign to assert regulatory dominance over" these ministries. *Air Evac*, 37 F.4th at 94; ¶¶96-157. After allowing these ministries, and comparable secular entities such as fraternal benefit societies ("fraternals"), to operate outside the Insurance Code for decades, OSI decided *these ministries*, and *not the secular entities*, would be subject to the Code. ¶¶80-157. Via this decision, Defendant is irreparably harming Plaintiffs.

**B.    Plaintiffs Exercise Both Religion and Expressive Religious Association.**

The Free Exercise Clause protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Working "in tandem," the "Free Exercise Clause protects religious exercises, whether communicative or not, [while] the Free Speech Clause provides overlapping protection for

expressive religious activities," thus "doubly protect[ing]" such activities. *Id.* at 523.

Plaintiffs have taken great care to explain their activities. SAC ¶¶35-79. They "[c]arry each other's burdens [to] fulfill the law of Christ," *Galatians* 6:2, even as each strives to "carry their own load," *id. at* 6:5. ¶¶32-41. Their physical and spiritual acts of bearing and sharing, including constant prayer and encouragement, are *religious exercises* for both Samaritan and its members. ¶¶42-49. Beyond those acts, Samaritan and its members engage in additional *expressive religious activities*. ¶¶50-79. They communicate and associate together to fulfill not just their burden-sharing mission but all of Christ's law, i.e., all of Scripture. ¶¶35-79 & Exs. 7-12.

### C.    Defendant's Ongoing Harms to Plaintiffs Are Irreparable.

**(1)** Defendant's threat to Samaritan became clear with her "unnecessarily aggressive" posture in the summer of 2023. SAC ¶¶150-57. This threat to Samaritan means at least: **(a)** fines ranging from $4,590,000 to $18,360,000 for its 918 existing New Mexico memberships (*plus* any past or future memberships "sold" in New Mexico) and **(b)** its permanent expulsion from New Mexico ("NM"). ¶¶226-42. This threat has inflicted irreparable harm in many ways, as follows.

**(2)** Ongoing loss of prospective NM members is irreparable. With each prospective NM member representing another illegal "transaction" and "fine," and each one facing loss of their membership if Defendant succeeds, Samaritan has had to turn away each prospective NM member since October 2023. The documented NM turnaways totaled 28 as of filing of the SAC. ¶230.

**(3)** As in *Air Evac*, the prospective "shut down" of Samaritan's "membership program" in New Mexico is "result[ing] in the loss of customers and [maybe] employees, damages that could not be remedied by money damages," 37 F.4th at 103, since "rebuilding those relationships following a state enforcement action could be impossible," 523 F.Supp.3d at 870.

**(4)** Critically, with each turnaway, Defendant irreparably harms the exercise of religion

and expressive religious association of the Plaintiffs and the turned-away member by preventing or restricting their mutual prayer, fellowship, and fulfillment of the law of Christ. SAC ¶232.

**(5)** This threat "has and will continue to hamper [Samaritan's] ability to recruit [members], constituting an enduring harm that will irreparably risk [its] continued existence." *Fellowship of Christian Athletes v. San Jose Sch. Dist.*, 82 F.4th 664, 695 (9th Cir. 2023) (en banc) ("*FCA*").

**(6)** A drop in NM turnaways evinces "irreparable reputational harm," *Planned Parenthood v. Herbert*, 828 F.3d 1245, 1264 (10th Cir. 2016), as fewer NM residents seek to enroll, ¶230.

**(7)** This threat causes Plaintiffs worry over the future of their ministry and their ability to fulfill the law of Christ, ¶¶233-34 & Exs. 7-12, irreparably fringing and chilling their rights.

**(8)** Responding to this threat compels Samaritan irreparably to divert time and resources away from its mission to fulfill the law of Christ. ¶¶35-41. To "distract[ its]leadership [and] prevent it from using its [resources] to serve [its] religious objectives … cannot be [an] insubstantial burden." *World Outreach v. Chicago, Ill.*, 787 F.3d 839, 843 (7th Cir. 2015) (Posner, J.).

**(9)** Each above harm is ongoing. Defendant's callous response that "Samaritan's claimed irreparable harm" is "entire[ly] speculative and theoretical," Doc. 18 at 15, suggests animus.

### D.    Defendant's Imminent Future Harms to Plaintiffs Are Irreparable.

Defendant's threats of imminent future harm are irreparable in at least five ways.

**(1)** Each above irreparable harm will *worsen* unless and until this Court provides relief.

**(2)** Each applicable harm from *Air Evac* also will worsen. "[G]iven the progress of [OSI enforcement and] Defendant's positions herein," 523 F.Supp.3d at 873, Samaritan is likely to "be subject to fines and a cease and desist order," *id*., resulting in *further* "loss of customers and employees, damages that could not be remedied by money damages," 37 F.4th at 103.

