**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

SAMARITAN MINISTRIES INTERNATIONAL, a
religious Illinois non-profit corporation,
6000 N. Forest Park Drive
Peoria, Illinois 61614,

and ten of its New Mexico members, namely,

CASE NO: 23-cv-001091-MIS-SCY

ZACHARY & RACHEL CORDEL, 662 CR F,
Clovis, New Mexico 88101,

DAVID ALLAN & MONETTE BELL, 3 Mountain
Vista Trail, La Luz, NM 88337,

REV. ANDREW & HEATHER HEATH, 1310
Meadow Lane, Roswell, NM 88203,

JAY & AMY O'NEILL, 275 Blue Sky Lane, Mesilla
Park, NM 88047, and

REV. NATHAN & REBEKAH BIENHOFF, 3501
Highland Road, Roswell, NM 88201,

    *Plaintiffs,*

  v.

ALICE T. KANE, in her personal capacity and in her
official capacity as the Superintendent of Insurance
for New Mexico, 1120 Paseo de Peralta 4th Floor,
Santa Fe, NM 87501,

    *Defendant.*

## <u>RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION</u>

   Defendant Alice T. Kane, who is named in both her personal capacity and official capacity

as the Superintendent of Insurance ("Superintendent"), by and through the Office of General

Counsel, Office of Superintendent of Insurance ("OSI") hereby submits her response to Plaintiffs'

*Motion for Preliminary Injunction.*

## I.     INTRODUCTION

Plaintiff Samaritan Ministries ("Samaritan") identifies itself as health care sharing ministry ("HCSM" or "ministry") with New Mexico membership of 918 as of October 1, 2023. Plaintiffs Zachary & Rachel Cordel, David Allan & Monette Bell, Rev. Andrew & Heather Heath, Jay & Amy O'Neill, and Rev. Nathan & Rebekah Bienhoff (the "Individual Plaintiffs") are identified as members of Samaritan. (Collectively, the Individual Plaintiffs and Samaritan are referred to as the "Plaintiffs").  Plaintiffs filed a 366-page complaint (the "Complaint") in a peremptorily attempt to prevent the Superintendent from taking any regulatory enforcement action against the Plaintiffs.

In the Complaint, the Plaintiffs plead a total of Sixteen Causes of Action alleging that unless prohibited from acting, any future enforcement action undertaken by the Superintendent would violate their federal constitutional rights and one state granted right.  Relying on the First Amendment Rights described in the first ten counts of the Complaint, and despite not having any evidence that the Superintendent had threatened or was contemplating enforcement against Samaritan, nor any action against the Individual Plaintiffs, Samaritan seeks to enjoy the Superintendent from exercising her general powers and duties under 59A-2-8(A)(3) to enforce those provisions of the Insurance Code that are administered by the Superintendent (i.e., engaging in the business of insurance without complying with the applicable provisions of the Insurance Code), and the authority order a party to cease and desist from engaging in an act or practice that is prohibited in Chapter 59A, Article 16 NMSA 1978 (i.e., selling or issuing an unlicensed or unapproved a health benefits plan).

## II. ARGUMENT

**A.    The legal requirements to obtain a stay.**

To obtain a stay, Samaritan must establish: "(1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest." *See, e.g.*, *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *United States v. Various Tracts of Land in Muskogee and Cherokee Counties*, 74 F.3d 197, 198 (10th Cir. 1996). *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)). As the moving party, Samaritan bears the burden of proving all four elements. *Nichols v. Alcatel USA, Inc*., 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985).

Stays are a matter of the court's sound, but not unfettered, discretion.

A stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case. The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.

*Nken v. Holder*, 556 U.S. 418, 433-34, 129 S. Ct. 1749, 1760-1761, 173 L. Ed. 2d 550 (2009).

In addition to bearing the burden of persuasion, the moving party "must demonstrate, by a clear showing, that the request relief is warranted." *Thorp v. District of Columbia*, 317 F. Supp. 3d 74, 79 (D.D.C.) (cleaned up), aff'd, 2018 WL 6720512 (D.C. Cir. 2018) (per curiam). "[T]he movant's right to relief must be clear and unequivocal." *Jewell*, 839 F.3d at 1281 (quoting *Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1224 (10th Cir. 2008)). An

injunction must "redress the plaintiff's particular injury," and no more. *Gill v. Whitford*, 585 U.S. 48, 138 S. Ct. 1916, 1934, 201 L. Ed. 2d 313 (2018) (citation omitted).

**(1)    Untimely Request**

As will be discussed in greater later, the second *Hilton* factor requires the Plaintiffs to make a showing that they will suffer irreparable harm unless the stay is granted.  "[A] *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits."  *Wreal, LLC v. Amazon.com, Inc.,* 840 F.3d 1244, 1248 (11th Cir. 2016).  "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm. *Id at* 1248.  For a dispute to stay ripe, the threat of enforcement "must remain 'real and immediate' throughout the course of the litigation." *Salvation Army v. Dep't of Cmty. Affs. of State of N.J.,* 919 F.2d 183, 192 (3d Cir. 1990).  Additionally, a delay in seeking injunctive relief can rebut a claim of irreparable harm. *Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc*., 429 F.3d 1364, 1381–82 (Fed.Cir.2005) (noting that delay generally "negates the idea of irreparability"); *Bushnell Inc. v. Brunton Co*., 673 F.Supp.2d 1241, 1264 (D.Kan.2009).

The Plaintiffs originally filed their Complaint (Doc No. 1) on December 7, 2023.  On June 6, 2024, the Court entered its *Order Striking Complaint* ("Court's First Order") (Doc. No. 30), *sua sponte*, striking Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(f).  Plaintiffs were given an additional 30 days to file an amended complaint.  On July 8, 2024, Plaintiffs filed their *Verified First Amended Complaint* ("Amended Complaint") (Doc. No. 32).  On July 17, 2024, the Superintendent filed her *Motion to Strike Plaintiffs' Amended Complaint* ("Motion to Strike") (Doc. No. 33), arguing that Plaintiffs' Amended Complaint was still lengthy.

On August 27, 2024, after briefing was complete on the *Motion to Strike*, the Court issued its *Order Granting in Part and Denying in Part Defendant's Motion to Strike Plaintiffs' Amended Complaint* ("Court's Second Order") (Doc. No. 48). The Court found that Plaintiffs' Amended Complaint contained descriptive paragraphs and encouraged Plaintiffs to consider what they deem sufficient to support their claims and only include what was necessary within the Complaint. The Court granted the Plaintiffs the opportunity to file a Second Amended Complaint.

The Plaintiffs filed their *Verified Second Amended Complaint for Declaratory Relief, Injunctive Relief, and Damages* ("Second Amended Complaint") (Doc. No. 50) on September 10, 2024.

Now, a year after filing the Complaint, and despite the fact that there existed no legal impediment prohibiting the OSI from commencing any civil investigation or enforcement action against Samaritan, the Plaintiffs argue that a stay is now necessary because Samaritan could be the next on the Superintendent's list of HCSMs to be targeted with enforcement proceedings. Nothing has changed during the past twelve months. Plaintiffs alleged injury remains remote and speculative. On this basis alone, Plaintiffs' request for injunctive relief should be denied.

### (2)    <u>Disfavored Injunction</u>

In the present proceeding, the Plaintiffs' request a should be viewed as a disfavored injunction. A disfavored injunction one which falls into one of the following three categories (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *O Centro Espirita Beneficente v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (per curiam). "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors: [s]he must make a

'strong showing' that these tilt in her favor." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916. F.3d 792, 797 (10th Cir. 2019) (citing *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)). A request for a disfavored injunction must thus make a stronger holistic showing in the four-prong analysis." *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1027 (D.N.M. 2016).

### (a)   First Disfavored Category - Mandatory Preliminary Injunctions

The typical preliminary injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits. See *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025–26 (2d Cir.1985), overruled on other grounds by *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 n. 2, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). "A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Id.* "The distinction between mandatory and prohibitory injunctions is not without ambiguities or critics. Determining whether the status quo is to be maintained or upset has led to distinctions that are 'more semantic[ ] than substantive.'" *Abdul Wali*, 754 F.2d at 1025; see *International Union, United Mine Workers v. Bagwell,* 512 U.S. 821, 835, 114 S.Ct. 2552, 2561, 129 L.Ed.2d 642 (1994) (noting that "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms").

If an injunction is deemed mandatory, "a greater showing is required of the moving party." *Abdul Wali*, 754 F.2d at 1025. A mandatory injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested," or where "extreme or very serious damage will result" from a denial of preliminary relief." *Id* at 1025-1026. Courts should show a "greater reluctance to issue a mandatory injunction than a prohibitory injunction." *Id* at 1026.

"The distinction between mandatory and prohibitory injunctions ... cannot be drawn simply by reference to whether or not the status quo is to be maintained or upset. As suggested

by the terminology used to describe them, these equitable cousins have been differentiated by examining whether the non-moving party is being ordered to perform an act, or ***refrain from performing*** [an act]. In many instances, this distinction is more semantical than substantive. ***For to order a party to refrain from performing a given act is to limit his ability to perform any alternative act***; similarly, an order to perform in a particular manner may be tantamount to a proscription against performing in any other. *Abdul Wali*, 754 F.2d at 1026. (Emphasis added). An injunction directing a party to do something is […] not fundamentally different from an injunction prohibiting something …" *Logan*, 163 F. Supp. 3d at 1027.

Plaintiffs' requested injunction asks the Court to prohibit the Superintendent from exercising her general powers and duties under Section 59A-2-8(A)(3) to enforce those provisions of the Insurance Code that are administered by the Superintendent (i.e., engaging in the business of insurance without complying with the applicable provisions of the Insurance Code), and the Superintendent's authority to order a party to cease and desist from engaging in an unfair practice that is prohibited by Chapter 59A, Article 16 NMSA 1978 (i.e., selling or issuing an unlicensed or unapproved a health benefits plan). Such an order refrains the Superintendent from performing certain acts and limits her ability to perform these acts. Presumably, those prohibited acts could include an investigation of a consumer complaint submitted to the OSI's Consumer Assistance Bureau. Out of the fear that the investigation could violate the terms of the injunctive order, the OSI would need to inform the consumer that the bureau is prohibited from providing any assistance, call back later. The request should therefore be viewed as a disfavored injunction.

**(b)    Second Disfavored Category - Alter the Status Quo**.

The second disfavored category is preliminary injunctions that alter the status quo. The status quo is "not necessarily the positions that the parties occupied at the time litigation

began." *Cobra N. Am., LLC v. Cold Cut Sys. Svenska AB*, 639 F. Supp. 2d 1217, 1229 (D. Colo. 2008).  It is also "not defined by the parties' existing legal rights," but rather by the "reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004).  The status quo is "the last uncontested status between the parties which preceded the controversy".  *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp*., 269 F.3d 1149, 1155 (10th Cir.2001) (quoting *SCFC ILC, Inc*., 936 F.2d at 1100 n.8).