**(3)** The "prospect of an unconstitutional enforcement 'supplies the necessary irreparable

injury,'" as "awaiting proceedings violating the Constitution" poses unacceptable "'risk.'" *Id.*

**(4)** Plaintiffs face greater irreparable harm than Air Evac since their case is much stronger. While both cases involve preemption, Plaintiffs' case also involves individual constitutional rights, as they endure ongoing and future harms to their First Amendment rights. SAC ¶¶225-39.

**(5)** Even "any *potential* loss of First Amendment freedoms—*however small*—also establishes irreparable injury." *Pryor*, 99 F.4th at 1254 (10th Cir.) (italics added).

### E.   Defendant's Imminent Threatened Harms to Samaritan Are Existential.

Defendant's threat to bring Samaritan under the Code is existential in many ways.

**(1)** Code compliance would destroy Samaritan. ¶¶240-42. (i) Compliance with the religious antidiscrimination mandate of §59A-16-12 would stop Samaritan from limiting its membership even to Christians, let alone likeminded ones, destroying the ministry. ¶¶203-07. (ii) Compliance with this mandate and others would require Plaintiffs to share for abortion, gender-transition, and other care that is inimical to their faith, *supra* §III.D.3, again destroying their ministry. ¶¶69, 293.[8] (iii) The Code's breadth and weight would crush Samaritan. ¶¶289-99.[9] Though "it is sufficient to scrutinize just one," *Union Gospel Mission v. Ferguson*, 2024 WL 4660918, at *3 (E.D.Wash. Nov. 1, 2024), each such example of Code compliance would suffice to destroy Samaritan.

**(2)** If Samaritan acquiesced in Defendant's insurance determination, it would imperil its legal statuses under IRC §501(c)(3) and §5000A due to §501(m)(1)'s ban on 501(c)(3) & (c)(4) entities providing "any 'type of insurance that can be purchased in the commercial market.'"[10]

---

[8] "By favoring Christians and those who can readily agree with statements connected to the Christian faith [such as Biblical marriage, Samaritan's] practices represent discrimination 'because of religion.'" *Christian Healthcare Centers v. Nessel*, 117 F.4th 826, 844 (6th Cir. 2024).

[9] Samaritan would be subject to both the Insurance Code, NMSA 1978, §§59A-1-1 *et seq.*, with over 1,500 sections, and the Regulations, NMAC §§13.1.1.1 *et seq.*, with comparable heft.

[10] *Fla. Hosp. Tr. Fund v. C.I.R.*, 103 T.C. 140, 158 (1994), *aff'd,* 71 F.3d 808 (11th Cir. 1996).

¶¶19-29, 240-42, 338-53. Defendant says §501(m)(1) "does not provide that the entity will lose its 501(c)(3) status." Doc. 18 at 13. That is exactly what it does: "Repeal of Tax-Exempt Status [for] Providing Commercial-Type Insurance." SAC ¶333. It operates not only to bar exempt status[11] but to repeal/revoke it,[12] and its enforcement can be initiated by regulators, watchdogs, rivals, or aggrieved consumers. Loss of these federal statuses would suffice to destroy Samaritan.

**(3)** Such loss of either federal status, especially 501(c)(3), and the underlying insurance determination, likely would cost Samaritan its related *state*-level statuses required for HCSM safe-harbor protection and for exemptions from insurance mandates, income tax, property tax, and other burdens. Loss of such state legal statuses might suffice to destroy Samaritan.

**(4)** All such losses, and the insurance determination, also could fuel legal actions by both regulators and consumers on the theory that Samaritan has misrepresented itself as an ACA-qualified HCSM, or as noninsurance, thereby committing fraud and/or an unfair/deceptive trade practice. ¶¶115-119. That is the core claim in legal actions by regulators and class-action lawyers.[13]

### F.    Defendant's Policy Violates Plaintiffs' Rights Facially and As Applied.

With such obvious irreparable harms, likelihood of success becomes the whole ball game. *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014). Reserving all their claims, Plaintiffs focus here on **(1)** free exercise, **(2)** free speech, and **(3)** expressive association/religious autonomy.

---

[11] *E.g.*, *FICURMA v. U.S.*, 850 F.Supp.2d 125 (D.D.C. 2012); I.R.S. P.L.R. 201218017.

[12] *E.g.*, *IHC Health Plans v. C.I.R.*, 325 F.3d 1188, 1193 (10th Cir. 2003); I.R.S. P.L.R. 201321036.