The last uncontested status between the parties is that there existed no legal prohibition preventing the Superintendent from lawfully exercising her general powers and duties under Section 59A-2-8(A)(3) or issuing an order directing Samaritan to cease and desist from engaging in an unfair practice that is prohibited by Chapter 59A, Article 16 NMSA 1978.  Plaintiffs' requested injunction would therefore alter that status quo and should be disfavored.  See e.g., *Ortega v. Lujan Grisham*, No. CIV 24-0471 JB/SCY, 2024 WL 3495314, *18 (D.N.M. July 22, 2024); *AgJunction LLC v. Agrian Inc.,* No. 14-CV-2069-DDC-KGS, 2014 WL 3661108 *2 (D. Kan. July 23, 2014).

A.    <u>**Valid and neutral law of general applicability**</u>.

Normally, the likelihood-of-success and irreparable-harm factors are "the most critical" in the standard test analysis. *Nken v. Holder*, 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).  The moving party must demonstrate something more than that there is a "possibility" of

either success on the merits or irreparable harm. *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

The Plaintiffs' advance the position that it is likely to succeed on the merits because the Superintendent's unwritten "anti-HCSM campaign" is not neutral.  Specifically, Plaintiffs' claim is that the Superintendent's unwritten policy targets religious ministries and is carried out with animus towards HCSMs.  Based on its past enforcement actions, it is equally plausible to conclude that Superintendent's unwritten policy targets entities that seek to circumvent compliance with the insurance code.

The legal standard applicable to the Plaintiffs' First Amendment claims is set forth in the United States Supreme Court's decision of *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).  *Smith* held that laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable. 494 U.S. at 878–882, 110 S.Ct. 1595; *Fulton v. Philadelphia*, 593 U.S. 522, 141 S.Ct.1868, 1876 (2021).  "[I]f the law is 'a valid and neutral law of general applicability,' then it must simply be rationally related to a legitimate government end." *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002).

OSI has taken enforcement action against several entities operating programs similar to Samaritan's program.  One such entity was the Sedera Medical Cost Sharing Community, eDocket No: 2023-0026.

In its membership guidelines, Sedera describes its operations as a membership based non-insurance community of like-minded individuals established for the purpose of sharing legitimate healthcare expenses between members.  Sedera goes on to acknowledge that its program is modeled after a number of proven and highly successful medical sharing ministries.  However,

instead of being based on a religious belief, the Sedera program is based on a list of ethical beliefs and principles. See https://sedera.com/membership-guidelines.[1] (last viewed December 16, 2024).

Similar to other investigations undertaken by the OSI, the review of Sedera's operations was initiated after receiving a consumer complaint. After being informed by the OSI that unless Sedera discontinued its operations in New Mexico or be subject an administrative enforcement proceeding, Sedera agreed to wind down its program in the state. A copy of the parties' Stipulation and Consent Order is attached as Exhibit A.

As the Sedera enforcement action shows, OSI's actions are not directed towards a wholly religious sector. There exists no intent to treat healthcare sharing programs differently regardless of whether they are premised on religious or secular ethical beliefs and principles. To the contrary, the OSI's enforcement actions are targeted against entities that seek to circumvent compliance with the Insurance Code and are not based on any hostility to a religion or religious viewpoint.

Another example that OSI's actions are not directed towards a wholly religious sector is its investigation of the program offered by Medical Air Services Association, Inc. ("MASA"). MASA engaged in the sales of a membership program to the residents of New Mexico that provided in part for coverage of a member's out of pocket emergency air and ground medical transportation services (the "Program"). MASA did not have a license or other authorization issued by the OSI. OSI took the position in its dealing with MASA that the Program comes within the statutory definition of transacting the business of insurance. Eventually, MASA agreed to discontinue the solicitation and sale of new memberships in the Program. The parties agreed to

---

[1]    "Recently, some HCSMs have stretched the religious concept of the sharing of medical burdens to those who share 'ethical' beliefs that include lifestyle and wellness, but do not require shared religious beliefs." Christina L. Goe, The Impact of Health Care Sharing Ministries on the Stability of the Individual Health Insurance Market in Wyoming, February 24, 2020, p. 1. ("Exhibit C").

work together to use commercially reasonable efforts to obtain and provide all regulatory approvals required to offer the Program as an approved insurance product written by an admitted insurance company.[2]

The Plaintiffs make both a facial and as-applied challenge to the Superintendent's unwritten policy. A facial challenge to an enforcement policy requires a plaintiff to show the existence of an unconstitutional policy by extrapolating from a series of enforcement actions. *Hoye v. City of Oakland*, 653 F.3d 835, 854-855 (9th Cir. 2011). In light of the above-described enforcement actions, the intent of OSI's enforcement actions is clearly to target entities that seek to circumvent compliance with the Insurance Code, not to target an entity when there exists no reasonable and probable cause[3] that the entity is violating the Insurance Code.

The regulation of the business of insurance by a state in the public interest". *Humana Inc. v. Forsyth*, 525 U.S. 299, 306, 119 S. Ct. 710, 716, 142 L. Ed. 2d 753 (1999). Insurance laws exist to further public policy. See e.g., *Progressive Direct Ins. Co. v. Hudgins*, No. 20-CV-497-GKF-SH, 2021 WL 5114313, at *7 (N.D. Okla. Sept. 13, 2021). Seeking compliance with those laws by targeting unlicensed entities or unauthorized products is a rational and legitimate exercise of the OSI's governmental powers. The Plaintiffs' argument that strict scrutiny should apply to those actions therefore must fail.

---

[2]    Unlike Air Evac EMS, Inc., the subject of enforcement action by West Virginia and others, see e.g, *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751 (4th Cir. 2018), MASA was not an "air carrier" within meaning of Airline Deregulation Act's preemption clause.

[3]    Section 59A-2-8, NMSA 1978. General powers and duties of superintendent.

    A.  The superintendent shall:

        (5)    conduct such examinations and investigations of insurance matters, in addition to those expressly authorized, as the superintendent may deem proper upon reasonable and probable cause to determine whether a person has violated a provision of the Insurance Code or to secure information useful in the lawful enforcement or administration of the provision.

(1)    **General Applicability.**

Relying on *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 210 L. Ed. 2d 137 (2021), Samaritan urges this Court to conclude that Samaritan has made a strong showing that it is likely to succeed on the merits because the New Mexico Insurance Code "is riddled with exceptions." In support of its argument, Samaritan references a claimed exception granted to fraternal benefit societies.[4] See NMSA 1978 59A-44-23. A cursory review of Chapter 59A, Article 44 (Fraternal Benefit Societies), could result in the erroneous conclusion that fraternal organizations are exempt from the Insurance Code. A closer review reveals that they are not.

For example, to list a few, NMSA 1978 Section 59A-44-41 specifically lists the provisions of the Insurance Code that apply as to fraternal benefit societies; NMSA 1978 Section 59A-44-19(F) requires the benefit contract to comply with Sections 59A-18-12, 59A-18-13 and 59A-18-14 NMSA 1978, and meet the standard contract requirements specified in Chapter 59A, Articles 20 and 22 NMSA 1978; and Section 59A-16-1 NMSA 1978 subjects fraternal benefit societies to the trade practices and frauds provisions of Chapter 59A, Article 16 NMSA 1978.[5]

The legal principle being advanced by the Plaintiffs is that a law is not generally applicable if it incorporates a system of individual exemptions that can be granted at the sole discretion of the decision maker. See *Fulton*, 593 U.S. 522, 141 S.Ct.1868; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 537, 113 S. Ct. 2217, 2229, 124 L. Ed. 2d 472 (1993); *Smith*, 494

---

[4]    A "Fraternal Benefit Society" is defined as: Any incorporated society, order or supreme lodge, without capital stock, including one exempted under the provisions of Paragraph (2) of Subsection A of Section 59A-44-40 NMSA 1978, whether incorporated or not, conducted solely for the benefit of its members and their beneficiaries and not for profit, operated on a lodge system with ritualistic form of work, having a representative form of government, and which provides benefits in accordance with Chapter 59A, Article 44 NMSA 1978, is hereby declared to be a fraternal benefit society.

[5]    Samaritan argues that the Insurance Code spares fraternal societies from anti-discrimination provisions. The particular provision of the insurance code cited by Samaritan is 59A-16-12. Fraternal benefit societies are not excepted from that particular provision of the Insurance Code. Section 59A-16-1 expressly provides that provisions of Chapter 59A, Article 16 NMSA 1978 shall apply to fraternal benefit societies.

U.S. 872, 884, 110 S.Ct. 1595, 1603; *Bowen v. Roy*, 476 U.S. 693, 708, 106 S. Ct. 2147, 2156, 90 L. Ed. 2d 735 (1986).  Article 44 of the Insurance Code contains no mechanism for granting discretionary individualized exemptions on a case-by-case determination by the Superintendent that would exempt the fraternal benefit society from complying with the Insurance Code.  There is simply nothing in Section 59A-44-41, or elsewhere in the Insurance Code that gives the Superintendent the discretion to waive application of any those provisions listed above.

The *Fulton* case being relied upon involved a decision by the City of Philadelphia to refuse to enter in an annual contract with Catholic Social Services because that entity would not certify unmarried couples—regardless of their sexual orientation—or same-sex married couples as prospective foster families.  At issue in the *Fulton* case was Section 3.21 of the City's standard foster care contract.  Section 3.21 of the contract requires an agency to provide services defined in the contract to prospective foster parents without regard to their sexual orientation.  The Court held that Section 3.21 was not generally applicable because section 3.21 permitted exceptions to this requirement at the "sole discretion" of the City.  The Court held that this inclusion of a mechanism for entirely discretionary exceptions rendered the section 3.21, the non-discrimination provision, not generally applicable under *Smith*, 494 U.S. at 884, 110 S.Ct. 1595.

Plaintiffs argue that the Superintendent's unwritten policy gives her the discretion to determine whether an entity is unlawfully engaging in the business of insurance. Accordingly, that policy creates a standardless mechanism for individualized exemptions contrary to *Fulton*. Although the Superintendent is vested with great discretion, the decision whether to take enforcement action against an entity is not without any standard.  Section 59A-2-8, NMSA 1978 of the Insurance Code described the general powers and duties of superintendent.  Section 59A-2-8(A)(5) provides that the Superintendent has the authority to "conduct such examinations and

investigations of insurance matters, in addition to those expressly authorized, as the superintendent may deem proper *upon reasonable and probable cause* to determine whether a person has violated a provision of the Insurance Code or to secure information useful in the lawful enforcement or administration of the provision." (Emphasis added.)  Similarly, Section 59A-16-27, NMSA 1978 of the Insurance Code requires that the Superintendent must make a *showing of cause* before issuing an order to an entity to cease and desist from engaging in any unfair method of competition or act or practice defined or prohibited in Chapter 59A, Article 16 NMSA 1978. (Emphasis added). These statutory provisions and others contained within the Insurance Code establish the parameters within which the Superintendent exercises her discretion to determine whether an entity is unlawfully engaging in the business of insurance.