[13]*E.g.*, *Smith v. Aliera Cos.*, 534 F.Supp.3d 1345 (D.Colo. Apr. 16, 2021); *Jackson v. Aliera Cos.*, 462 F.Supp.3d 1129 (W.D.Wash. May 26, 2020); *Duncan v. Aliera*, 2021 WL 4728760 (E.D.Cal. Sep. 9, 2021); *Albina v. Aliera*, 2021 WL 5238590 (E.D.Ky. Nov. 8, 2021). "[C]itizen-initiated complaints are the method by which [OSI] enforcement proceedings are initiated in practice." *Christian Healthcare Centers v. Nessel*, 117 F.4th 826, 849 (6th Cir. 2024). Defendant concedes as much. *E.g.*, ¶157. Any consumer or producer could complain to OSI about Samaritan.

### G.     Defendant Is Violating Plaintiffs' Free Exercise of Religion.

Plaintiffs can prove free-exercise violations by showing Defendant "burdened [their] religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525. To fail either is to discriminate. Defendant fails both. ¶¶253-83 (Counts 1-3).

#### 1.     *Free exercise requires strict neutrality and strict general applicability.*

**(a)** The Free Exercise Clause forbids even "subtle departures" from religious neutrality, *Church of Lukumi Babalu Aye v. Hialeah, Fla.*, 508 U.S. 520, 534 (1993), as do the Equal Protection and Establishment Clauses, *id*. at 540. Such "neutrality in its application requires an equal protection mode of analysis." *Id*. Non-neutrality does not depend on motive, such as animus.

**(b)** Any non-neutral policy or action that harms Plaintiffs discriminates against them "no matter how well-intentioned," *FCA*, 82 F.4th at 689, "regardless of design or intent," *id*., and "even in the absence of any motive to do so," *id*. at 672, and is "subject to strict scrutiny regardless of [Defendant's] benign motive, content-neutral justification, or lack of 'animus,'" *id*. at 686 n.8.

**(c)** It is immaterial whether Defendant had invidious intent, because "the constitutional benchmark is 'government *neutrality*,' not 'governmental avoidance of bigotry.'" *Roberts v. Neace*, 958 F.3d 409, 415 (6th Cir. 2020) (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008)). Thus, it makes no difference if "faith-based bigotry did not motivate" Defendant's treatment of Samaritan. *Id. See also, e.g.*, *Roman Cath. Diocese v. Cuomo*, 592 U.S. 14, 16 (2020) (finding neutrality violation apart from evidence of invidious intent); *Tandon v. Newsom*, 593 U.S. 61, 62-63 (2021) (finding violation without any consideration of motive).

**(d)** The "motivation for the [Code itself] is irrelevant." *Does*, 100 F.4th at 1280. "What matters is how—and why—[Defendant has] implemented the" Code the way she has. *Id*. Plaintiffs need not show invidious intent since the operative "'intent to discriminate' … 'is merely the intent to treat differently.'" *Fowler v. Stitt*, 104 F.4th 770, 784 (10th Cir. 2024) (quoting *Colo. Christian*).

**(e)** Defendant's conduct has not been the product of accident, neglect, or inaction. It has been intentional and intended to treat these ministries differently. Animus only makes it worse.

### 2.    *Defendant's policy and actions toward Plaintiffs are not neutral.*

**(a)** Defendant's HCSM policy is not neutral since (i) "it is specifically directed [at] religious practice," (ii) it "discriminates on its face," or (iii) "a religious exercise is otherwise its object," *Kennedy*, 597 U.S. at 526, or (iv) it "targets religious conduct for distinctive treatment" or (v) "advances [interests] only against conduct with religious motivation," *Lukumi*, 508 U.S. at 546.

**(b)** This policy facially targeting *religious ministries* whose *sincerity* remains uncontested since at least 2015[14] is incapable of valid application. It also is non-neutral as applied. OSI has known of Samaritan's religious nature since at least March 2, 2015. *Supra* §III.E.1; SAC ¶¶85-86.

**(c)** OSI's goal of ousting HCSMs has caused it to manipulate its own policies in an absurd cycle of contradictions about what HCSMs are and whether they are insurance. ¶¶94, 109-110, 120-57. This chaotic approach results from OSI's protectionism and prejudgment bias.

**(d)** Defendant has singled out Samaritan at least twice since 2015. *Supra* §III.E.

**(e)** Defendant has "singled out" ministries like Samaritan for "especially harsh treatment," as happened to houses of worship during Covid. *Cuomo*, 592 U.S. at 16. Defendant's conduct is worse in two ways. (i) Unlike the restrictions in *Cuomo*, which merely *delayed* in-person worship for *some* worshipers, Defendant's restrictions would destroy Samaritan. *Supra* §V.E. (ii) Unlike Gov. Cuomo's interest in battling a global plague, Defendant would use a modest regulatory interest to destroy a ministry that has ministered in her state without incident for 30 years.

**(f)** Though animus is not required, its existence further evinces non-neutrality, as follows.

**(g)** The level of animus evident in material published by OSI and embraced by Defendant

---

[14] OSI: "The sincerity of [HCSMs] is not in question here." Fiscal Impact Report (¶81) at 3.

exceeds that in most religious discrimination cases. To characterize Samaritan's core activity as an "Insurance Scam" having "no proper use" and "trying to lure" and "hoodwink" "vulnerable" consumers constitutes flagrant animus. *Supra* §III.D.1. But animus also comes in subtler forms.