State regulation of the business of insurance is comprehensive.  *Doe v. Mut. of Omaha Ins. Co.,* 179 F.3d 557, 564 (7th Cir. 1999).  The McCarran-Ferguson Act gives the states the authority to determine when an entity is engaged in the business of insurance.  In *Blue Cross & Blue Shield of Kansas City v. Bell*, 798 F.2d 1331 (10th Cir. 1986), the Tenth Circuit Court of Appeals adopted a three-part analysis for use by the federal courts in the Tenth Circuit in determining whether a particular practice sought to be regulated by a state qualifies as the "business of insurance." *Id at* 1334.  Now, without the benefit of any factual record that would allow this Court to make such an analysis, Plaintiffs request this Court to determine that Samaritan is not engaging in the business of insurance.  An injunctive order should not denied OSI the ability to show that Samaritan is engaging in the business of insurance.

Samaritan argues that after operating outside of the Insurance Code for decades now because of the Superintendent's unwritten policy to go after HCSMs Samaritan is going to be targeted with an enforcement action.  Because they could potentially be the next HCSM targeted,

Samaritan and its members argue that they will be irreparably harmed which justifies judicial intervention. Samaritan forgets the posture of this proceedings. The Plaintiffs have commenced a pre-enforcement challenge to the Superintendent' legal authority in order to prevent any possible future enforcement action against Samaritan. Maybe the reason that Samaritan has not been the subject of any enforcement action in the past is that the check on the Superintendent's exercise of her discretionary authority that she must have *reasonable and probable cause* to determine that a person has violated a provision of the Insurance Code actually serves as a standard.

### (3)    <u>Likelihood of Success on the Merits.</u>

Plaintiffs' primary argument why they are substantially likely to succeed on the merits is premised entirely on the application of strict scrutiny. Plaintiffs' fallback position is that federal law preempts state insurance law. Such an argument ignores the express supremacy of the states in the regulation of the business of insurance created by the McCarran-Ferguson Act.[6]

The McCarran-Ferguson Act created what is commonly referred to as the "reverse preemption doctrine" "which, if applicable, can cause state insurance laws to trump federal laws that interfere with [the state insurance laws]." *W. Ins. Co. v. A & H Ins., Inc.,* 784 F.3d 725, 727 (10th Cir. 2015). Although the McCarran–Ferguson Act does not "cede the field of insurance regulation to the States", *United States v. Redcorn*, 528 F.3d 727, 736 (10th Cir. 2008), the reverse preemption doctrine will nevertheless result in the "state insurance laws [ ] trump[ing] federal laws that interfere with" the state insurance laws. *W. Ins. Co. v. A & H Ins., Inc*., 784 F.3d at 725. The McCarran–Ferguson Act does not define the term insurance and unlike the issues presented to the Supreme Court in *Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.,* 359 U.S. 65, 79

---

[6]    See 15 U.S.C. §§ 1011–1015.

S. Ct. 618, 3 L. Ed. 2d 640 (1959), the Plaintiffs fail to point to any federal act which supersedes the definition of insurance as defined by the Insurance Code. Therefore, Plaintiffs fail to meet their burden that they are likely to succeed on the merits of their claims.

### (4) Irreparable Harm

Under the traditional standard "a showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004) (quotation, alteration omitted). Under the heightened standard applicable to disfavored injunctions a showing of irreparable harm is given less significance. Instead, the likelihood of success on the merits and balance of harm factors are given more weight. Nevertheless, "[t]he heightened standard does not affect the analysis of the other two preliminary injunction factors: irreparable injury and public interest." *Awad v. Ziriax*, 670 F.3d 1111, 1126 (10th Cir. 2012), and the Plaintiffs are not excused from meeting all four factors.

To merit preliminary injunctive relief under the traditional standard, the Plaintiffs must make a showing that there exists a "significant risk" that the Plaintiffs "will experience harm that cannot be compensated after the fact by money damages." *Id.* at 1250 (quoting Fish, 840 F.3d at 751–52). That harm "must be both certain and great," not "merely serious or substantial." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). A speculative or theoretical injury will not suffice. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). The injury must also be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Schrier v. Univ. of Co.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

Samaritan advances the argument that it would suffer irreparable harm if Samaritan was required to comply with the Insurance Code. Specifically, compliance would "deprive it of two federal statuses required for its existence." Samaritan argues that "any determination by the OSI that Samaritan's religious activities *is* insurance may jeopardize Samaritan's 501(c)(3) status." (Emphasis in original). Samaritan goes on to assert that a loss of its 501(c)(3) status will have a domino effect causing it to lose status under 26 U.S.C § 5000A-(d)(2)(B).

Samaritan's claimed irreparable harm is extremely speculative or theoretical. It is not a foregone conclusion that Samaritan would lose its 501(c)(3) if it is required to comply with the Insurance Code. Samaritan writes that 26 U.S.C. § 501(m) bars an entity tax exempt status if it "substantially" provides any "commercial-type insurance". The relevant subsection of section 501(m) is subsection 501(m)(1). It provides that a 501(c)(3) entity will be exempt from tax "only if no substantial part of its activities consists of providing commercial-type insurance." It does not provide that the entity will lose its 501(c)(3) status. If the provision of commercial-type insurance is determined to be a substantial part of its activities, the activity will be treated as an unrelated trade or business and taxed on the income from the activity similar to an insurance company.

Granted, "[t]he legislative history of section 501(m) of the Code provides that commercial-type insurance generally is any insurance of a type provided by commercial insurance companies." *I.R.S. Tech. Adv. Mem*. 200033046 (Aug. 18, 2000). Apparently, Samaritan is not confident in its statement that the IRS "has determined that Samaritan's expressive religious activity is nothing like insurance." Doc. 10 at 12.[7]

---

[7]        Nothing in 26 U.S.C.A. § 5000A, Requirement to Maintain Minimum Essential Coverage (the individual mandate) or the February 26, 2014, letter from the Department of Health and Human Services, Center for Medicare & Medicaid Services (Doc. 1, Ex. 19) contains any such conclusion.

Such uncertainty could be due to the disclaimers made in the letter received from the Department of Health and Human Services, Center for Medicare & Medicaid Services. Doc. 1, Ex. 19. (a copy of the letter is attached as "Exhibit B"). The letter notified Samaritan that it had submitted sufficient information to be considered a health care sharing ministry for purposes of subpart G of 45 CFR part 155, which relates to an individual's eligibility under 45 CFR 155.605(d) to obtain an exemption from the ACA's individual mandate.

That same letter goes on to provide:

> This determination is limited to Samaritan Ministries International's compliance with standards relevant to an organization being considered a health·care·sharing ministry for the purposes of subpart G of 45 CFR part 155. As such, this determination does not supersede other relevant state or federal laws that govern the conduct of Samaritan Ministries International. Furthermore, this determination does not reflect any decision by the Internal Revenue Service regarding Samaritan Ministries International's status as a health care sharing ministry or compliance with the Internal Revenue Code. …

The IRS granted Samaritan section 501(c)(3) status by letter dated June 17, 2005. Doc. 1, Ex. 18. There exists a statutory process by which the IRS can seek to revoke an entity's tax-exempt status. See e.g., 26 C.F.R. § 601.201(n)(9)(i)(d), Statement of Procedural Rules; *Educ. Assistance Found. for Descendants of Hungarian Immigrants in Performing Arts, Inc. v. United States*, 111 F. Supp. 3d 34 (D.D.C. 2015); *Partners In Charity, Inc. v. Comm'r*, 141 T.C. 151 (2013).

Moreover, any effort by the IRS to revoke Samaritan's 501(c)(3) status could prove to be unsuccessful. See *Bethel Conservative Mennonite Church v. Comm'r*, 746 F.2d 388 (7th Cir. 1984). Bethel Conservative Mennonite Church's (Bethel Mennonite) challenged the Commissioner of Internal Revenue's denial of 501(c)(3) status. The Seventh Circuit reversed the decision of the Tax Court ruling that Bethel Mennonite's plan which provided financial aid from a pooled fund "to members of its congregation only" was operated for an exempt purpose. *Id.* at

392.    As the *Bethel Conservative MennFnFFonite Church* decision evidences, revocation of Samaritan's 501(c)(3) status is not a foregone conclusion.  Samaritan's claim irreparable harm is speculative or theoretical. Samaritan therefore fails to meet its burden to show that the injury must also be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."

(5)    **Balance of the Harms.**

Provided an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.  Where the opposing party is the government, the balance of the harms and public interest factors merge. *Nken*, 556 U.S. at 435.  "When balancing the equities, the Court must 'consider the effect on each party of the granting or withholding of the requested relief.' *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "Moreover, 'courts of equity should [have] particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Ctr. for Pub. Integrity v. United States Dep't of Def.*, 411 F. Supp. 3d 5, 14 (D.D.C. 2019).

In enacting the McCarran–Ferguson Act,[8] Congress expressly acknowledged the "continued regulation and taxation by the several States of the business of insurance is in the public interest". *Humana Inc. v. Forsyth*, 525 U.S. 299, 306, 119 S. Ct. 710, 716, 142 L. Ed. 2d 753 (1999).  Insurance laws exists to further public policy.  See e.g., *Progressive Direct Ins. Co. v. Hudgins*, No. 20-CV-497-GKF-SH, 2021 WL 5114313, at *7 (N.D. Okla. Sept. 13, 2021).  A state's ability to enact and enforce measures it deems to be in the public interest is an equity to be

---

[8]        See 15 U.S.C. §§ 1011–1015.

considered in balancing hardships. *Heideman*, 348 F.3d at 1191; *Pueblo of Pojoaque*, 223 F.Supp.3d at 1146; *see also Nken*, 556 U.S. at 436.