**(h)** For Defendant to say Samaritan cannot coordinate its members' funds "in a manner [it] deems necessary" to "bear one another's burdens" is "incredulous." *Bethel*, 746 F.2d at 391. And it disparages those beliefs to characterize them as (i) "'insubstantial,'" *Does 1-11*, 100 F.4th at 1281 (quoting *Masterpiece Cakeshop v. Colo. C.R.C.*, 584 U.S. 617, 635 (2018)), (ii) "'insincere,'" *id.*, or (iii) "selfish," *Spivack v. Phila., Pa.*, 109 F.4th 158, 170 (3d Cir. 2024) (not concerned enough for society), or in other ways that are (iv) "dismissive," *Knights of Columbus v. Fairfield, Conn.*, 2024 WL 3900102, at *13 (D.Conn. Aug. 22, 2024) or (v) not "'respectful,'" *id*.

In Defendant's view, Samaritan's mission to fulfill the law of Christ is [i] *insubstantial* compared to her weighty interests, *supra* §III.E.2(b)-(d), and/or [ii] *insincere* or [iii] *selfish* since it amounts to common charity at best and ACA-sapping cheap insurance at worst, *id*. This [iv] *dismissive* and [v] *disrespectful* view is reinforced by her filings. *E.g.*, SAC ¶185 (arguing that Christian sharing is simply "being charitable"—just "a value shared by people of all creeds and no creeds"—and equating Liberty's religious practices with "donating to GoFundMe pages").

**(i)** Defendant, alone and with others, has disparaged HCSMs, especially Samaritan, while opposing (i) an HCSM safe-harbor bill, ¶¶81-86; (ii) tax benefits for HCSM members, ¶¶131-35; and (iii) any consumer consideration of HCSMs over the ACA and BeWellNM, ¶¶96 & 102.

**(j)** Defendant fined Liberty, and presumably will fine Samaritan, even on memberships that *predated* OSI's 2020 Release, Ex. 14 at 3, that first declared such activity to be illegal.

**(k)** Defendant is harming Plaintiffs without the slightest evidence of just cause.

**(l)** Even if Defendant is pursuing valid interests, her methods suggest protectionism and/or

animus. These methods include the (i) use of the *most* restrictive means to achieve *any* interest, ¶¶240-42; (ii) suddenness of the U-Turn on HCSMs, contrary to nationwide norms, ¶¶80-107; (iii) sheer breadth of the insurance definition that OSI invented to fuel its anti-HCSM campaign, ¶¶157, 316-18; and (iv) absurdity of forcing the square peg of HCSMs into the round hole of the Code.[15]

**(m)** Defendant's anti-HCSM campaign, as applied to Plaintiffs, results at least in part from her antipathy toward religious beliefs or practices viewed as too conservative or out of step with NM's preferred health care policies or practices. *Supra* §III.D.3; ¶¶96-105, 120-130.

**(n)** Defendant thus fails neutrality via both targeting and animus. *Does*, 100 F.4th at 1275.

### 3. *Defendant's policy and actions also are not generally applicable.*

**(a)** Defendant's policy fails general applicability since it (i) provides "'a mechanism for individualized exemptions,'" *Fulton v. Phila., Pa.*, 593 U.S. 522, 533-37 (2021), (ii) "prohibits religious conduct while permitting secular conduct that undermines the [state's] interests in a similar way," *id*, or (iii) treats "*any* comparable secular activity more favorably than religious exercise," *Tandon*, 593 U.S. at 62. Mere existence of a "mechanism" suffices. *Fulton*, at 537.[16]

**(b)** The *mechanism* here is Defendant's application of the Code that allows her, in her *sole discretion*, to determine which comparable entities are insurers and which are not. For decades, HCSMs were not considered insurers until suddenly they were. SAC ¶¶80-157.

**(c)** Defendant repeatedly has advised this Court that she has not decided (nor necessarily even contemplated) whether to pursue Samaritan, *e.g.*, Doc. 52 at 11, despite having concluded that (i) "Samaritan … fits New Mexico's statutory definition of insurance" and (ii) its "continued operations outside of the Insurance Code are harmful [to] the public interest," *supra* §III.C. This

---

[15] Many or most of the Code's more than 1,500 sections do not even fit what Samaritan does.

[16] Other circuits have rejected "overly narrow" constructions of *Fulton*. *FCA*, 82 F.4th at 687. This Circuit forbids even such an attempt. *Dine Citizens v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016).

I'll-come-after-you-if-and-when-I-feel-like-it posture epitomizes unbridled discretion.