When viewed from a merged perspective, Plaintiffs' alleged injury is entire speculative and theoretical. As such, little weight should be given this claimed harm. On the other hand, the OSI has an interest in enforcing the insurance laws that are intended to further and protect the public interest. For example, the Insurance Code contains several provisions intended to protect the consumer from an insurer's failure to maintain adequate reserves. The prevention of insolvency and the maintenance of 'sound' financial condition in terms of fixed-dollar obligations is precisely what traditional state regulation [of insurance] is aimed at." *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 780 (8th Cir.1990) (*quoting SEC v. Variable Annuity Life Ins. Co. of Am.,* 359 U.S. 65, 90–91, 79 S.Ct. 618, 631–32, 3 L.Ed.2d 640 (1959). To guard against an insurer's insolvency, the Insurance Code requires the insurer to "maintain reserves in such amount as is requisite to cover losses and claims incurred and unpaid . . .." NMSA 1978, Section 59A-8-8(A). Domestic insurers are subject to financial examination every five years. NMSA 1978, Section 59A-4-5(A). In lieu of conducting its own examination of a foreign insurer, Section 59A-4-5(E) allows the Superintendent to accept the examination conducted by another state for a foreign insurer provided certain conditions are met. If the examination discloses a deficiency of capital or surplus, or other issues, the insurer is subject to regulatory action. NMSA 1978, Section 59A-4-13(C). Loss reserves are a critical measure of financial health for an insurance company because the reserves represent expected future amounts that the company will be required to pay on its policies.

As Samaritan has expressly acknowledged, as of October 1, 2023, Samaritan's members in New Mexico total 918. Doc. 1, footnote 4. As of that date, it is unknown the total number of

unpaid medical bills or dollar amount of unpaid medical bills outstanding.  Because of its refusal to comply to any insurance regulation, it is unknown whether Samaritan has adequate financial reserves to provide coverage to its members in the event of the entity's financial failure.

Further, the members of the Samaritan do not benefit from other provisions of the Insurance Code that further the public interest.  Those provision include Article 22 (which specifies the required provision of a health insurance contract); Article 22B, the "Prior Authorization Act"; Article 42A, the "Provider Service Network Act"; Article 57, the "Patient Protection Act"; Article 57A, the "Surprise Billing Protection Act"; Article 42, the Life and Health Insurance Guaranty Association, which provides for payment of claims in the event of insurer insolvency; 13.10.16.5 NMAC, which allows an insured party the ability to present a provider grievance to the OSI; NMSA 1978, Section 59A-23E-3, which addresses coverage for preexisting health conditions; NMSA 1978, Section 59A-18.16.1(A), which prohibits denial of coverage for essential health benefits; and NMSA 1978, Section 59A-18.16.1(D), which provides an insured party protection against any lifetime or annual dollar limit on essential health benefits.

If reviewed under the disfavored analysis, the Plaintiffs bear a heavier burden to show that the balance-of-harms factor tilts in their favor.  A state's ability to enact and enforce measures it deems to be in the public interest is an equity to be considered in balancing hardships. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190-1191 (10th Cir. 2003).  The Plaintiffs cannot show that they have suffered any injury.  Their injury is entirely speculative or theoretical.  In contrast, as discussed above and as will discussed below, prohibiting the Superintendent from enforcing the Insurance Code harms the members of the Samaritan program and not only harms but is adverse to the public interest.

Samaritan maintains that it is not engaging in the business of insurance. If these proceedings are to go forward, it will be necessary for the OSI to establish that Samaritan is engaging in the business of insurance. In weighing the preliminary injunction factors, the Court must determine whether the nonmoving party will be irreparably harmed by the injunction. *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). OSI would suffer irreparable harm if prohibited from mounting such a defense or the ability to bring a counter-claim. The balance of the harms clearly tips against granting the injunction.

### (6)    <u>Harm-to-Other-Interested-Persons</u>

The fourth factor that the Plaintiffs must satisfy is that the injunction would not be adverse to the public interest. The harm-to-other-interested-persons factor does not turn on whether the applicant will be injured absent a stay; it simply requires that the applicant meet its burden to establish that the requested stay will not be harmful to the public interest. *Associated Sec. Corp. v. Sec. & Exch. Comm'n*, 283 F.2d 773, 775 (10th Cir. 1960).

As noted above, the members of the Samaritan do not currently benefit from a myriad of statutory provisions intended to protect them from suffering harm. In addition, programs such the Samaritan program are harmful and adverse to the public interest. Recently Wyoming's Division of Insurance retained Wakely Consulting Group, LLC ("Wakely") to analyze Health Care Sharing Ministry organizations and their potential effect on Wyoming's individual Affordable Care Act ("ACA") market. Wakely estimated that if a significant portion of the members of HCSMs enrolled in the individual ACA market, "premium changes could range from a negligible impact up to a 10% reduction, with a 2% to 4% premium reduction most likely given the available data." See Julie Peper, FSA, MAAA, Wakely Consulting Group, State of Wyoming, Health Care Sharing Ministries—Actuarial Analysis, January 26, 2021, p. 2. ("Exhibit C").

An earlier report from Wyoming concluded that "[i]ncreasing enrollment in HCSMs may increase health insurance premiums because it reduces the number of healthy individuals who may have otherwise enrolled in the individual market. Because HCSMs do not guarantee claims payment, they sometimes leave individuals and health care providers exposed to unpaid medical bills, and uncompensated health care negatively affects the whole health care system and has many trickle-down effects." See Christina L. Goe, The Impact of Health Care Sharing Ministries on the Stability of the Individual Health Insurance Market in Wyoming, February 24, 2020, p. 8. ("Exhibit D").

Plaintiffs' requested stay would prohibit the Office of Superintendent of Insurance from conducting an investigation and initiating possible enforcement action against Samaritan. As these two reports reveal, Samaritan continued operations outside of the Insurance Code are harmful and adverse to the public interest.

Whether Plaintiffs' requested stay is analyzed using the traditional standard or as a disfavored injunction, at a minimum, the Plaintiffs must nevertheless show that all four injunction factors weigh in their favor. *Awad*, 670 F.3d at 1126. Plaintiffs fail to do so.

WHEREFORE, for all of the foregoing reasons, the Superintendent of Insurance respectively requests that this Court deny the Plaintiffs' *Motion for Preliminary Injunction.*

Respectfully submitted,

*/s/ Stephen P. Theis*
Stephen P. Thies
General Counsel
Office of General Counsel
NM Office of Superintendent of Insurance
PO Box 1689, Santa Fe, NM 87504-1689
505-470-7366
Stephen.Thies@osi.nm.gov

Attorneys for Defendants Alice T. Kane in her personal capacity and in her official capacity as the Superintendent of Insurance for New Mexico.

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2024, a true and accurate copy of the foregoing

*Response to Motion for Preliminary Injunction* was electronically filed with the Court and served

upon the parties by means of the CM/ECF system.

*/s/ Stephen P. Thies*
Stephen P. Thies
General Counsel
Office of General Counsel
NM Office of Superintendent of Insurance
PO Box 1689, Santa Fe, NM 87504-1689
505-470-7366
Stephen.Thies@osi.nm.gov

Attorneys for Defendants Alice T. Kane in her
personal capacity and in her official capacity as the
Superintendent of Insurance for New Mexico.

DocuSign Envelope ID: 23722A99-4BA2-4B94-9FD5-78E73278C7EC

## BEFORE THE NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE

| | |
|---|---|
| IN RE: SEDERA MEDICAL COST<br>SHARING COMMUNITY )<br>)<br>Respondent. )<br>) | Docket No.: 2023-0026<br>**Investigative Inquiry** |

## STIPULATION AND CONSENT ORDER

This Stipulation and Consent Order ("Order") is entered into by the New Mexico Office of the Superintendent of Insurance ("OSI"), and the Sedera Medical Cost Sharing Community (the "Respondent").

**BASIS:**

1.    The New Mexico Superintendent of Insurance ("Superintendent") has jurisdiction in the State of New Mexico over matters involving insurance regulation and licensing in accordance with Chapter 59A NMSA 1978, the New Mexico Insurance Code.

2.    The Sedera Medical Cost Sharing Community is a nonresident nonprofit corporation incorporated in the state of Texas.  Sedera represents itself as a Health Care Sharing Membership ("HCSM"), not insurance.

3.    The Respondent does not hold a certificate of authority to transact insurance in the State of New Mexico.

4.    The OSI's Civil Investigations Bureau ("CIB"), instituted an investigation of the Respondent arising out of an investigation of a third-party entity known as Knew Health.

5.    As a result of this investigation, the Superintendent had cause to believe that the Respondent was acting as an unauthorized insurer in New Mexico.

6.    Following discussions between the Respondent and the OSI, and in view of the

"Exhibit A"

complex issues raised and the probability that long-term litigation or administrative proceedings would be required to resolve these disputes, the Respondent desires to resolve this matter by entering into this Order.

**CONSENT TO ORDER:**

7.    The OSI and the Respondent agree the best interest of the public will be served by entering into this Order. NOW, THEREFORE, the Respondent consents to the following in consideration of its desire to resolve this matter without further administrative or judicial proceedings, and the OSI consents to settle this matter in consideration of the terms and conditions as are set forth below:

8.    The Respondent acknowledges its duty to comply fully with the applicable laws of the state of New Mexico.

9.    The Respondent consents to the entry of this Order, waives any and all hearing or other procedural rights, and further administrative or judicial challenges to this Order.

10.    By agreement of the parties, Respondent will voluntarily withdraw and terminate all membership and/or HCSM products offered in New Mexico, subject to the membership terms and commitments signed by Sedera members. Prior to May 1, 2023, Sedera shall notify all of its current members residing in New Mexico that they will not be renewed after July 1, 2023, which will ensure that current members have time to find other options prior to the expiration of their Sedera membership.

11.    Respondent's Membership Guidelines defines "Needs" as "[o]ne or more Medical Bills caused by an injury, illness, or a medical event to an eligible Member." The Respondent agrees to process Needs pursuant to its standard membership obligations for a period of six (6) months following expiration of the New Mexico memberships. In the event a member is involved

Whether Plaintiffs' requested stay is analyzed using the traditional standard or as a disfavored injunction, at a minimum, the Plaintiffs must nevertheless show that all four injunction factors weigh in their favor. *Awad*, 670 F.3d at 1126. Plaintiffs fail to do so.

WHEREFORE, for all of the foregoing reason, the Superintendent of Insurance respectively requests that this Court deny the Plaintiffs' *Motion for Preliminary Injunction.*

Respectfully submitted,

_____

Stephen P. Thies
Acting General Counsel
Office of General Counsel
NM Office of Superintendent of Insurance
PO Box 1689, Santa Fe, NM 87504-1689
505-470-7366
Stephen.Thies@osi.nm.gov

Attorneys for Defendants Alice T. Kane in her personal
capacity and in her official capacity as the Superintendent
of Insurance for New Mexico.

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2024, a true and accurate copy of the foregoing

*Response to Motion for Preliminary Injunction* was electronically filed with the Court and served

upon the parties by means of the CM/ECF system.