**(d)** Defendant's discretion to determine whether an entity is an insurer is standardless, itself a hallmark of a *Fulton* violation. ¶264. In *Knights of Columbus Council v. Town of Fairfield*, 2024 WL 3900102 (D.Conn. Aug. 22, 2024), the court invalidated a licensing scheme on its face because its "lack of standards creates a mechanism for individualized exemptions," *id*. at *13. *See Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1320-26 (11th Cir. 2024) ("unbridled discretion").

**(e)** Defendant's discrimination favoring fraternals is obvious. Fraternals enjoy categorical and specific exemptions. ¶¶194-207. They are comparable to HCSMs but pose even greater risk to OSI's interest in restraining unsafe insurers since fraternals *do* act as *insurers*. "Comparability is concerned with the risks various activities pose[.]" *Tandon*, 593 U.S. at 62; *accord Union Gospel*, 2024 WL 4660918, at *4; *St. Dominic Acad. v. Makin*, 2024 WL 3718386, at *23 (D.Me. Aug. 8, 2024). Nowhere does Defendant argue that Samaritan poses greater risk than fraternals. Nor could she: Samaritan has ministered outside the Code in NM for decades without incident.

**(f)** Defendant has never addressed *Tandon's* rule of "*any*." 593 U.S. at 62. Her policy "will 'trigger strict scrutiny' even if it contains just *one* comparable secular exception to its restrictions." *Pleasant View Baptist v. Beshear*, 78 F.4th 286, 303 (6th Cir. 2023) (Murphy, J., concurring). "Exceptions for one means strict scrutiny for all." *Union Gospel*, 2024 WL 4660918, at *3; *see Spivack*, 109 F.4th at 175; *Antonyuk v. Chiumento*, 89 F.4th 271, 349 (2d Cir. 2023), *vacated on other grounds*, 144 S.Ct. 2709 (2024); *FCA*, 82 F.4th at 686. As just one example, by exempting *all* fraternals from §59A-16-12, Defendant treats *every* fraternal better than Samaritan. §V.E.1. At least *some* such fraternals are secular. ¶¶194-207. Even *one* will trigger strict scrutiny.

**(g)** Defendant's contradictory treatment of HCSMs as both insurance and noninsurance precludes general applicability. ¶257. This treatment is in part to protect domestic producers who

view HCSMs as competitors or disruptors of their market. ¶¶99-105, 121-30. This evil of protectionism is causing Defendant to apply the law unevenly to HCSMs like Samaritan.

**(h)** The Code is "not applied in an evenhanded, across-the-board way" and OSI should "concede[] its challenged directives [are] not 'generally applicable.'" *Kennedy*, 597 U.S. at 527.

### 4. *Defendant's policy facially chills Plaintiffs' religious exercise.*

"The chill that the prospect of [a C&D] imposes on [Plaintiffs'] First Amendment rights is patent." *Hodgkins v. Peterson*, 355 F.3d 1048, 1063 (7th Cir. 2004); *see U.S. v. Church of World Peace*, 775 F.2d 265, 266 (10th Cir. 1985); *People for Pearce v. Oliver*, 2017 WL 5891763, at *8 (D.N.M. Nov. 28, 2017); ¶239. Plaintiffs' 28 (and counting) NM turnaways evince such a chill.

### H. Defendant Is Violating Plaintiffs' Free Speech/Expression.

Here, "the Free Speech Clause provides overlapping protection for [Plaintiffs'] expressive religious activities," *Kennedy*, 597 U.S. at 523, supplying "double protection," *id*. at 540. Plaintiffs can prove free-speech violations by showing Defendant (i) discriminated against their speech, (ii) suppressed or chilled it, or (iii) imposed vague or overbroad limits on it. ¶¶300-18 (Counts 6-8).

### 1. *Defendant's non-neutrality discriminates against Plaintiffs' speech.*

Defendant may not "suppress religious observances [while allowing] comparable secular speech." *Kennedy*, 597 U.S. at 543-44. Such "viewpoint discrimination is uniquely harmful." *NRA v. Vullo*, 602 U.S. 175, 187 (2024). Defendant seeks to influence Plaintiffs' speech based on its content or, worse, its viewpoint. ¶¶300-06. She would suppress the subject of ACA alternatives, ¶¶96-102, 120-29, and specific viewpoints on it and on other topics, *supra* §III.D.3. She is targeting Plaintiffs at least partly due to their views on certain religious, social, and/or political topics. *Id*.

### 2. *Defendant's policy chills Plaintiffs' speech facially and as applied.*

Defendant "'must give the benefit of any doubt to protecting rather than stifling speech.'" *Citizens United v. FEC*, 558 U.S. 310, 327 (2010). She may not suppress "expressive religious

activities" or "observances." *Kennedy*, 597 U.S. at 523-24, 543-44. She may not wield her "power selectively to punish or suppress speech, directly or [indirectly]." *Vullo*, 602 U.S. at 198; *id*. at 191 (condemning attempt to suppress "NRA's gun-promotion advocacy"); *Josephson v. Ganzel*, 115 F.4th 771, 783-90 (6th Cir. 2024) (condemning retaliation for "views on gender dysphoria").