_____
Stephen P. Thies
Acting General Counsel
Office of General Counsel
NM Office of Superintendent of Insurance
PO Box 1689, Santa Fe, NM 87504-1689
505-470-7366
Stephen.Thies@osi.nm.gov

Attorneys for Defendants Alice T. Kane in her
personal capacity and in her official capacity as the
Superintendent of Insurance for New Mexico.

in an ongoing Needs request that necessitates or requires membership to continue beyond the term outlined in section 10, Sedera will notify the OSI and the parties will agree on an appropriate course of action to handle the termination of that member.

12.    The OSI will provide Sedera members the option to obtain health insurance coverage through the New Mexico's Marketplace during a Special Enrollment Period. Respondent agrees to inform its members of this option, including a link to the New Mexico Marketplace at beWellnm.com and any verbiage provided by OSI to facilitate the ability of the members to obtain coverage through the New Mexico's Marketplace, provided such verbiage is provided by OSI on or before April 17, 2023 and does not include references to third parties or disparage Sedera. The parties shall take measures to protect the confidentiality and privacy of Sedera members to the extent required by law.

13.    The Respondent represents and warrants to the OSI that the information, representations, acknowledgments and all other matters set forth herein are complete, true and correct, and are being relied upon by the OSI as a material inducement to enter into this Order.

14.    Noncompliance with any of the terms and conditions in this Order shall be a violation of a lawful order of the Superintendent and a violation of the laws of the State of New Mexico and may result in additional administrative or civil action and the imposition of injunctive relief, sanctions, and additional penalties pursuant to applicable provisions of Chapter 59A NMSA 1978.

15.    This Order and the violations set forth herein constitute admissible evidence that may be considered in any future action by the OSI involving the Respondent.

16.    The Respondent understands and agrees that any further findings that the Respondent has failed, after the date of this stipulation, to comply with the statutes and/or

regulations that are the subject of this Order constitute grounds for further penalties, which may be imposed in direct response to further violations.

17.    With respect to the facts and violations identified herein, the Respondent waives its right to an administrative hearing pursuant to Section 59A-4-15, NMSA 1978, and to all other administrative or judicial review otherwise available under New Mexico law, including but not limited to the right to a hearing, the right to be presented at such hearing by counsel, the right to present a defense, the right to present oral and documentary evidence, and to cross-examine witnesses at such hearing, and the right to seek judicial review of this Order, and any Order issued by the Superintendent approving this Order.

18.    This Order is subject to the approval of the Superintendent and shall become effective and binding upon such approval. Should the Superintendent not approve this Order, the Respondent shall have all of its rights, claims, and/or defenses.

19.    The parties agree to accept electronic signatures in the form of a portable document format (PDF) or facsimile, as original signatures for purposes of this settlement.

DocuSigned by:

Bρussell Grigsby                                      Dated: 4/15/2023
Sedera Medical Cost Sharing Community

The undersigned staff attorney approves this Stipulation and Consent Order.

_____                          Dated:    4-17-2023

Stephen P. Thies
Assistant General Counsel

Office of the Superintendent of Insurance
Approved by the Interim Superintendent of Insurance

_____                          Dated: 4/15/2023

Jennifer A. Catechis

Docket No.: 2023-0026
Page 4 of 4



==May 1, 2023==

Dear [Member Name],

We are reaching out to you today with some disappointing news. As of ==July 1, 2023==, Sedera will no longer be operating in New Mexico.  We've always known that changing the way people pay for healthcare wouldn't be easy, but we embraced the challenge because the Sedera Medical Cost Sharing model is making a positive impact on people's lives and pocketbooks. In this case, we will need to work to change the law, and that's an obstacle that will require more than just a stellar record of member service and an innovative mindset.

Here's what that means for you:

If you have an open Needs case, a Sedera Needs Coordinator will be reaching out to you during the upcoming week to discuss resolution. Per the Guidelines ("Needs that Members Share"), Members must submit a Need within six months after the date of service.  If you have a sharable Need that you have been intending to share with the Community, we encourage you to open a Needs case as soon as possible to ensure that it can be timely shared. Our Needs Coordinators and Member Service Teams are here to assist you with this process.

As a reminder, per the Membership Commitments agreed to when you joined, the medical cost sharing dollars in your account as of the termination date will be retained for one year after your membership ends for continued sharing with the Community, after which time the account will be closed and any remaining funds returned to you.

Please be advised that New Mexico will be offering a special open enrollment period for Sedera Members to access New Mexico's health insurance marketplace, located online at beWellnm.com. To learn more about available options for individuals and families, visit the New Mexico Office of Superintendent of Insurance's [website](website) and the New Mexico Health Exchange [website](website).

We are so sad to exit New Mexico. It was only after a lengthy and respectful discussion with the New Mexico Office of Superintendent of Insurance that Sedera agreed to make the difficult decision to voluntarily comply with the Office's request to cease operations. We are doing so in order to preserve the opportunity to re-enter the state when the law is more conducive to innovative and fresh thinking. As a fellow change-maker, we hope you will partner with us to get the law changed when the time is right.



From the bottom of our hearts, thank you for being a Member of our Community. It has been an honor to serve you. If you have any additional questions or concerns that are not addressed here, please contact memberservices@sedera.com.

Sincerely,

Team Sedera

# EXHIBIT 19

(SMI CMS Ruling: IRC 5000A HCSM Status)
*(Samaritan Ministries, et al. v. Kane, et al.)*

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
Center for Consumer Information and Insurance Oversight
200 Independence Avenue SW
Washington, DC 20201



February 26, 2014

RE:   Samaritan Ministries International – Review of Materials Submitted

Dear Mr. Heller,

This letter conveys the results of our review of the materials submitted in connection with your request for consideration as a health care sharing ministry for the purposes of subpart G of 45 CFR part 155, which governs the granting of certificates of exemption from the shared responsibility payment under section 5000A of the Internal Revenue Code (the Code) by an Affordable Insurance Exchange (also known as a Health Insurance Marketplace).

Section 5000A of the Code, as added by the Patient Protection and Affordable Care Act (Affordable Care Act), establishes an exemption from the shared responsibility payment for members of a health care sharing ministry. Section 1311(d)(4)(H) of the Affordable Care Act specifies that one of the minimum functions of an Exchange is to grant certificates of exemption from the shared responsibility payment under section 5000A of the Code in certain categories. Section 1411(a)(4) of the Affordable Care Act specifies that the Secretary of Health and Human Services (Secretary) shall establish a program for determining whether to grant a certification of exemption from the shared responsibility payment for certain categories of exemptions listed in section 5000A of the Code, including the exemption for members of a health care sharing ministry. The Secretary established this program in part through the process described in 45 CFR 155.615(c)(2)[1], which provides that to be considered a health care sharing ministry for the purposes of certificates of exemption provided by an Exchange, an organization must submit information to HHS that substantiates the organization's compliance with the standards specified in section 5000A(d)(2)(B)(ii) of the Code.

Section 5000A(d)(2)(B)(ii)(I) – (V) specifies that, "the term 'health care sharing ministry' means an organization—

   (I) which is described in section 501(c)(3) and is exempt from taxation under section 501(a),
   (II) where members of which share a common set of ethical or religious beliefs and share medical expenses among members in accordance to these beliefs without regard to the state in which a member resides or is employed,
   (III) members of which retain membership even after they develop a medical condition,

---

[1] 78 FR 39494, 39527 (July 1, 2013).

(IV) which (or a predecessor of which) has been in existence at all times since December 31, 1999 and medical expenses of its members have been shared continuously and without interruption since at least December 31, 1999, and

(V) which conducts an annual audit which is performed by an independent certified public accounting firm in accordance with generally accepted accounting principles and which is made available to the public upon request."

Having completed the review of the materials you submitted dated December 12, 2013 and February 6, 2014, the Centers for Medicare & Medicaid Services (CMS) has determined that Samaritan Ministries International has submitted sufficient information to substantiate its compliance with the standards specified in section 5000A(d)(2)(B)(ii) of the Code and will be considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155.

This determination is limited to Samaritan Ministries International's compliance with standards relevant to an organization being considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155. As such, this determination does not supersede other relevant state or federal laws that govern the conduct of Samaritan Ministries International. Furthermore, this determination does not reflect any decision by the Internal Revenue Service regarding Samaritan Ministries International's status as a health care sharing ministry or compliance with the Internal Revenue Code. Samaritan Ministries International should not inform its members or the general public that this determination provides any such rights or status other than those rights which flow from an organization being considered a health care sharing ministry for the purposes of subpart G of 45 CFR part 155, which relate strictly to an individual's eligibility under 45 CFR 155.605(d) to obtain from a Health Insurance Marketplace a certificate of exemption from the individual shared responsibility payment under section 5000A of the Internal Revenue Code.

Please note that if any change in your status or operation affects any of the information you have submitted to CMS for the purpose of requesting consideration as a health care sharing ministry pursuant to 45 CFR 155.615(c)(2), you must notify CMS within 30 days of such change. If your organization no longer meets the standards specified in section 5000A(d)(2)(B)(ii) of the Code, CMS may revoke this decision regarding the status of Samaritan Ministries International as a health care sharing ministry for the purposes of subpart G of 45 CFR part 155.

If you have any questions or concerns, please contact Ben Walker at benjamin.walker@cms.hhs.gov. Thank you for your cooperation.

Sincerely,

Gary Cohen
Director, Center for Consumer Information & Insurance Oversight



wakely.com

# State of Wyoming

## Health Care Sharing Ministries – Actuarial Analysis

January 26, 2021

Prepared by:
**Wakely Consulting Group, LLC**

**Julie Peper, FSA, MAAA**
Principal

"Exhibit C"



# Table of Contents

Introduction ................................................................................................................. 2

Results and Methodology .............................................................................................. 2

   Results ..................................................................................................................... 2

   Impact on the Individual ACA Market............................................................................ 3

   Key Takeaways from Financial Statements ...................................................................... 4

Reliances and Caveats .................................................................................................. 6

Disclosures and Limitations............................................................................................ 6



## Introduction

Wyoming's Division of Insurance ("Wyoming") retained Wakely Consulting Group, LLC ("Wakely"), to analyze Health Care Sharing Ministry (HCSM) organizations and their potential effect on Wyoming's individual Affordable Care Act (ACA) market. Christina Goe, J.D., a sub-contractor of Wakely, will be providing a thorough review of HCSMs in the state of Wyoming. This report is specific to the actuarial analysis on the potential high level impact on the individual ACA market and some key takeaways from a review of select HCSM financial statements.

This document has been prepared for the sole use of Wyoming to provide a summary of the high-level results and takeaways of the analysis. It is expected that this information will be incorporate into the larger report by Christina Goe. The full report should be reviewed for additional context and background. Using the information in this report for other purposes may not be appropriate. This report satisfies the Actuarial Standard of Practice (ASOP) 41 on reporting requirements.