Samaritan has shown that Defendant's actions "*have* chilled [its] protected speech and deterred [it] from" exercising its rights. *Pryor*, 99 F.4th at 1254; *see 303 Creative v. Elenis*, 600 U.S. 570, 597 (2023); *cf. Chiles v. Salazar*, 116 F.4th 1178, 1195 (10th Cir. 2024) ("chilling effect"). Defendant seeks to regulate Plaintiffs' views. ¶¶239 (chill); 307-08 (compel/suppress). For example, to apply antidiscrimination mandates to Plaintiffs would restrict their speech on issues such as life, marriage, and sexuality. *Supra* §§III.D.3, V.E.1, V.G.3(f); ¶¶50-59, Exs. 7-12.

### 3.   *Defendant's policy also is facially vague and overbroad.*

**(a)** (i) By defining *insurance* broadly enough to capture members of a health care sharing ministry voluntarily and directly sharing in each other's medical bills and (ii) by failing to define *health care sharing ministry*, Defendant's policy is both overbroad and vague, as follows.

**(b)** Defendant's HCSM policy is overbroad for two reasons. (i) Its breadth "may deter or chill" "protected speech," leaving little "breathing room for free expression." *U.S. v. Hansen*, 599 U.S. 762, 769-70 (2023). (ii) Many of "its applications are unconstitutional,'" *Americans for Prosperity v. Bonta*, 594 U.S. 595, 615 (2021), or reach "a substantial amount of constitutionally protected conduct,'" *Ortiz y Pino*, 2024 WL 4591840, at *5. As Defendant's counsel advised this Court: "If we concluded that the five [church] members [staying after service to share medical expenses] were engaging in the unauthorized business of insurance, yes, we would take enforcement action against them." ¶157. Such a potential sweep is patently overbroad.

**(c)** The policy is "impermissibly vague" because (i) "people of ordinary intelligence" may not "understand what conduct it prohibits," *Hill v. Colorado*, 530 U.S. 703, 732 (2000), and (ii)

"it authorizes or even encourages arbitrary and discriminatory enforcement," *id*. It never defines *HCSM* and even Defendant's counsel is unsure what it covers. ¶157 (five church members?). A policy that can mean anything means nothing; it permits Defendant to define HCSM however she likes, to label as insurance whatever she wishes, and to discriminate at will. *Supra* §§V.G.2-3.

## I.    Defendant Is Violating Plaintiffs' Association and Autonomy.

The First Amendment includes the freedom "to associate with others" for First Amendment purposes. *Bonta*, 594 U.S. at 606; *NAACP v. Button*, 371 U.S. 415, 430 (1963). This freedom: (i) applies *a fortiori* to "religious organizations" since the "First Amendment … gives special solicitude to [their] rights," *Hosanna-Tabor Evang. Luth. v. EEOC*, 565 U.S. 171, 189 (2012), (ii) applies to such organizations with further "special force" because their "very existence is dedicated to the collective expression and propagation of shared religious ideals," *id*. at 200 (Alito & Kagan, JJ., concurring), (iii) bars "intrusion into [their] internal structure or affairs," *Boy Scouts v. Dale*, 530 U.S. 640, 648 (2000), (iv) "plainly presupposes a freedom not to associate," *id*, and (v) requires deference to a group's view of the "nature of its expression [and] what would impair [it]," *id*. at 653; *Crowe v. Ore. State Bar*, 112 F.4th 1218, 1235 (9th Cir. 2024) (applying *Dale*).

Samaritan has explained its expressive associational activities, why they are central to its ministry, how its internal polity serves them, and what would impair them. ¶¶43-72 and Exs. 7-12.

### 1.    *Defendant's policy impairs expressive association facially and as applied.*

**(a)** Samaritan's sharing activities are precisely the "modes of expression and association" that Defendant may not infringe by (i) imposing the *insurance* label, *Button*, 371 U.S. at 428-29, or (ii) impeding their "right to solicit charitable contributions," *Bonta*, 594 U.S. at 618. *See also, e.g.*, *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) ("solicitation is characteristically intertwined with informative and perhaps persuasive speech").

**(b)** Code enforcement would destroy Plaintiffs' expressive association by (i) preventing

Samaritan from using *religion* to limit members and staff to likeminded Christians, causing it to "cease to exist," *Slattery v. Hochul*, 61 F.4th 278, 290 (2d Cir. 2023); (ii) compelling Samaritan and its members to explicitly and/or implicitly support the State's views on life, marriage, and sexuality, forcing Samaritan to "secularize," "liberalize," or close its doors; and (iii) interfering directly with Samaritan's right to solicit its members and their rights to solicit one another with and through Samaritan's facilitation. *Supra* §III.D.3 & §V.E.1; SAC ¶¶289-99 & Exs. 7-12.