## Results and Methodology

### Results

Based on a high level analysis of estimated enrollment in the individual ACA and HCSM products, as well as the expected relative morbidity of HCSM members, Wakely estimates that if a significant portion of the HCSM enrolled in the individual ACA market, premium changes could range from a negligible impact up to a 10% reduction, with a 2% to 4% premium reduction most likely given the available data.

In reviewing the national financial statement of select HCSM organizations, the key takeaways include the following:

- There is no consistent method for reporting among HCSM organizations.

- HCSMs are growing quickly. Five of the six organizations showed growth of 50% or more over a two-year period in either fees collected and/or asset growth. The sixth only provided one year of financial statements so growth could not be determined.

- The amount of medical care paid for from the HCSM organizations is often not clear and in some cases is not included in the financial statements at all. This does not allow for a clear understanding on the amount of medical care that is paid for compared to the fees collected. In addition, there is no information in any of the statements on the amount of care of members that is not paid for. Since HCSMs have no obligation to pay for health care claims of their members, this would be a helpful metric for members to understand before signing up.



- For HCSM organizations where there is some ability to estimate the amount of medical care paid, often the amount paid as a percent of total funds received is less than the medical loss ratio (paid claims over premiums) of health insurance organizations.

- A few of the HCSM organizations spend a significant amount on broker commissions and/or negotiator fees. The former helps with enrolling more members, since they compete with ACA plans, despite HCSM not being actual insurance. The latter appears to support the members negotiate lower bills with providers.

## Impact on the Individual ACA Market

To estimate the impact on the individual ACA market if HCSMs were not available and a portion of the members enrolled in an individual ACA plan, Wakely developed a set of assumptions and ran scenarios using various combinations of these assumptions. Based on these scenarios, we estimate that the most likely range of impacts is a 2% to 4% premium reduction on the individual ACA market. On the low end, where it is possible that there would be a negligible impact, a very low take-up of HCSM members is assumed and those that take-up have relatively similar costs to the current individual ACA members. On the high end, it is possible for the impact to be around a 10% premium reduction, but this would require a high take-up of healthy HCSM members.

The following outlines the key assumptions used in the scenario testing.

- **Individual ACA market.** Size of the individual ACA market is between 22,500 to 27,500. In 2019, the average members were just below 25,000. Current open enrollment for 2021 implies an increase from 2020[1], but the actual enrollment for 2021 and in the future is uncertain.
- **HCSM members.** The range of estimates is 5,000 to 10,000. The state of Wyoming received information from the Alliance of HCSM that indicated there were around 5,400 members enrolled in Wyoming. However, not all HCSM organizations are in the Alliance and not all those that are in the Alliance report membership. This information is also dated[2] and enrollment in HCSM plans has been growing rapidly in recent years. Thus, this estimate is likely low. Information collected as part of Wyoming's data request to HCSM organizations also indicates total enrollment greater than this estimate.
- **Migration to the individual ACA market.** It is difficult to determine the portion of HCSM members who would purchase an individual ACA plan if HCSM plans were not available. From a premium perspective, HCSM fees are likely less than ACA premiums although potentially more than other types of individual insurance such as short-term limited duration (STLD) plans. However, it is also likely that some of the HCSM members could be eligible for ACA premium subsidies and could potential purchase individual ACA plans

---

[1] https://www.cms.gov/newsroom/fact-sheets/2021-federal-health-insurance-exchange-weekly-enrollment-snapshot-final-snapshot
[2] The Alliance information was collected in 2020 but is assumed to be enrollment from 2018 or 2019.

**Wakely**

that are more comprehensive (and with guaranteed coverage) for cheaper than the HCSM fees. Thus, it is possible the HCSM members either do not have the information to accurately compare the options or they are choosing to not purchase individual ACA coverage. Since it is difficult to discern what the take-up would be, Wakely used a wide range of assumptions such that anywhere between 20% and 80% of HCSM members would purchase an individual ACA plan if HCSM plans were not available. For context, the Congressional Budget Office's (CBO's) analysis of take-up of STLD plans estimates that approximately 60% of newly enrolled short-term limited duration members would have otherwise had coverage in the individual market.[3]

- **Morbidity of the HCSM members.** HCSM members are underwritten and there is no guarantee that health care costs will actually be paid. As a result, it is expected that the relative health, or morbidity, of HCSM members is significantly better or lower than the average individual ACA market member. If HCSM plans were not available, not all would enroll in the individual ACA market, and those that would are likely less healthy than the average HCSM member, but still healthier than the average individual ACA member. Wakely estimated that HCSM members who would migrate to the individual ACA market would have between 10% and 40% lower health care costs than the average individual ACA member.[4] These estimates are based on studies on take-up assumptions based on premiums levels so actuarial judgment has been included as well. The morbidity assumptions do not incorporate any pent up demand from HCSM members if certain services were not previously covered by the HCSM.

- **The portion of individual ACA fixed non-benefit expenses.** This represents the amount of premium that goes toward items such as administration of the insurance and does not depend on the amount of claims or number of members covered. These costs will not change if more, healthier members enter the individual ACA market. Based on industry norms, we estimate this will be between 10% and 15% of premiums.

The range of potential impacts is due to the lack of information on the number of HCSM enrollment and member morbidity, as well as the uncertainty on how many would actually enroll in an individual ACA plan if HCSM plans were not an option. This range of estimates should be considered our best estimate based on the data that is available and actuarial judgment. It is possible that the actual impact could be significantly different from these estimates.

## Key Takeaways from Financial Statements

We reviewed national financial statements from six HCSM organizations. Some provided recent financial statements, as of 2019, while many were more dated, with the most recent being 2017. Since HCSMs are not insurance companies, these financial statements are not on the standard

---

[3] For more information on CBO's analysis please see https://www.cbo.gov/system/files/2019-01/54915-New_Rules_for_AHPs_STPs.pdf
[4] For context, CBO's analysis of take-up of short-term limited plans estimates that short-term duration members that exited the individual market would have health care costs 40% less than the market average.



blue or orange blank and the structure of the financial statements vary. The items listed in the financial statements are also often not defined, so many of the takeaways are speculation based on a reasonable understanding of what they include.

Some of the key takeaways from a review of these financial statements includes the following:

- **Growth.** While these are national financial statements and the enrollment in Wyoming over time is unknown, almost all of the HCSM statements indicate significant growth. Many showed revenue (i.e., member fees) that increased by 50% to 100% over a year or two. Many also saw their assets double in that same time period.
- **Lack of Information**. Despite the fact that most HCSMs were established to provide reimbursement to members with health care needs, two of the largest HCSMs do not report the amount of fees collected or payments made that are specific to health care claims. In particular, the financial statements indicate that since the HCSMs have no obligation to pay these claims and since the members' fees for these claims are put into a separate account, that they have no obligation to report these claims. Thus, the true amount of claims paid by these member organizations, and more importantly the portion of member needs that are not paid, is unknown. All that is reported are member fees and costs related to the overhead of the program. One HCSM did include an analysis of total current member needs (based on outstanding claims) compared to the average monthly member fee and it was seven times higher, implying that the member needs were far exceeding what the HCSM was collecting.
- **Administrative Costs.** While some HCSMs do not detail their expenses, many include a breakdown. Of note was that while most did not appear to have broker costs, at least a couple of HCSM appear to have significant broker and/or marketing costs, sometimes up to 10% of total expenses.
- **Medical loss Ratio.** While HCSMs do not have medical loss ratios since they are not considered insurance, we attempted to calculate a loss ratio (amount going to paying for medical need divided by the total revenue/fees received from members). This was not always possible since not all statements included the total fees collected (that is, they excluded the fees related to paying medical needs). For those that did include the necessary information, the ratio of "claims" to "revenue" varied significantly by HCSM and by year. On the low end, some HCSMs did experience reasonable ratios that are similar to the individual ACA market (typically between 80% and 90%). However, there were some HCSMs that had ratios in the 70% range, while a couple were even lower, although they tended to be the smaller HCSMs. It should be noted that since there is no detail behind what they include in their expenses and medical needs, it is possible these ratios are even lower. For example, one financial statement indicated significant payments to a negotiator who is assumed to help negotiate lower provider payments for the members. The financial statement indicated that the fees paid to the negotiator were a percent of the lowered costs and that the member was liable for the negotiator fee (but could use funds



provided by the HCSM to pay these fees). Thus, it is possible that some organizations include fees such as these as "medical need" costs.

## Reliances and Caveats

The analysis relied on audited financial statements provided by the HCSMs and other information collected by the State of Wyoming as part of a data collection on HCSM organizations. Wakely reviewed the data for reasonableness but did not otherwise audit the data. In addition, Wakely focused on the impact of HCSMs on the individual ACA market and takeaways from the financial statements. Wakely did not review nor make any attempt to understand overall fees, benefits, limitations, or the structure of HCSMs.

Given the lack of current, comprehensive data on HCSMs, the information provided in the report should be relied on by those qualified to do so and even then, additional resources should be considered to draw any conclusions.

## Disclosures and Limitations

**Responsible Actuary.** Julie Peper is the actuary responsible for this communication. She is a Member of the American Academy of Actuaries and a Fellow of the Society of Actuaries. She meets the Qualification Standards of the American Academy of Actuaries to issue this report. Michael Cohen, PhD, also contributed to this report.

**Intended Users.** This information has been prepared for the State of Wyoming to assess the potential impact of HCSMs on the individual ACA market in Wyoming.

**Risks and Uncertainties**. The assumptions and resulting estimates included in this report and produced by the modeling are inherently uncertain. Users of these results should be qualified to read and interpret them and understand the associated inherent uncertainty. Actual results may vary, potentially materially, from our estimates. Wakely does not warrant or guarantee that the state or the issuers will attain the estimated values included in this report. It is the responsibility of those receiving this output to review the assumptions carefully and notify Wakely of any potential concerns.

**Conflict of Interest.** Wakely provides actuarial services to a variety of clients throughout the health industry. Our clients include commercial, Medicare, and Medicaid health plans, the federal government and state governments, medical providers, and other entities that operate in the domestic and international health insurance markets. Wakely has implemented various internal practices to reduce or eliminate conflict of interest risk in serving our various clients. Except as noted here, I am financially independent and free from conflict concerning all matters related to performing the actuarial services underlying this analysis. In addition, Wakely is organizationally and financially independent to the State of Wyoming.



**Data and Reliance.** We have relied on others for data and assumptions used in the assignment. We have reviewed the data for reasonableness, but have not performed any independent audit or otherwise verified the accuracy of the data/information. If the underlying information is incomplete or inaccurate, our estimates may be impacted, potentially significantly.

**Subsequent Events.** The analyses, assumptions and results may change based on discussions and if any new information is received that may influence the estimates.