**(c)** Consistent with the First Amendment, the Code exempts the "membership [criteria] of any fraternal" from the antidiscrimination mandate in §59A-16-12. Otherwise, the Masons could not remain the Masons, and Woman's Life and Royal Neighbors could not empower women. Doc. 21 at 13. Without such protections, Orthodox Jewish groups could not remain Jewish or orthodox; gay sports leagues could not remain gay; environmental groups could not remain faithfully green. Without a comparable exemption for Samaritan, it could not remain faithful to its values.

**(d)** "Every demand that might chill association therefore fails exacting scrutiny." *Bonta*, 594 U.S. at 615. Every member applicant turnaway represents chilled expressive association.

### 2. *Defendant's conduct intrudes on Plaintiffs' religious autonomy.*

Subjecting Samaritan to hundreds of mandates and thousands of sections of the combined Code and Regulations, §V.E.1 & n.9, would "intru[de into its] internal structure or affairs," *Dale*, 530 U.S. at 648, violate its "autonomy with respect to internal management decisions that are essential to [its] central mission," *Our Lady of Guadalupe v. Morrissey-Berru*, 591 U.S. 732, 746 (2020), and "foster impermissible entanglement" with religion, *Medina v. Cath. Health*, 877 F.3d 1213, 1233 (10th Cir. 2017). *Supra* §V.C-E and SAC ¶¶50-79, 289-99, & Exs. 7-12.

### J.    Defendant Must Satisfy "At Least" Strict Scrutiny.

At "this point the burden shifts to [Defendant who] must satisfy *at least* 'strict scrutiny.'" 597 U.S. at 531-32 (italics added); *Slattery*, 61 F.4th at 286. Once Plaintiffs show Defendant "'has

burdened [their First Amendment rights,] this Court *must* 'find a First Amendment violation unless the government can satisfy strict scrutiny.'" *Does*, 100 F.3d at 1268 (italics added).[17]

### K.    Defendant Cannot Satisfy Strict Scrutiny.

Defendant cannot meet strict scrutiny. Her policy neither advances interests of the highest order nor uses the least restrictive means to do so. *Thomas v. Rev. Bd.*, 450 U.S. 707, 718 (1981).

**(1)** Defendant's interest is to prevent fraudulent, unsafe, or unsound insurers from harming consumers. **(a)** This interest is not of the *highest order*. **(b)** Even if it were, it is not compelling *in context*, since there is no suggestion that Samaritan is fraudulent, unsafe, or unsound. **(c)** It is not even apt, since Samaritan neither holds itself out as insurance nor suggests it offers insurance. **(d)** Any interest in regulating what Defendant labels *insurance* is further diluted since Samaritan's direct religious sharing falls outside the State's congressionally granted, exclusive, insurance regulatory zone under the McCarron-Ferguson Act. SAC ¶¶335-37, 351; *Air Evac*, *infra*.

**(2)** Moreover, Defendant's discriminatory and protectionist anti-HCSM campaign, ¶¶96-157, undercuts any claim that her broadly formulated interest in regulating Samaritan is even *important*. "Defendant's efforts to employ a broad definition of 'insurance' to reach [Samaritan's] program," *Air Evac*, 523 F.Supp.3d at 873, and to engage in protectionism, 37 F.4th at 98, 101-02 (in "cases of protectionism [the] state interest is narrower"), have further eroded whatever interest she had. "While [Defendant] and the public have an interest in the appropriate regulation of insurance, [Samaritan's] interest in the uninterrupted continuation of its Membership Program and

---

[17] But if Defendant's "Policy is permeated with animus against certain religions [or] involves an intrusive inquiry into religious beliefs," it is "'categorically unconstitutional,'" *id.*, "regardless of any purported government interest," *id.*, and it is "'set aside' … without further inquiry," *Kennedy*, 597 U.S. at 525 n.1 (quoting *Masterpiece*, 584 U.S. at 639). Religious "animus is not [even] a permissible government interest." *Jesus Christ Is the Answer v. Baltimore, Md.*, 915 F.3d 256, 262 (4th Cir. 2019); *Does 1-11*, 100 F.4th at 1269. Any animus-motivated action here is simply barred.

in protecting its [rights] ***heavily outweighs*** that interest." 523 F.Supp.3d at 874 (emphasis added).

**(3)** As strict scrutiny is exemptions-focused, "courts must 'scrutinize the asserted harm of granting specific exemptions to particular religious claimants.' The question, then, is not whether [Defendant] has a compelling interest in enforcing [her] policies generally, but whether [she] has such an interest in denying an exception to [Plaintiffs]." *Fulton*, 593 U.S. at 541. "[S]o long as [OSI] can achieve its interests in a manner that does not burden religion, it must do so." *Id*.