**Contents of Actuarial Report.** This document and any subsequent documentation constitute the entirety of the actuarial report.

**Deviations from ASOPs.** Wakely completed the analysis using sound actuarial practice. To the best of my knowledge, the report and methods used in the analysis are in compliance with the appropriate Actuarial Standards of Practice (ASOP) with no known deviations.



**CLG**

**Christina Lechner Goe**

ATTORNEY, PLLC

# THE IMPACT OF HEALTH CARE SHARING MINISTRIES ON THE STABILITY OF THE INDIVIDUAL HEALTH INSURANCE MARKET IN WYOMING

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

ENROLLMENT IN HEALTH CARE SHARING MINISTRIES IS GROWING ............................................. 2

HCSM ENROLLMENT AFFECTS THE STABILITY OF THE INDIVIDUAL MARKET RISK POOL ............... 3

HCSMS DO NOT CONTAIN THE SAME PROTECTIONS AS ACA-COMPLIANT HEALTH PLANS ............ 3

THE COST OF JOINING AN HCSM VERSUS THE COST OF HEALTH INSURANCE............................... 4

FINANCIAL INFORMATION ABOUT HCSMs IS DIFFICULT TO ACCESS AND INTERPRET ................... 5

HCSMs MAY EXACERBATE THE HEALTH CARE COST CRISIS ......................................................... 6

CONSUMERS NEED TO BE EDUCATED ON THEIR CHOICES ......................................................... 6

CONCLUSION ................................................................................................................................ 8

## INTRODUCTION

Health Care Sharing Ministries (HCSMs) have existed for many decades, starting with the Mennonites and Amish and then spreading to other groups of Christians who share the same religious beliefs and want to assist with providing for the medical needs of their fellow church members. Certainly, individuals who genuinely hold these beliefs should be free to share the medical burdens of others who share their faith. This mission was especially important in the past when some individuals were unable to obtain any health insurance because of health status discrimination, which was eliminated by the Affordable Care Act (ACA) in 2014.

However, when HCSMs are freely marketed to the public as an allegedly cheaper alternative to actual health insurance, they can have a negative impact on the stability of the health insurance market. Recently, some HCSMs have stretched the religious concept of the sharing of medical burdens to those who share "ethical" beliefs that include lifestyle and wellness, but do not require shared religious beliefs.

*"Exhibit D"*

## ENROLLMENT IN HEALTH CARE SHARING MINISTRIES IS GROWING

Enrollment in health care sharing ministries has grown in the last several years, especially since 2014. Initially, this growth may have been prompted by an ACA exemption from the individual mandate penalty for people who are members of certain HCSMs (those created before 1999). [1] The individual mandate penalty was "zeroed" out in 2019, and yet HCSMs continue to grow. The more recent HCSM expansion is probably fueled, in part, by increases in health insurance rates, especially since 2017. It is estimated that the HCSM enrollment grew from about 160,000 in 2014 to about 1 million in 2018. [2] In 2020, the Alliance for Health Care Sharing Ministries (the Alliance) estimates that enrollment in HCSMs nationwide is 1.5 million.[3]  Five of six HCSMs operating in Wyoming show growth of 50 % or more over a two-year period.[4]

Calculating enrollment in HCSMs is difficult because these entities are not considered insurance and are not regulated or subject to any oversight.  In response to a request for information from Wyoming's state insurance commissioner, only six HCSMs responded out of ten surveyed. The survey asked for audited financial statements, which are required by Wyoming statute to be provided upon request,[5] along with other basic information, including the number of members in Wyoming.[6] Of the six respondents, only four provided the number of their Wyoming members. The Alliance reports that that there are 5,424 HCSM members in Wyoming in 2020. However, not all of the Alliance's larger members report enrollment numbers by state, so that number is low and could be as high as 10,000.[7]

The individual market average enrollment in 2019 in Wyoming was just under 25,000. The 2021 enrollment may be slightly higher, but it is too early for an actual count. Wyoming's individual market health insurance rates are among the highest in the country. However, it is significant to note that Wyoming's average premium rate for its benchmark policy dropped 10.2 % between 2020 and 2021. [8] This decrease may have occurred in part because a second health insurer began offering health plans in Wyoming on the federal marketplace, where premium tax credits are available. It is also important to note that nationally, individual health insurance rates have been decreasing for the last three years. The Center for Medicare Medicaid Service (CMS) reports: "Three years of declining average benchmark plan premiums combine to deliver an 8% premium reduction across HealthCare.gov since the 2018 coverage year. Looking at the coming year [2021], four states will

---

[1] 26 U.S. Code § 5000A

[2] Santhanam, Laura, 1 million Americans pool money in religious ministries to pay for health care, PBS News Hour, January 16, 2018; https://www.pbs.org/newshour/health/1-million-americans-pool-money-in-religious-ministries-to-pay-for-health-care

[3] Alliance for Health Care Ministries consists of seven of the nine "true" HCSMs that have the largest enrollment nationwide.  To qualify, HCSMs must meet certain standards, including a genuine religious purpose and qualify for the ACA exemption from the individual mandate penalty. http://ahcsm.org/about-us/data-and-statistics/

[4] Julie Peper, FSA, MAAA, Wakely Consulting Group, State of Wyoming, Health Care Sharing Ministries—Actuarial Analysis, January 26, 2021, Attachment A, p. 2

[5] W.S. 26-1–104 (a)

[6] Survey tool, Attachment B

[7] Attachment A, p. 3

[8] The average benchmark rate for individual coverage in Wyoming 2021 is $791 vs. a national average of $452. Marketplace Average Benchmark Premiums, State Health Facts, Kaiser Family Foundation, 2021; https://www.kff.org/health-reform/state-indicator/marketplace-average-benchmark-premiums/

---

see double-digit decreases in the average benchmark plan premiums for 27-year-olds, including Iowa, Maine, New Hampshire and Wyoming."[9]

## HCSM ENROLLMENT AFFECTS THE STABILITY OF THE INDIVIDUAL MARKET RISK POOL

The actuaries that were retained to analyze the data collected from the survey responses (Wakely Consulting Group) found that if a significant portion of the HCSM members in Wyoming did enroll in individual health insurance coverage, the premium changes in that market could range from a "'negligible' impact, up to a 10 % reduction, with a 2 % to 4 % premium reduction most likely given the available data."[10]  These projections rely in part on the assumption that HCSM enrollees are healthier.

It is likely that the HCSM population is healthier than the population in the individual health insurance market. HCSM plans have pre-existing condition exclusions, and most of them conduct medical underwriting and may reject individuals based on their health status.  In addition, anyone who uses alcohol or tobacco, abuses drugs or lives an "immoral" lifestyle will also be rejected or have their membership terminated.  Since 2014, major medical health insurers are no longer allowed to reject individuals based on their health status or age (unless Medicare eligible), may not rate based on health status (except for tobacco use), and may not impose pre-existing condition exclusions.

## HCSMS DO NOT CONTAIN THE SAME PROTECTIONS AS ACA-COMPLIANT HEALTH PLANS

HCSM programs do not provide the protections that are required in ACA-compliant plans.  HCSMs do not have to comply with essential health benefit (EHB) requirements and generally exclude any reimbursement for medical claims relating to mental health, substance use disorders, many preventive services, contraception, treatment for chronic disease and most prescription drugs. Some plans limit or exclude claims for doctor visits unless incurred while hospitalized. Many of these programs have annual and lifetime dollar limits and include additional dollar limits on certain types of services, like maternity.

The majority of HCSMs do not have networks of contracted health care providers.[11]  Members are instructed to negotiate a discounted rate with the provider, then "self-pay" and wait for reimbursement from the HCSM.  If a member experiences a significant health event that involves multiple medical providers, such as a simple appendix removal or something more complex, like cancer or a heart attack, the member may be left with numerous complex medical bills to negotiate and a significant financial burden while waiting for reimbursement from the HCSM.

---

[9] Premiums for Healthcare.Gov Plans are Lower for Third consecutive Year, Center for Medicare Medicaid Services, Press Release, October 19, 2020; https://www.cms.gov/newsroom/press-releases/premiums-healthcaregov-plans-are-lower-third-consecutive-year
[10] Attachment A, p. 3
[11] One HCSM advertises a PPO network, but there are no network adequacy standards that apply to it, so its effectiveness is unknown.  Adequate provider networks are difficult and expensive to achieve.

Most importantly, consumers who choose HCSMs take a significant risk that cannot be underestimated. As is plainly stated in all HCSM disclosures, there is no guarantee that their claims will ever be paid or may not be paid in full. HCSMs are not insurance. Wyoming statute requires that HCSM include the following disclaimer:

> Notice: The organization facilitating the sharing of medical expenses is not an insurance company, and neither its guidelines nor plan of operation is an insurance policy. Any assistance with your medical bills is completely voluntary. No other participant is compelled by law or otherwise to contribute toward your medical bills. Participation in the organization or a subscription to any of its documents shall not be considered to be health insurance and is not subject to the regulatory requirements or consumer protections of the Wyoming insurance code. You are personally responsible for payment of your medical bills regardless of any financial sharing you may receive from the organization for medical expenses. You are also responsible for payment of your medical bills if the organization ceases to exist or ceases to facilitate the sharing of medical expenses.

All states with "safe harbor" laws for HCSMs have similar notice requirements. Unfortunately, some consumers do not read these disclosures. These disclosures are usually not prominently displayed on advertising websites. Usually, they are found at the end of lengthy membership guidelines.

## THE COST OF JOINING AN HCSM VERSUS THE COST OF HEALTH INSURANCE

A review of information found on the websites of several HCSMs sold in Wyoming revealed that monthly fees (share amounts) for a married couple in their 50s ranged from a high of $724 to a low $235. The cost depends heavily on the amount and/or type of medical claims eligible for sharing. There is a wide range of dollar limits and member cost-sharing to choose from. There are also "add on" benefits, such as prescription drugs (often just a drug discount card) and preventive benefits that are sometime available for an additional cost. HCSMs are sometimes marketed with other types of products, including certain types of limited benefit insurance plans, discount cards and direct primary care plans. Frequently there are other fees charged that are difficult to identify from the advertising and websites, such as enrollment fees, renewal fees, and other fees for administrative costs that are added on a monthly or annual basis.