**(4)** In the past four years of litigation, OSI has offered no valid reason for its aggression against HCSMs. In the past 18 months of Defendant's tenure, she has offered no valid reason to threaten Samaritan. Since OSI can continue treating Samaritan as it always has, without destroying it, ***it must do so***. That is the "bottom line." *Nunez v. Wolf*, 117 F.4th 137, 149 (3d Cir. 2024).

**(5)** Even if Defendant's policy were compelling *here*, it is not the least restrictive means to achieve *any* interest. OSI was aware of the HCSM sector, its rapid growth nationwide, and the role of Samaritan as of its March 2015 review of the safe-harbor bill. ¶¶81-86. Even so, OSI continued its decades-long practice, along with the national consensus, of treating HCSMs as noninsurance, until OSI's U-Turn in March 2020. ¶¶80-95. Thus, OSI "itself has demonstrated that it has at its disposal an approach that is less restrictive." *Burwell v. Hobby Lobby*, 573 U.S. 682, 730 (2014).

**(6)** Forty-nine other states are addressing any regulatory concerns about Samaritan without subjecting it to an insurance code. ¶¶12-29; §III.A; §V.A.[18] Other such milder means plainly exist.

**(7)** OSI must "proactively" "identify and rebut less restrictive" alternatives, *Nunez*, 117 F.4th at 148, by showing the "'alternative won't work,'" *id*. at 154. Plaintiffs bear no such burden.

---

[18] For example, the safe-harbor laws in 29 states preempt consumer confusion by requiring HCSMs to post prominent public notices, in specified language, that they are neither insurance nor anything like it. SAC ¶¶26-27. If Samaritan had to operate as a licensed insurer in New Mexico, it would be disqualified from protection in those 29 states and could not remain a nationwide ministry.

**(8)** Three recent Covid-related religious-freedom cases against the military prove the rigor of *strict* scrutiny in the face of *national security* and *pandemic* concerns. *Singh v. Berger*, 56 F.4th 88, 97-107 (D.C. Cir. 2022); *Navy Seals v. Biden*, 27 F.4th 336, 351-53 (5th Cir. 2022); *Doster v. Kendall*, 54 F.4th 398, 421-27 (6th Cir. 2022), *vacated on other grounds,* 144 S.Ct. 481 (2023). *See also, e.g.*, *Spivack*, 109 F.4th at 171-79 (Covid restrictions); *Antonyuk*, 89 F.4th at 348-51 (gun safety); *Nunez*, 117 F.4th at 152-55 (prison safety).[19] "In sum, this record [lacks] *any* [evidence of] the estimated cost of granting [Samaritan] accommodations [or any] basis to believe [Samaritan itself] poses particular risks, [or any] data to justify denying [it] religious accommodations when [OSI] accommodates secular activities that implicate the same compelling interests [or] when similarly-situated [States offer] analogous accommodations[.]" *Nunez*, at 155. If such paramount interests fail strict scrutiny in those cases, Defendant's modest regulatory interests fail it here.

**(9)** None of Defendant's *insurance* interests is even achievable unless Plaintiffs purchase *insurance*, which they refuse to do for religious reasons. SAC Exs. 8-12.

**(10)** On these facts, Defendant's Policy is not even rationally related to any valid interests.

## VI.    CONCLUSION.

There is "no question that the challenged restrictions, if enforced, will cause irreparable harm," *Cuomo*, 592 U.S. at 19, including immediately to each individual Plaintiff, *e.g., supra* at §V.A (the Cordels), and that the requested "injunctive relief would directly redress the injury stemming from [Defendant's] threat of enforcement," *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 62-63 (9th Cir. 2024). Plaintiffs need relief "*before* [facing] the coercive action [defendants] admit they intend to bring." *Travelers Cas. Ins. v. A-Quality*, 98 F.4th 1307, 1315 (10th Cir. 2024).

---

[19] The same *strict scrutiny* applies to *all* applicable religious-freedom cases, regardless of claim type (e.g., Free Exercise, RFRA, RLUIPA), and was in fact applied in all six of these cases.

Dated this **5th** day of **December, 2024** and respectfully submitted,

/s/ *J. Matthew Szymanski*
J. Matthew Szymanski, Bar #23-267
Scott J. Ward, Bar #23-361
GAMMON & GRANGE, P.C.
1945 Old Gallows Rd., Tysons, VA 22182
JMS@gg-law.com; SJW@gg-law.com
(703) 761-5030; (703) 761-5012

J. Brian Heller
Bar #06180273
J. BRIAN HELLER, PC
200 Walnut St.
Washington, IL 61571
(309) 444-9223
Jbhpc@comcast.net

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2024, a true and correct copy of the foregoing was filed and served via the CM/ECF system.

/s/ *J. Matthew Szymanski*
Counsel for Plaintiffs