While the cost of joining a HCSM appears to be less than health insurance, that may not always be the case. Many Wyoming residents may be eligible for premium tax credits that significantly reduce the published premium rate for individual health insurance. In Wyoming in 2020, 94 % of the 23,059 individuals who enrolled through the Federal marketplace received premium tax credits.[12] An issue brief published by the Kaiser Family Foundation estimates that a large percentage of the currently uninsured population may be eligible for a $0 premium bronze plan after tax credits are applied. In Wyoming, it is estimated that **44 %** of the uninsured population (22,400 individuals) may be eligible for a $0 premium bronze plan.[13] The uninsured population in Wyoming is estimated

---

[12] Marketplace Effectuated Enrollment and Financial Assistance, State Health Facts, Kaiser Family Foundation, 2020, https://www.kff.org/other/state-indicator/effectuated-marketplace-enrollment-and-financial-assistance/
[13] R. Fehr, C. Cox and M. Rae, How Many of the Uninsured can purchase a Marketplace Plan for Free? Kaiser Family Foundation, December 10, 2019; https://www.kff.org/private-insurance/issue-brief/how-many-of-the-uninsured-can-purchase-a-marketplace-plan-for-free-in-2020/

to be 14.8 % to 17 %.[14] Recent job losses in the oil and gas industry in Wyoming and the subsequent loss of employer-based health insurance may lead to an even higher uninsured rate.[15] Also, for just a few dollars a month in premium, these individuals would  qualify for a cost-sharing-reduction silver plan or a gold plan that has much lower cost sharing and more affordable access to care. A more recent Kaiser issue brief revealed that in Wyoming, a 60-year-old with an income of $30,000 per year could purchase a gold plan for $0 in premium.  A 40-year-old with the same income would pay $69 a month for a gold plan.[16]  The median income for an individual in Wyoming in 2019 was $31,974.[17] The findings in these two Kaiser issue briefs illustrate that many people are not aware of the extent to which the ACA's premium tax credits often make health insurance very affordable.

## FINANCIAL INFORMATION ABOUT HCSMS IS DIFFICULT TO ACCESS AND INTERPRET

The ACA contains provisions that require health insurers to meet a meet minimum loss ratio (MLR) or pay rebates back to policyholders.  Individual and small employer group health insurers must spend approximately 80 % of every premium dollar on claims and health care improvement expenses. (For large employer group insurers, the required MLR is 85 %.)  There are no similar requirements for HCSMs. Wyoming statute requires that HCSM produce audited financial statements upon request.[18] When the Wakely actuaries reviewed the financial statements provided by the survey respondents, they found it difficult to ascertain necessary financial information from the financial statements provided. Insurers are required to use a uniform reporting format established by the National Association of Insurance Commissioners (NAIC) for their financial statements. There is no similar uniformity for HCSM financial statements.

As a result, the key take-aways in the Wakely Report regarding the HCSM financial statements were as follows:

- The amount of medical care paid for by the HCSM organizations is often not clear and in some cases is not included in the financial statements at all.  This omission does not allow for a clear understanding of the amount of medical care that is paid for compared to the fees collected.
- Two of the largest HCSMs do not report the amount of fees collected or payments made that are specific to health care claims. Their financial statements indicate that since the HCSMs

---

[14] Ayla Ellison, States ranked by Uninsured Rate, Becker Hospital Review, July 15, 2020, https://www.beckershospitalreview.com/rankings-and-ratings/states-ranked-by-uninsured-rates.html; Uninsured Rates for the Non-elderly by Age, State Health Facts, Kaiser Family Foundation, 2019, https://www.kff.org/uninsured/state-indicator/nonelderly-uninsured-rate-by-age/
[15]  Bowen Garrett and Anuj Gangopadhyaya, How the COVID-19 Recession Could Affect Health Insurance Coverage, Urban Institute, May 2020; https://www.urban.org/sites/default/files/publication/102157/how-the-covid-19-recession-could-affect-health-insurance-coverage_0.pdf
[16] Cynthia Cox, Et al., Affordability in the ACA Marketplace Under a Proposal Like Joe Biden's Health Plan, Kaiser Family Foundation, September 28, 2020, https://www.kff.org/health-reform/issue-brief/affordability-in-the-aca-marketplace-under-a-proposal-like-joe-bidens-health-plan/
[17] Rankings of Median Individual income, Data Commons.org, 2019; https://datacommons.org/ranking/Median_Income_Person/State/country/USA?h=geoId%2F56
[18] W.S. 26–1–104 (a)

have no obligation to pay these claims and since the member's fees for these claims are put into a separate account, they have no obligation to report these claims. Thus, the amount of member needs that are unmet is unknown.

- For HCSM organizations where there is some ability to estimate the amount of medical care paid, the amount paid to reimburse medical claims as a percent of total funds received is often far less than the 80 % medical loss ratio (paid claims over premiums) that health insurers are required to meet.

- However, the financial condition of this sample of HCSMs varied widely. One HCSM did include an analysis of total current member needs (based on outstanding claims) compared to the average monthly member fee, and it was seven times higher, implying that the member needs were far exceeding what the HCSM was collecting. A health insurer in that financial condition would be declared insolvent and shut down by the insurance regulator.

- A few of the HCSM organizations spend a significant amount on broker commissions and/or negotiator fees. The former helps with enrolling more members. The later appears to help the members negotiate lower prices with providers. At least one HCSM indicated that the member was responsible for paying the negotiator fees.[19]

## HCSMS MAY EXACERBATE THE HEALTH CARE COST CRISIS

The largest driver of health insurance premium is health care costs. When health insurers create and maintain provider networks, they are constantly negotiating and re-negotiating with health care providers to find ways to lower health care costs for their insureds in the long term by designing contracts that have global or bundled fee arrangements or even capitated fee arrangements. Provider contracting provides opportunities to move away a system that relies on discounting the billed charges that providers establish. Health insurers spend considerable time and money finding ways to bend the cost curve and improve access to value-based health care services by providing care management and support for individuals with chronic diseases and low cost or no cost preventive services.

## CONSUMERS NEED TO BE EDUCATED ON THEIR CHOICES

Consumers need more education on options they may have to obtain premium tax credits and cost sharing reductions, depending on their income. There are still many consumers in Wyoming that do not understand their options on the exchange. In recent years, HCSMs are adding more and more features that echo health insurance, and a few of them have begun to pay insurance agents to sell these plans. They frequently use terminology that mirrors insurance sold on the exchange, such as "bronze, silver, gold" and "open enrollment." Most HCSMs offer opportunities to purchase richer, more expensive plans with higher dollar limits or "unlimited" coverage for eligible medical events. Add-on benefits for prescription drugs and preventive benefits are also an option. HCSM program offerings are becoming more complex every year, making it even more difficult for consumers to know what they are getting. However, one constant remains: All HCSMs must expressly state that

---

[19] Attachment A, pps. 5 - 6

they do not guarantee payment of claims and that they are not insurance. Consumers take a significant risk when they choose these products, and they need to understand those risks.

HCSM members are generally admonished not to file complaints or take legal action against the organization when they apply for membership, so few complaints are filed. Some states have taken actions against HCSMs in the past and are continuing to do so, when their activities are alleged to constitute fraud, misrepresentation, or acting as an unauthorized insurer. Insurance agents who misrepresent the limits and purpose of HCSM programs may be particularly vulnerable to regulatory violations.[20]

Thirty states, including Wyoming, have "safe harbor" laws, and those laws have various requirements that must be met before meeting the "safe harbor" protection that allows them to avoid compliance with health insurance laws and regulations. The express provisions of Wyoming's safe harbor law requires that HSCMs be "faith-based."[21]  Certainly, some people who join a HCSM are genuinely seeking a religious alternative to health insurance, and these laws are meant to protect the rights of those people. Leaders of some of the major health care sharing ministries have stated that HCSMs are not an option for everyone who may be seeking a cheaper alternative to health insurance.  A former president and CEO of Christian Care Ministry said, "We live our lives in a way that that we share each other's needs.  That's a Biblical mandate Christ gives us in scripture… [HSCMs are not for] someone who isn't of the faith and doesn't have familiarity of the commands and requirements of the scripture.[22]  However, some HCSMs are currently marketing these memberships to individuals who do not share this level of religious beliefs and may only require common "ethical" beliefs.  When that occurs, the legal basis for the exemption from consumer protection laws may be lost.

Consumers need to be educated about all their health insurance options, including the premium assistance and benefit guarantees that are available to them on Federal marketplace.  There also needs to be public education about HCSMs that includes the following information:

- HCSMs are an option for individuals who are truly seeking a religious alternative to health insurance.
- HCSMs are not insurance and there is no guarantee of that claims will be paid. Read the disclaimer carefully.
- There is no regulatory oversight and little recourse if the HCSM is unable or unwilling to contribute to your medical costs.
- HCSMs often exclude reimbursement for pre-existing conditions.
- HCSMs usually do not ever cover costs related to mental health issues and there are many other exclusions from coverage, as well as dollar limits on coverage.  Read the member guidelines carefully before purchasing.

---

[20] Christina L. Goe, Non-ACA-Compliant Plans and the Risk of Market Segmentation, March 2018, pp. 22 – 23; https://advocacy.consumerreports.org/wp-content/uploads/2018/08/NAIC-Goe-C-Non-ACA-Compliant-Plans-paper-March-2018-1.pdf
[21] W.S. 26 -1-104
[22]  Goe, Non-ACA-Compliant Plans and the Risk of Market Segmentation, p. 22

- Understand all the costs of joining, including miscellaneous extra fees relating to administrative costs.
- The member usually must pay up front and then wait for reimbursement, which may take months.  This can be a significant financial burden, so consumers should be financially prepared to pay their own medical bills.
- Do your research.  Some HCSMs strive to fulfill their legitimate religious purpose and have a history that reflects their adherence to that purpose.  However, other entities are less scrupulous, to the extent that they may be considered fraudulent.

## CONCLUSION

Without any regulatory oversight, HCSM enrollment has grown quickly in the last few years and that affects the stability of the individual health insurance market in Wyoming. [23] Increasing enrollment in HCSMs may increase health insurance premiums because it reduces the number of healthy individuals who may have otherwise enrolled in the individual market.[24] Because HCSMs do not guarantee claims payment, they sometimes leave individuals and health care providers exposed to unpaid medical bills, and uncompensated health care negatively affects the whole health care system and has many trickle-down effects.[25]

To protect consumers, HCSMs should publish financial statements that include sufficient information, so that consumers can make an informed decision.  Consumers need more education about the options for financing their health care, including the financial assistance that may be available to them through the Federal marketplace. It is also particularly important that consumers be educated about the real cost and risks of joining a HCSM, to ensure that membership in a HCSM is a religious choice, not a financial choice.

---

[23] Christina L. Goe, Non-ACA-Compliant Plans and the Risk of Market Segmentation, pp. 20 – 24;
[24] Attachment A, p. 3
[25] Jessica Schubel and Matt Broadus, Uncompensated Care Costs Fell in Nearly Every State as ACA's Major Coverage Provisions Took Effect, Center on Budget and Policy Priorities, May 23, 2018;
https://www.cbpp.org/research/health/uncompensated-care-costs-fell-in-nearly-every-state-as-acas-major-coverage